# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**MICAH FIALKA-FELDMAN,**

      Plaintiff,

                                            Case No. 08-CV-14922

v.                                         Hon. Patrick J. Duggan

**OAKLAND UNIVERSITY BOARD OF TRUSTEES,**

      Defendant.

---

| | |
|---|---|
| Chris E. Davis (P52159) | BUTZEL LONG |
| Michigan Protection & Advocacy Service, Inc. | By: Robert A. Boonin (P38172) |
| 29200 Vassar Blvd., Suite 200 | 350 S. Main Street, Suite 300 |
| Livonia, MI 48152 | Ann Arbor, MI 48104 |
| (248) 473-2990 | (734) 995-3110 |
| Attorney for Plaintiff | Attorneys for Defendant |
| | boonin@butzel.com |

---

# DEFENDANT OAKLAND UNIVERSITY'S BRIEF IN RESPONSE TO
# PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

ISSUES PRESENTED ................................................................................................. iii

INDEX OF CONTROLLING AUTHORITIES FOR RELIEF SOUGHT ................................. iv

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF FACTS ....................................................................................1

   A.   Oakland University's OPTIONS Program as Compared to Its Regular
      Academic Programs ....................................................................................1

   B.   Oakland University's Housing Policy ...........................................................4

   C.   Plaintiff's Request for Housing ....................................................................5

III.   ARGUMENT ....................................................................................................6

PLAINTIFF IS NOT ENTITLED TO BE GRANTED A PRELIMINARY INJUNCTION AND
THIS CASE SHOULD BE DISMISSED FOR PLAINTIFF'S LACK OF STANDING ...............6

     a.   Feldman Will Not Prevail on the Merits ....................................................7

        i.    Feldman Has No Standing ....................................................................7

           1.   The Legal Framework for Standing ..............................................7

           2.   Cases on Discrimination in Student Housing Have Found No Standing
              When the Applicant for Housing Does Not Meet Other Legitimate
              Requirements ........................................................................8

           3.   The Sixth Circuit Has Repeatedly Found No Standing When the Plaintiff is
              Ineligible to Receive the Benefit he Claims he is Owed ........................9

           4.   Feldman has no Standing Because He is Ineligible for Oakland University
              Housing Based on a Legitimate, NonDiscriminatory Requirement ..............11

        ii.   The Eleventh Amendment Bars Plaintiff's Fair Housing Act Claims ..............12

        iii.  Feldman's Accommodation Request Fundamentally Alters the University's
           Housing Program, and is therefore Unreasonable, as a Matter of Law. ...........15

     b.   Feldman Will Not Experience Irreparable Harm if the Preliminary Injunction
        Does Not Issue ....................................................................................18

c.   The Harm to Oakland University If a Preliminary Injunction Is Granted
     Outweighs the Harm to Feldman If It Is Denied ............................................................19

d.   It is in the Public Interest that the Preliminary Injunction be Denied ............................19

IV.   CONCLUSION...................................................................................................................20

# ISSUES PRESENTED

1.     Whether Plaintiff has standing to maintain this cause of action, and if not, should this matter be dismissed?

2.     Whether Plaintiff has failed to meet the requisites for the extraordinary relief sought, i.e., the issuance of a Preliminary Injunction?

# INDEX OF CONTROLLING AUTHORITIES FOR RELIEF SOUGHT

**Page**

**Cases**

*Allen v. Wright*, 468 U.S. 737 (1984) ........................................................................... 7

*Am. Family Life Ins. Co. v. Hagan*, 266 F. Supp. 2d 682 (N.D. Ohio 2002) ........................................ 6

*Bashir v. Supreme Court of Ohio*, 652 F.2d 641 (6th Cir. 1981) ........................................ 10, 11

*Beztak Land Co. v. City of Detroit*, 298 F.3d 559 (6th Cir. 2002) ........................................ 10, 11

*Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039 (6th Cir. 2001) ........................................ 15

*Grutter v Bollinger*, 539 U.S. 306 (2003) ........................................................................... 20

*Honeywell, Inc. v. Brewer Garrett Co.*, No. 97-3673, 1998 U.S. App. LEXIS
   (6th Cir. March 23, 1998) ........................................................................... 6

*Johnson-Brown v. Wayne State University*, No. 98-1001, 1999 U.S. App. LEXIS 4751
   (6th Cir. Mar. 17, 1999) ........................................................................... 13

*Kalai v. State of Hawaii Dept. of Human Services*, No. 06-00433, 2008 U.S. Dist.
   LEXIS 64215 ........................................................................... 14

*Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000) ........................................................................... 13, 14

*Kuchmas v. Townson Univ.*, No. 06-3281, 2007 U.S. Dist. LEXIS 66689 (D. Md. Sept. 10, 2007) ..... 14

*McPherson v. Michigan High School Athletic Association, Inc.*, 119 F.3d 453 (6th Cir. 1997) ............. 16

*Midwest Media Property, L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456 (6th Cir. 2007) .................... 9, 11

*Morris v. Dehaan*, No. 90-2190, 1991 U.S. App. LEXIS 22135 (6th Cir. Sept. 12, 1991) ............ 13, 14

*Nev. Dept. of Human Resources v. Hibbs*, 538 U.S. 721 (2003) ........................................ 13

*Northeastern Florida Chapter of Associated General Contractors of America v.*
   *City of Jacksonville*, 508 U.S. 656 (1993) ........................................ 7, 11

*Oversteet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566 (6th Cir. 2002) ........................... 6

*Schanz v. The Village Apartments*, 998 F. Supp. 784 (E.D. Mich. 1998) ........................................ 16, 17

*Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781 (6th Cir. 1996) ........................................ 15

*The Oakland Sail v. Oakland Univ. Bd. of Trustees*, No. 252391, 2005 Mich. App.
   LEXIS 2132 (Mich. Ct. App. Aug. 30, 2005) ........................................ 13

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
   454 U.S. 464 (1982) ........................................ 7, 11

*Wilson v. Glenwood Intermountain Properties, Inc.* 98 F.3d 590 (10th Cir. 1996) ........................ 8, 11

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. __ (2008) ........................................ 6

*Woods v. Milner*, 955 F.2d 436 (6th Cir. 1992) ........................................................................... 9, 11

**Other Authorities**

Wright & Miller ........................................................................... 9, 11

**Statutes**

Mich. Comp. Laws § 390.151 ........................................................................... 13

**Constitutional Provisions**

Mich. Const. 1963, Art. 8, § 6 ........................................................................... 13

## BRIEF

Defendant Oakland University Board of Trustees ("Oakland University" or the "University") responds to Plaintiff's Motion for a Preliminary Injunction. Plaintiff Micah Fialka-Feldman ("Feldman") does not meet the requirements necessary for the issuance of a preliminary injunction.

## I.     INTRODUCTION

Plaintiff should be denied the Preliminary Injunction he seeks because he fails to meet any requirement for such drastic relief. Most importantly, Feldman lacks standing to proceed with any further action in this Court. What Plaintiff eventually hopes to accomplish through this lawsuit – admission to student housing – is reserved for those admitted to degree-granting programs at Oakland University. Feldman is not admitted to a degree-granting program, and therefore regardless of the findings in this suit, Feldman will not be eligible to live in university housing.

Feldman should also be denied injunctive relief because Oakland University is immune under the Eleventh Amendment of the United States Constitution, because Feldman does not face irreparable harm, and because the balance of the harms and the public interest weigh against an injunction. Defendant Oakland University therefore respectfully requests that this Court deny Plaintiff's Motion for a Preliminary Injunction.

## II.     STATEMENT OF FACTS

### A.     Oakland University's OPTIONS Program as Compared to Its Regular Academic Programs

In 2007, Oakland University established the Oakland University Post-Secondary Transitions ("OPTIONS") program to allow those with mild cognitive disabilities to participate in certain specified aspects of college life without being admitted to a degree granting program. These activities include

attending classes in which the individual is interested, social events, and wellness and recreational activities.[1]  Currently there are nine OPTIONS program participants. (Snyder, ¶¶ 4-7)[2]

Importantly, OPTIONS is *not a degree-granting program*, nor is it a vocational training program.  Instead, OPTIONS is intended for someone who, among other things, has a disability that prevents regular admission to a college or university but still wants to attend academic classes and interact with other young adults.  Participants in the OPTIONS program do not apply for admission to the University as a regularly enrolled degree seeking student.  Accordingly, they do not need to have a high school degree, submit standardized test scores (such as the American College Test ("ACT")), or go through the formal admissions process, as required of others seeking admission in a degree-granting program. (Snyder, ¶ 4)

While OPTIONS is intended to provide cognitively impaired young adults with a glimpse of student life after completing their high school program with at least a certificate of completion, many important differences exist between OPTIONS participants and degree seeking students.  For instance, OPTIONS participants cannot qualify for financial aid.  Also, while OPTIONS participants may attend classes, they do not receive any academic credit for doing so.  Indeed, they can only attend an academic class with the permission of the faculty member.  OPTIONS participants do not receive grades for the courses they attend, nor do they take exams. (Snyder, ¶¶ 4-5)

---

[1] The OPTIONS program is an outgrowth of the Transitions Program, which is similar program the University operates in conjunction with the Rochester Public School District and Oakland Schools (the local Intermediate School District).  The Transitions Program is exclusively for cognitively impaired high school students.  The OPTIONS program is a means for Transitions Program students and others similarly situated to continue being involved on a campus with their age peers. (Snyder, ¶ 3)

[2] References to "Snyder, ¶__" are to the Affidavit of Mary Beth Snyder, the University's Vice President of Student Affairs and Enrollment Management, which is attached as Exhibit A.  References to "Maten, ¶__" are to the Affidavit of Lionel Maten, Director of University Housing, which is attached as Exhibit B.

The participants involved in the OPTIONS program are currently categorized as continuing education students for administrative purposes. The University has over 1400 continuing education students enrolled in its programs for every semester. Continuing education students are not typically enrolled in degree granting programs or even pursuing admission into degree granting programs at the University, and so they do not enjoy all of the accoutrements of regular student status. Among the major accoutrements for which they are not eligible is University housing. (Snyder, ¶¶ 4, 10 and 11)

The OPTIONS program has many purposes, but none of them involve granting a degree. Although OPTIONS program participants are not pursuing a degree, their presence on campus offers them something that is not generally available in other post-secondary programs for individuals with cognitive disabilities. In addition to an emphasis on community living skills and work experiences, the program provides an academic focus through access to college classes. Some of the college classes they attend are available to the general student population, as well – but the general student population must meet the academic requirements of the class and earn a grade. Many of the classes they attend, however, are exclusively for OPTIONS participants, are taught by non-faculty, and focus on life skills. No credits are earned for these classes, either. (Snyder, ¶ 5)

Another important aspect of the OPTIONS program is the regular contact it provides participants with age appropriate peers through peer mentoring. Regularly enrolled Oakland University students have both assisted, and personally benefited from acting as program volunteers. These peer mentors support OPTIONS participants in their classes, assist them in getting around campus, initiate them in the social life of the University, act as "study buddies" or just offer their friendship. (Snyder, ¶ 8)

OPTIONS participants enjoy considerable access to the campus community. They interact with peers and they are exposed to an academic environment not ordinarily available to individuals with their impairments. They also are able to participate in many student activity programs.

Significantly, though, being a student – whether enrolled in a degree granting or continuing education program – is not a prerequisite for participating in these activities. Virtually all student activities are open to both students and non-students, and indeed many non-students are involved in those activities (including local hockey players in the hockey club and alumni in various clubs and organizations) (Snyder, ¶ 6). In short, participation in student activity programs in and of itself does not confer any student status at Oakland University.

Oakland University believes that OPTIONS has been a success, benefiting not only those participating in the program, but others at Oakland University as well. Not only have the OPTIONS participants gained valuable exposure to an academic and social environment, but students seeking degrees have enriched their experiences through helping those with mild disabilities. Being a new program with some unique features, the University is still working through the administrative nuances of the program, including such issues as how long individuals may participate in the OPTIONS program and the best administrative means for providing identification cards, e-mail access and computer access to the participants. The fact remains, however, that the OPTIONS program has very specific purposes and was never designed to be a full-fledged degree-granting program, (Snyder, ¶¶ 7, 10 and 20), or to provide OPTIONS participants with all of the accoutrements available to students pursuing degrees.

**B.**    **Oakland University's Housing Policy**

Oakland University maintains only a limited number of housing options for its over 14,000 students enrolled in degree granting programs. (Maten, ¶¶ 3-4) To be eligible for University housing, a student must be:

1. Formally admitted to the University as matriculated or conditionally admitted students *in a degree program* at the University and enrolled in a minimum of 8 credit hours during each fall or winter semester and 4 credit hours for each spring or summer semester in which they reside in Residence Halls or Apartments;

2. Matriculated students in a degree program at another college or university that has an affiliation agreement with the University; or

3. Participating in the University's spring/summer hostel program or authorized summer camp programs. (Maten, ¶¶ 5-6)

The University can only accommodate approximately 1,800 students in its housing, which is divided proportionally between male and female students (about 65% of Oakland University students are female). (Maten, ¶ 3)

Once residing in University housing, a student can remain there unless he or she does not enroll for a certain amount of academic credits per semester, or if the student fails to maintain a certain grade point average. (Maten, ¶ 8) As mentioned earlier, OPTIONS participants do not receive academic credit for their classes and do not receive grades.

**C.     Plaintiff's Request for Housing**

In the Fall of 2007, Plaintiff applied for University housing at Oakland University for his first semester as an OPTIONS participant, i.e., for the Winter Term of 2008. (Maten, ¶ 9) While his application was initially processed and accepted, once it was realized by the housing officials that he was not a student enrolled in a degree granting program, his request was denied. (Maten, ¶ 10) Plaintiff asked the University to reconsider its position and to waive its normal requirements for living in University housing. The University has denied those requests. (Snyder, ¶¶ 16-17) Plaintiff subsequently filed this action and moved the Court for a preliminary injunction permitting him access to University housing in January, 2009.

Oakland University does not differentiate between those with cognitive disabilities and those without them in its admissions policies and housing policies. (Snyder, ¶ 14) In fact, one former participant in the OPTIONS program applied for and was recently admitted to a degree-granting program at Oakland University. That student is currently eligible to apply for University housing. (Snyder, ¶ 19) Plaintiff has never applied for admission to a degree-granting program at Oakland

University.  (Snyder, ¶ 15)  Further, many students with disabilities live in University housing and the University accommodates those disabilities to enable those students to do so.  Those students, though, have met and must continue to meet the academic requirements for inclusion in those dormitories.  (Snyder, ¶ 14; Maten, ¶ 7-8)

## III.  ARGUMENT

### PLAINTIFF IS NOT ENTITLED TO BE GRANTED A PRELIMINARY INJUNCTION AND THIS CASE SHOULD BE DISMISSED FOR PLAINTIFF'S LACK OF STANDING

To obtain a preliminary injunction, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. __ (2008) (Nov. 12, 2008, slip op., at 10) (opinion attached hereto as Exhibit C). *See also Jones v. City of Monroe*, 341 F.3d 474 (6th Cir. 2003); *Tesmer v. Granholm*, 333 F.3d 687 (6th Cir. 2003); *Lowry Computer Products, Inc. v. Head*, 984 F. Supp. 1111, 1113 (E.D. Mich. 1997).  "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at __ (slip op., at 14).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction," especially in cases that involve "complex, subtle, and professional decisions" by government officials.  *Id.*  Plaintiffs must establish their case by clear and convincing evidence.  *Honeywell, Inc. v. Brewer Garrett Co.*, No. 97-3673, 1998 U.S. App. LEXIS, at *7 (6th Cir. March 23, 1998) (attached as Exhibit D).

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Am. Family Life Ins. Co. v. Hagan*, 266 F. Supp. 2d 682, 687 (N.D. Ohio 2002) (citation omitted); *Oversteet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566 (6th Cir. 2002).  It is a remedy that should be used

sparingly. *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1263 (W.D. Mich. 1990), aff'd 948 F.2d 1290 (6th Cir. 1991).

### a. Feldman Will Not Prevail on the Merits

### i. Feldman Has No Standing

Feldman cannot prevail in this Court because he lacks standing. Courts have found that those claiming discrimination in student housing do not have standing if they are ineligible for student housing based on other legitimate reasons. The Sixth Circuit has also held on numerous occasions that one claiming discrimination in the provision of a benefit lacks standing if there are other, non-discriminatory reasons for denying the benefit. In this case, Feldman has no standing because he is not eligible to receive the benefit of student housing for a perfectly legitimate, non-discriminatory reason: he is not admitted to a degree-granting program.

### 1. The Legal Framework for Standing

The concept of standing derives from the "case or controversy" requirement in Article III of the Constitution. *Allen v. Wright*, 468 U.S. 737, 750 (1984). A party must establish three elements to prove standing: (1) injury in fact; (2) a causal relationship between the injury and the challenged conduct; and (3) likelihood that the injury will be redressed by a favorable decision. *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 663-64 (1993). The "injury in fact" requirement insists that there be an actual, particularized, imminent injury that the litigant faces. The United States Supreme Court stated that "[t]he exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, is therefore restricted to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982). No standing exists when a

plaintiff has "no legal right under the constitutional or statutory provision upon which he relies." *Id.* at 492.

### 2. Cases on Discrimination in Student Housing Have Found No Standing When the Applicant for Housing Does Not Meet Other Legitimate Requirements

Federal courts have repeatedly stressed that one does not have standing to bring discrimination claims based on the denial of a benefit, when the benefit would, in any event, be denied for other legitimate reasons. This general concept underlying standing was applied in the student housing context in *Wilson v. Glenwood Intermountain Properties, Inc.* 98 F.3d 590, 592 (10th Cir. 1996). In *Wilson*, two non-students challenged the gender-segregated housing program of Brigham Young University. Plaintiffs, a man and a woman, had each been denied Brigham Young University housing – the male plaintiff had been denied housing at a university apartment intended for women, and the female plaintiff was denied at a university apartment designed for men. *Id.* The United States Court of Appeals for the Tenth Circuit dismissed the plaintiffs' case, among other reasons, because as non-students, plaintiffs would not qualify to live in any student housing regardless of their gender. Plaintiffs lacked standing because there were other, legitimate reasons (*i.e.* legitimate discrimination based on student/non-student status) for denying them the benefit of housing. *Id.* at 594.

Feldman's situation can easily be analogized to that of the plaintiffs in *Wilson*. Feldman is claiming discrimination in student housing for a disability, much like the plaintiffs in *Wilson* claimed discrimination based on gender. In both situations, however, the university maintains a legitimate reason for denying housing to the applicants. In *Wilson*, the legitimate reason was that school regulations stipulated that only students could live in university housing. Similarly, in this case, Oakland University has a legitimate reason for its denial of Feldman's application for housing, namely, that Feldman does not meet its requirement of being formally admitted in a degree program. As in *Wilson*, Feldman's case should be dismissed because he lacks standing.

### 3. The Sixth Circuit Has Repeatedly Found No Standing When the Plaintiff is Ineligible to Receive the Benefit he Claims he is Owed

The Sixth Circuit has on numerous occasions found no standing for plaintiffs claiming that they were discriminated against by not receiving a benefit, when the plaintiffs would not receive the benefit for other, legitimate reasons. *Wright & Miller* notes that one of the classic "lack of standing" cases is when persons file suit "who were ineligible for desired benefits, or failed to satisfy some precondition." Wright & Miller, 13A *Federal Practice and Procedure* § 3531.5.

The plaintiffs in *Woods v. Milner,* 955 F.2d 436 (6th Cir. 1992), were temporary full-time employees who wished to be permanent employees. *Id.* at 439. Actually, plaintiffs argued that they would be permanent employees were it not for a regulation that allowed temporary employment for long periods of time. *Id.* The Sixth Circuit found that plaintiffs lacked standing because, even if the court enjoined the regulation from being effective, none of the employees would be eligible for permanent employment under applicable criteria. *Id.*

In *Midwest Media Property, L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 461–63 (6th Cir. 2007), the Sixth Circuit addressed a challenge to a township's regulations regarding billboard advertising. The township had in place two main requirements before one could erect a billboard: (1) the billboard could not advertise a commercial message off one's premises; and (2) the billboard had to meet certain size and height restrictions. *Id.* at 459-60. A company attempted to erect several billboards that violated both requirements, and filed suit claiming that the first requirement violated its free speech rights under the Constitution. *Id.* The Sixth Circuit stated that the plaintiff lacked standing because the courts could not redress its injury through the lawsuit:

> The key problem with plaintiffs' claim is one of redressability. Even if plaintiffs could show that the township's original off-premises advertising ban (or its sign-approval process) violated the First Amendment, each of Midwest Media's nine sign applications sought permission to post signs that plainly violated the township's size and height regulations. Yet plaintiffs chose not to challenge the size and height requirements in their complaint--perhaps in view of the difficulty of such a challenge

here. Having chosen not to challenge the size and height regulations and having filed nine applications to post a sign in the township that violated these regulations, plaintiffs cannot tenably show that success in challenging other regulations of the sign ordinance will redress any injury caused by these regulations. For even in the absence of these regulations--even if, consistent with the relief sought in plaintiffs' complaint, our court invalidated them--that would not redress plaintiffs' injury because the size and height restrictions still would preclude the township from approving their sign applications and thus still would preclude plaintiffs from erecting each of these signs.

*Id.* at 461 (citations omitted). Thus, because the plaintiff was ineligible to receive the benefit of erecting billboards for other, legitimate reasons (size and height restrictions), plaintiff had no standing.[3]

In *Bashir v. Supreme Court of Ohio*, 652 F.2d 641, 643 (6th Cir. 1981), an immigrant who received a law degree in Pakistan applied for admission to the Ohio Bar on motion (rather than by taking the bar exam). When Bashir was denied admission, he filed suit in federal court, claiming discrimination based on his citizenship. *Id.* at 642. The district court dismissed Bashir's case for lack of standing, and the Sixth Circuit affirmed. *Id.* at 642-43. Bashir's problem was that he was not licensed to practice in another state other than Ohio, which was required for someone moving for admission to the bar. *Id.* The Sixth Circuit held that Bashir lacked standing because, regardless of any alleged discrimination he may have suffered, he would not qualify for admission due to other, perfectly legitimate reasons. *Id.* at 643.

In *Beztak Land Co. v. City of Detroit*, 298 F.3d 559, 565–568 (6th Cir. 2002), the plaintiff claimed that the City of Detroit violated several constitutional provisions by denying it the right to develop a casino. The plaintiff, however, had failed to participate in the RFP/RFQ process, which the city considered a prerequisite to being chosen as a casino developer. The Sixth Circuit, affirming the

---

[3] In another case, the Sixth Circuit heard the appeal of state officials seeking to challenge a prohibition on the use of federal funds to support student busing. *Carroll v. Board of Ed. of Jefferson County, Kentucky*, 561 F.2d 1, 4 (6th Cir. 1977). The Sixth Circuit found that the state officials had no standing, however, because even if they received their desired outcome (lifting the prohibition), their school system would still not be eligible for any federal funds to support any type of busing. *Id.*

holding of the District Court, found that the plaintiff lacked standing because, regardless of any alleged Constitutional violations, plaintiff had not met the City's legitimate prerequisite to building chosen as a casino operator.

The Sixth Circuit has thus endorsed different aspects of the standing analysis to dismiss the claims of those ineligible for benefits. Sometimes the court has found eligibility to relate to the causation requirement for standing. *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 663-64 (1993); Wright & Miller, 13A *Federal Practice and Procedure* § 3531.5. At other times, the court has focused on the standing requirement that a plaintiff's injury be redressable by the court system. *E.g., Midwest Media*, 503 F.3d at 461–63. What remains clear throughout the case law is that one who is ineligible for a benefit for purely legitimate reasons does not have standing to file suit after being denied the benefit.

### 4. Feldman has no Standing Because He is Ineligible for Oakland University Housing Based on a Legitimate, Non-Discriminatory Requirement

Feldman lacks standing because he is not eligible, under Oakland University's policies and practices, to live in University housing. In particular, Feldman is not formally admitted in a degree-granting program, which would be required before he could be eligible to receive student housing. Further, since Feldman does not earn grades or credits, he cannot meet the other academic requirements for living in the dormitories. In other words, Plaintiff has "no legal right" to assert before this Court. *Valley Forge*, 454 U.S. at 492; *Midwest Media*, 503 F.3d at 461–463; *Beztak*, 298 F.3d at 565–568; *Woods*, 955 F.2d at 439; *Bashir*, 652 F.2d at 643; *Carroll*, 561 F.2d at 4; *Wilson*, 98 F.3d at 594.

Importantly, other students at Oakland University who have cognitive disabilities *and* who are admitted to degree-granting programs *would* likely have standing to bring these types of claims. (Oakland University is aware of at least one person with a cognitive disability who is admitted to a

degree-granting program, and that person is eligible for student housing.) Feldman, however, cannot assert his right to University housing when he has no such right under the University's non-discriminatory policies. Nor would this Court be able to redress the alleged wrong that Plaintiff claims, since Plaintiff's ability to live in University housing would still be prevented by the legitimate, non-discriminatory prerequisites that he be pursuing a degree and maintain a certain grade-point average.

In his motion, Feldman attempts to leap over the standing requirement by stating that the law requires the University to waive its housing requisites as a means for accommodating his disability. Feldman is asking the Court to do something that the University is not required to do by the statute. Rather, the statute requires certain housing providers to accommodate disabilities *as long as the individual otherwise meets the requirements for that housing*. Thus, if Feldman were admitted to a degree granting program and wanted to live in student housing, but needed an accommodation of a disability to do so, and if the University failed to provide a reasonable accommodation, then arguably he would have standing to bring a claim. The facts show, however, that University routinely accommodates students with disabilities – who otherwise qualify for housing – so that they can live in student housing or otherwise participate in its programs. The law does not provide a remedy for Feldman. Accordingly, all of his claims should be dismissed due to his lack of standing.

### ii. The Eleventh Amendment Bars Plaintiff's Fair Housing Act Claims

If Feldman had standing, then his claims for damages and injunctive relief under the Fair Housing Act should still be dismissed since they are barred by the Eleventh Amendment to the U.S. Constitution. The Eleventh Amendment states that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State...." The Supreme Court has extended this immunity to suits against a state by its own citizens. *See, e.g., Nev. Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 726

(2003); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72-73 (2000); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54 (1996).

A suit against any state agency is a suit against the state for purposes of the Eleventh Amendment. *Morris v. Dehaan*, No. 90-2190, 1991 U.S. App. LEXIS 22135 at *8 (6th Cir. Sept. 12, 1991) (citing *Fla. Dept. of Health and Rehabilitative Services v. Florida Nursing Home Assn.*, 450 U.S. 147 (1981)) (attached as Exhibit E). Oakland University is a state university that is established by Michigan statute and the Constitution of the State of Michigan. *See* Mich. Const. 1963, Art. 8, § 6; Mich. Comp. Laws § 390.151; *see also The Oakland Sail v. Oakland Univ. Bd. of Trustees*, No. 252391, 2005 Mich. App. LEXIS 2132, at *2-4 (Mich. Ct. App. Aug. 30, 2005) (attached as Exhibit F). The Oakland University Board of Trustees is a body corporate of the State of Michigan. *Id.* Courts have routinely held that state universities such as Oakland University and their boards are state agencies for purposes of the Eleventh Amendment. *See, e.g., Underfer v. Univ. of Toledo, No. 00-4568,* 361 Fed. Appx. 831, 2002 U.S. App. LEXIS 10860, at * 9 (6th Cir. June 5, 2002) (University of Toledo is a state agency for purposes of the Eleventh Amendment) (attached as Exhibit G); *Johnson-Brown v. Wayne State University*, No. 98-1001, 1999 U.S. App. LEXIS 4751, at *2 (6th Cir. Mar. 17, 1999) (Wayne State University is a state agency for purposes of the Eleventh Amendment) (attached as Exhibit H). *See also Wasserman v. Purdue Univ.*, 431 F. Supp. 2d 911, 916 (N.D. Ind. 2006) ("[T]he Board of Trustees [of Purdue University] is a political arm of the state which is immune to suit"); *Joseph v. Bd. of Regents of the Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005) ("The [Wisconsin Board of Regents] is an 'arm of the state' for Eleventh Amendment purposes."[4]

---

[4] *See also Richardson v. Southern Univ.*, 118 F.3d 450, 455 (5th Cir. 1997) ("Southern [University] and its Board are considered an agency of the State of Louisiana"); *Hall v. Hawaii*, 791 F.2d 759, 761 (9th Cir. 1986) (holding that the University of Hawaii and its board of regents "are clearly immune as agencies of the state"); *Harden v. Adams*, 760 F.2d 1158, 1164 (11th Cir. 1985) (noting that "the Board of Trustees of a state university is entitled to sovereign immunity as an instrumentality of the state"); *Cannon v. Univ. of Health Sciences/Chi. Med. Sch.*, 710 F.2d 351, 356 (7th Cir. 1983) (Southern

Because Oakland University is a state agency under the Eleventh Amendment, it can only be subject to suit under the Fair Housing Act if Congress abrogated the state of Michigan's Eleventh Amendment immunity "by making its intention unmistakably clear" in the language of the Fair Housing Act. *Kimel*, 528 U.S. at 73. Congress has shown no such intention to abrogate the sovereign immunity of the states under the Fair Housing Act.

The Sixth Circuit, in an unpublished opinion, has held that the Eleventh Amendment bars Fair Housing Act suits against Michigan state agencies because nothing in Michigan law can be construed as waiving Michigan's Eleventh Amendment immunity, and nothing in the Fair Housing Act can be construed as a congressional abrogation of Michigan's Eleventh Amendment immunity. *Morris*, 1991 U.S. App. LEXIS 22135, at *8. Courts in other jurisdictions have also held that Congress did not show its clear intention in the Fair Housing Act to abrogate the state's sovereign immunity under Eleventh Amendment. *See, e.g., Kalai v. State of Hawaii Dept. of Human Services*, No. 06-00433, 2008 U.S. Dist. LEXIS 64215, at *9 (D. Hawaii Aug. 20, 2008) ("the court concludes that the [Fair Housing Act] does not abrogate the state's sovereign immunity")(attached as Exhibit I); *Kuchmas v. Townson Univ.*, No. 06-3281, 2007 U.S. Dist. LEXIS 66689, at *27 (D. Md. Sept. 10, 2007) ("the text of the FHA lacks any clear statements of Congress's intent to abrogate states' immunity under the Eleventh Amendment" and thus "the Eleventh Amendment bars private suits against Townsend University under the Fair Housing Act")(attached as Exhibit J).

Accordingly, because Oakland University is a state agency, Plaintiff's claims for damages and injunctive relief under the Fair Housing Act, are barred by the Eleventh Amendment. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S. Ct. 684, 121 L. Ed. 2d 605

---

Illinois University and the Board of Trustees of the University of Illinois are state agencies with Eleventh Amendment immunity); *Wellman v. Tr. of Purdue Univ.*, 581 F. Supp. 1228, n.1 (N.D. Ind. 1984) ("[F]or purposes of Eleventh Amendment immunity, no distinction can, should, or will be drawn between Purdue University and its Board of Trustees.").

(1993) ("[t]he doctrine of *Ex Parte Young*. . . has no application in suits against the States and their agencies, which are barred regardless of the relief sought"); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 496 (10th Cir. 1998) ("[T]he *Ex Parte Young* exception does not permit plaintiff to subject [University of New Mexico School of Medicine], [and] its Regents. . . to suit because they are state agencies ....").

### iii. Feldman's Accommodation Request Fundamentally Alters the University's Housing Program, and is therefore Unreasonable, as a Matter of Law.

If the merits were to be reached, the outcome of this matter should be no different; Feldman will not prevail. The reasons are similar to those supporting the conclusion that Feldman lacks standing. Feldman cannot overcome the fact that, notwithstanding his disability, he is not eligible for to live in student housing because he is not a student enrolled in a degree granting program. Feldman's lack of matriculated status is fatal to his case.

Feldman's reliance on the two cases cited in his brief, *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781 (6th Cir. 1996) and *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039 (6th Cir. 2001), is misplaced. Indeed, those cases only support the University's position in this matter.

*Smith* involved zoning issues, which was a primary focus of the Fair Housing Act's enactment and is distinguishable from the instant matter. Zoning of residential neighborhoods and the statute's specific requirement that zoning rules be waived as accommodations deal with the fact that modifying a zoning rule – which is residential in character – is reasonable to allow disabled individuals to reside. *Smith* found that the zoning accommodations requested did not involve "'a fundamental alteration in the nature of a program'" or impose "'undue financial and administrative burdens,'" either of which would have made the accommodations "unreasonable" under the statute. *Smith*, 102 F.3d at 795. Allowing disabled persons to live in a residential community, the court held, did not fundamentally alter the zoning regulations. However, and conversely, *see McPherson v. Michigan High School*

*Athletic Association, Inc.,* 119 F.3d 453, 460-62 (6th Cir. 1997) (waiving an eight semester limit to participate in high school sports would be an unreasonable accommodation under Section 504, since the waiver would fundamentally alter the athletic program).

*Groner* also recognizes that accommodations under the Fair Housing Act "must be both reasonable and necessary," and that the plaintiff has the burden of proving reasonableness. *Groner,* 250 F.3d at 1044. The court in *Groner* then proceeds to discuss how all of the plaintiff's requested accommodations are unreasonable. *Id.* at 1045-07. In that case, in which the disabled plaintiff was evicted, the Sixth Circuit held that even requiring the apartment complex to soundproof the plaintiff's apartment "would amount to such a fundamental change" so as to make that accommodation unreasonable. *Id.* at 1047.

*Schanz v. The Village Apartments,* 998 F. Supp. 784, 792 (E.D. Mich. 1998) (J. Gadola), is also instructive in this regard. *Schanz* involved a claim by a mentally disabled plaintiff who sought a waiver or modification of the landlord's minimum income and credit worthiness requirements. While holding that the requested accommodation (specifically, having a relative guaranty the rent) was unreasonable, the court stated:

> [P]laintiff has no need for the Village to accept the Guarantor Agreement to accommodate his handicap because his handicap is not preventing him from obtaining an apartment at The Village, and it is plaintiff's financial situation which he is requesting that defendants accommodate. The FHAA does not require that this be done. Also, while plaintiff argues that his financial situation is directly attributable to his handicap, such a contention is nothing more than an attempt by him to transform his "financial status" into a "handicap" in order to secure relief under the FHAA. This court cannot accept this argument because it clearly stretches the FHAA beyond its intended bounds.

*Id.* at 792. The court also stated:

> [T]he plaintiff is undeniably requesting a preference, rather than a reasonable accommodation. Plaintiff, who is handicapped, needs to obtain a waiver of The Village's standard income and credit requirements in order to qualify for a rental. Yet, a waiver of such requirements would put plaintiff in a privileged position in

relation to other residents. As such, the FHAA does not require The Village to accommodate plaintiff by accepting the Guarantor Agreement.

*Id.* at 792, n.15. *Schanz* also upholds the requirement that in order for an accommodation to be reasonable, a "direct nexus between the requested accommodations and the plaintiffs' handicaps" must exist. *Id.* at 792. "In other words," stated the court, a plaintiff must prove that "the requested accommodations would not have been needed if the plaintiffs were not handicapped." *Id.*

Likewise, Feldman's request that the University waive its student status requirement proposes a fundamental alteration of the University's housing program. The waiver changes the fact that the housing program is designed for matriculated students who are a part of the regular academic community. Unlike the plaintiffs in the cases cited by Feldman, Feldman's disability status is not the bar to his eligibility for University housing. Accordingly, the requisite nexus is missing. Many individuals with disabilities can and do live in University housing. Further, eliminating the University's requirement would open the doors for other non-matriculated students to live in University housing, and that may not only change the academic environment being fostered in the dormitories, but also limit the regularly matriculated students' access to the already limited University housing.

As in *Schanz*, it is Feldman's non-regular student status which is preventing him from living in University housing – not his disability, and if the student status requirement were to be waived, along with the grade point average requirement, then he would be given a preference. The granting of such preferences are not required nor envisioned by the Act. Finally, the relief that Feldman seeks is unreasonable because there is no nexus between the requested accommodation (*i.e.* creating an exception to the policy that housing is for students admitted to degree-granting programs) and Feldman's disability.

### b. Feldman Will Not Experience Irreparable Harm if the Preliminary Injunction Does Not Issue

Plaintiff cannot show that he will suffer irreparable harm if his motion for a preliminary injunction is denied and, in fact, Plaintiff will not be harmed if his motion is denied. Plaintiff has been living with his parents while he has participates in the OPTIONS program at Oakland University, and has lived with his parents since he participated in the Transitions Program at Oakland University beginning in 2003. There is no indication that he will not be able to continue this arrangement during the upcoming semester. Thus, Plaintiff will have housing and be able to participate in the OPTIONS program if his motion is denied and will suffer no harm on that basis.

In his brief, Plaintiff claims that he will experience irreparable harm if this motion is denied because he will be forced to take two busses each day to school and will thus experience "considerable risk of harm to him both due to inclement weather, the loss of time, and considerable inconvenience" due to the "public transportation system in Southeast Michigan," which is "notorious for its inefficiency and during inclement weather it can pose a considerable health risk." (Plaintiff's Brief at pp. 11-12.) Plaintiff has presumably endured these perceived risks during the time that he has been a participant in both the Transitions and OPTIONS programs, as have the thousands of other public transit consumers in the region, and offers no reason why it would cause him irreparable harm at this time when it has presumably not caused such harm in the past. Furthermore, Plaintiff's perceived harm is entirely preventable if his motion is denied. Plaintiff has not alleged that he is unable to secure off-campus housing closer to the University or arrange an alternate form of transportation that would allow him to avoid these perceived harms. (Snyder, ¶¶ 20 and 22)

Plaintiff also cites dicta in other cases to support his contention that he does not need to show irreparable harm because the Fair Housing Act displaces the traditional standards in equity for an injunction. (Plaintiff's Brief at pp. 11-12.) As discussed above, Plaintiff does not have standing to

assert his claim under the Fair Housing Act, and, even if he had standing, his claim under the Fair Housing Act is barred by the Eleventh Amendment. Accordingly, contrary to Plaintiff's assertion, and even if this Court followed the dicta cited by Plaintiffs, the Fair Housing Act does not supply this Plaintiff with irreparable harm when no such harm exists in fact.

### c. The Harm to Oakland University If a Preliminary Injunction Is Granted Outweighs the Harm to Feldman If It Is Denied

In contrast to Plaintiff, who, as discussed above, would suffer no harm if this motion is granted, Oakland University would suffer substantial harm if Plaintiff's motion is granted. The University maintains its housing policies to assure that full-time students in degree seeking programs have housing in the dorms available to them. If the University is required to make an exception to these policies for Plaintiff, then that exception will open the door for a surge of demands for similar exceptions from other individuals who participate in the University's continuing education and other programs. The University does not have the resources, nor is it the University's intent, to provide housing in dorms for ordinary participants in any of the continuing education or other programs. The University reserves those facilities for those in academic programs for both space reasons and to foster the academic experience for students enrolled in degree granting programs. A change to that environment, and the elimination or waiver of the enrollment, grade point average and other academic requirements would adversely impact on the University's ability to meet its legitimate educational and other goals. Accordingly, the University will suffer substantial harm if Plaintiff's motion for an injunction is granted.

### d. It is in the Public Interest that the Preliminary Injunction be Denied

It is in the public interest that Plaintiff's motion be denied. Oakland University is a state agency of the State of Michigan which has promulgated housing policies that best meet the needs of its students who are pursuing college degrees. As such, Oakland University should be accorded a degree

of judicial deference relative to its academic decisions. *See Grutter v Bollinger,* 539 U.S. 306 (2003). Forcing the University to make an exception to these policies for Plaintiff would infringe on its institutional academic freedom and, as discussed above, result in a slippery slope of continuing education and other students demanding housing in the dorms, which would further limit available housing for students in a full-time, degree granting program. The public interest would also be harmed by discouraging educational institutions from offering continuing education and other programs such as the OPTIONS program because by offering such programs, the University would be required to house all of the participants in its dorms at the expense of its students pursuing degrees.

The University agrees with Plaintiff's arguments that maintaining diversity and that eradicating housing discrimination are important to the public interest, and the University encourages both of these interests with respect to its students who are admitted to degree-granting programs. In fact, the University houses many disabled students who are pursuing college degrees. It does not advance these public interests, however, by allowing its continuing education students to reside in its dorms.

## IV.    CONCLUSION

Based on the foregoing, Oakland University respectfully requests that this Court deny Plaintiff's Motion for a Preliminary Injunction and dismiss the claims for lack of standing.

Respectfully submitted,

BUTZEL LONG

By: /s/ Robert A. Boonin
    Robert A. Boonin (P38172)
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
(734) 995-3110
Attorneys for Defendant
boonin@butzel.com

Dated:  January 5, 2009

## Certificate of Service

I, Robert A. Boonin, hereby certify that on January 5, 2009, I electronically filed the foregoing papers with the Clerk of the court using the ECF system, which will send notification of such filing to the following counsel of record:

> Chris E. Davis
> Michigan Protection & Advocacy Service, Inc.
> 29200 Vassar Blvd., Ste. 200
> Livonia, MI 48152
> (248) 473-2990
> cdavis@mpas.org
> Attorney for Michah Fialka-Feldman

Respectfully submitted,

**BUTZEL LONG**

By: /s/ Robert A. Boonin
Robert A. Boonin (P38172)
Zachary V. Moen (P72029)
Omar N. Chaudhary (P71676)

300 South Main Street, Suite 300
Ann Arbor, Michigan 48104
(734) 995-3110
boonin@butzel.com

**Attorneys for Defendant Oakland
University Board of Trustees**

Dated: January 5, 2009