

**EXHIBIT C**

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WINTER, SECRETARY OF THE NAVY, ET AL. *v* NATURAL RESOURCES DEFENSE COUNCIL, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 07–1239.   Argued October 8, 2008—Decided November 12, 2008

Antisubmarine warfare is one of the Navy's highest priorities. The Navy's fleet faces a significant threat from modern diesel-electric submarines, which are extremely difficult to detect and track because they can operate almost silently. The most effective tool for identifying submerged diesel-electric submarines is active sonar, which emits pulses of sound underwater and then receives the acoustic waves that echo off the target. Active sonar is a complex technology, and sonar operators must undergo extensive training to become proficient in its use.

This case concerns the Navy's use of "mid-frequency active" (MFA) sonar during integrated training exercises in the waters off southern California (SOCAL). In these exercises, ships, submarines, and aircraft train together as members of a "strike group." Due to the importance of antisubmarine warfare, a strike group may not be certified for deployment until it demonstrates proficiency in the use of active sonar to detect, track, and neutralize enemy submarines.

The SOCAL waters contain at least 37 species of marine mammals. The plaintiffs—groups and individuals devoted to the protection of marine mammals and ocean habitats—assert that MFA sonar causes serious injuries to these animals. The Navy disputes that claim, noting that MFA sonar training in SOCAL waters has been conducted for 40 years without a single documented sonar-related injury to any marine mammal. Plaintiffs sued the Navy, seeking declaratory and injunctive relief on the grounds that the training exercises violated the National Environmental Policy Act of 1969 (NEPA) and other federal laws; in particular, plaintiffs contend that the Navy should have prepared an environmental impact statement (EIS) before con-

ducting the latest round of SOCAL exercises.

The District Court entered a preliminary injunction prohibiting the Navy from using MFA sonar during its training exercises. The Court of Appeals held that this injunction was overbroad and remanded to the District Court for a narrower remedy. The District Court then entered another preliminary injunction, imposing six restrictions on the Navy's use of sonar during its SOCAL training exercises. As relevant to this case, the injunction required the Navy to shut down MFA sonar when a marine mammal was spotted within 2,200 yards of a vessel, and to power down sonar by 6 decibels during conditions known as "surface ducting."

The Navy then sought relief from the Executive Branch. The Council on Environmental Quality (CEQ) authorized the Navy to implement "alternative arrangements" to NEPA compliance in light of "emergency circumstances." The CEQ allowed the Navy to continue its training exercises under voluntary mitigation procedures that the Navy had previously adopted.

The Navy moved to vacate the District Court's preliminary injunction in light of the CEQ's actions. The District Court refused to do so, and the Court of Appeals affirmed. The Court of Appeals held that there was a serious question whether the CEQ's interpretation of the "emergency circumstances" regulation was lawful, that plaintiffs had carried their burden of establishing a "possibility" of irreparable injury, and that the preliminary injunction was appropriate because the balance of hardships and consideration of the public interest favored the plaintiffs. The Court of Appeals emphasized that any negative impact of the injunction on the Navy's training exercises was "speculative," and determined that (1) the 2,200-yard shutdown zone was unlikely to affect naval operations, because MFA sonar systems are often shut down during training exercises; and (2) the power-down requirement during surface ducting conditions was not unreasonable, because such conditions are rare and the Navy has previously certified strike groups not trained under these conditions.

*Held:* The preliminary injunction is vacated to the extent challenged by the Navy. The balance of equities and the public interest—which were barely addressed by the District Court—tip strongly in favor of the Navy. The Navy's need to conduct realistic training with active sonar to respond to the threat posed by enemy submarines plainly outweighs the interests advanced by the plaintiffs. Pp. 10–24.

(a) The lower courts held that when a plaintiff demonstrates a strong likelihood of success on the merits, a preliminary injunction may be entered based only on a "possibility" of irreparable harm. The "possibility" standard is too lenient. This Court's frequently reiterated standard requires plaintiffs seeking preliminary relief to dem-

onstrate that irreparable injury is *likely* in the absence of an injunction.

Even if plaintiffs have demonstrated a likelihood of irreparable injury, such injury is outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors. For the same reason, it is unnecessary to address the lower courts' holding that plaintiffs have established a likelihood of success on the merits. Pp. 10–14.

(b) A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences. *Weinberger* v. *Romero-Barcelo,* 456 U. S. 305, 312. Military interests do not always trump other considerations, and the Court has not held that they do, but courts must give deference to the professional judgment of military authorities concerning the relative importance of a particular military interest. *Goldman* v. *Weinberger,* 475 U. S. 503, 507.

Here, the record contains declarations from some of the Navy's most senior officers, all of whom underscored the threat posed by enemy submarines and the need for extensive sonar training to counter this threat. Those officers emphasized that realistic training cannot be accomplished under the two challenged restrictions imposed by the District Court—the 2,200-yard shutdown zone and the power-down requirement during surface ducting conditions. The use of MFA sonar under realistic conditions during training exercises is clearly of the utmost importance to the Navy and the Nation. The Court does not question the importance of plaintiffs' ecological, scientific, and recreational interests, but it concludes that the balance of equities and consideration of the overall public interest tip strongly in favor of the Navy. The determination of where the public interest lies in this case does not strike the Court as a close question. Pp. 14–16.

(c) The lower courts' justifications for entering the preliminary injunction are not persuasive. Pp. 16–21.

(1) The District Court did not give serious consideration to the balance of equities and the public interest. The Court of Appeals did consider these factors and conclude that the Navy's concerns about the preliminary injunction were "speculative." But that is almost always the case when a plaintiff seeks injunctive relief to alter a defendant's conduct. The lower courts failed properly to defer to senior Navy officers' specific, predictive judgments about how the preliminary injunction would reduce the effectiveness of the Navy's SOCAL training exercises. Pp. 16–17.

(2) The District Court abused its discretion by requiring the
Navy to shut down MFA sonar when a marine mammal is spotted
within 2,200 yards of a sonar-emitting vessel. The Court of Appeals
concluded that the zone would not be overly burdensome because ma-
rine mammal sightings during training exercises are relatively rare.
But regardless of the frequency of such sightings, the injunction will
increase the radius of the shutdown zone from 200 to 2,200 yards,
which expands its surface area by a factor of over 100. Moreover, be-
cause training scenarios can take several days to develop, each addi-
tional shutdown can result in the loss of several days' worth of train-
ing. The Court of Appeals also concluded that the shutdown zone
would not be overly burdensome because the Navy had shut down
MFA sonar several times during prior exercises when marine mam-
mals were spotted well beyond the Navy's self-imposed 200-yard
zone. But the court ignored undisputed evidence that these volun-
tary shutdowns only occurred during tactically insignificant times.
Pp. 18–20.

(3) The District Court also abused its discretion by requiring the
Navy to power down MFA sonar by 6 decibels during significant sur-
face ducting conditions. When surface ducting occurs, active sonar
becomes more useful near the surface, but less effective at greater
depths. Diesel-electric submariners are trained to take advantage of
these distortions to avoid being detected by sonar. The Court of Ap-
peals concluded that the power-down requirement was reasonable
because surface ducting occurs relatively rarely, and the Navy has
previously certified strike groups that did not train under such condi-
tions. This reasoning is backwards. Given that surface ducting is
both rare and unpredictable, it is especially important for the Navy to
be able to train under these conditions when they occur. Pp. 20–21.

(4) The Navy has previously taken voluntary measures to ad-
dress concerns about marine mammals, and has chosen not to chal-
lenge four other restrictions imposed by the District Court in this
case. But that hardly means that other, more intrusive restrictions
pose no threat to preparedness for war. The Court of Appeals noted
that the Navy could return to the District Court to seek modification
of the preliminary injunction if it actually resulted in an inability to
train. The Navy is not required to wait until it is unable to train suf-
ficient forces for national defense before seeking dissolution of the
preliminary injunction. By then it may be too late. P. 21.

(d) This Court does not address the underlying merits of plaintiffs'
claims, but the foregoing analysis makes clear that it would also be
an abuse of discretion to enter a permanent injunction along the
same lines as the preliminary injunction. Plaintiffs' ultimate legal
claim is that the Navy must prepare an EIS, not that it must cease

Syllabus

sonar training. There is accordingly no basis for enjoining such training pending preparation of an EIS—if one is determined to be required—when doing so is credibly alleged to pose a serious threat to national security. There are many other remedial tools available, including declaratory relief or an injunction specifically tailored to preparation of an EIS, that do not carry such dire consequences. Pp. 21–23.

518 F. 3d 658, reversed; preliminary injunction vacated in part.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. BREYER, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined as to Part I. GINSBURG, J., filed a dissenting opinion, in which SOUTER, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–1239

## DONALD C. WINTER, SECRETARY OF THE NAVY, ET AL., PETITIONERS *v.* NATURAL RESOURCES DEFENSE COUNCIL, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[November 12, 2008]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

"To be prepared for war is one of the most effectual
means of preserving peace." 1 Messages and Papers of the
Presidents 57 (J. Richardson comp. 1897). So said George
Washington in his first Annual Address to Congress, 218
years ago. One of the most important ways the Navy
prepares for war is through integrated training exercises
at sea. These exercises include training in the use of
modern sonar to detect and track enemy submarines,
something the Navy has done for the past 40 years. The
plaintiffs complained that the Navy's sonar training pro-
gram harmed marine mammals, and that the Navy should
have prepared an environmental impact statement before
commencing its latest round of training exercises. The
Court of Appeals upheld a preliminary injunction impos-
ing restrictions on the Navy's sonar training, even though
that court acknowledged that "the record contains no
evidence that marine mammals have been harmed" by the
Navy's exercises. 518 F. 3d 658, 696 (CA9 2008).

The Court of Appeals was wrong, and its decision is reversed.

I

The Navy deploys its forces in "strike groups," which are groups of surface ships, submarines, and aircraft centered around either an aircraft carrier or an amphibious assault ship. App. to Pet. for Cert. (Pet. App.) 316a–317a. Seamless coordination among strike-group assets is critical. Before deploying a strike group, the Navy requires extensive integrated training in analysis and prioritization of threats, execution of military missions, and maintenance of force protection. App. 110–111.

Antisubmarine warfare is currently the Pacific Fleet's top war-fighting priority. Pet. App. 270a–271a. Modern diesel-electric submarines pose a significant threat to Navy vessels because they can operate almost silently, making them extremely difficult to detect and track. Potential adversaries of the United States possess at least 300 of these submarines. App. 571.

The most effective technology for identifying submerged diesel-electric submarines within their torpedo range is active sonar, which involves emitting pulses of sound underwater and then receiving the acoustic waves that echo off the target. Pet. App. 266a–267a, 274a. Active sonar is a particularly useful tool because it provides both the bearing and the distance of target submarines; it is also sensitive enough to allow the Navy to track enemy submarines that are quieter than the surrounding marine environment.[1] This case concerns the Navy's use of "mid-frequency active" (MFA) sonar, which transmits sound

---

[1] In contrast, passive sonar "listens" for sound waves but does not introduce sound into the water. Passive sonar is not effective for tracking diesel-electric submarines because those vessels can operate almost silently. Passive sonar also has a more limited range than active sonar, and cannot identify the exact location of an enemy submarine. Pet. App. 266a–271a.

waves at frequencies between 1 kHz and 10 kHz.

Not surprisingly, MFA sonar is a complex technology, and sonar operators must undergo extensive training to become proficient in its use. Sonar reception can be affected by countless different factors, including the time of day, water density, salinity, currents, weather conditions, and the contours of the sea floor. *Id.*, at 278a–279a. When working as part of a strike group, sonar operators must be able to coordinate with other Navy ships and planes while avoiding interference. The Navy conducts regular training exercises under realistic conditions to ensure that sonar operators are thoroughly skilled in its use in a variety of situations.

The waters off the coast of southern California (SOCAL) are an ideal location for conducting integrated training exercises, as this is the only area on the west coast that is relatively close to land, air, and sea bases, as well as amphibious landing areas. App. 141–142. At issue in this case are the Composite Training Unit Exercises and the Joint Tactical Force Exercises, in which individual naval units (ships, submarines, and aircraft) train together as members of a strike group. A strike group cannot be certified for deployment until it has successfully completed the integrated training exercises, including a demonstration of its ability to operate under simulated hostile conditions. *Id.*, at 564–565. In light of the threat posed by enemy submarines, all strike groups must demonstrate proficiency in antisubmarine warfare. Accordingly, the SOCAL exercises include extensive training in detecting, tracking, and neutralizing enemy submarines. The use of MFA sonar during these exercises is "mission-critical," given that MFA sonar is the only proven method of identifying submerged diesel-electric submarines operating on battery power. *Id.*, at 568–571.

Sharing the waters in the SOCAL operating area are at least 37 species of marine mammals, including dolphins,

whales, and sea lions. The parties strongly dispute the
extent to which the Navy's training activities will harm
those animals or disrupt their behavioral patterns. The
Navy emphasizes that it has used MFA sonar during
training exercises in SOCAL for 40 years, without a single
documented sonar-related injury to any marine mammal.
The Navy asserts that, at most, MFA sonar may cause
temporary hearing loss or brief disruptions of marine
mammals' behavioral patterns.

The plaintiffs are the Natural Resources Defense Coun-
cil, Jean-Michael Cousteau (an environmental enthusiast
and filmmaker), and several other groups devoted to the
protection of marine mammals and ocean habitats. They
contend that MFA sonar can cause much more serious
injuries to marine mammals than the Navy acknowledges,
including permanent hearing loss, decompression sick-
ness, and major behavioral disruptions. According to the
plaintiffs, several mass strandings of marine mammals
(outside of SOCAL) have been "associated" with the use of
active sonar. They argue that certain species of marine
mammals—such as beaked whales—are uniquely suscep-
tible to injury from active sonar; these injuries would not
necessarily be detected by the Navy, given that beaked
whales are "very deep divers" that spend little time at the
surface.

## II

The procedural history of this case is rather compli-
cated. The Marine Mammal Protection Act of 1972
(MMPA), 86 Stat. 1027, generally prohibits any individual
from "taking" a marine mammal, defined as harassing,
hunting, capturing, or killing it. 16 U. S. C. §§1362(13),
1372(a). The Secretary of Defense may "exempt any ac-
tion or category of actions" from the MMPA if such actions
are "necessary for national defense." §1371(f)(1). In Janu-
ary 2007, the Deputy Secretary of Defense—acting for the

Secretary—granted the Navy a 2-year exemption from the MMPA for the training exercises at issue in this case. Pet. App. 219a–220a. The exemption was conditioned on the Navy adopting several mitigation procedures, including: (1) training lookouts and officers to watch for marine mammals; (2) requiring at least five lookouts with binoculars on each vessel to watch for anomalies on the water surface (including marine mammals); (3) requiring aircraft and sonar operators to report detected marine mammals in the vicinity of the training exercises; (4) requiring reduction of active sonar transmission levels by 6 dB if a marine mammal is detected within 1,000 yards of the bow of the vessel, or by 10 dB if detected within 500 yards; (5) requiring complete shutdown of active sonar transmission if a marine mammal is detected within 200 yards of the vessel; (6) requiring active sonar to be operated at the "lowest practicable level"; and (7) adopting coordination and reporting procedures. *Id.*, at 222a–230a.

The National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, requires federal agencies "to the fullest extent possible" to prepare an environmental impact statement (EIS) for "every . . . major Federal actio[n] significantly affecting the quality of the human environment." 42 U. S. C. §4332(2)(C) (2000 ed.). An agency is not required to prepare a full EIS if it determines—based on a shorter environmental assessment (EA)—that the proposed action will not have a significant impact on the environment. 40 CFR §§1508.9(a), 1508.13 (2007).

In February 2007, the Navy issued an EA concluding that the 14 SOCAL training exercises scheduled through January 2009 would not have a significant impact on the environment. App. 226–227. The EA divided potential injury to marine mammals into two categories: Level A harassment, defined as the potential destruction or loss of biological tissue (*i.e.*, physical injury), and Level B harassment, defined as temporary injury or disruption of

behavioral patterns such as migration, feeding, surfacing,
and breeding. *Id.*, at 160–161.

The Navy's computer models predicted that the SOCAL
training exercises would cause only eight Level A harass-
ments of common dolphins each year, and that even these
injuries could be avoided through the Navy's voluntary
mitigation measures, given that dolphins travel in large
pods easily located by Navy lookouts. *Id.*, at 176–177, 183.
The EA also predicted 274 Level B harassments of beaked
whales per year, none of which would result in permanent
injury. *Id.*, at 185–186. Beaked whales spend little time
at the surface, so the precise effect of active sonar on these
mammals is unclear. Erring on the side of caution, the
Navy classified all projected harassments of beaked
whales as Level A. *Id.*, at 186, 223. In light of its conclu-
sion that the SOCAL training exercises would not have a
significant impact on the environment, the Navy deter-
mined that it was unnecessary to prepare a full EIS. See
40 CFR §1508.13.

Shortly after the Navy released its EA, the plaintiffs
sued the Navy, seeking declaratory and injunctive relief
on the grounds that the Navy's SOCAL training exercises
violated NEPA, the Endangered Species Act of 1973
(ESA), and the Coastal Zone Management Act of 1972
(CZMA).[2] The District Court granted plaintiffs' motion for
a preliminary injunction and prohibited the Navy from
using MFA sonar during its remaining training exercises.
The court held that plaintiffs had "demonstrated a prob-
ability of success" on their claims under NEPA and the
CZMA. Pet. App. 207a, 215a. The court also determined
that equitable relief was appropriate because, under Ninth

---

[2]The CZMA states that federal agencies taking actions "that affec[t]
any land or water use or natural resources of the coastal zone" shall
carry out these activities "in a manner which is consistent to the
maximum extent practicable with the enforceable policies of approved
State management programs." 16 U. S. C. §1456(c)(1)(A).

Circuit precedent, plaintiffs had established at least a
"'possibility'" of irreparable harm to the environment. *Id.*,
at 217a. Based on scientific studies, declarations from
experts, and other evidence in the record, the District
Court concluded that there was in fact a "near certainty"
of irreparable injury to the environment, and that this
injury outweighed any possible harm to the Navy. *Id.*, at
217a–218a.

The Navy filed an emergency appeal, and the Ninth
Circuit stayed the injunction pending appeal. 502 F. 3d
859, 865 (2007). After hearing oral argument, the Court of
Appeals agreed with the District Court that preliminary
injunctive relief was appropriate. The appellate court
concluded, however, that a blanket injunction prohibiting
the Navy from using MFA sonar in SOCAL was overbroad,
and remanded the case to the District Court "to narrow its
injunction so as to provide mitigation conditions under
which the Navy may conduct its training exercises." 508
F. 3d 885, 887 (2007).

On remand, the District Court entered a new prelimi-
nary injunction allowing the Navy to use MFA sonar only
as long as it implemented the following mitigation meas-
ures (in addition to the measures the Navy had adopted
pursuant to its MMPA exemption): (1) imposing a 12-mile
"exclusion zone" from the coastline; (2) using lookouts to
conduct additional monitoring for marine mammals; (3)
restricting the use of "helicopter-dipping" sonar; (4) limit-
ing the use of MFA sonar in geographic "choke points"; (5)
shutting down MFA sonar when a marine mammal is
spotted within 2,200 yards of a vessel; and (6) powering
down MFA sonar by 6 dB during significant surface duct-
ing conditions, in which sound travels further than it
otherwise would due to temperature differences in adja-
cent layers of water. 530 F. Supp. 2d 1110, 1118–1121
(CD Cal. 2008). The Navy filed a notice of appeal, chal-
lenging only the last two restrictions.

The Navy then sought relief from the Executive Branch. The President, pursuant to 16 U. S. C. §1456(c)(1)(B), granted the Navy an exemption from the CZMA. Section 1456(c)(1)(B) permits such exemptions if the activity in question is "in the paramount interest of the United States." The President determined that continuation of the exercises as limited by the Navy was "essential to national security." Pet. App. 232a. He concluded that compliance with the District Court's injunction would "undermine the Navy's ability to conduct realistic training exercises that are necessary to ensure the combat effectiveness of . . . strike groups." *Ibid.*

Simultaneously, the Council on Environmental Quality (CEQ) authorized the Navy to implement "alternative arrangements" to NEPA compliance in light of "emergency circumstances." See 40 CFR §1506.11.[3] The CEQ determined that alternative arrangements were appropriate because the District Court's injunction "create[s] a significant and unreasonable risk that Strike Groups will not be able to train and be certified as fully mission capable." Pet. App. 238a. Under the alternative arrangements, the Navy would be permitted to conduct its training exercises under the mitigation procedures adopted in conjunction with the exemption from the MMPA. The CEQ also imposed additional notice, research, and reporting requirements.

In light of these actions, the Navy then moved to vacate the District Court's injunction with respect to the 2,200-yard shutdown zone and the restrictions on training in

---

[3]That provision states in full: "Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review."

surface ducting conditions. The District Court refused to do so, 527 F. Supp. 2d 1216 (2008), and the Court of Appeals affirmed. The Ninth Circuit held that there was a serious question regarding whether the CEQ's interpretation of the "emergency circumstances" regulation was lawful. Specifically, the court questioned whether there was a true "emergency" in this case, given that the Navy has been on notice of its obligation to comply with NEPA from the moment it first planned the SOCAL training exercises. 518 F. 3d, at 681. The Court of Appeals concluded that the preliminary injunction was entirely predictable in light of the parties' litigation history. *Ibid.* The court also held that plaintiffs had established a likelihood of success on their claim that the Navy was required to prepare a full EIS for the SOCAL training exercises. *Id.,* at 693. The Ninth Circuit agreed with the District Court's holding that the Navy's EA—which resulted in a finding of no significant environmental impact—was "cursory, unsupported by cited evidence, or unconvincing." *Ibid.*[4]

The Court of Appeals further determined that plaintiffs had carried their burden of establishing a "possibility" of irreparable injury. Even under the Navy's own figures, the court concluded, the training exercises would cause 564 physical injuries to marine mammals, as well as 170,000 disturbances of marine mammals' behavior. *Id.,* at 696. Lastly, the Court of Appeals held that the balance of hardships and consideration of the public interest weighed in favor of the plaintiffs. The court emphasized that the negative impact on the Navy's training exercises was "speculative," since the Navy has never before operated under the procedures required by the District Court.

---

[4]The Ninth Circuit's discussion of the plaintiffs' likelihood of success was limited to their NEPA claims. The court did not discuss claims under the CZMA or ESA.

*Id.*, at 698–699. In particular, the court determined that:
(1) the 2,200-yard shutdown zone imposed by the District
Court was unlikely to affect the Navy's operations, be-
cause the Navy often shuts down its MFA sonar systems
during the course of training exercises; and (2) the power-
down requirement during significant surface ducting
conditions was not unreasonable because such conditions
are rare, and the Navy has previously certified strike
groups that had not trained under such conditions. *Id.*, at
699–702. The Ninth Circuit concluded that the District
Court's preliminary injunction struck a proper balance
between the competing interests at stake.

We granted certiorari, 554 U. S. __ (2008), and now
reverse and vacate the injunction.

### III

### A

A plaintiff seeking a preliminary injunction must estab-
lish that he is likely to succeed on the merits, that he is
likely to suffer irreparable harm in the absence of prelimi-
nary relief, that the balance of equities tips in his favor,
and that an injunction is in the public interest. See *Munaf*
v. *Geren*, 553 U. S. __, __ (2008) (slip op., at 12); *Amoco
Production Co.* v. *Gambell*, 480 U. S. 531, 542 (1987);
*Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 311–312
(1982).

The District Court and the Ninth Circuit concluded that
plaintiffs have shown a likelihood of success on the merits
of their NEPA claim. The Navy strongly disputes this
determination, arguing that plaintiffs' likelihood of suc-
cess is low because the CEQ reasonably concluded that
"emergency circumstances" justified alternative arrange-
ments to NEPA compliance. 40 CFR §1506.11. Plaintiffs'
briefs before this Court barely discuss the ground relied
upon by the lower courts—that the plain meaning of
"emergency circumstances" does not encompass a court

order that was "entirely predictable" in light of the parties' litigation history. 518 F. 3d, at 681. Instead, plaintiffs contend that the CEQ's actions violated the separation of powers by readjudicating a factual issue already decided by an Article III court. Moreover, they assert that the CEQ's interpretations of NEPA are not entitled to deference because the CEQ has not been given statutory authority to conduct adjudications.

The District Court and the Ninth Circuit also held that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a "possibility" of irreparable harm. *Id.*, at 696–697; 530 F. Supp. 2d, at 1118 (quoting *Faith Center Church Evangelistic Ministries* v. *Glover*, 480 F. 3d 891, 906 (CA9 2007); *Earth Island Inst.* v. *United States Forest Serv.*, 442 F. 3d 1147, 1159 (CA9 2006)). The lower courts held that plaintiffs had met this standard because the scientific studies, declarations, and other evidence in the record established to "a near certainty" that the Navy's training exercises would cause irreparable harm to the environment. 530 F. Supp. 2d, at 1118.

The Navy challenges these holdings, arguing that plaintiffs must demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief. On the facts of this case, the Navy contends that plaintiffs' alleged injuries are too speculative to give rise to irreparable injury, given that ever since the Navy's training program began 40 years ago, there has been no documented case of sonar-related injury to marine mammals in SOCAL. And even if MFA sonar does cause a limited number of injuries to individual *marine mammals*, the Navy asserts that plaintiffs have failed to offer evidence of species-level harm that would adversely affect *their* scientific, recreational, and ecological interests. For their part, plaintiffs assert that they would prevail under any formulation of the irreparable injury standard, because the

District Court found that they had established a "near certainty" of irreparable harm.

We agree with the Navy that the Ninth Circuit's "possibility" standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. *Los Angeles* v. *Lyons,* 461 U. S. 95, 103 (1983); *Granny Goose Foods, Inc.* v. *Teamsters,* 415 U. S. 423, 441 (1974); *O'Shea* v. *Littleton,* 414 U. S. 488, 502 (1974); see also 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2948.1, p. 139 (2d ed. 1995) (hereinafter Wright & Miller) (applicant must demonstrate that in the absence of a preliminary injunction, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered"); *id.,* at 155 ("a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury"). Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Mazurek* v. *Armstrong,* 520 U. S. 968, 972 (1997) (*per curiam*).

It is not clear that articulating the incorrect standard affected the Ninth Circuit's analysis of irreparable harm. Although the court referred to the "possibility" standard, and cited Circuit precedent along the same lines, it affirmed the District Court's conclusion that plaintiffs had established a "'near certainty'" of irreparable harm. 518 F. 3d, at 696–697. At the same time, however, the nature of the District Court's conclusion is itself unclear. The District Court originally found irreparable harm from sonar-training exercises generally. But by the time of the District Court's final decision, the Navy challenged only two of six restrictions imposed by the court. See *supra,* at 7–8. The District Court did not reconsider the likelihood

of irreparable harm in light of the four restrictions not challenged by the Navy. This failure is significant in light of the District Court's own statement that the 12-mile exclusion zone from the coastline—one of the unchallenged mitigation restrictions—"would bar the use of MFA sonar in a significant portion of important marine mammal habitat." 530 F. Supp. 2d, at 1119.

We also find it pertinent that this is not a case in which the defendant is conducting a new type of activity with completely unknown effects on the environment. When the Government conducts an activity, "NEPA itself does not mandate particular results." *Robertson* v. *Methow Valley Citizens Council*, 490 U. S. 332, 350 (1989). Instead, NEPA imposes only procedural requirements to "ensur[e] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.*, at 349. Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures. Here, in contrast, the plaintiffs are seeking to enjoin—or substantially restrict— training exercises that have been taking place in SOCAL for the last 40 years. And the latest series of exercises were not approved until after the defendant took a "hard look at environmental consequences," *id.*, at 350 (quoting *Kleppe* v. *Sierra Club*, 427 U. S. 390, 410, n. 21 (1976) (internal quotation marks omitted)), as evidenced by the issuance of a detailed, 293-page EA.

As explained in the next section, even if plaintiffs have shown irreparable injury from the Navy's training exercises, any such injury is outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors. A proper consideration of these factors alone requires denial of the requested injunctive relief. For the same reason, we do not address the lower courts' holding

that plaintiffs have also established a likelihood of success
on the merits.

### B

A preliminary injunction is an extraordinary remedy
never awarded as of right. *Munaf*, 553 U. S., at __ (slip
op., at 12). In each case, courts "must balance the compet-
ing claims of injury and must consider the effect on each
party of the granting or withholding of the requested
relief." *Amoco Production Co.*, 480 U. S., at 542. "In
exercising their sound discretion, courts of equity should
pay particular regard for the public consequences in em-
ploying the extraordinary remedy of injunction." *Romero-
Barcelo*, 456 U. S., at 312; see also *Railroad Comm'n of
Tex.* v. *Pullman Co.*, 312 U. S. 496, 500 (1941). In this
case, the District Court and the Ninth Circuit significantly
understated the burden the preliminary injunction would
impose on the Navy's ability to conduct realistic training
exercises, and the injunction's consequent adverse impact
on the public interest in national defense.

This case involves "complex, subtle, and professional
decisions as to the composition, training, equipping, and
control of a military force," which are "essentially profes-
sional military judgments." *Gilligan* v. *Morgan*, 413 U. S.
1, 10 (1973). We "give great deference to the professional
judgment of military authorities concerning the relative
importance of a particular military interest." *Goldman* v.
*Weinberger*, 475 U. S. 503, 507 (1986). As the Court em-
phasized just last Term, "neither the Members of this
Court nor most federal judges begin the day with briefings
that may describe new and serious threats to our Nation
and its people." *Boumediene* v. *Bush*, 553 U. S. __, __
(2008) (slip op., at 68).

Here, the record contains declarations from some of the
Navy's most senior officers, all of whom underscored the
threat posed by enemy submarines and the need for ex-

tensive sonar training to counter this threat. Admiral Gary Roughead—the Chief of Naval Operations—stated that during training exercises:

> "It is important to stress the ship crews in all dimensions of warfare simultaneously. If one of these training elements were impacted—for example, if effective sonar training were not possible—the training value of the other elements would also be degraded . . . ." Pet. App. 342a.

Captain Martin May—the Third Fleet's Assistant Chief of Staff for Training and Readiness—emphasized that the use of MFA sonar is "mission-critical." App. 570–571. He described the ability to operate MFA sonar as a "highly perishable skill" that must be repeatedly practiced under realistic conditions. *Id.,* at 577. During training exercises, MFA sonar operators learn how to avoid sound-reducing "clutter" from ocean floor topography and environmental conditions; they also learn how to avoid interference and how to coordinate their efforts with other sonar operators in the strike group. *Id.,* at 574. Several Navy officers emphasized that realistic training cannot be accomplished under the two challenged restrictions imposed by the District Court—the 2,200-yard shutdown zone and the requirement that the Navy power down its sonar systems during significant surface ducting conditions. See, *e.g.,* Pet. App. 333a (powering down in presence of surface ducting "unreasonably prevent[s] realistic training"); *id.,* at 356a (shutdown zone would "result in a significant, adverse impact to realistic training"). We accept these officers' assertions that the use of MFA sonar under realistic conditions during training exercises is of the utmost importance to the Navy and the Nation.

These interests must be weighed against the possible harm to the ecological, scientific, and recreational interests that are legitimately before this Court. Plaintiffs

have submitted declarations asserting that they take
whale watching trips, observe marine mammals underwa-
ter, conduct scientific research on marine mammals, and
photograph these animals in their natural habitats.
Plaintiffs contend that the Navy's use of MFA sonar will
injure marine mammals or alter their behavioral patterns,
impairing plaintiffs' ability to study and observe the
animals.

While we do not question the seriousness of these inter-
ests, we conclude that the balance of equities and consid-
eration of the overall public interest in this case tip
strongly in favor of the Navy. For the plaintiffs, the most
serious possible injury would be harm to an unknown
number of the marine mammals that they study and
observe. In contrast, forcing the Navy to deploy an inade-
quately trained antisubmarine force jeopardizes the safety
of the fleet. Active sonar is the only reliable technology for
detecting and tracking enemy diesel-electric submarines,
and the President—the Commander in Chief—has deter-
mined that training with active sonar is "essential to
national security." Pet. App. 232a.

The public interest in conducting training exercises with
active sonar under realistic conditions plainly outweighs
the interests advanced by the plaintiffs. Of course, mili-
tary interests do not always trump other considerations,
and we have not held that they do. In this case, however,
the proper determination of where the public interest lies
does not strike us as a close question.

## C

1. Despite the importance of assessing the balance of
equities and the public interest in determining whether to
grant a preliminary injunction, the District Court ad-
dressed these considerations in only a cursory fashion.
The court's entire discussion of these factors consisted of
one (albeit lengthy) sentence: "The Court is also satisfied

that the balance of hardships tips in favor of granting an injunction, as the harm to the environment, Plaintiffs, and public interest outweighs the harm that Defendants would incur if prevented from using MFA sonar, absent the use of effective mitigation measures, during a subset of their regular activities in one part of one state for a limited period." *Id.*, at 217a–218a. As the prior Ninth Circuit panel in this case put it, in staying the District Court's original preliminary injunction, "[t]he district court did not give serious consideration to the public interest factor." 502 F. 3d, at 863. The District Court's order on remand did nothing to cure this defect, but simply repeated nearly verbatim the same sentence from its previous order. Compare 530 F. Supp. 2d, at 1118, with Pet. App. 217a–218a. The subsequent Ninth Circuit panel framed its opinion as reviewing the District Court's exercise of discretion, 518 F. 3d, at 697–699, but that discretion was barely exercised here.

The Court of Appeals held that the balance of equities and the public interest favored the plaintiffs, largely based on its view that the preliminary injunction would not in fact impose a significant burden on the Navy's ability to conduct its training exercises and certify its strike groups. *Id.*, at 698–699. The court deemed the Navy's concerns about the preliminary injunction "speculative" because the Navy had not operated under similar procedures before. *Ibid.* But this is almost always the case when a plaintiff seeks injunctive relief to alter a defendant's conduct. The lower courts failed properly to defer to senior Navy officers' specific, predictive judgments about how the preliminary injunction would reduce the effectiveness of the Navy's SOCAL training exercises. See Wright & Miller §2948.2, at 167–68 ("The policy against the imposition of judicial restraints prior to an adjudication of the merits becomes more significant when there is reason to believe that the decree will be burdensome").

2. The preliminary injunction requires the Navy to shut down its MFA sonar if a marine mammal is detected within 2,200 yards of a sonar-emitting vessel. The Ninth Circuit stated that the 2,200-yard shutdown zone would not be overly burdensome because sightings of marine mammals during training exercises are relatively rare. But regardless of the frequency of marine mammal sightings, the injunction will greatly increase the size of the shutdown zone. Pursuant to its exemption from the MMPA, the Navy agreed to reduce the power of its MFA sonar at 1,000 yards and 500 yards, and to completely turn off the system at 200 yards. Pet. App. 222a–230a. The District Court's injunction does not include a graduated power-down, instead requiring a total shutdown of MFA sonar if a marine mammal is detected within 2,200 yards of a sonar-emitting vessel. There is an exponential relationship between radius length and surface area (Area = $\pi$ r$^2$). Increasing the radius of the shutdown zone from 200 to 2,200 yards would accordingly expand the surface area of the shutdown zone by a factor of over 100 (from 125,664 square yards to 15,205,308 square yards).

The lower courts did not give sufficient weight to the views of several top Navy officers, who emphasized that because training scenarios can take several days to develop, each additional shutdown can result in the loss of several days' worth of training. *Id.,* at 344a. Limiting the number of sonar shutdowns is particularly important during the Joint Tactical Force Exercises, which usually last for less than two weeks. *Ibid.* Admiral Bird explained that the 2,200-yard shutdown zone would cause operational commanders to "lose awareness of the tactical situation through the constant stopping and starting of MFA [sonar]." *Id.,* at 332a; see also *id.,* at 356a ("It may take days to get to the pivotal attack in antisubmarine warfare, but only minutes to confound the results upon which certification is based"). Even if there is a low likeli-

hood of a marine mammal sighting, the preliminary in-
junction would clearly increase the number of disruptive
sonar shutdowns the Navy is forced to perform during its
SOCAL training exercises.

The Court of Appeals also concluded that the 2,200-yard
shutdown zone would not be overly burdensome because
the Navy had shut down MFA sonar 27 times during its
eight prior training exercises in SOCAL; in several of
these cases, the Navy turned off its sonar when marine
mammals were spotted well beyond the Navy's self-
imposed 200-yard shutdown zone. 518 F. 3d, at 700, n. 65.
Admiral Locklear—the Commander of the Navy's Third
Fleet—stated that any shutdowns beyond the 200-yard
zone were voluntary avoidance measures that likely took
place at tactically insignificant times; the Ninth Circuit
discounted this explanation as not supported by the re-
cord. *Ibid.* In reaching this conclusion, the Court of Ap-
peals ignored key portions of Admiral Locklear's declara-
tion, in which he stated unequivocally that commanding
officers "would not shut down sonar until legally required
to do so if in contact with a submarine." Pet. App. 354a–
355a. Similarly, if a commanding officer is in contact with
a target submarine, "the CO will be expected to continue
to use active sonar unless another ship or helicopter can
gain contact or if regulatory reasons dictate otherwise."
*Id.*, at 355a. The record supports the Navy's contention
that its shutdowns of MFA sonar during prior training
exercises only occurred during tactically insignificant
times; those voluntary shutdowns do not justify the Dis-
trict Court's imposition of a mandatory 2,200-yard shut-
down zone.

Lastly, the Ninth Circuit stated that a 2,200-yard shut-
down zone was feasible because the Navy had previously
adopted a 2,000-meter zone for low-frequency active (LFA)
sonar. The Court of Appeals failed to give sufficient
weight to the fact that LFA sonar is used for long-range

detection of enemy submarines, and thus its use and
shutdown involve tactical considerations quite different
from those associated with MFA sonar.  See App. 508
(noting that equating MFA sonar with LFA sonar "is
completely misleading and is like comparing 20 degrees
Fahrenheit to 20 degrees Celsius").

   3. The Court of Appeals also concluded that the Navy's
training exercises would not be significantly affected by
the requirement that it power down MFA sonar by 6 dB
during significant surface ducting conditions.  Again, we
think the Ninth Circuit understated the burden this re-
quirement would impose on the Navy's ability to conduct
realistic training exercises.

   Surface ducting is a phenomenon in which relatively
little sound energy penetrates beyond a narrow layer near
the surface of the water.  When surface ducting occurs,
active sonar becomes more useful near the surface but less
useful at greater depths.  Pet. App. 299a–300a.  Diesel-
electric submariners are trained to take advantage of
these distortions to avoid being detected by sonar.  *Id.,* at
333a.

   The Ninth Circuit determined that the power-down
requirement during surface ducting conditions was
unlikely to affect certification of the Navy's strike groups
because surface ducting occurs relatively rarely, and the
Navy has previously certified strike groups that did not
train under such conditions.  518 F. 3d, at 701–702.  This
reasoning is backwards.  Given that surface ducting is
both rare and unpredictable, it is especially important for
the Navy to be able to train under these conditions when
they occur.  Admiral Bird explained that the 6 dB power-
down requirement makes the training less valuable be-
cause it "exposes [sonar operators] to unrealistically lower
levels of mutual interference caused by multiple sonar
systems operating together by the ships within the Strike
Group."  Pet. App. 281a (footnote omitted).  Although a 6

dB reduction may not seem terribly significant, decibels are measured on a logarithmic scale, so a 6 dB decrease in power equates to a 75% reduction. *Id.*, at 284a–285a.

4. The District Court acknowledged that "'the imposition of these mitigation measures will require the Navy to alter and adapt the way it conducts antisubmarine warfare training—a substantial challenge.   Nevertheless, evidence presented to the Court reflects that the Navy has employed mitigation measures in the past, without sacrificing training objectives.'"   527 F. Supp. 2d, at 1238. Apparently no good deed goes unpunished.  The fact that the Navy has taken measures in the past to address concerns about marine mammals—or, for that matter, has elected not to challenge four additional restrictions imposed by the District Court in this case, see *supra*, at 7–8—hardly means that other, more intrusive restrictions pose no threat to preparedness for war.

The Court of Appeals concluded its opinion by stating that "the Navy may return to the district court to request relief on an emergency basis" if the preliminary injunction "actually result[s] in an inability to train and certify sufficient naval forces to provide for the national defense."   518 F. 3d, at 703.  This is cold comfort to the Navy.  The Navy contends that the injunction will hinder efforts to train sonar operators under realistic conditions, ultimately leaving strike groups more vulnerable to enemy submarines.  Unlike the Ninth Circuit, we do not think the Navy is required to wait until the injunction "actually result[s] in an inability to train . . . sufficient naval forces for the national defense" before seeking its dissolution.  By then it may be too late.

IV

As noted above, we do not address the underlying merits of plaintiffs' claims.  While we have authority to proceed to such a decision at this point, see *Munaf*, 553 U. S., at ___

(slip op., at 13–14), doing so is not necessary here. In addition, reaching the merits is complicated by the fact that the lower courts addressed only one of several issues raised, and plaintiffs have largely chosen not to defend the decision below on that ground.[5]

At the same time, what we have said makes clear that it would be an abuse of discretion to enter a permanent injunction, after final decision on the merits, along the same lines as the preliminary injunction. An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course. *Romero-Barcelo*, 456 U. S., at 313 ("a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law").

The factors examined above—the balance of equities and consideration of the public interest—are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent. See *Amoco Production Co.*, 480 U. S.,

---

[5]The bulk of JUSTICE GINSBURG's dissent is devoted to the merits. For the reasons stated, we find the injunctive relief granted in this case an abuse of discretion, even if plaintiffs are correct on the underlying merits. As to the injunction, the dissent barely mentions the Navy's interests. *Post*, at 11. We find that those interests, and the documented risks to national security, clearly outweigh the harm on the other side of the balance.

We agree with much of JUSTICE BREYER's analysis, *post*, at 3–9 (opinion concurring in part and dissenting in part), but disagree with his conclusion that the modified conditions imposed by the stay order should remain in force until the Navy completes its EIS, *post*, at 9–11. The Court is reviewing the District Court's imposition of the preliminary injunction; once we conclude, as JUSTICE BREYER does, *post*, at 9, that the preliminary injunction should be vacated, the stay order is no longer pertinent. A stay is a useful tool for managing the impact of injunctive relief *pending further appeal,* but once the Court resolves the merits of the appeal, the stay ceases to be relevant. See 518 F. 3d 704, 706 (CA9 2008) ("the partial stay . . . shall remain in effect until final disposition by the Supreme Court"). Unexamined conditions imposed by the stay order are certainly no basis for what would be in effect the entry of a new preliminary injunction by this Court.

at 546, n. 12 ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success"). Given that the ultimate legal claim is that the Navy must prepare an EIS, not that it must cease sonar training, there is no basis for enjoining such training in a manner credibly alleged to pose a serious threat to national security. This is particularly true in light of the fact that the training has been going on for 40 years with no documented episode of harm to a marine mammal. A court concluding that the Navy is required to prepare an EIS has many remedial tools at its disposal, including declaratory relief or an injunction tailored to the preparation of an EIS rather than the Navy's training in the interim. See, *e.g.*, *Steffel* v. *Thompson*, 415 U. S. 452, 466 (1974) ("Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction"). In the meantime, we see no basis for jeopardizing national security, as the present injunction does. Plaintiffs confirmed at oral argument that the preliminary injunction was "the whole ball game," Tr. of Oral Arg. 33, and our analysis of the propriety of preliminary relief is applicable to any permanent injunction as well.

\*    \*    \*

President Theodore Roosevelt explained that "the only way in which a navy can ever be made efficient is by practice at sea, under all the conditions which would have to be met if war existed." President's Annual Message, 42 Cong. Rec. 67, 81 (1907). We do not discount the importance of plaintiffs' ecological, scientific, and recreational interests in marine mammals. Those interests, however, are plainly outweighed by the Navy's need to conduct realistic training exercises to ensure that it is able to neutralize the threat posed by enemy submarines. The

District Court abused its discretion by imposing a 2,200-yard shutdown zone and by requiring the Navy to power down its MFA sonar during significant surface ducting conditions. The judgment of the Court of Appeals is reversed, and the preliminary injunction is vacated to the extent it has been challenged by the Navy.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 07–1239

## DONALD C. WINTER, SECRETARY OF THE NAVY, ET AL., PETITIONERS *v.* NATURAL RESOURCES DEFENSE COUNCIL, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[November 12, 2008]

JUSTICE BREYER, with whom JUSTICE STEVENS joins as to Part I, concurring in part and dissenting in part.

As of December 2006, the United States Navy planned to engage in a series of 14 antisubmarine warfare training exercises off the southern California coast. The Natural Resources Defense Council, Inc., and others (hereinafter NRDC) brought this case in Federal District Court claiming that the National Environmental Policy Act of 1969 (NEPA) requires the Navy to prepare an environmental impact statement (EIS) (assessing the impact of the exercises on marine mammals) prior to its engaging in the exercises. As the case reaches us, the District Court has found that the NRDC will likely prevail on its demand for an EIS; the Navy has agreed to prepare an EIS; the District Court has forbidden the Navy to proceed with the exercises unless it adopts six mitigating measures; and the Navy has agreed to adopt all but two of those measures.

The controversy between the parties now concerns the two measures that the Navy is unwilling to adopt. The first concerns the "shutdown zone," a circle with a ship at the center within which the Navy must try to spot marine mammals and shut down its sonar if one is found. The controverted condition would enlarge the radius of that circle from about one-tenth of a mile (200 yards) to one

and one-quarter mile (2,200 yards). The second concerns special ocean conditions called "surface ducting conditions." The controverted condition would require the Navy, when it encounters any such condition, to diminish the sonar's power by 75%. The Court of Appeals affirmed the District Court order that contained these two conditions. 518 F. 3d 658, 703 (CA9 2008).

## I

We must now decide whether the District Court was legally correct in forbidding the training exercises *unless* the Navy implemented the two controverted conditions. In doing so, I assume, like the Court, that the NRDC will prevail on its demand for an EIS. (Indeed, the Navy is in the process of preparing one.) And, I would ask whether, in imposing these conditions, the District Court properly "balance[d the] harms." See, *e.g., Amoco Production Co.* v. *Gambell*, 480 U. S. 531, 545 (1987).

Respondents' (hereinafter plaintiffs) argument favoring the District Court injunction is a strong one. As JUSTICE GINSBURG well points out, see *post*, at 4–5 (dissenting opinion), the very point of NEPA's insistence upon the writing of an EIS is to force an agency "carefully" to "consider . . . detailed information concerning significant environmental impacts," while "giv[ing] the public the assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process.'" *Robertson* v. *Methow Valley Citizens Council*, 490 U. S. 332, 349 (1989). NEPA seeks to assure that when Government officials consider taking action that may affect the environment, they do so fully aware of the relevant environmental considerations. An EIS does not force them to make any particular decision, but it does lead them to take environmental considerations into account when they decide whether, or how, to act. *Id.*, at 354. Thus, when a decision to which EIS obligations attach is made without

the informed environmental consideration that NEPA
requires, much of the harm that NEPA seeks to prevent
has already taken place. In this case, for example, the
*absence* of an injunction means that the Navy will proceed
with its exercises in the absence of the fuller consideration
of environmental effects that an EIS is intended to bring.
The absence of an injunction thereby threatens to cause
the very environmental harm that a full preaction EIS
might have led the Navy to avoid (say, by adopting the two
additional mitigation measures that the NRDC proposes).
Consequently, if the exercises are to continue, conditions
designed to mitigate interim environmental harm may
well be appropriate.

On the other hand, several features of this case lead
me to conclude that the record, as now before us, lacks
adequate support for an injunction imposing the two
controverted requirements. *First,* the evidence of need for
the two special conditions is weak or uncertain. The record
does show that the exercises as the Navy originally pro-
posed them could harm marine mammals. The District
Court found (based on the Navy's study of the matter) that
the exercises might cause 466 instances of Level A harm
and 170,000 instances of Level B harm. App. to Pet. for
Cert. 196a–197a. (The environmental assessment (EA)
actually predicted 564 instances of Level A harm. See
App. 223–224.) The study defines Level A injury as "any
act that injures or has the significant potential to injure a
marine mammal or marine mammal stock in the wild"
through "destruction or loss of biological tissue," whether
"slight to severe." *Id.,* at 160. It defines Level B harm as
"'any act that disturbs or is likely to disturb a marine
mammal . . . by causing disruption of natural behavioral
patterns including, but not limited to, migration, surfac-
ing, nursing, breeding, feeding, or sheltering to a point
where such behaviors are abandoned or significantly
altered'" and describes it as a "short term" and "tempo-

rary" "disturbance." *Id.,* at 161, 175.

The raw numbers seem large. But the parties argue about the extent to which they mean likely harm. The Navy says the classifications and estimates err on the side of caution. (When in doubt about the amount of harm to a mammal, the study assumed the harm would qualify as Level A harassment. *Id.,* at 200.) The Navy also points out that, by definition, mammals recover from Level B injuries, often very quickly. It notes that, despite 40 years of naval exercises off the southern California coast, no injured marine mammal has ever been found. App. to Pet. for Cert. 274a–275a. (It adds that dolphins often swim alongside the ships. *Id.,* at 290, 346.) At the same time, plaintiffs point to instances where whales have been found stranded. They add that scientific studies have found a connection between those beachings and the Navy's use of sonar, see, *e.g.,* App. 600–602, and the Navy has even acknowledged one stranding where "U. S. Navy mid-frequency sonar has been identified as the most plausible contributory source to the stranding event," *id.,* at 168.

Given the uncertainty the figures create in respect to the harm caused by the Navy's original training plans, it would seem important to have before us at least some estimate of the harm likely avoided by the Navy's decision not to contest here *four of the six mitigating conditions* that the District Court ordered. Without such evidence, it is difficult to assess the *relevant* harm—that is, the environmental harm likely caused by the Navy's exercises with the four uncontested mitigation measures (but without the two contested mitigation measures) in place.

*Second,* the Navy has filed multiple affidavits from Navy officials explaining in detail the seriousness of the harm that the delay associated with completion of this EIS (approximately one year) would create in respect to the Navy's ability to maintain an adequate national defense. See generally App. to Pet. for Cert. 260a–357a. Taken by

themselves, those affidavits make a strong case for the proposition that insistence upon the two additional mitigating conditions would seriously interfere with necessary defense training.

The affidavits explain the importance of training in antisubmarine warfare, *id.*, at 263a; the need to use active sonar to detect enemy submarines, *id.*, at 266a–267a, App. 566; the complexity of a training exercise involving sonar, App. to Pet. for Cert. 343a; the need for realistic conditions when training exercises take place, *id.*, at 299a–300a, App. 566; the "cascading" negative "effect" that delay in one important aspect of a set of coordinated training exercises has upon the Navy's ability "to provide combat ready forces," App. to Pet. for Cert. 343a; the cost and disruption that would accompany the adoption of the two additional mitigating conditions that the NRDC seeks, *ibid.*; the Navy's resulting inability adequately to train personnel, *id.*, at 278a; the effectiveness of the mammal-protecting measures that the Navy has taken in the past, *id.*, at 285a–298a; and the reasonable likelihood that the mitigating conditions to which it has agreed will prove adequate, *id.*, at 296a.

*Third*, and particularly important in my view, the District Court did not explain *why* it rejected the Navy's affidavit-supported contentions. In its first opinion enjoining the use of sonar, the District Court simply stated:

"The Court is . . . satisfied that the balance of hardships tips in favor of granting an injunction, as the harm to the environment, Plaintiffs, and public interest outweighs the harm that Defendants would incur if prevented from using [mid-frequency active (MFA)] sonar, absent the use of effective mitigation measures, during a subset of their regular activities in one part of one state for a limited period." *Id.*, at 217a–218a.

Following remand from the Court of Appeals, the District

Court simply repeated, word for word, this same state-
ment. It said:

> "The Court is . . . satisfied that the balance of hard-
> ships tips in favor of granting an injunction, as the
> harm to the environment, Plaintiffs, and public inter-
> est outweighs the harm that Defendants would incur
> (or the public interest would suffer) if Defendants
> were prevented from using MFA sonar, absent the use
> of effective mitigation measures, during a subset of
> their regular activities in one part of one state for a
> limited period." 530 F. Supp. 2d 1110, 1118 (CD Cal.
> 2008).

With respect to the imposition of the 2,200 yard shutdown
zone, the District Court noted evidence of the harm that
MFA sonar poses to marine mammals, and then concluded
that "[t]he Court therefore is persuaded that while the
2200 yard shutdown requirement may protect marine
mammals from the harshest of sonar-related conse-
quences, it represents a minimal imposition [on] the
Navy's training exercises." *Id.,* at 1119. The District
Court did not there explain the basis for that conclusion.
With respect to the imposition of the surface ducting
condition, the District Court said nothing about the Navy's
interests at all. *Id.,* at 1120–1121.

While a District Court is often free simply to state its
conclusion in summary fashion, in this instance neither
that conclusion, nor anything else I have found in the
District Court's opinion, answers the Navy's documented
claims that the two extra conditions the District Court
imposed will, in effect, seriously interfere with its ability
to carry out necessary training exercises.

The first condition requires the Navy to reduce the
power of its sonar equipment by 75% when the ship en-
counters a condition called "surface ducting" that occurs
when the presence of layers of water of different tempera-

ture make it unusually difficult for sonar operators to determine whether a diesel submarine is hiding below. Rear Admiral John Bird, an expert in submarine warfare, made clear that the 75% power-reduction requirement was equivalent to forbidding any related training. App. to Pet. for Cert. 297a. But he says in paragraph 52 of his declaration: "Training in surface ducting conditions is critical to effective training because sonar operators need to learn how sonar transmissions are altered due to surface ducting and how submarines may take advantage of them." *Id.*, at 299a–300a. The District Court, as far as I can tell, did not even acknowledge in its opinion the Navy's asserted interest in being able to train under these conditions. 530 F. Supp. 2d, at 1120–1121.

The second condition requires the Navy to expand the sonar "shutdown" area surrounding a ship (*i.e.*, turn off the sonar if a mammal is spotted in the area) from a circle with a radius of about one-tenth of a mile to a circle with a radius of about one mile and a quarter. Both sides agree that this requirement will lead to more shutdowns. Admiral Gary Roughead, Chief of Naval Operations, states in paragraph 12 of his declaration that this expanded zone requirement "will result in increased interruptions to training exercises, . . . vastly increas[ing] the risk of negating training effectiveness, preventing strike group certification, and disrupting carefully orchestrated deployment plans to meet world-wide operational commitments." App. to Pet. for Cert. 344a. Again, I can find nothing in the District Court's opinion that specifically explains why this is not so. 530 F. Supp. 2d, at 1119–1120.

*Fourth*, the Court of Appeals sought, through its own thorough examination of the record, to supply the missing explanations. But those explanations are not sufficient. In respect to the surface ducting conditions, the Court of Appeals rejected the Navy's contentions on the ground that those conditions are "rar[e]," and the Navy has certi-

fied trainings that did not involve any encounter with
those conditions. 518 F. 3d, at 701–702. I am not certain,
however, why the rarity of the condition supports the
District Court's conclusion. Rarity argues as strongly for
training when the condition is encountered as it argues for
the contrary.

In respect to the expansion of the "shutdown" area,
the Court of Appeals noted that (1) the Navy in earlier
exercises had shut down its sonar when marine mammals
were sited within about one-half a mile, (2) the Navy has
used a larger shutdown area when engaged in exercises
with lower frequency sonar equipment, and (3) foreign
navies have used larger shutdown areas. *Id.*, at 699–701,
and nn. 63, 67. But the Navy's affidavits state that (1)
earlier shutdowns when marine mammals were spotted at
farther distances "likely occurred during tactically insig-
nificant times," App. to Pet. for Cert. 356a, (2) ships with
low frequency sonar (unlike the sonar here at issue) have
equipment that makes it easier to monitor the larger area,
particularly by significantly reducing the number of moni-
toring personnel necessarily involved, and (3) foreign navy
experience is not relevant given the potentially different
military demands upon those navies, App. 508–509.

Finally, the Court of Appeals, mirroring a similar
District Court suggestion in the language I have quoted,
says that "the exercises in southern California are only a
subset of the Navy's training activities involving active
sonar." 518 F. 3d, at 702. It adds that the Navy's study
"shows the Navy is still able to conduct its exercises in
alternative locations, in reduced number, or through
simulation." *Ibid.*, n. 69. The Court of Appeals, however,
also concluded that the study "provides reasonably de-
tailed justifications for why the Southern California Oper-
ating Area is uniquely suited to these exercises, and dem-
onstrates that the Navy would suffer a certain hardship if
the considered alternatives were employed instead." *Ibid.*

*Fifth*, when the Court of Appeals first heard this case following the District Court's imposition of a broad, absolute injunction, it held that any injunction must be crafted so that the Navy could continue its training exercises. Noting that the Navy had, in the past, been able to use mitigation measures to "reduce the harmful effects of its active sonar," it "vacate[d] the stay and remand[ed] this matter to the district court to narrow its injunction so as to provide mitigation conditions *under which the Navy may conduct its training exercises.*" 508 F. 3d 885, 887 (CA9 2007) (emphasis added). For the reasons just stated, neither the District Court nor the Court of Appeals has explained why we should reject the Navy's assertions that it cannot effectively conduct its training exercises under the mitigation conditions imposed by the District Court.

I would thus vacate the preliminary injunction imposed by the District Court to the extent it has been challenged by the Navy. Neither the District Court nor the Court of Appeals has adequately explained its conclusion that the balance of the equities tips in favor of plaintiffs. Nor do those parts of the record to which the parties have pointed supply the missing explanation.

## II

Nonetheless, as the Court of Appeals held when it first considered this case, the Navy's past use of mitigation conditions makes clear that the Navy can effectively train under *some* mitigation conditions. In the ordinary course, I would remand so the District Court could, pursuant to the Court of Appeals' direction, set forth mitigation conditions that will protect the marine wildlife while also enabling the Navy to carry out its exercises. But, at this point, the Navy has informed us that this set of exercises will be complete by January, at the latest, and an EIS will likely be complete at that point, as well. Thus, by the time the District Court would have an opportunity to impose

new conditions, the case could very well be moot.

In February of this year, the Court of Appeals stayed the injunction imposed by the District Court—*but only pending this Court's resolution of the case.* The Court of Appeals concluded that "[i]n light of the short time before the Navy is to commence its next exercise, the importance of the Navy's mission to provide for the national defense and the representation by the Chief of Naval Operations that the district court's preliminary injunction in its current form will 'unacceptably risk' effective training and strike group certification and thereby interfere with his statutory responsibility . . . to 'organiz[e], train[], and equip[] the Navy,'" interim relief was appropriate, and the court then modified the two mitigation conditions at issue. 518 F. 3d 704, 705 (CA9 2008).

With respect to the 2,200 yard shutdown zone, it required the Navy to suspend its use of the sonar if a marine mammal is detected within 2,200 yards, *except* when sonar is being used at a "critical point in the exercise," in which case the amount by which the Navy must power down is proportional to the mammal's proximity to the sonar. *Id.,* at 705–706 (internal quotation marks omitted). With respect to surface ducting, the Navy is only required to shut down sonar altogether when a marine mammal is detected within 500 meters and the amount by which it is otherwise required to power down is again proportional to the mammal's proximity to the sonar source. *Id.,* at 705–706. The court believed these conditions would permit the Navy to go forward with its imminently planned exercises while at the same time minimizing the harm to marine wildlife.

In my view, the modified conditions imposed by the Court of Appeals in its February stay order reflect the best equitable conditions that can be created in the short time available before the exercises are complete and the EIS is ready. The Navy has been training under these conditions

since February, so allowing them to remain in place will, in effect, maintain what has become the status quo. Therefore, I would modify the Court of Appeals' February 29, 2008, order so that the provisional conditions it contains remain in place until the Navy's completion of an acceptable EIS.

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–1239

———————

## DONALD C. WINTER, SECRETARY OF THE NAVY, ET AL., PETITIONERS *v.* NATURAL RESOURCES DEFENSE COUNCIL, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[November 12, 2008]

JUSTICE GINSBURG, with whom JUSTICE SOUTER joins, dissenting.

The central question in this action under the National Environmental Policy Act of 1969 (NEPA) was whether the Navy must prepare an environmental impact statement (EIS). The Navy does not challenge its obligation to do so, and it represents that the EIS will be complete in January 2009—one month after the instant exercises conclude. If the Navy had completed the EIS before taking action, as NEPA instructs, the parties and the public could have benefited from the environmental analysis— and the Navy's training could have proceeded without interruption. Instead, the Navy acted first, and thus thwarted the very purpose an EIS is intended to serve. To justify its course, the Navy sought dispensation not from Congress, but from an executive council that lacks authority to countermand or revise NEPA's requirements. I would hold that, in imposing manageable measures to mitigate harm until completion of the EIS, the District Court conscientiously balanced the equities and did not abuse its discretion.

## I

In December 2006, the Navy announced its intent to

prepare an EIS to address the potential environmental
effects of its naval readiness activities in the Southern
California (SOCAL) Range Complex. See 71 Fed. Reg.
76639 (2006). These readiness activities include expan-
sion and intensification of naval training, as well as re-
search, development, and testing of various systems and
weapons. *Id.*, at 76639, 76640. The EIS process is under-
way, and the Navy represents that it will be complete in
January 2009. Brief for Petitioners 11; Tr. of Oral Arg. 11.

In February 2007, seeking to commence training before
completion of the EIS, the Navy prepared an Environ-
mental Assessment (EA) for the 14 exercises it planned to
undertake in the interim. See App. L to Pet. for Cert.
235a.[1] On February 12, the Navy concluded the EA with a
finding of no significant impact. App. 225–226. The same
day, the Navy commenced its training exercises. *Id.*, at
227 ("The Proposed Action is hereby implemented.").

On March 22, 2007, the Natural Resources Defense
Council (NRDC) filed suit in the U. S. District Court for
the Central District of California, seeking declaratory and
injunctive relief based on the Navy's alleged violations of
NEPA and other environmental statutes. As relevant
here, the District Court determined that NRDC was likely
to succeed on its NEPA claim and that equitable principles
warranted preliminary relief. On August 7, 2007, the
court enjoined the Navy's use of mid-frequency active
(MFA) sonar during the 11 remaining exercises at issue.

On August 31, the Court of Appeals for the Ninth Cir-
cuit stayed the injunction pending disposition of the
Navy's appeal, and the Navy proceeded with two more
exercises. In a November 13 order, the Court of Appeals

---

[1] An EA is used "for determining whether to prepare" an EIS. *De-
partment of Transportation* v. *Public Citizen*, 541 U. S. 752, 757 (2004)
(quoting 40 CFR §1508.9(a) (2003)); see *ante*, at 5. By definition, an EA
alone does not satisfy an agency's obligation under NEPA if the effects
of a proposed action require preparation of a full EIS.

vacated the stay, stating that NRDC had shown "a strong likelihood of success on the merits" and that preliminary injunctive relief was appropriate. 508 F. 3d 885, 886 (2007). The Court of Appeals remanded, however, instructing the District Court to provide mitigation measures under which the Navy could conduct its remaining exercises.

On remand, the District Court received briefing from both parties. In addition, the court "toured the USS *Milius* at the naval base in San Diego, California, to improve its understanding of the Navy's sonar training procedures and the feasibility of the parties' proposed mitigation measures. Counsel for both [parties] were present." 530 F. Supp. 2d 1110, 1112 (2008). On January 3, 2008, the District Court entered a modified preliminary injunction imposing six mitigation measures. The court revised the modified injunction slightly on January 10 in response to filings by the Navy, and four days later, denied the Navy's application for a stay pending appeal.

On the following day, January 15, the Council on Environmental Quality (CEQ), an advisory body within the Executive Office of the President, responded to the Navy's request for "alternative arrangements" for NEPA compliance. App. L to Pet. for Cert. 233a. The "arrangements" CEQ set out purported to permit the Navy to continue its training without timely environmental review. *Id.*, at 241a–247a. The Navy accepted the arrangements on the same day. App. 228.

The Navy then filed an emergency motion in the Court of Appeals requesting immediate vacatur of the District Court's modified injunction. CEQ's action, the Navy urged, eliminated the injunction's legal foundation. In the alternative, the Navy sought a stay of two aspects of the injunction pending its appeal: the 2,200-yard mandatory shutdown zone and the power-down requirement in significant surface ducting conditions, see *ante*, at 7–8.

While targeting in its stay application only two of the six measures imposed by the District Court, the Navy explicitly reserved the right to challenge on appeal each of the six mitigation measures. Responding to the Navy's emergency motion, the Court of Appeals remanded the matter to allow the District Court to determine in the first instance the effect of the intervening executive action. Pending its own consideration of the Navy's motion, the District Court stayed the injunction, and the Navy conducted its sixth exercise.

On February 4, after briefing and oral argument, the District Court denied the Navy's motion. The Navy appealed, reiterating its position that CEQ's action eliminated all justification for the injunction. The Navy also argued that vacatur of the entire injunction was required irrespective of CEQ's action, in part because the "conditions imposed, in particular the 2,200 yard mandatory shutdown zone and the six decibel (75%) power-down in significant surface ducting conditions, severely degrade the Navy's training." Brief for Appellants in No. 08–55054 (CA9), p. 15. In the February 29 decision now under review, the Court of Appeals affirmed the District Court's judgment. 518 F. 3d 658, 703 (2008). The Navy has continued training in the meantime and plans to complete its final exercise in December 2008.

As the procedural history indicates, the courts below determined that an EIS was required for the 14 exercises. The Navy does not challenge that decision in this Court. Instead, the Navy defends its failure to complete an EIS before launching the exercises based upon CEQ's "alternative arrangements"—arrangements the Navy sought and obtained in order to overcome the lower courts' rulings. As explained below, the Navy's actions undermined NEPA and took an extraordinary course.

## II

NEPA "promotes its sweeping commitment" to environmental integrity "by focusing Government and public attention on the environmental effects of proposed agency action." *Marsh* v. *Oregon Natural Resources Council,* 490 U. S. 360, 371 (1989). "By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Ibid.*

The EIS is NEPA's core requirement. *Department of Transportation* v. *Public Citizen,* 541 U. S. 752, 757 (2004). This Court has characterized the requirement as "action-forcing." *Andrus* v. *Sierra Club,* 442 U. S. 347, 350 (1979) (internal quotation marks omitted). Environmental concerns must be "integrated into the very process of agency decisionmaking" and "interwoven into the fabric of agency planning." *Id.,* at 350–351. In addition to discussing potential consequences, an EIS must describe potential mitigation measures and alternatives to the proposed course of action. See *Robertson* v. *Methow Valley Citizens Council,* 490 U. S. 332, 351–352 (1989) (citing 40 CFR §§1508.25(b), 1502.14(f), 1502.16(h), 1505.2(c) (1987)). The EIS requirement "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." 490 U. S., at 349.

"Publication of an EIS . . . also serves a larger informational role." *Ibid.* It demonstrates that an agency has indeed considered environmental concerns, and "perhaps more significantly, provides a springboard for public comment." *Ibid.* At the same time, it affords other affected governmental bodies "notice of the expected consequences and the opportunity to plan and implement corrective measures in a timely manner." *Id.,* at 350.

In light of these objectives, the timing of an EIS is critical. CEQ regulations instruct agencies to "integrate the

NEPA process with other planning at the earliest possible
time to insure that planning and decisions reflect envi-
ronmental values." 40 CFR §1501.2 (1987). An EIS must
be prepared "early enough so that it can serve practically
as an important contribution to the decisionmaking proc-
ess and will not be used to rationalize or justify decisions
already made." *Andrus*, 442 U. S., at 351–352, n. 3 (quot-
ing 40 CFR §1502.5 (1979)).

The Navy's publication of its EIS in this case, scheduled
to occur *after* the 14 exercises are completed, defeats
NEPA's informational and participatory purposes. The
Navy's inverted timing, it bears emphasis, is the very
reason why the District Court had to confront the question
of mitigation measures at all. Had the Navy prepared a
legally sufficient EIS before beginning the SOCAL exer-
cises, NEPA would have functioned as its drafters in-
tended: The EIS process and associated public input might
have convinced the Navy voluntarily to adopt mitigation
measures, but NEPA itself would not have impeded the
Navy's exercises. See *Public Citizen*, 541 U. S., at 756,
769, n. 2 (noting that NEPA does not mandate particular
results, but rather establishes procedural requirements
with a "focus on improving agency decisionmaking").

The Navy had other options. Most importantly, it could
have requested assistance from Congress. The Govern-
ment has sometimes obtained congressional authorization
to proceed with planned activities without fulfilling
NEPA's requirements. See, *e.g.,* Floyd D. Spence National
Defense Authorization Act for Fiscal Year 2001, Pub. L.
106–398, §317, 114 Stat. 1654A–57 (exempting the mili-
tary from preparing a programmatic EIS for low-level
flight training); 42 U. S. C. §10141(c) (exempting the
Environmental Protection Agency from preparing an EIS
for the development of criteria for handling spent nuclear
fuel and high-level radioactive waste); 43 U. S. C. §1652(d)
(exempting construction of the trans-Alaska oil pipeline

from further NEPA compliance).

Rather than resorting to Congress, the Navy "sought relief from the Executive Branch." *Ante*, at 8. On January 10, 2008, the Navy asked CEQ, adviser to the President, to approve alternative arrangements for NEPA compliance pursuant to 40 CFR §1506.11 (1987). App. L to Pet. for Cert. 233a; see *ante*, at 8, n. 3. The next day, the Navy submitted supplementary material to CEQ, including the Navy's EA and after-action reports, the District Court's orders, and two analyses by the National Marine Fisheries Service (NMFS). App. L to Pet. for Cert. 237a–238a. Neither the Navy nor CEQ notified NRDC, and CEQ did not request or consider any of the materials underlying the District Court orders it addressed.

Four days later, on January 15, the Chairman of CEQ issued a letter to the Secretary of the Navy. Repeating the Navy's submissions with little independent analysis, the letter stated that the District Court's orders posed risks to the Navy's training exercises. See *id.*, at 238a ("You have explained that the training restrictions set forth in the . . . injunctive orders prevent the Navy from providing Strike Groups with adequate proficiency training and create a substantial risk of precluding certification of the Strike Groups as combat ready."). The letter continued:

"Discussions between our staffs, your letter and sup-porting documents, and the classified declaration and briefings I have received, have clearly determined that the Navy cannot ensure the necessary training to certify strike groups for deployment under the terms of the injunctive orders. Based on the record support-ing your request . . . CEQ has concluded that the Navy must be able to conduct the [exercises] . . . in a time-frame that does not provide sufficient time to com-plete an EIS. Therefore, emergency circumstances

are present for the nine exercises and alternative ar-
rangements for compliance with NEPA under CEQ
regulation 40 C.F.R. §1506.11 are warranted." *Id.,* at
240a.

The alternative arrangements CEQ set forth do not
vindicate NEPA's objectives. The arrangements provide
for "public participation measures," which require the
Navy to provide notices of the alternative arrangements.
*Id.,* at 242a. The notices must "seek input on the process
for reviewing post-exercise assessments" and "include an
offer to meet jointly with Navy representatives . . . and
CEQ to discuss the alternative arrangements." *Id.,* at
242a–243a. The alternative arrangements also describe
the Navy's existing research and mitigation efforts. *Id.,* at
243a–247a.

CEQ's hasty decision on a one-sided record is no substi-
tute for the District Court's considered judgment based on
a two-sided record.[2] More fundamentally, even an exem-
plary CEQ review could not have effected the short circuit
the Navy sought. CEQ lacks authority to absolve an
agency of its statutory duty to prepare an EIS. NEPA
established CEQ to assist and advise the President on
environmental policy, 42 U. S. C. §4342, and a 1977 Ex-
ecutive Order charged CEQ with issuing regulations to
federal agencies for implementation of NEPA's procedural
provisions, Exec. Order No. 11991, 3 CFR 123 (1977
Comp.). This Court has recognized that CEQ's regulations
are entitled to "substantial deference," *Robertson,* 490
U. S., at 355, and §1506.11 indicates that CEQ may play

---

[2]The District Court may well have given too spare an explanation for
the balance of hardships in issuing its injunction of August 7, 2007.
The court cured any error in this regard, however, when it closely
examined each mitigation measure in issuing the modified injunction of
January 3, 2008. The Court of Appeals, too, conducted a detailed
analysis of the record.

an important consultative role in emergency circumstances, but we have never suggested that CEQ could eliminate the statute's command. If the Navy sought to avoid its NEPA obligations, its remedy lay in the Legislative Branch. The Navy's alternative course—rapid, self-serving resort to an office in the White House—is surely not what Congress had in mind when it instructed agencies to comply with NEPA "to the fullest extent possible." 42 U. S. C. §4332.[3]

### III

### A

Flexibility is a hallmark of equity jurisdiction. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 312 (1982) (quoting *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329 (1944)). Consistent with equity's character, courts do not insist that litigants uniformly show a particular, predetermined quantum of probable success or injury before awarding equitable relief. Instead, courts have evaluated claims for equitable relief on a "sliding scale," sometimes awarding relief based on a lower likelihood of harm when the likelihood of success is very high. 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2948.3, p. 195 (2d ed. 1995). This Court has never rejected that formulation, and I do not believe it does so today.

Equity's flexibility is important in the NEPA context. Because an EIS is the tool for *uncovering* environmental

---

[3] On the same day that CEQ issued its letter, the President granted the Navy an exemption from the requirements of the Coastal Zone Management Act of 1972 (CZMA) pursuant to 16 U. S. C. §1456(c)(1)(B). That exemption, expressly authorized by the CZMA, does not affect NRDC's NEPA claim.

harm, environmental plaintiffs may often rely more heav-
ily on their probability of success than the likelihood of
harm. The Court is correct that relief is not warranted
"simply to prevent the possibility of some remote future
injury." *Ante,* at 12 (quoting Wright & Miller, *supra,*
§2948.1, at 155). "However, the injury need not have been
inflicted when application is made or be certain to occur; a
strong threat of irreparable injury before trial is an ade-
quate basis." Wright & Miller, *supra,* §2948.1, at 155–156
(footnote omitted). I agree with the District Court that
NRDC made the required showing here.

## B

   The Navy's own EA predicted substantial and irrepara-
ble harm to marine mammals. Sonar is linked to mass
strandings of marine mammals, hemorrhaging around the
brain and ears, acute spongiotic changes in the central
nervous system, and lesions in vital organs. *E.g.,* App.
600–602; 360–362; 478–479. As the Ninth Circuit noted,
the EA predicts that the Navy's "use of MFA sonar in the
SOCAL exercises will result in 564 instances of physical
injury including permanent hearing loss (Level A harass-
ment) and nearly 170,000 behavioral disturbances (Level
B harassment), more than 8,000 of which would also
involve temporary hearing loss." 518 F. 3d, at 696; see
App. 223–224. Within those totals,

> "the EA predicts 436 Level A harassments of Cuvier's
> beaked whales, of which, according to NOAA, as few
> as 1,121 may exist in California, Oregon and Wash-
> ington combined. Likewise, the EA predicts 1,092
> Level B harassments of bottlenose dolphins, of which
> only 5,271 may exist in the California Coastal and
> Offshore stocks." 518 F. 3d, at 691–692.

   The majority acknowledges the lower courts' findings,
*ante,* at 9, but also states that the EA predicted "only eight

Level A harassments of common dolphins each year" and "274 Level B harassments of beaked whales per year, none of which would result in permanent injury," *ante*, at 6. Those numbers do not fully capture the EA's predictions.

The EA classified the harassments of beaked whales as Level A, not Level B. The EA does indeed state that "modeling predicts non-injurious Level B exposures." App. 185. But, as the majority correctly notes, *ante*, at 6, the EA also states that "all beaked whale exposures are counted as Level A," App. 185. The EA counted the predicted exposures as Level A "[b]y Navy policy developed in conjunction with NMFS." *Id.*, at 200. The record reflects "the known sensitivity of these species to tactical sonar," *id.*, at 365 (National Oceanic and Atmospheric Administration letter), and as the majority acknowledges, beaked whales are difficult to study, *ante*, at 6. Further, as the Ninth Circuit noted, "the EA . . . maintained that the methodology used was based on the 'best available science.'" 518 F. 3d, at 669.[4]

In my view, this likely harm—170,000 behavioral disturbances, including 8,000 instances of temporary hearing loss; and 564 Level A harms, including 436 injuries to a beaked whale population numbering only 1,121—cannot be lightly dismissed, even in the face of an alleged risk to the effectiveness of the Navy's 14 training exercises. There is no doubt that the training exercises serve critical interests. But those interests do not authorize the Navy to

---

[4]The majority reasons that the environmental harm deserves less weight because the training exercises "have been taking place in SOCAL for the last 40 years," such that "this is not a case in which the defendant is conducting a new type of activity with completely unknown effects on the environment." *Ante*, at 13. But the EA explains that the proposed action is not a continuation of the "status quo training." App. 128. Instead, the EA is based on the Navy's proposal to employ a "surge" training strategy, *ibid.*, in which the commander "would have the option to conduct two concurrent major range events," *id.*, at 124.

violate a statutory command, especially when recourse to the Legislature remains open. "Of course, military interests do not always trump other considerations, and we have not held that they do." *Ante,* at 16.

In light of the likely, substantial harm to the environment, NRDC's almost inevitable success on the merits of its claim that NEPA required the Navy to prepare an EIS, the history of this litigation, and the public interest, I cannot agree that the mitigation measures the District Court imposed signal an abuse of discretion. Cf. *Amoco Production Co.* v. *Gambell,* 480 U. S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.").

For the reasons stated, I would affirm the judgment of the Ninth Circuit.