**MICAH FIALKA-FELDMAN,**

               Plaintiff,

v.

**OAKLAND UNIVERSITY BOARD
OF TRUSTEES, GARY D. RUSSI, MARY BETH
SNYDER,** and **LIONEL MATEN,** in their
official capacities,

               Defendants.

Case Number 08-CV-14922
Hon. Patrick J. Duggan

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendant Oakland University Board of Trustees and Defendants Gary D. Russi, Mary

Beth Snyder and Lionel Maten, in their official capacities, by their attorneys, Butzel Long, a

professional corporation, in accordance with Rule 56 of the Federal Rules of Civil Procedure,

hereby request that this Court enter an Order dismissing Plaintiff's Second Amended Complaint.

As is demonstrated in detail in the Brief accompanying this Motion, there are no genuine issues

of material fact in this case, and Defendants are entitled to judgment in their favor as a matter of

law.

WHEREFORE, Defendants respectfully request that this Court dismiss Plaintiff's Second

Amended Complaint with prejudice and award Defendants their costs and fees incurred in

defending this meritless lawsuit.

Concurrence in this motion was sought, but denied, on November 12, 2009.

<div style="margin-left: 2em;">

**BUTZEL LONG, a professional corporation**

By: /s/ Robert A. Boonin
       Robert A. Boonin (P38172)
       Regan K. Dahle (P53975)
350 S. Main St., Suite 300
Ann Arbor, MI 48104
(734) 995-3110
boonin@butzel.com
dahle@butzel.com
Attorneys for Defendants

</div>

Dated: November 13, 2009

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**MICAH FIALKA-FELDMAN,**

     Plaintiff,

  Case Number 08-CV-14922
  Hon. Patrick J. Duggan

v.

**OAKLAND UNIVERSITY BOARD
OF TRUSTEES, GARY D. RUSSI, MARY BETH
SNYDER,** and **LIONEL MATEN,** in their
official capacities,

   Defendants.

_____ /

## DEFENDANTS' BRIEF IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED ................................................................ ii

CONTROLLING AUTHORITY ....................................................................... iii

INTRODUCTION.......................................................................................... 1

STATEMENT OF FACTS................................................................................ 1

I.     Background of the OPTIONS Program ................................................. 1

II.    The Academic Focus of On-Campus Housing at Oakland University.............. 2

III.   Plaintiff Submitted a Contract for On-Campus Housing ................................. 3

IV.   Modifications to the Housing Contract..................................................... 5

V.    Procedural History............................................................................. 6

STANDARD OF REVIEW ............................................................................ 7

ARGUMENT............................................................................................... 7

I.     Plaintiff Disparate Impact Claim Fails Due to the Absence of Statistical Evidence................................................................................................. 7

II.    Plaintiff's Claims in Counts II, III, V and VI Fail, because Plaintiff Is Not an Otherwise Qualified Individual with a Disability................................. 9

      A.    The Eligiblity Requirements are Necessary to the Housing Program. 11

      B.    Plaintiff's Accommodation Request is Unreasonable.......................... 13

III.   Plaintiff's Claims Fail because Plaintiff Has No Evidence Of Pretext.......... 15

IV.   Plaintiff's Requested Accommodation is Unrelated to His Disability............ 16

V.    Congress Implicitly Rejected the Idea that Cognitively-Impaired Students in Transition Programs Are Entitled to On-Campus Housing....... 18

CONCLUSION ........................................................................................... 20

## STATEMENT OF ISSUES PRESENTED

I.      Is Summary Judgment warranted on Count I of Plaintiff's Second Amended Complaint where Plaintiff has no statistical evidence in support of his disparate impact claim under the Fair Housing Act?

II.     Is Summary Judgment warranted on Counts II, III, V, and VI of Plaintiff's Second Amended Complaint since Plaintiff has no evidence that he is an otherwise qualified individual with a disability?

III.    Is Summary Judgment warranted on Plaintiff's disparate treatment claims since Plaintiff has no evidence that Defendants' legitimate, non-discriminatory reason for declining his request for on-campus housing was a pretext for disability discrimination?

IV.    Is Summary Judgment warranted on Plaintiff's claim that Defendants failed to provide him with a reasonable accommodation where the accommodation that Plaintiff requested was unreasonable and unrelated to his disability?

V.     Is Summary Judgment warranted on all of Plaintiff's claims where Congress has implicitly recognized that cognitively impaired students in Transition Programs are not legally entitled to on-campus housing?

Defendants answer "yes" to each of these questions.

# CONTROLLING AUTHORITY

Page

## CASES

*Alexander v. Choate,*
    469 U.S. 287 (U.S. 1985) ...................................................................... 9

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, S.Ct. 2505, 91 L.Ed.2d 202 (1986) ..................................... 7

*Dollar Corp. v. Zebedee (In re Dollar Corp.),*
    25 F.3d 1320 (6th Cir. 1994)................................................................... 7

*Graoch Assocs. # 33, L.P. v. Louisville/Jefferson County Metro Human Rels. Comm'n,*
    508 F.3d 366 (6th Cir. 2007)................................................................... 8

*Johari v. Big Easy Rests., Inc.,*
    78 Fed. Appx. 546 (6th Cir. 2003)............................................................ 7

*Jones v. City of Monroe,*
    341 F.3d 474 (6th Cir. 2003).............................................................. 9, 16

*Kaltenberger v. Ohio College of Podiatric Medicine,*
    162 F.3d 432 (6th Cir. 1998)...................................................................13

*Marbly v. Home Props. of N.Y.,*
    205 F. Supp. 2d 736 (E.D. Mich. 2002)................................................ 9, 15

*McPherson v. Michigan High School Athletic Association, Inc.,*
    119 F.3d 453 (6th Cir. 1997).............................................................. 14, 16

*Miles v. Apex Marine Corp.,*
    498 U.S. 19, 111 S. Ct. 317, L. Ed. 2d 275 (1990) .................................. 19

*Poynter v. Dreydahl,*
    359 F. Supp. 1137 (W.D. Mich. 1972)......................................................13

*Schanz v. Village Apartments,*
    998 F. Supp. 784 (E.D. Mich. 1998)................................................ 16, 17, 18

*Smith & Lee Assocs. v. City of Taylor,*
    102 F.3d 781 (6th Cir. 1996)............................................... 10, 16, 17

*Southeastern Community College v. Davis,*
    442 U.S. 397 (U.S. 1979) ................................................................ 10

*Stewart v Barnhart*
    2005 WL 3088543 (W.D. Ky. Nov. 14, 2005) .......................... 16

*Street v. J.C. Bradford & Co.,*
    886 F.2d 1472 (6th Cir. 1989) ............................................ 7

*Sutton v. Piper,*
    2009 U.S. App. LEXIS 17201 *3-*4 (July 30, 3009) ................ 17

*Wilson v. Glenwood Intermountain Properties, Inc.*
    98 F.3d 590 (10th Cir. 1996) .................................................... 18

*Zibbell v. Mich. Dep't of Human Servs.,*
    313 Fed. Appx. 843 (6th Cir. 2009) ........................................ 9, 16

## STATUTES

20 USC § 1001 ......................................................................................... 18

20 USC § 1094 (a) (17) ........................................................................ 10

20 USC § 1140f. ..................................................................................... 18

20 USC § 1140g ..................................................................................... 19

29 U.S.C. § 794 ....................................................................................... 1

42 U.S.C. § 12131 ............................................................................... 1,10

42 U.S.C. § 1301 ..................................................................................... 1

## INTRODUCTION

Plaintiff is a participant in Oakland University's OPTIONS program. The OPTIONS program is a program for individuals with cognitive disabilities. Administratively, Oakland University ("OU" or the "University") classifies OPTIONS participants as continuing-education students. Pursuant to OU's housing policy only those enrolled as students in degree-granting programs are eligible to live in on-campus housing; continuing-education students are not.

In October 2007, Plaintiff applied to live in OU's dorms. OU denied Plaintiff's application because Plaintiff was not enrolled as a student in a degree-granting program. Plaintiff claims that the University's failure to waive this eligibility requirement amounts to disability discrimination in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq.*, Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794 (a) and the Fair Housing Act (FHA), 42 U.S.C. § 1301, *et seq.* Plaintiff's discrimination claims have no merit. Just like the other 1,400 continuing-education students, and all other individuals not enrolled as students in degree-granting programs at OU, Plaintiff is not eligible to live in on-campus housing, because he is not enrolled as a student in a degree-granting program; his ineligibility has nothing to do with his disability.

There are no genuine issues of material fact in this case, and no legal grounds for granting Plaintiff relief. Summary judgment is warranted.

## STATEMENT OF FACTS

### I. Background of the OPTIONS Program

The OPTIONS program is designed to allow young adults with cognitive impairments to experience an academic setting after high school, meet interesting people, and improve their

social skills. (Ex. 1, Dep. of R. Wiggins, p. 23) Robert Wiggins, OU's Associate Dean of the School of Education and Human Services ("SEHS"), first proposed the OPTIONS program to the Dean of the SEHS in March 2007. In his proposal, Wiggins described on-campus housing as a possible element of the program. (Ex. 2, Proposal) However, Wiggins did not consult with the Housing Department to verify whether OPTIONS participants were eligible for on-campus housing. (Ex. 1 at p. 42) The Proposal was ultimately approved by the Dean without a housing component. (*Id.* at pp. 62-63)

OPTIONS is not an academic program, and, as with all continuing-education students, its participants do not earn credits applicable toward any degree. (Ex. 3, Dep. of J. Fialka, pp. 83-84) OU did not intend that OPTIONS participants become enrolled as students in degree-granting programs. (Ex. 1 at p. 10) This was clear by the Provost's August 2007 order. (Ex. 20)

## II.     The Academic Focus of On-Campus Housing at Oakland University

It is OU's policy to offer on-campus housing to those enrolled as students in degree-granting programs.  (Ex. 4, Dep. of L. Maten, pp. 48, 64-65)[1]  Oakland University has on-campus housing capacity for approximately 1,900 students; the University has approximately 18,000 enrolled students. (Ex. 5, IPEDS Report)

OU's housing eligibility policy is premised on the fact that on-campus housing at OU is an integral part of the University's academic program (Ex. 6, Dep. of M. Snyder, p. 9), and the focus of the Housing Department is to further that academic program:

> We like to believe that our entire focus as a department was geared towards creating an academic program for students.  So everything we did . . . we like to believe that we were enhancing or creating an academic program.  Whether that

---

[1] During the summer, the University permits certain external summer camp programs and hostel services limited access to certain dormitories. (Ex. 6)

was . . . even the dining program, it was an opportunity for those students to intermingle, talk, discuss academic work and those needs. So we felt our program and our efforts were geared towards creating an academic . . . program in a residential environment. . . . We had movie nights, we had . . . Friday night live where we had comedians that came in and talk to students. The RAs [Resident Advisors] again provided those programs, but again those were we felt opportunities for students to. . . engage and build relationships that could have led to someone agreeing, some student social engagement, the student may find a study partner. So all of those were social opportunities . . . they were underlying goals of those students actually focusing on their . . . academic pursuits and that was my vision for the department. (Ex. 4 at pp. 14-15)

As Vice President Snyder testified, ". . . housing is there to serve the interest of the University in moving students through the pipeline to get their degree." (Ex. 6 at p. 29)[2]

## III. Plaintiff Submitted a Contract for On-Campus Housing

In October 2007, Plaintiff applied to live in on-campus housing by submitting to the Department of University Housing a contract for Residence Hall Services. When the Housing Department receives housing contracts for processing, a staff member first verifies that the individual has completed the contract in full and paid the deposit. (Ex. 7, Affidavit of R. Fisher) After this step, the contract is forwarded to a second person in the Housing Department who confirms that the individual meets the eligibility requirements for housing, and once confirmed, mails out the housing assignment. (*Id.*) The Housing Department received Plaintiff's housing contract on or about October 30, 2007. Roxanne Fisher, the clerical employee in the Housing Department responsible for the first step in the process described above, verified that Plaintiff had completed the contract and submitted the deposit. (*Id.*)

---

[2] Other accoutrements of the University's programs are reserved for students pursuing degrees, including such services and programs as financial aid, student employment, Academic Skills Center, Student Technology Center and Peer Mentoring. (Ex. 19)

Plaintiff's father emailed Ms. Fisher on November 14, 2007, just two weeks after Plaintiff submitted the contract, and inquired whether there was anything else he needed to do so that Plaintiff would be available for January dormitory living. Ms. Fisher notified Mr. Feldman that they were "all set" and proceeded to provide the Department's boilerplate schedule for the making of housing assignments. (Ex. 8, Email from Feldman to Fisher) By telling Mr. Feldman that Plaintiff was "all set," Ms. Fisher only meant that the contract was completed and the deposit had been submitted. She did not intend her response to indicate that Plaintiff was qualified for on-campus housing. That is not her job, and she does not have the authority to make that representation or decision. (Ex. 7)

Lionel Maten was, at that time, OU's Director of University Housing. Soon after Plaintiff submitted his housing application, Mr. Maten learned that Plaintiff had informed others at the University that he had been approved to move into the dorms. Based on his previous contact with the OPTIONS program, specifically his attendance at meetings where he told OPTIONS participants, administrators and parents that the participants were not eligible for on-campus housing, it was Mr. Maten's understanding that said participants were not enrolled as students in degree-granting programs. (Ex. 4 at pp. 32-38) Mr. Maten then contacted Vice President Snyder to confirm that his previous understanding was correct. (*Id.* at p. 47) When Vice President Snyder confirmed that Plaintiff had not gone through the admissions process and qualified himself as a student enrolled in a degree-granting program, Mr. Maten immediately notified Plaintiff that his contract was being returned because he did not meet the eligibility requirements for student housing. (Ex. 4 at p. 48, Ex. 9, Letter from L. Maten to Plaintiff) Plaintiff then met with several University administrators and requested that the University waive

its policy of offering housing to only those enrolled as students in degree-granting programs, but the University opted not to waive its policy.

## IV.  Modifications to the Housing Contract

Mr. Maten became the Director of University Housing in October 2006.  After the customary settling-in period to become oriented with his new post, he began the process to revise the University's housing contracts in two principle ways.  First, the University had separate contracts for its student apartments and traditional residence hall facilities, and Mr. Maten wanted to combine those two contracts into a single contract for efficiency reasons.  (Ex. 4 at pp. 19-22)  Second, Mr. Maten believed that OU should amend the contract so that students had to maintain a higher academic standard to remain in on-campus housing.  As he explained:

> There was always a credit requirement to live in our residential facilities. However, that requirement was one students could initially start with, with what the university termed a full load for the undergraduate student, which was twelve hours, and they could actually reduce their number of hours all the way down to one hour and could continue to live in the residential facilities.  That student was not focused on their academic pursuit, making academic progress I felt towards a degree.  And our goal in continuing to grow the academic program in the residence halls was for students to . . . focus on academic pursuits.  (*Id.* at p. 22)

To accomplish this, Mr. Maten advocated a strict credit-hour requirement for housing eligibility.  In the Summer of 2007, Mr. Maten received approval from Vice President Snyder to include a strict credit-hour requirement in the housing contract forms that would become effective for the 2008-2009 academic year.  (Ex. 10, ¶9)  The revised version clarified the eligibility requirements to include very specific credit-hour and grade-point average requirements, among other eligibility criteria:

> To be eligible to reside in Residence Halls or Apartments, students must be: (a) formally admitted to the University as matriculated or conditionally admitted students in a degree program at the University and enrolled in a minimum of 8

credit hours during each fall or winter semester, and 4 credit hours for each spring or summer semester, in which they reside in Residence Halls or Apartments; (b) matriculated students in a degree program in another college or university that has an affiliation agreement with the University; or (c) participating in the University's hostel program or authorized summer camp programs. Students enrolled in continuing education classes or other non-degree programs are not formally admitted to the University. (Ex. 11, 2008-2009 Contract for Residence Hall Services)

As this Court is aware, the version of the housing contract submitted by Plaintiff stated that to be eligible for on-campus housing, an individual had to be "enrolled as a student." (Ex. 12, 2007-2008 Contract for Residence Hall Services) Plaintiff, ignoring the uncontroverted evidence that Mr. Maten had been seeking to include a strict credit-hour requirement so as to increase the academic focus of the residence halls, makes much ado about the timing of the modification of the contract language and argues it is evidence of pretext. However, the amendments to the housing contract had absolutely no effect on Plaintiff's eligibility to live in on-campus housing. Plaintiff did not qualify for housing under the 2007-2008 housing contract because he was not "enrolled as a student," as discussed in detail in Argument Section II *infra,* and he also did not qualify for housing under the 2008-2009 housing contract.

## V. Procedural History

On November 25, 2008 Plaintiff filed the initial Complaint in this matter. On December 15, 2008, Plaintiff filed a Motion for Preliminary Injunction and Expedited Consideration. On February 5, 2009, this Court denied Plaintiff's Motion.

On February 26, 2009, Plaintiff filed a Motion for Leave to File Amended Complaint. This Court granted in part and denied in part Plaintiff's Motion. On April 30, 2009, Plaintiff filed a Motion for Leave to File Second Amended Complaint. This Court granted Plaintiff's Motion and Plaintiff filed the Second Amended Complaint on June 19, 2009. The Second

Amended Complaint asserted the following causes of action: Violation of the FHA, Disparate Impact and Disparate Treatment; Violation of § 504, Disparate Treatment, Denial of Reasonable Accommodation and Disparate Impact; and Violation of the ADA, Title II, Disparate Treatment; For the reasons discussed in detail *infra*, all of these claims are ripe for summary judgment.

## STANDARD OF REVIEW

Summary judgment is warranted where there is an "absence of a genuine issue of material fact" as to an essential element of the respondent's case, and where the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478-1480 (6th Cir. 1989). To defeat summary judgment, the respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The respondent "must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment," *Dollar Corp. v. Zebedee (In re Dollar Corp.)*, 25 F.3d 1320, 1322 (6th Cir. 1994). Furthermore, "conclusory allegations do not create a genuine issue of material fact which precludes summary judgment." *Johari v. Big Easy Rests., Inc.*, 78 Fed. Appx. 546, 548 (6th Cir. 2003). Under these standards, summary judgment is warranted in this case.

## ARGUMENT

**I.     Plaintiff Disparate Impact Claim Fails Due to the Absence of Statistical Evidence.**

In Count I of the Second Amended Complaint, Plaintiff is asserting a claim of disparate impact discrimination under the FHA against Defendants Russi, Snyder and Maten in their official capacities. To prove discrimination under a disparate impact analysis, Plaintiff must use

7

statistical evidence to show that Oakland University's facially neutral policy of allowing only students enrolled in degree-granting programs access to on-campus housing has a significant adverse impact on disabled individuals. *Graoch Assocs. # 33, L.P. v. Louisville/Jefferson County Metro Human Rels. Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007); *Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003).

Summary judgment is warranted on Plaintiff's disparate impact claim under the FHA because Plaintiff has no statistical evidence to support his theory that the University's policy has a significant adverse impact on disabled individuals. In fact, the only disabled individuals whom Plaintiff can demonstrate may be denied on-campus housing by operation of the University's policy are the participants in the OPTIONS program—at no time numbering more than twelve individuals. This "statistic" certainly does not demonstrate that the University's policy had a significant impact on disabled individuals, especially considering that there are approximately 1,400 other continuing-education students who are also not eligible for housing under the University's policy. Granted, some of the other continuing-education students might also be disabled, but Plaintiff has no statistical evidence identifying the number of disabled continuing-education students denied housing as opposed to the number of non-disabled continuing education students denied housing. Without this statistical evidence, Plaintiff cannot prove his disparate impact claim.

Furthermore, Oakland University currently has 383 self-identified disabled students enrolled in degree-granting programs, and 76 of those students live in on-campus housing. (Ex. 13, Affidavit of L. Sisson) These statistics demonstrate that nearly 20% of Oakland University's disabled students live in on-campus housing. (*Id.*) In contrast, of the approximately 18,000

enrolled students in degree-granting programs at the University, only approximately 1,700--or about 9.4 %--live in on-campus housing. (Ex. 10, Maten Affidavit, ¶¶3, 4) In sum, a higher percentage of disabled students in degree-granting programs live in on-campus housing than non-disabled students in degree-granting programs. This statistic certainly does not support a finding that the University's housing policy has an adverse impact on disabled students.

Plaintiff simply cannot meet his burden of proving with statistical evidence that significantly more disabled students than non-disabled students are denied housing under the University's policy. Consequently, summary judgment is warranted.

## II.     Plaintiff's Claims in Counts II, III, V and VI Fail, because Plaintiff Is Not an Otherwise Qualified Individual with a Disability.

In Counts II, III and V, respectively, Plaintiff is asserting claims of disparate treatment disability discrimination under the FHA, Section 504 and Title II of the ADA. In Count VI he is asserting a claim of disparate impact discrimination under Section 504. Under each of these statutes, at a minimum, Plaintiff must prove that he is an "otherwise qualified" individual with a disability. *Marbly v. Home Props. of N.Y.*, 205 F. Supp. 2d 736, 740 (E.D. Mich. 2002) (setting forth the standard for disparate treatment claim under the FHA); *Jones v. City of Monroe,* 341 F.3d 474, 477 (6th Cir. 2003) (setting forth the standard for disparate treatment claim under the ADA); *Zibbell v. Mich. Dep't of Human Servs.*, 313 Fed. Appx. 843, 849 (6th Cir. 2009) (holding that ADA and Section 504 claims are subject to the same analysis); *Alexander v. Choate*, 469 U.S. 287, 300-302 (1985) (setting forth standard for disparate impact claim under Section 504).

The FHA, ADA and Section 504 employ the same basic definition for determining whether an individual is "qualified." A "qualified individual with a disability" is "an individual with a disability who, with or without <u>reasonable modifications to rules, policies, or practices</u> . . .

meets the <u>essential eligibility requirements</u> for receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131 (emphasis added); *Southeastern Community College v. Davis*, 442 U.S. 397, 406 (1979). A modification is only "reasonable" if it does not amount to a fundamental alteration in the nature of the program at issue. *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996). Plaintiff's claims under these statutes fail because: (1) the eligibility requirements to live in on-campus housing are necessary and essential to the University's academic and housing programs; and (2) the modification that Plaintiff is proposing to render him eligible to live on-campus is unreasonable, as it would fundamentally alter the academic nature of the housing program.

Plaintiff will likely maintain that the essential eligibility requirements at issue should be limited to those set forth on the housing contract he submitted and argue that he satisfies such requirements by virtue of being classified as a continuing-education student and participating in the OPTIONS program. Any such argument will fail.

In OU's Housing Department the term "enrolled student" means a student who is enrolled as a student in a degree-granting program. (Ex. 4 at p. 24) Vice President Snyder testified that "enrolled students" are those that are pursuing an academic degree. (Ex. 6 at p. 9)

The term "enrolled" is a term of art within the context of higher education. The University's various government-mandated reporting requirements are evidence of this fact. For example, all institutions of higher education which participate in any Federal financial assistance program authorized by Title IV of the Higher Education Act of 1965, as amended, are required to complete an IPEDS (Integrated Postsecondary Education Data System) report. 20 U.S.C. § 1094

(a)(17). That report requires the disclosure of certain enrollment data. (Ex. 5)[3] Per the National Center for Education Services' directive, students who are only engaged in non-credit bearing activities, as is Plaintiff, are not to be included in enrollment figures. (Ex. 14, 2009-2010 NCES Survey Materials) In other words, they are not considered "enrolled students."

Similarly, OU's financial aid office is subject to numerous federal reporting requirements, including filing an annual Fiscal Operations Report and Application to Participate (FISAP). (Ex. 15, 2008-2009 Sample FISAP Report) Similar to IPEDS requirement, in this process the University is directed to not report students as enrolled if they are exclusively engaged in non-credit bearing activity, such as auditing classes. (Ex. 16, 2010-2011 FISAP Instructions)

Consistent with IPEDS and FISAP reporting requirements, OU does not include any continuing-education students or OPTIONS participants as "enrolled" students in these reports. OU's classification of these individuals in this regard is consistent with OU's classification of them as non-enrolled students for purposes of on-campus housing eligibility.

## A.     The Eligibility Requirements are Necessary to the Housing Program.

Limiting on-campus housing to enrolled students in degree-granting programs is an essential and necessary requirement to the University's housing program. OU's housing program is an academic program, the focus of which is to move students forward to the achievement of their academic degree. (Ex. 6 at pp. 9, 29) The Housing Department has implemented special academic and social programs for on-campus housing with the purpose of

---

[3] Interestingly, the report also required disclosure of on-campus housing data, which is defined in IPEDS as "[a]ny residence halls owned or controlled by an institution within the same reasonably contiguous geographic area and used by the institution in direct support of or in a manner related to, the institution's education purposes." (Ex. 21) (Emphasis added)

supporting and encouraging students in their pursuit of an academic degree. (Ex. 4 at pp. 14-15)

In fact, the Housing Department has designated certain residence halls and even specific floors in

residence halls for students engaged in common academic pursuits, like pre-nursing, the honors'

college, business students, etc. One dorm is even reserved solely for freshmen. (Ex. 4 at pp. 8-

13) If non-degree-seeking students were permitted to live in the dorms, the academic focus of

the housing program would be jeopardized in several different ways, many of which have been

described by Mary Beth Snyder:

> Q: Would waiving this rule about being enrolled in the university as a matriculating student, waiving that housing condition for eligibility, would that change or alter the nature of the housing program?
>
> A: Yes it would. . . . You would have individuals living in housing who have a very different purpose for being there then for what housing is designed for. . . . Their purpose would be different because they would not be continuously enrolled in courses that are important to their degree aspirations. They would have very different needs for services. It would be hard to say for anybody that wasn't a student what their requirements would be. Right now we've designed the programs and services to keep students focused on achieving the academic degree.
>
> ***
>
> Q: What about the housing program, in terms of what it offers, would be changed by allowing a person from the OPTIONS program to live in housing on campus?
>
> A: The culture itself would change. You've got a culture with undergraduates who all have the same goals, and that is to move toward degree completion. Having individuals who aren't of a similar mind set, who don't have that goal, changes the nature of the program.
>
> ***
>
> Q: What undo administrative burden are they going to create?
>
> A: Just take an example, you have study floors, you've got quiet hours, you've got all kinds of rules that are designed to work well and keep students who have serious degree aspirations on task. And if you've got individuals, OPTIONS or otherwise, who are not [in] degree programs, student staff . . . would have to have multiple sets of rules and policies that would guide their interactions with these different segments of the residential population. (Ex. 6 at pp. 28-32)

Ms. Snyder also testified that the disciplinary nature of the housing program would be jeopardized because the University cannot use expulsion as leverage with a continuing-education student like it can with a student in a degree-granting program. (*Id.* at p. 34) And furthermore, allowing continuing-education students and/or OPTIONS participants to live in the dorms would change the basic nature of the housing program by taxing the already limited on-campus housing capacity. (*Id.* at p. 31)

The Sixth Circuit has pronounced that "when reviewing the substance of academic decisions, courts should show great respect for the faculty's professional judgment." *Kaltenberger v. Ohio College of Podiatric Medicine,* 162 F.3d 432 (6th Cir. 1998). That pronouncement applies with equal force to the University's decisions about standards both in the classroom and in on-campus housing. There should be no question that the University's eligibility requirements for on-campus housing are a necessary element of its overall academic program for students pursuing degrees.[4]

### B.  Plaintiff's Accommodation Request is Unreasonable.

Given that the eligibility requirements for on-campus housing are a necessary element of the University's housing and academic programs, Plaintiff can only prove that he is a qualified individual with a disability if there is some reasonable modification to those requirements that would render him eligible to live in the dorms. There is no such reasonable modification.

---

[4] University housing being integral to academic programs is not unique to OU. The Court in *Poynter v. Dreydahl,* 359 F. Supp. 1137, 1142 (W.D. Mich. 1972), stated that "[i]t is not altogether necessary for a court to have before it extensive affidavits in order to conclude . . . that there is more to learning than simply sitting in a classroom and that the living and learning centers, afforded by dormitory, eating, student life and other similar facilities are just as important as the classroom instruction itself."

Indeed, the only modification that Plaintiff has proposed is a complete waiver of the eligibility requirements, which is tantamount to bestowing upon him enrolled-student status. Such a modification to the eligibility requirements would not cause Plaintiff to be a qualified individual with a disability, since it is unreasonable as a matter of law.

This case is similar to *McPherson v. Michigan High School Athletic Association, Inc.*, 119 F.3d 453, 460-62 (6th Cir. 1997). In *McPherson*, the plaintiff sued the defendant after it refused to waive its policy that any student who had completed eight semesters of high school was ineligible to participate in interscholastic sports. The plaintiff had been diagnosed with a cognitive impairment; he claimed that because of this impairment, he was unable to complete high school in eight semesters. In his ninth semester in high school, the plaintiff sought a waiver of the eight-semester rule, but the defendant denied his request. The plaintiff sued under the ADA and Section 504, claiming that, by refusing to waive the eight-semester rule, the defendant failed to provide him with a reasonable accommodation to his disability.

The Sixth Circuit rejected the plaintiff's claim, finding that waiving the eight-semester rule would not be a reasonable modification, because it would alter the fundamental nature of the high-school athletic program; a waiver would inject into high-school athletic competition athletes who are older and more physically mature than the majority of other competing students. The Court also held that to allow waivers on a case-by-case basis would create an administrative burden on the defendant to sort out legitimate requests for waivers with requests calculated to gain a competitive advantage.

Plaintiff's requested accommodation is not a reasonable modification to the University's housing policy, as it would inject into OU's housing program individuals not engaged in

14

academic degree-seeking pursuits. And, since it is the only modification that would render Plaintiff eligible to live in the dorms, Plaintiff is not "qualified." Consequently, Counts II, III, V and VI of the Second Amended Complaint should be dismissed.

## III.    Plaintiff's Claims Fail because Plaintiff Has No Evidence of Pretext.

Even if Plaintiff could establish a prima facie case of disparate treatment discrimination, his claim should still fail because he has no evidence that the University's reason for denying him on-campus housing, namely that he is not enrolled as a student in a degree-granting program, is a pretext for disability discrimination. *Marbly v. Home Props. of N.Y.*, 205 F. Supp. 2d 736, 740 (E.D. Mich. 2002). As an initial matter, Plaintiff has no evidence that the University has ever allowed anyone other than those enrolled as students in degree-granting programs to live in on-campus housing. Moreover, one former OPTIONS participant who has since become enrolled as a student in a degree-granting program is now eligible to live in on-campus housing. (Ex. 10, ¶ 14) And finally, as discussed in Section I *supra*, there are currently 76 disabled individuals enrolled as students in degree-granting programs living in on-campus housing. All of these facts, which are undisputed, dispel any finding that the University's reason for not accepting Plaintiff's housing application was a pretext for disability discrimination.

Plaintiff will likely argue that the fact that the University revised the housing contract after he submitted his application for housing is evidence of pretext. However, Plaintiff's argument fails, because Plaintiff would not have been eligible for on-campus housing under the terms of either the contract he submitted or the revised contract. The amendments to the contract had absolutely no effect on Plaintiff's eligibility for housing; they merely clarified the housing

eligibility requirements. Plaintiff has no evidence to suggest otherwise. The amended contract is not evidence of pretext.

Plaintiff has no evidence to support an allegation that the real reason the University declined his housing application is because he is disabled. As a result, he cannot prove pretext, and his disparate treatment claims should fail.[5]

## IV.    Plaintiff's Requested Accommodation Is Unrelated to His Disability.

Plaintiff claims in Count IV that the University failed to provide a reasonable accommodation to his disability under Section 504 by not waiving its requirement that he be enrolled as a student in a degree-seeking program in order to be eligible for on-campus housing. An accommodation under Section 504 is reasonable "unless it requires a fundamental alteration in the nature of a program or imposes undue financial and administrative burdens." *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996) The accommodation that Plaintiff requests is not reasonable since, as discussed in Section II, *supra*, it would require a fundamental alteration in the nature of the University's housing program. *See McPherson, supra.*

Furthermore, the University is only obligated to provide Plaintiff with a reasonable accommodation if his disability is the bar to living in on-campus housing, as opposed to some other factor. *Schanz v. Village Apartments*, 998 F. Supp. 784, 791 (E.D. Mich. 1998) Here,

---

[5] Similarly, Plaintiff's disparate treatment claims under Section 504 and the ADA should fail because Plaintiff has no evidence that the University denied him on-campus housing *solely* because of his disability. In fact, Plaintiff has no evidence that his disability had *any* reason to do with the University's decision. *Zibbell v. Mich. Dep't of Human Servs.*, 313 Fed. Appx. 843, 849 (6th Cir. 2009); *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003); *Stewart v. Barnhart*, 2005 WL 3088543 (Nov. 14, 2005 W.D. KY) (the plaintiff's Section 504 and ADA claims failed because he had no evidence that he was denied student housing *solely* because of his disability; he was denied housing because he was no longer enrolled as a student) (Ex. 18).

Plaintiff's disability is not the bar to Plaintiff's living in on-campus housing; the bar is the fact that Plaintiff is not an enrolled student in a degree-granting program.

This case is similar to *Schanz v. Village Apartments*, 998 F. Supp. 784, 791 (E.D. Mich. 1998). In *Schanz* the plaintiff was mentally disabled and sought a waiver or modification of the landlord's minimum income and credit worthiness requirements. In holding that the requested accommodation (specifically, having a relative guaranty the rent) was unreasonable, the court stated:

> [P]laintiff has no need for the Village to accept the Guarantor Agreement to accommodate his handicap because his handicap is not preventing him from obtaining an apartment at The Village, and it is plaintiff's financial situation which he is requesting that defendants accommodate. The FHAA does not require that this be done. Also, while plaintiff argues that his financial situation is directly attributable to his handicap, such a contention is nothing more than an attempt by him to transform his "financial status" into a "handicap" in order to secure relief under the FHAA. This court cannot accept this argument because it clearly stretches the FHAA beyond its intended bounds. *Id.* at 792.

Similarly, in a recent FHA case where the plaintiff alleged that a private apartment complex discriminated against him because of his disability when it refused to waive its requirement that residents maintain a certain credit rating, the Sixth Circuit held that the FHA does not entitle disabled individuals to modifications that are unrelated to their disability:

> The FHAA requires accommodation of a person's disability when the rule in question, if left unmodified, hurts handicapped people by reason of their handicap, rather than by virtue of what they have in common with other people, such as a limited amount of money to spend on housing. . . . Stated a different way, the FHAA's accommodation requirement is limited only to lowering barriers to housing that are created by the disability itself. *Sutton v. Piper*, 2009 U.S. App. LEXIS 17201 *3-*4 (July 30, 3009) (citations omitted) (Ex. 17)[6]

---

[6] The Sixth Circuit has held that courts should apply the same line of reasoning in FHA reasonable accommodation cases as they do in Section 504 cases. *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996)

The holdings in both *Schanz* and *Sutton* support dismissal of Plaintiff's claims. Here, the accommodation that Plaintiff is requesting is a waiver of the University's requirement that, to live in the dorms, one must be enrolled as a student in a degree-granting program. However, waiving that requirement does nothing to accommodate Plaintiff's disability; waiving the requirement would only accommodate the fact that Plaintiff is not enrolled as a student in a degree-granting program. The accommodation that Plaintiff seeks would, because of his disability, grant him a preference or "privilege" over non-disabled continuing-education students, and just as in *Schanz*, transform his non-enrolled student status into a disability. Such a result is not favored or required. *Schanz* at 792, n.15.[7]

The accommodation that Plaintiff is requesting under Section 504 is not reasonable. It is unrelated to his disability and would fundamentally alter the nature of the University's housing program. This claim should be dismissed.

## V. Congress Implicitly Rejected the Idea that Cognitively-Impaired Students in Transition Programs Are Entitled to On-Campus Housing.

Congress amended the Higher Education Act (HEA), 20 USC § 1001, *et seq.,* on August 14, 2008 to include a subpart "to support model demonstration programs that promote the successful transition of students with intellectual disabilities into higher education." 20 USC § 1140f. The statute authorizes the award of federal grants "on a competitive basis, to institutions

---

[7] *See also* the court's *dicta* in *Wilson v. Glenwood Intermountain Properties, Inc.* 98 F.3d 590, 592 (10th Cir. 1996), where two non-students challenged the gender-segregated housing program of Brigham Young University: "The Fair Housing Act does not make it unlawful for landlords to give preference to college students over non-students." *Id. at* 594 The same can be said in this case---that the Fair Housing Act does not make it unlawful for OU to give preference to those enrolled as students in degree-granting programs over individuals not enrolled as students in degree-granting programs. It is their status as students who are not enrolled and in degree-granting programs that is the determining factor, not their membership in a protected class.

of higher education . . . to enable the institutions . . . to create or expand high quality, inclusive model comprehensive transition and postsecondary programs for students with intellectual disabilities." 20 USC § 1140g.

In awarding grants under the amended HEA, the Department of Education "give[s] preference to applications submitted . . . that agree to incorporate into the model comprehensive transition and postsecondary program for students with intellectual disabilities carried out under the grant <u>one or more</u> of the following elements:

> (A) The formation of a partnership with any relevant agency serving students with intellectual disabilities, such as a vocational rehabilitation agency.

> (B) In the case of an institution of higher education that provides institutionally owned or operated housing for students attending the institution, <u>the integration of students with intellectual disabilities into the housing</u> offered to nondisabled students.

> (C) The involvement of students attending the institution of higher education who are studying special education, general education, vocational rehabilitation, assistive technology, or related fields in the model program.

20 USC § 1140g (*emphasis added*).  On its face, the statute does not require an institution to integrate the participants in such model comprehensive transition and postsecondary programs into housing offered to regular students in order to qualify for federal grant money; housing integration is merely one element that a program could include to ensure that its grant application receives preference.

Congress is presumed to enact legislation with knowledge of the law, and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts.  *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990) ("We assume that Congress is aware of existing law when it passes legislation").  Consequently, when Congress

pronounced that integrated housing is an optional component of a transitional higher-education program for intellectually disabled students, as opposed to a mandatory component, the presumption is that this pronouncement is consistent with existing law, including the FHA, ADA, and Section 504. This presumption belies Plaintiff's argument that OU had a legal obligation in the OPTIONS program to provide Plaintiff with on-campus housing.

In short, if existing legislation obligated institutions that chose to implement such programs to treat participants in the exact same respect and grant them the exact same rights as regularly enrolled students in degree-granting programs, Congress would not have gone through the exercise of providing additional incentive for institutions to include a housing element in such programs by granting a preference to their grant applications.

## CONCLUSION

WHEREFORE, Defendants respectfully request that this Court dismiss Plaintiff's Complaint with prejudice and award Defendants their costs and fees incurred in defending this meritless lawsuit.

Respectfully submitted,

**BUTZEL LONG, a professional corporation**

By: /s/ Robert A. Boonin
    Robert A. Boonin (P38172)
    Regan K. Dahle (P53975)
350 South Main Street, Suite 300
Ann Arbor, Michigan  48104
(734) 995-3110
boonin@butzel.com
dahle@butzel.com
**Attorneys for Defendants**

Dated:  November 13, 2009

## Certificate of Service

I, Robert A. Boonin, hereby certify that on November 13, 2009, I electronically filed the foregoing document with the Clerk of the court using the ECF system, which will send notification of such filing to all counsel of record.

**BUTZEL LONG, a professional corporation**

By: /s/ Robert A. Boonin
Robert A. Boonin (P38172)
350 South Main Street, Suite 300
Ann Arbor, Michigan 48104
(734) 995-3110
boonin@butzel.com
**Attorneys for Defendants**