# EXHIBIT
## 4

Lionel Maten

### Page 5

1  Q. And are you on any medications that would impair your
2     ability to understand the questions, or answer the
3     questions I'm asking you today?
4  A. I am not.
5  Q. And where are you currently living?
6  A. San Antonio, Texas.
7  Q. And you're currently employed with?
8  A. The University of Texas at San Antonio.
9  Q. And how old are you?
10 A. Thirty-nine years old.
11 Q. Turn forty soon?
12 A. Friday.
13 Q. Happy birthday.
14    MR. BOONIN: Welcome to the club.
15 Q. (Continuing by Mr. Davis:) Did you use any documents to
16    refresh your memory in preparing for today's deposition?
17 A. Yes, the two affidavits that I completed. The depositions
18    of Mary Beth Snyder and Robert Wiggins, and the contract
19    from 2007, '08, 9, and 10 housing contract.
20 Q. Are there any other documents that you used?
21 A. No.
22 Q. What is your current employment with the University of
23    Texas at San Antonio?
24 A. Director of housing, housing and resident life.
25 Q. I'm going to turn your attention to your employment here at

### Page 6

1     Oakland University. When did you start working at Oakland
2     University?
3  A. I recall October 2006.
4  Q. And what was your title here at Oakland University?
5  A. Director of university housing.
6  Q. You oversaw the housing department, would that be correct?
7  A. Oversaw campus housing.
8  Q. Who else worked in the department, do you recall, and what
9     role did they, what jobs did they have?
10 A. Can you rephrase your question.
11 Q. Who else worked in the housing department with you and what
12    roles, what were their job titles?
13    MR. BOONIN: You're asking for everyone employed in
14    the housing department?
15 Q. (Continuing by Mr. Davis:) First of all, let me back up.
16    How many people were employed in the housing department?
17 A. I can't provide an exact number, but roughly forty to
18    fifty.
19 Q. Okay. Who were the people that were directly under you in
20    the housing department?
21 A. Do you mean directly under my supervision?
22 Q. Not every single person, but were there certain departments
23    within the housing department, and who were those heads of
24    those departments?
25 A. We had Rebecca Wickham who was the associate director for

### Page 7

1     housing. We had Deb Meadowbrook, she was the assistant
2     director for operations. David Tindall who was the
3     assistant director for resident life. Prior to him in the
4     same position was Christine, and I don't remember,
5     Christine Cleary. Adam Sternburg who was the systems
6     specialist. At this current time I think those were the
7     direct reports.
8  Q. The last one you mentioned was Adam Sternburg; is that
9     correct, yes?
10 A. Yes.
11 Q. And you say he was a systems specialist, what did he do in
12    that role as a systems specialist?
13 A. He managed our IT operation.
14 Q. The resident life person that was in charge of resident
15    life, there was two people, what did that job entail?
16 A. That particular person was responsible for taking care of
17    our educational components within our resident halls. They
18    were instrumental in creating a living and learning
19    communities. They, those individuals supervised or
20    supervised our hall director staff. There, this current
21    time that gives a good overview of that position.
22 Q. You said they handled the educational components of the
23    housing program, what did that entail?
24 A. That entailed multiple things. We actually had, in Hamlin
25    Hall, a first year student housing component where all of

### Page 8

1     our first year students resided in the same building. We
2     infused that with a lot of university counsels from the
3     academic skills center. We also infused, incorporated and
4     partnered with advisors to be available to offer students
5     assistance with advising to help them to continue to make
6     satisfactory progress towards their academic degrees. We,
7     the entire floor was, the entire building was geared
8     towards retention and keeping students focused and
9     providing resources and academic program to support them in
10    their achievement of an academic degree from the
11    university.
12 Q. Okay. Were any speakers brought in to speak to them on
13    different topics?
14 A. There were speakers that would have been brought in, the
15    university officials, yes.
16 Q. Can you tell me, if you recall, some examples of some
17    speakers and the topics they may have talked on?
18 A. I can't remember names, but there was Omar Brown-El was
19    brought in to talk to students, certain segments of the
20    population of students about their academic achievement,
21    how to get involved in the university, study habits and
22    those things. There were, as well there were other
23    university officials who were brought in, such as officials
24    out of the academic skills center to work with students and
25    meet with students, and present programs, and study skills,

2 (Pages 5 to 8)
Tri-County Court Reporters
248-608-9250

Electronically signed by Amanda Grosshans (501-183-703-0801)          9122ccc3-84b4-406a-a3d0-12922df42a06

### Page 9

1  those things. Sara Webb was brought in to do presentations
2  on study skills and those things as well.
3  Q. Were these presentations individual one on one, or were
4     there held in like a large meeting room somewhere?
5  A. They, it was a combination. There were some one on one,
6     and then there were some in the lounge areas, as well as in
7     our graduate staff hall directors team also presented
8     presentations to students on academic study skills and
9     those things as well. And those, they were held in
10    multiple, it could have been one on one and could have been
11    large groups.
12 Q. Were these advertised as well?
13 A. Yes.
14 Q. Was any records kept of the advertisements of these
15    speeches or presentations?
16 A. As of today, I can't confirm that.
17 Q. Now, that was in Hamlin Hall which was for first year
18    students, correct?
19 A. Yes.
20 Q. What other halls and what other activities occurred in
21    other halls?
22 A. What other halls, the other halls that we had were
23    Vandenberg Hall, Hamlin Hall, I said Hamlin. Hill House is
24    what we call it, Van Wagoner House, Fitzgerald, university
25    student apartments, and Matthew apartments.

### Page 10

1  Q. What educational activities were conducted in those halls?
2  A. In Vandenberg we had the scholars tower, which was geared
3     towards students in the honors program. We worked in
4     partnership with the honors college, the honors college
5     office was housed in Vandenberg on the first floor to serve
6     that purpose of working with those students. During my
7     tenure we added a pre-nursing floor. That floor was geared
8     towards working with students who were in pre-nursing to
9     provide them with academic regiment. We worked with the
10    advisor, one of the academic advisors in the, in the
11    nursing department. I can't recall her full name, and she
12    worked directly with our assistant director, residents
13    life.
14 Q. This is all in Vandenberg?
15 A. All in Vandenberg. We also have in Vandenberg leadership
16    pre-business. Again, this was a program geared towards
17    business students with the focus, that is a new program
18    this year and in the halls, but help business students
19    matriculate to their, to their college degree. After the
20    pre-nursing program we have a, I think it's called eco
21    interest floor, eco, E-C-0 interest in that floor, actual
22    rooms with the, to actually these are students who have an
23    interest in the environmental issues. And we work with
24    those students to help them to, to navigate in those causes
25    and things that they have. That program is split up

### Page 11

1  between Hamlin and Vandenberg currently. When I was here
2  under my leadership and the university was working towards
3  moving career services out of residence hall, eco interest
4  would have taken over that floor. And those at this
5  current time, those are the academic components.
6  Q. The eco would have taken over that floor?
7  A. And they would have taken over the, they would have taken
8     over the floor where our current career services operations
9     is.
10 Q. And that's where?
11 A. That's in Vandenberg, I don't know which tower.
12 Q. So you had these different students housed in Vandenberg
13    kind of grouped together towards their degree or programs
14    that they were seeking. What services did you offer, what
15    services did the housing department offer to them,
16    educational services did the housing department offer to
17    them?
18 A. We had study hours in which we advertised throughout the
19    buildings and encouraging students to study. We provided
20    programs to those students. In our partnership with the
21    academic departments, we actually had faculty members to
22    come over and actually eat in the cafeteria with students
23    which were in the pre-nursing program. We actually also
24    had, in Vandenberg, there's also a tutoring room in which
25    students can, could go down for tutoring. Those, the

### Page 12

1  actual tutors are managed through the academic skills
2  center. And so they provided those services as well as
3  computers and a computer lab in Hamlin Hall.
4  Q. And what types of services were offered in hill, I'm sorry,
5     let me rephrase that.
6        What type of educational services were offered in Hill
7     Hall by the housing department?
8  A. In Hill House, that building was programmed for upper class
9     students, and so as a result those students, just by
10    nature, it was a quiet living environment. The RAs, the
11    resident assistants, actually put on programs and different
12    things to, to accommodate those students. There have been
13    in those programs a range of anything from helping the
14    students know that you're starting to, you know,
15    matriculate through your degree and you're at the point
16    that you're starting to look at jobs. The programs in that
17    particular building was geared more towards preparing the
18    students for, for their careers upon graduation.
19 Q. Okay. And by upper class, these would be sophomore,
20    junior, senior level?
21 A. Correct.
22 Q. Undergraduate students. How about Van Wagoner, what
23    educational services were offered there?
24 A. Van Wagoner resembled that of Hill's program in similar
25    fashion.

Lionel Maten

Page 13

1  Q. Are those also upper classmen students?
2  A. Predominately.
3  Q. Okay. Fitzgerald, what educational services did housing
4     offer there?
5  A. Again, it was upper class and it was programmed as Hill as
6     well.
7  Q. Okay. And how about in the apartment building, I think you
8     mentioned two of them, were educational services offered by
9     the housing department to those that were in the apartment
10    buildings?
11        MR. BOONIN: What do you mean by educational
12    services?
13 Q. (Continuing by Mr. Davis:) Well, I'm asking you what
14    educational services did you offer to students in the
15    apartment buildings?
16 A. We provided the apartment buildings with computers, we had
17    programs designed, again, this was upper class students.
18    There was an age requirement for students to reside in that
19    facility, the age or academic standing, junior, it was
20    twenty years or junior is my recollection of that
21    requirement to live in that facility. Again, programs were
22    and educational resources were geared towards preparing
23    those students for life after achieving their degrees.
24 Q. Was any record kept of, or tracking made of what the level
25    of participation by students were in these educational

Page 14

1     programs?
2  A. At this moment I cannot recollect.
3  Q. What nonacademic needs did the housing department provide
4     to students living in the housing on campus, other than the
5     obvious of a place to live?
6  A. Can you clarify your question?
7  Q. I'm just looking at what other services that the housing
8     department provided to the students living on campus, other
9     than what we've talked about in terms of educational and
10    the obvious of providing a place to live, what other
11    nonacademic services did the housing department offer to
12    students?
13 A. We like to believe that our entire focus as a department
14    was geared towards creating an academic program for
15    students. So everything that we did we, you know, we like
16    to believe that we were enhancing or creating an academic
17    program. Whether that was, you know, even the dining
18    program, it was an opportunity for students to intermingle,
19    talk, discuss academic work and those needs. So we felt
20    our program and our efforts were geared towards creating an
21    academic, an academic program in a residential environment.
22 Q. Did you provide social, let me rephrase that.
23       Did you put on strictly social activities for students
24    in the housing programs?
25 A. Yes.

Page 15

1  Q. Can you give me an example of some of those social
2     activities that were provided?
3  A. We had movie nights, we had, we had Friday night live where
4     we had comedians that came in and talk to students. The
5     RAs again provided those programs, but again those were we
6     felt opportunities for students to, to engage and build
7     relationships that could have led to someone agreeing, some
8     student social engagement, the student would, may find a
9     study partner. So all of those were social opportunities,
10    I mean they were underlying, in my opinion, they were
11    underlying goals of those students actually focusing on
12    their, on their academic pursuits and that was my vision
13    for the department.
14 Q. Were there, I'm sorry, did you mention were there
15    university sponsored parties for the students at all?
16 A. I can, at this current time, I cannot recall a party being
17    sponsored.
18 Q. With the housing department, was there an internal
19    operations manual about the way the department was run?
20 A. At this current time, not to my recollection.
21 Q. Do you have an operations manual at the University of
22    Texas?
23 A. No.
24 Q. So you didn't create one while you were there at all?
25 A. At this current time I do not remember creating.

Page 16

1         MR. BOONIN: Is there a specific aspect of
2     operations you're referring to?
3  Q. (Continuing by Mr. Davis:) Any operations type manual at
4     all?
5  A. At this current time, I do not recall an operations manual.
6  Q. So let's say if a student, were there at the halls, were
7     there bulletin boards where students could post things?
8  A. Yes.
9  Q. Did that have to be approved by the university, or could a
10    student put up anything they wanted?
11 A. It had to be approved by a, a housing employee.
12 Q. How did the housing employee know how to go about reviewing
13    that, or knowing what was appropriate or not appropriate by
14    university standards?
15 A. At the current time, I can't recall.
16 Q. Were there any type of guidance to housing department
17    employees about how to put in purchase orders if something
18    needed to be purchased for the housing department?
19 A. Yes.
20 Q. And how would they know how to do that, where would they
21    consult to find out how to do that?
22 A. University purchasing, and actually what just came back to
23    my recollection is that posting would have been available
24    through the two handbooks. There was a housing handbook
25    and a university handbook. That would have had those

Electronically signed by Amanda Grosshans (501-183-703-0801)    9122ccc3-84b4-406a-a3d0-12922df42a06

Page 17

1 policies.
2 Q. Covered postings was in the handbooks?
3 A. To my, to my recollection, yes.
4 Q. And you said, just to clarify, the purchasing question
5   about how to go about purchasing things and putting in
6   purchase orders, that was covered where?
7 A. That actually, the overseer of that in the university
8   system would have been, you know, don't recall titles, but
9   it would have been through our business and purchasing
10   departments would have been the overseers of that. In our
11   operation the person, there's two individuals who have been
12   responsible for that, and that's the clerical technical
13   staff member and Deb Meadowbrook who I addressed earlier.
14 Q. There's no where like a new employee could come in and see
15   purchasing orders are to be directed to the assistant
16   director of operations?
17 A. In their meeting with whoever was there immediate direct
18   report, they would have been instructed in our orientation
19   process who to go to for those things.
20 Q. Okay. Did you undertake a rewrite of the student handbook
21   at all?
22 A. The student handbook is not under my administrative duties.
23 Q. Who handles that?
24 A. I'm aware that it comes out of the office that's occupied
25   by Dean Snyder, but who manages it and actually has the

Page 18

1   final say, I do not know.
2 Q. Just to clarify, we're talking about the housing student
3   handbook.
4 A. Okay.
5 Q. That still comes out of --
6 A. That is managed under my operation.
7 Q. That is managed under you?
8 A. Uh-huh.
9 Q. Did you undertake a rewriting of the student housing
10   handbook?
11 A. Yes.
12 Q. How frequently was that rewritten?
13 A. It wasn't, it wasn't necessarily rewritten, it was, it was
14   revised.
15 Q. How often was it revised?
16 A. Annually.
17 Q. Annually. Okay. So when you came in 2006, you didn't look
18   around and say, there needs to be a significant change in
19   policies and procedures and rewriting of the handbook, it
20   was just the normal yearly review, or did you see need for
21   major changes?
22 A. To the student handbook?
23 Q. To the student handbook and the policies and procedures in
24   the student handbook for housing?
25       MR. BOONIN: When he arrived?

Page 19

1 Q. (Continuing by Mr. Davis:) When he arrived.
2 A. No, I was learning the program.
3 Q. And after you got familiar with the program and became use
4   to it, what's going on in the program, did you see a need
5   then to conduct a revision of those policies and
6   procedures?
7 A. Yes.
8 Q. And when was that?
9 A. Discussions were had throughout my first year in my
10   administration. The initial, the initial action that I can
11   recall to memory was when I approached our general counsel,
12   informed him about redoing the housing contract and
13   actually trying to combine, we had two separate contracts
14   for university student apartments and for a, for our
15   traditional residence halls. And so as we, as we worked to
16   enhanced to continue to grow the academic programs within
17   the residence house, it was, it was my opinion and through
18   internet research what other schools were doing, that we
19   needed to really focus on having a set number of credit
20   hours for students living in the residence house, as well
21   as, initially I had conversation with Mary Beth about a GPA
22   requirement as well.
23 Q. What other changes needed to be made?
24 A. I cannot recall.
25 Q. Were there additional changes made?

Page 20

1 A. The process for rewriting the student, there were
2   additional changes being made, yes.
3 Q. Do you recall any major ones that needed to be done?
4       MR. BOONIN: To the handbook?
5 Q. (Continuing by Mr. Davis:) To the handbook, or to the
6   contract, since you've mentioned that application slash
7   contract.
8 A. Repeat your question.
9 Q. Do you recall any other major changes that were made,
10   either in the student housing handbook, or the application
11   contract, other than the one that you just mentioned about
12   credits?
13 A. I mean as we were combining university student apartments
14   contract and the traditional residence hall contract,
15   there were multiple changes being made. Can I recall those
16   sub headings, not without having the information.
17 Q. Why was there a need to combine the two contracts?
18 A. The two housing contracts?
19 Q. Yes.
20 A. Efficiency.
21 Q. And why was there a need to put a credit requirement in
22   there?
23 A. Credit requirements in the handbook?
24 Q. In the, either the handbook or in the housing contract?
25 A. Why was there a requirement?

Electronically signed by Amanda Grosshans (501-183-703-0801)    9122ccc3-84b4-406a-a3d0-12922df42a06

## Page 21

1 Q. Why was there a need to add that?
2 A. We were, we were continuing to grow the academic component
3     of the, of the residence halls. And my feeling, from my
4     expertise in working in this profession, it was critical
5     that students was focused on their academic, their academic
6     progress to remain in the residence halls. So one way to
7     do that is to have some criteria and standards that
8     students were responsible for and working towards.
9 Q. Okay.
10     (BREAK HAD AT 10:31 A.M. TO 10:33 A.M.)
11     (EXHIBIT NO. 1 MARKED)
12 Q. (Continuing by Mr. Davis:) I'm going to hand you what's
13     been marked as Exhibit No. 1. Take a moment to look at
14     that. Let me know when you've had a chance to review it.
15     MR. BOONIN: Copy for me?
16     MR. DAVIS: Actually I only made one extra copy.
17 A. Okay.
18 Q. (Continuing by Mr. Davis:) I want to direct your attention
19     to paragraph number nine there. And in that paragraph,
20     actually the second sentence, I, began discussing the
21     university's retention rates and how they were negatively
22     affected by the number of credit hours a student was
23     required to carry to be eligible to live in student
24     housing. What was that discussion about, and how did the
25     credits affect retention rates?

## Page 22

1 A. There was always a credit requirement to live in our
2     residential facilities. However, that requirement was one
3     students could initially start with, with what the
4     university termed a full load for the undergraduate
5     student, which was twelve hours, and they could actually
6     reduce their number of hours all the way down to one hour
7     and could continue to live in the residential facilities.
8     That student was not focused on their academic pursuit,
9     making academic progress I felt towards a degree. And our
10     goal in continuing to grow the academic program in the
11     residence halls was for students to, to focus on academic
12     pursuits. And so that's how that discussion started with,
13     at that time.
14 Q. Okay. So a decision was to increase the number of academic
15     hours that was required?
16 A. That was required to live in the residential facilities?
17 Q. Yes. Is that correct?
18 A. Yes.
19 Q. And it went from a minimum of at least one up to what's now
20     in the current contract application?
21 A. Uh-huh.
22 Q. Which is I think about eight; is that correct?
23 A. Eight. Are you talking, is your question eight?
24 Q. What's the current credit application requirements?
25 A. It's eight during the fall and winter semester, and four

## Page 23

1     during the summer term.
2 Q. So you increased them from one up to eight, and four for
3     the respective semesters?
4 A. Increased the number of credits?
5 Q. Increased the required number of credit hours that the
6     students had to carry to live in housing on campus, from
7     one up to eight or four, depending on the respective
8     semester?
9 A. Yes.
10 Q. How did that improve the retention rates?
11 A. There are, there's antidotal, maybe mispronouncing that
12     word wrong, data that supported, we saw increases in
13     student GPA's, and we saw our retention numbers from the
14     first to second year of students residing in the residence
15     halls increase as well.
16 Q. What did they increase from?
17 A. I do not have that data to memory.
18 Q. You say it's antidotal, so the data is not available, was
19     it collected?
20 A. The data, yes.
21 Q. Okay. But again, looking at that paragraph number nine.
22     It says, at the time if a person was a student enrolled in
23     a one credit course, they were eligible to live in student
24     housing. We ultimately decided to increase the minimum
25     credit hour required to be eight hours for the fall and

## Page 24

1     winter semester, and four credit hours for the then spring
2     and summer semesters, and to implement those changes for
3     the following fall 2008 semester, correct?
4 A. Correct.
5 Q. So when Micah applied in the fall of 2007, the actual
6     policy was that he had to be enrolled for at least one
7     credit hour at the university, correct?
8 A. Our policy states that students must be enrolled as a
9     student, matriculating student, working towards a degree.
10     And if that student was accepted, we perceived a student in
11     our operations having been admitted through admissions and
12     going through the admissions process from the university
13     and from a housing perspective, that is really how our
14     process operated.
15 Q. But that's not what you said in paragraph number nine of
16     your affidavit, is it?
17 A. We said that a person was a student enrolled, and again
18     enrollment to housing was a student who had gone through
19     the admissions process, and been admitted to the
20     university, and pursuing an academic, working towards the
21     pursuit of an academic degree.
22 Q. Did that language appear anywhere in the application that
23     was being used in the fall of 2007 to your recollection?
24     MR. BOONIN: Let the record reflect he doesn't have
25     the contract in front of him.

Electronically signed by Amanda Grosshans (501-183-703-0801)  9122ccc3-84b4-406a-a3d0-12922df42a06

## Page 29

1  A. The fall semester of each year that I was the director of
2     housing?
3  Q. Yes.
4  A. To my recollection, I can recall the last two years were
5     typically full during the fall. And during my term last,
6     over the three years of my two years seven months of my
7     administration, we did have waiting lists.
8  Q. We're talking the fall of 2007 and the fall of 2008 to be
9     specific?
10 A. The fall of 2007, at this point in time I would say yes.
11 Q. Then in the winter terms, were there wait lists?
12 A. In the winter terms, or in the winter of 2008.
13 Q. Well, let's go each one. In the winter of 2008 and the
14    winter of 2009?
15 A. There were not, no.
16 Q. So there were empty dorm rooms in the winter of 2007, I'm
17    sorry, 2008?
18 A. Winter 2008, in the winter of 2008, your question?
19 Q. Were there empty dorm rooms in the winter of 2008?
20 A. Due to attrition, yes.
21 Q. Were there empty dorm rooms in the winter of 2009?
22 A. Due to attrition, yes.
23 Q. How about in the winter of 2007, you came in the middle of
24    that school year, do you recall in the winter of 2007 if
25    there was waiting lists then?

## Page 30

1  A. Winter of 2007, the winter of 2007, yes.
2  Q. I want to turn now your attention to the OPTIONS Program.
3     Go off the record for a second.
4        (BREAK HAD AT 10:58 A.M. TO 11:00 A.M.)
5  Q. (Continuing by Mr. Davis:) Back on the record then. I
6     want to turn your attention now to the OPTIONS Program
7     itself. How did you first learn of the OPTIONS Program?
8  A. There were conversations with Dr. Wiggins.
9  Q. And do you know when that was approximately?
10 A. I cannot recall a date and time.
11 Q. Can you maybe break it down by year, or school year?
12 A. It would have been in the academic year of fall 2006,
13    winter 2007.
14 Q. So before the program actually started operating in the
15    fall of 2007, he first talked with you about it in the
16    winter of 2007?
17       MR. BOONIN: Sometime during that year he said.
18 Q. (Continuing by Mr. Davis:) You said winter of 2007?
19 A. I said sometime during that year.
20       MR. BOONIN: The 06/07 year.
21 Q. (Continuing by Mr. Davis:) Okay. During the, so during
22    the academic 06/07 year, you had some discussion with Dr.
23    Wiggins about the housing program, I'm sorry, about the
24    OPTIONS Program?
25 A. Sometime during the fall 2006, winter 2007.

## Page 31

1  Q. Okay. And what did he tell you about the OPTIONS Program?
2  A. He spoke with me about the, about his desire to have the
3     OPTIONS Program to have, to have a housing component with
4     the OPTIONS Program.
5  Q. Okay. And did you, what was your response to that?
6  A. I do not recall my direct response to Dr. Wiggins.
7  Q. Okay. Do you recall having to consult with anybody about
8     his ideas?
9  A. Yes.
10 Q. And who did you consult with?
11 A. Rebecca Wickham.
12 Q. And what were those concerns about her discussions?
13 A. It was simply to inform that I'd been approached by a
14    faculty member about having a program for having a housing
15    component for program called OPTIONS, and my inquiry was
16    what was, did she have any knowledge of the program.
17 Q. Of the OPTIONS Program?
18 A. The OPTIONS Program wanting a housing component.
19 Q. Now, in your conversations with Dr. Wiggins, did he explain
20    to you the nature of the OPTIONS Program at all?
21       MR. BOONIN: His first conversation?
22       MR. DAVIS: The first conversation, yeah.
23 A. I cannot recall to what level of detail. What I remember
24    is him talking about the housing component to the program.
25 Q. (Continuing by Mr. Davis:) Okay. Did he explain to you

## Page 32

1     the students that were in the OPTIONS Program, what the
2     general nature of the program was, and what the students,
3     who the students were that were in the OPTIONS Program?
4  A. At this current time, I cannot recall.
5  Q. So you talked with Rebecca Wickham, and I'm sorry, I forgot
6     what you said, she's the head, what was her position then?
7  A. Rebecca title is associate director for housing.
8  Q. Okay. And did she have any knowledge of the OPTIONS
9     Program?
10 A. Yes.
11 Q. So did she share that knowledge with you, or what did you
12    talk about when talking about this component for the
13    OPTIONS housing component for the OPTIONS Program?
14 A. Can you rephrase your question.
15 Q. What did the two of you discuss about the housing
16    components to the OPTIONS Program, was it feasibility, did
17    that come up as a discussion?
18 A. No.
19 Q. Was it not possible at all, is that discussed?
20 A. Yes.
21 Q. Why was it not possible?
22 A. The students, the participants in the OPTIONS Program were
23    not matriculating students. They were students who, from
24    what I recall from Rebecca in our discussion, who were just
25    auditing courses, and we did not provide housing to

Electronically signed by Amanda Grosshans (501-183-703-0801)    9122ccc3-84b4-406a-a3d0-12922df42a06

Page 33

1  students that just audited courses.
2  Q. How did Rebecca know about the program, do you recall her
3  telling you that?
4  A. She had a conversation with Dr. Wiggins.
5  Q. She had a conversation with Dr. Wiggins prior to you having
6  a conversation with Dr. Wiggins; is that correct?
7  A. That is correct, yes.
8  Q. So did you speak again with Dr. Wiggins regarding the
9  OPTIONS Program, did you speak again with Dr. Wiggins?
10 A. Yes.
11 Q. And did you, at that time, just inform him that after your
12 conversation with Rebecca that it's not possible to have a
13 housing component?
14 A. Yes.
15 Q. Did you discuss any possibilities of ways that it could be
16 made to work or was --
17 A. Ways the OPTIONS Program could make it work?
18 Q. Yes.
19 A. No.
20 Q. How about, was there any discussions at all about how there
21 could be a housing component added?
22     MR. BOONIN: Between him and Dr. Wiggins?
23 Q. (Continuing by Mr. Davis:) Yes.
24 A. Rephrase your question.
25 Q. Did you and Dr. Wiggins have any further discussions, after

Page 34

1  you told him initially, this isn't going to work, was there
2  any additional discussions about how this might be able to
3  made to work in the future?
4  A. Dr. Wiggins had his ideas, but my stance was no.
5  Q. And what ideas did Mr. Wiggins have?
6      MR. BOONIN: If you know.
7  A. Hum.
8      MR. BOONIN: If you know his ideas.
9  Q. (Continuing by Mr. Davis:) I'll ask him what he shared
10 with you.
11 A. I don't necessarily know if he shared ideas, other than,
12 you know, really motivating me, trying to motivate me to,
13 to waiver on the policy of the university. That was the
14 extent of those conversations.
15 Q. Do you recall when these conversations took place?
16 A. Again, some of those, as previously mentioned, sometime
17 during the fall 2006, winter 2007.
18 Q. Did discussions continue at all into the summer of 2007?
19 A. I cannot recall.
20 Q. Was the conversations with Dr. Wiggins, did you report that
21 to vice-president Snyder?
22 A. I do not recall.
23 Q. Did you ever have any conversations with vice-president
24 Snyder about the OPTIONS Program prior to the fall of 2007?
25 A. At this current time, I do not recall.

Page 35

1  Q. Do you recall having any conversations with doctor, or with
2  vice-president Snyder prior to Micah's application in
3  November of 2007?
4  A. At this current time, I do not recall.
5  Q. How many conversations did you have with Dr. Wiggins in
6  2006, 2007 academic year?
7      MR. BOONIN: You're not including the summer now?
8  Q. (Continuing by Mr. Davis:) I believe your earlier comments
9  was you didn't recall any conversations in the summer,
10 correct?
11 A. Uh-huh.
12 Q. So do you recall how many conversations you had in that
13 2006, 2007, fall and winter academic year?
14 A. I'm trying to think, I mean that's a while back. I'm
15 trying to play this stuff through my head. Okay. I cannot
16 provide a hard number of how many conversations.
17 Q. There were at least two?
18 A. Yes.
19 Q. At least the initial one and then the follow-up one,
20 correct?
21 A. Yes.
22 Q. You think there were more than that?
23     MR. BOONIN: These are one on one conversations?
24     MR. DAVIS: Any conversations.
25 A. Yes.

Page 36

1  Q. (Continuing by Mr. Davis:) Were there conversations
2  involving other persons, let me rephrase that question.
3      When you had these conversation with Dr. Wiggins, were
4  there other persons involved in the conversations as well?
5  A. Present at the conversations?
6  Q. That were present at the conversations, involved in the
7  conversations?
8  A. Yes.
9  Q. Who were those persons?
10 A. They were, the one that comes to mind for me was the, I'm
11 not for certain particulars correct title of the actual
12 forum, but I would label it as an assessment meeting, or an
13 evaluation meeting. Again, there may be a more
14 professional term used for that. In that particular
15 meeting that Dr. Wiggins asked me to attend, there were
16 Micah, his mother and father, Dr. Wiggins, maybe one or
17 more other professionals, and one or more students.
18 Q. Does the term person centered planning meeting, does that
19 recall?
20     MR. BOONIN: What was the first word?
21     MR. DAVIS: Person centered planning meeting.
22 Q. (Continuing by Mr. Davis:) Does that sound familiar at all
23 to you?
24 A. No.
25 Q. Did you speak at this, at this assessment meeting?

Electronically signed by Amanda Grosshans (501-183-703-0801)   9122ccc3-84b4-406a-a3d0-12922df42a06

### Page 37

1   A. Yes.
2   Q. What did you have to say?
3   A. I answered questions related to housing.
4   Q. And what, this assessment meeting, when did that take
5       place, do you recall?
6   A. I do not remember the exact date or time.
7   Q. Was it in the winter of 2007?
8   A. Again, I don't recall.
9   Q. Is it possible it was before the fall of 2007?
10  A. I don't recall the time and place.
11      MR. BOONIN: I believe he said, I thought this was
12     still within the academic year of 06/07 he was talking
13     about the conversations that he had during that period.
14     One of he said other people were present.
15  A. The question is, that you asked, this meeting that I was
16     invited to attend. And when that meeting occurred, I do
17     not know the time, remember the time or place.
18      MR. BOONIN: I just understood it to be one of the
19     two meetings or discussions that you had with Dr. Wiggins
20     but if it's not.
21  Q. (Continuing by Mr. Davis:) Do you recall what questions
22     you answered regarding housing at this assessment meeting?
23  A. Some.
24  Q. And what were those questions?
25  A. One was, and this is not verbatim.

### Page 38

1   Q. I understand.
2   A. One was, you know, what is the, the, could Micah reside in
3      the, in the residential facility. And my answer to that
4      was, you know, was that he needed to actually be a student
5      admitted to the university, and so that was one such
6      question. One was, could we get a tour of the facility
7      and, again, what is the opportunity for Micah to, to give
8      it a try and reside in the facilities.
9   Q. And in regard to that last question, what was your answer
10     to that, do you recall?
11  A. That if, we have a policy, we have actually, my response
12     was steamed around our current policy, our current guest
13     policy and overnight policy, and that is if someone was
14     willing to sign him in, we have a policy in place that he
15     could stay in the facilities.
16  Q. And in regard to giving him a tour of the facilities, did
17     you agree to do that?
18  A. A tour of the residential facilities?
19  Q. Yes.
20  A. Yes.
21  Q. And did that tour in fact take place?
22  A. Yes.
23  Q. Did you conduct the tour, or did you have somebody do that?
24  A. I cannot recall now, I tried to, but I can't recall if I
25     did.

### Page 39

1   Q. Were there any discussions about how the OPTIONS Program
2     might satisfy the enrolled student requirement?
3   A. Is there any discussion?
4      MR. BOONIN: During that meeting?
5   Q. (Continuing by Mr. Davis:) Yes. I'm still talking about
6     the assessment meeting.
7   A. Can you rephrase your question, please.
8   Q. Were there any discussions about how the OPTIONS Program
9     might be able to satisfy the housing requirements of being
10    an enrolled student?
11  A. Could be satisfied. I'm trying to remember the last part
12     of your question.
13  Q. Were there any discusses at this assessment meeting about
14     how the OPTIONS Program, if Micah was in the OPTIONS
15     Program, how that might satisfy the housing department's
16     requirement of being an enrolled student for housing?
17  A. Yes, if he was an enrolled student.
18  Q. Did you indicate that being in the OPTIONS Program would be
19     sufficient to satisfy the enrolled student requirement?
20  A. No.
21  Q. Okay. At that time was there any discussion about, I'm
22     talking again about this assessment meeting, the OPTIONS
23     Program having a certificate of completion?
24  A. Not to my, I do not recall at this current time.
25  Q. At this assessment meeting, you agreed to give a tour, but

### Page 40

1     why did you agree to give a tour if he wasn't going to be
2     eligible for the housing?
3   A. Our standard, why did I agree to give a tour. Our standard
4     process is to provide tours to anyone who seeks it, who
5     seeks them.
6   Q. You're saying you made it clear that he's not eligible?
7   A. I, yes.
8   Q. In addition to the assessment meeting, did you have any
9     other meetings with the family members, by family members
10    let's be specific, I'm talking about Rick Feldman, Micah
11    Fialka-Feldman, or Janis Fialka, that's his mother and
12    father and himself?
13  A. Yes.
14  Q. Were these meetings prior to or after that assessment
15     meeting?
16  A. To my knowledge, they were, they were after the assessment
17     meeting.
18  Q. How many meetings did you have?
19  A. Can you, can you define meetings?
20  Q. Well, let's just say, did you have any conversations with
21     the family members?
22      MR. BOONIN: Any other family members?
23      MR. DAVIS: Any of the family members.
24  A. Yes.
25  Q. (Continuing by Mr. Davis:) And who, which family members

Electronically signed by Amanda Grosshans (501-183-703-0801)      9122ccc3-84b4-406a-a3d0-12922df42a06

### Page 45

1  that has a stamp on it of November 1st that we've used
2  before. But in regards to this application, marked as
3  Exhibit 2, do you know how the, who accepted the
4  application at the housing department?
5  A. Define to me acceptance?
6  Q. Just took the application. I'm not talking about approving
7  the application, I'm just talking about physically taking
8  the application from him for review.
9  A. No.
10 Q. When did you first learn of the fact that Micah had
11 submitted an application?
12 A. I do not recall the date and time.
13 Q. Did it ever, did you ever learn that the housing department
14 staff were discussing with Micah a move-in date for a
15 dormitory room?
16 A. Define, can you just clarify your question?
17 Q. Did you ever learn that a housing staff member, any house
18 staff member, was discussing with Micah a move-in date for
19 a dormitory room on campus?
20 A. Again, I need to understand what the discussion is.
21 Q. When did you learn, did you ever learn of an e-mail from
22 Roxanne, who works in your housing department, correct?
23 A. Yes.
24 Q. Roxanne works in the housing department?
25 A. Uh-huh.

### Page 46

1  Q. Drawing on blank on Roxanne's last name at the moment.
2  A. Fisher.
3  Q. Ms. Fisher. Did you ever see an e-mail from her to Micah
4  discussing a move-in date for a dormitory room for Micah?
5     MR. BOONIN: Prior to the lawsuit or ever?
6     MR. DAVIS: Prior to the lawsuit.
7  A. Did I ever see the e-mail?
8  Q. (Continuing by Mr. Davis:) My question is isn't did you
9  see the e-mail, let me rephrase that.
10    Did you ever learn that someone was processing an
11 application, or did you ever learn of an e-mail from
12 Roxanne to Micah concerning housing, moving into the
13 housing dormitory room?
14 A. Micah moving into the dormitory room, yes.
15 Q. Do you recall when you learned of that?
16 A. I do not at this current time do I recall the date and
17 time.
18 Q. Was it prior to you sending out the rejection letter of
19 November the 29th, 2007?
20 A. Yes.
21 Q. And what did you do when you learned of that communication?
22 A. I, when I learned of the communication, what did I do. I
23 informed Rebecca Wickham to, to take that communication to
24 a committee that she sat on addressing students who were
25 matriculating students, who were on a program where we were

### Page 47

1  doing with students with Asperger's, and to get further
2  clarification as to if, if Micah in fact met the enrollment
3  requires of the university to reside in the residence.
4  Q. You asked for further clarification on Micah's enrollment
5  status?
6  A. On Micah's, on whether or not Micah had made satisfactory,
7  had gone through the satisfactory process of being accepted
8  as an enrolled student at the university.
9  Q. Did you discuss it with vice-president Snyder at all?
10 A. Did I discuss?
11 Q. Did you discuss the situation with vice-president Snyder at
12 all, I'm talking about while this application was pending,
13 before your rejection letter?
14 A. Yes.
15 Q. You recall when you had the discussions with vice-president
16 Snyder?
17 A. Date and actual time, I do not, I cannot recall.
18 Q. Do you recall what the nature of the conversation was?
19 A. It was, it was, had conversation was, yes.
20 Q. And what did the two of you discuss in this conversation?
21 A. Did Micah's application, or had, did Micah complete the
22 necessary requirements of the university to going through
23 the admissions process to qualify himself as a
24 matriculating student pursuing a college degree.
25 Q. At this time, did you understand that OPTIONS students were

### Page 48

1  not matriculating students?
2     MR. BOONIN: Prior to the meeting?
3  Q. (Continuing by Mr. Davis:) At the time you met with
4  doctor, or with vice-president Snyder, did you know that
5  the OPTIONS students were not matriculating students?
6  A. Yes.
7  Q. And it was a firm policy of the university, of the housing
8  department, that matriculating students, nonmatriculating
9  students were not eligible for housing, correct?
10 A. During the time I was employed, I embody those policies of
11 the institution, of the institution, yeah.
12 Q. So that was a firm policy of the university?
13 A. Yes.
14 Q. So why was there a need to have a conversation with
15 vice-president Snyder?
16 A. There was, because, because for the first time, I mean our
17 process for admission into housing was to when we got the
18 contract, was to go in and see of the student had a G
19 number, and, and Micah showed that he had a G number.
20 Q. So you now were questioning whether OPTIONS students were
21 matriculating students?
22 A. Yes.
23 Q. And how do you know Micah had a G number?
24 A. It was included on his contract.
25 Q. Was --

Page 61

1  A. Yes.
2  Q. Did his father, Rich, ever make that request to you?
3  A. I don't recall if it was him, or his wife, or both.
4  Q. Micah's request, did he make that prior to the filing of
5     this lawsuit?
6  A. I don't remember the time and the place when that was going
7     on, and I really don't recall when the lawsuit was filed.
8     And so Micah definitely was vocal that he wanted to live in
9     a residence house, but was that before the lawsuit. I will
10    be honest, I can't recollect exactly the time and place.
11 Q. If I told you the lawsuit was filed in November of 2008, a
12    year after the application had been submitted.
13 A. Uh-huh.
14 Q. Would you recall any, if Micah made his request any time
15    prior to November of 2008?
16 A. Yes.
17 Q. You said you weren't sure if it was Rich Feldman or Janis
18    Fialka, or if it was them together, do you recall the
19    parents making that request prior to November of 2008?
20 A. I can't, I can't, to my, to the best of my recollection I
21    can't remember the exact time and place.
22 Q. What granting, if you had granted his requested to waiver,
23    what problems would that have caused for you as director of
24    housing and administering the program?
25 A. I can't speculate as to what that process would be because

Page 62

1     the OPTIONS students did not qualify to live in the
2     residential facilities.
3  Q. You didn't make any inquiry into what that would look like,
4     or you just pretty much said, that's the policy, it's not
5     changing, I'm not making any further inquiry into it?
6  A. I think we discussed earlier as to how that process
7     occurred with Mary Beth and, you know, my question going to
8     Mary Beth, and that's the process that I followed and that
9     was the extent of the process.
10 Q. Did you ever talk with anybody from disability support
11    services in that department at all about this?
12 A. Yes.
13 Q. Who did you talk with here?
14 A. Linda Sisson.
15 Q. And what did you discuss with Linda?
16 A. That meeting, whether or not, whether or not Micah met the
17    enrollment, met the enrollment guidelines or policies and
18    procedures and process to be a matriculated student at the
19    university.
20 Q. But did you discuss at all waiving that policy with her as
21    an accommodation of a disability or anything of that
22    nature?
23 A. To the best of my knowledge at this current time I do not
24    remember.
25 Q. Did you ever discuss with any organization, outside of

Page 63

1     Oakland University, the possibility of on campus housing
2     for participants in the OPTIONS Program?
3  A. To the best of my knowledge, no.
4  Q. Did you discuss with any organizations about off campus
5     housing for participants in the OPTIONS Program?
6  A. No.
7  Q. What about the transitions program?
8  A. When you say outside organizations.
9  Q. Any organization outside of Oakland University, did you
10    discuss the possibility of off campus housing with them,
11    either for the OPTIONS Program or the transitions program?
12 A. To the best of my knowledge, no.
13 Q. I'm going to ask you to look at your deposition exhibit,
14    again, I believe it was marked as Exhibit 1. And in there
15    on paragraph fifteen it talks, give you a moment to look at
16    that. What I want to direct your attention to, it makes
17    mention of other colleges or universities that have an
18    affiliation agreement with the university. Are there any
19    such colleges or universities while you were the housing
20    director?
21 A. Other colleges or universities that have affiliation
22    agreements?
23 Q. For housing.
24 A. Agreements for housing?
25 Q. For housing students of those universities or colleges?

Page 64

1  A. For students attending academic programs, and of course as
2     students, those students would be housed in, or could be
3     housed in our residential facilities because they were
4     matriculating students.
5  Q. My question was, do you have any such agreements?
6  A. Do I have an agreement with another housing program?
7  Q. Does Oakland University, when you were the housing director
8     at Oakland University housing department --
9  A. Have an agreement?
10 Q. -- with any other college or university?
11 A. Oakland University housing department have an agreement
12    with another university housing program or just university
13    period?
14 Q. It was your affidavit. You're referring there to a degree
15    program at another college or university has an affiliation
16    agreement with the university, I'm assuming the university
17    means Oakland University, correct?
18 A. Yes, the university had an affiliation agreement.
19 Q. Oakland University?
20 A. To the best of my knowledge, yes.
21 Q. Who did they have affiliation agreements with?
22 A. I cannot recall all of those affiliation agreements.
23 Q. Did you ever --
24 A. The process.
25 Q. As you are the housing director, have you ever signed any

Electronically signed by Amanda Grosshans (501-183-703-0801)    9122ccc3-84b4-406a-a3d0-12922df42a06

### Page 65

```
 1      of those agreements?
 2   A. That would not have been under my jurisdiction.
 3   Q. Who would?
 4   A. I'm not for certain exactly who.
 5   Q. Do you recall how many other students from other colleges
 6      or universities were housed in the housing department?
 7   A. Yes.
 8   Q. How many?
 9   A. I'm not for certain of exact numbers, I can't give you an
10      actual number.
11   Q. In lets say your last year at the university 2007, 2008
12      2009.
13   A. Uh-huh.
14   Q. Academic year. Do you recall if there were more than ten,
15      less than ten?
16   A. The number will have to be verified. I think it was more
17      than ten, Cooley students.
18   Q. Cooley students, Cooley College of Law?
19   A. I'm not for certain the exact title, but yes, it was a law
20      program.
21   Q. Do you recall any other students from any other colleges or
22      universities being in the housing, being housed at Oakland
23      University?
24   A. To the best of my, to the best of my knowledge at this
25      current time I can't think of any other.
```

### Page 66

```
 1      MR. DAVIS: Why don't we take a little break and
 2      then I think we're going to wrap up.
 3      (BREAK HAD AT 12:18 P.M. TO 12:25 P.M.)
 4   Q. (Continuing by Mr. Davis:) We're back on the record. In
 5      your current employment at the University of Texas, are
 6      there any programs similar to the OPTIONS Program?
 7   A. None have been brought to my attention.
 8   Q. In the previous universities and colleges where you've
 9      worked, did they have any programs similar to the OPTIONS
10      Program?
11   A. I do not recall any at this time.
12   Q. When Micah brought up waiving the matriculating student
13      role, did you consider that an accommodation request at all
14      regarding his disability?
15   A. No.
16   Q. But you did talk with the disability support services
17      department, correct?
18   A. Linda Sisson in the department, yes.
19   Q. Did you discuss disability issues at all, or accommodations
20      at all?
21      MR. BOONIN: Regarding?
22   Q. (Continuing by Mr. Davis:) Regarding Micah.
23   A. To the best of my recollection, the discussion was centered
24      on whether or not Micah was a student and entitled to the
25      services of the institution.
```

### Page 67

```
 1      MR. DAVIS: I think that's all I have to ask.
 2      MR. BOONIN: I have nothing. Thank you very much.


 8      (WHEREUPON THE DEPOSITION CONCLUDED AT 12:27 P.M.)
```

### Page 68

```
          CERTIFICATE
STATE OF MICHIGAN}
              } ss:
COUNTY OF MACOMB }

     I, Amanda L. Grosshans, Certified Court Reporter,
Registered Professional Reporter, a notary public in and for the
aforesaid county and state, do hereby certify that the witness,
LIONEL MATEN, was duly sworn by me prior to the taking of
testimony as to the truth of the matters attested to and
contained therein, that the testimony of said witness was taken
by me in machine shorthand and was thereafter reduced to
typewritten form by me or under my direction and supervision,
that the foregoing transcript is a true and accurate record of
the testimony given to the best of my understanding and ability.
     I FURTHER CERTIFY that I am neither counsel for, related
to, nor employed by any of the parties to the action in which
this proceeding was taken; and, further, that I am not a
relative or employee of any attorney or counsel employed by the
parties hereto, nor financially interested, or otherwise, in the
outcome of this action; and that I have no contract with the
parties, attorneys, or persons with an interest in the action
that affects or has a substantial tendency to affect
impartiality, that requires me to relinquish control of an
original deposition transcription or copies of the transcript
attorney, or that requires me to provide any service not made
available to all parties to the action.

              Amanda L. Grosshans
              Amanda L. Grosshans, CSR 3853
              Notary Public

My commission expires: 9/20/2010
```