**Page 21**

1 Q. why was that necessary?
2 A. We wanted to make distinction that this was not a
3    vocational training program, that it was about academics.
4 Q. And the mobility requirement that you first mentioned, why
5    was that?
6 A. We would not have, we were not going to have enough staff
7    to assist students who needed constant attention from a
8    paraprofessional is the term that they use in the public
9    schools, or I don't know what term they use outside of the
10   public schools.
11 Q. What other requirements were necessary requirements?
12 A. I guess the first one was being successful in an inclusive
13   classroom was necessary.
14 Q. Okay.
15    MR. BOONIN: Your question about all of these or
16   about the two that he's talked about.
17 Q. (Continuing by Mr. Davis:) I'm asking if that list that's
18   there, what are requirements that absolutely had to be met?
19    MR. BOONIN: He's identified two so far.
20 Q. (Continuing by Mr. Davis:) He's identified two, and I
21   think did you just mention a third was my understanding.
22 A. The difficulty with the third one I mentioned is that there
23   is some range there.
24 Q. There is some range on that?
25 A. Uh-huh.

**Page 22**

1 Q. And, okay. Are there any other necessary requirements?
2 A. I guess at this time I would say no, the rest of them
3    weren't absolutely necessary.
4 Q. Just to be clear, there's one on here that says, has
5    completed high school either degree or certificate of
6    completion, was that a necessary requirement for the
7    OPTIONS Program?
8 A. That was something that we would, wanting to make an
9    absolute requirement, but we had made exceptions in one or
10   two cases.
11 Q. Was the plaintiff one person that you made an exception
12   for?
13 A. I believe he was.
14 Q. So the OPTIONS, let me back up. Who made the decision
15   about who to accept into the program?
16 A. It was a combination of myself and the two people who
17   worked for the OPTIONS Program who were involved with the
18   students.
19 Q. And when you made the exception on this requirement for the
20   plaintiff, you were aware that he did not have a high
21   school diploma?
22 A. We were.
23 Q. And to your knowledge, did he have a certificate of
24   completion?
25 A. Not to my knowledge.

**Page 23**

1 Q. What did you see as the purpose behind the OPTIONS Program?
2 A. It was to give students who wanted to continue to be around
3    other smart, well, let me rephrase that, because we've
4    already had that discussion about what constitutes a
5    student. I'm referring to a high school student here.
6    There are high school students who want to continue to be
7    around and involved in academic settings. There weren't
8    very many opportunities for them to do that in the public
9    school system the way it exists once they get older. This
10   was to allow these individuals to be participates in an
11   academic setting as they continue to get older.
12 Q. Was age appropriate --
13 A. Yes.
14 Q. -- fellow participants?
15 A. Uh-huh.
16 Q. That is yes or no?
17 A. I'm sorry, yes.
18 Q. For the court reporter. What benefits do you see for
19   participants in the OPTIONS Program?
20 A. I guess the biggest benefit is that they're more
21   interesting people.
22 Q. Any other benefits?
23 A. I guess their social interaction skills improve.
24 Q. Are they measurably improved?
25 A. Not any measure system we used.

**Page 24**

1 Q. But there were discussions about how they may have
2    individual plans developed that would measure that?
3 A. Most people use measure in a very quantitative sense, so
4    I'm not sure that's the correct word. Many of the things
5    that we might have thought about were more anecdotal in
6    nature.
7 Q. Can you give me an example?
8 A. We see the student talking with other students more
9    frequently, we see the student engaging in social
10   activities on campus.
11 Q. What benefits did you see the program providing to
12   participates in transition to their adult lives?
13 A. I'll go back to what I said, they're more interesting
14   people.
15 Q. Was there any vocational benefits that you saw to this, to
16   the OPTIONS Program?
17 A. We intentionally did not make the OPTIONS Program a
18   vocational program.
19 Q. Did the improvement in potential social skills improve
20   vocational aspects?
21 A. That was our hope.
22 Q. Was the program intended in any way to address any academic
23   needs of the participant?
24 A. It was not.
25 Q. When the program was originally designed, did you see the

| | |
|---|---|
| 1 courses? | 1 were? |
| 2 A. They do not. | 2 A. I mentioned Kathy Schmitt and Michelle, can't remember, I |
| 3 Q. They do not receive an official transcript for the course? | 3 don't know why I can't remember her last name. And |
| 4 A. That's correct. | 4 there were I think two parents involved, and someone from |
| 5 Q. Do you know if any of the students received grades from | 5 Community Living Services, and somebody, there may have |
| 6 professors maybe on individual papers that were not later | 6 been one or two others, I can't recall right now. |
| 7 put into an official transcript? | 7 Q. Did their involvement at all go beyond just the advisory |
| 8 A. I do not. | 8 board meetings, or were there tasks or duties that they |
| 9 Q. Just to clarify, you do not know? | 9 performed? |
| 10 A. I do not know. | 10 A. No, they just came to meetings. |
| 11 Q. In addition to paying this fee based on credit hours, do | 11 Q. Were you primary university liaison to this advisory board? |
| 12 they pay any other types of fees to attend the university? | 12 A. I was. |
| 13 A. Not that I recall. | 13 Q. Can you tell me how the program, the OPTIONS Program, came |
| 14 Q. Like some universities there might be a student center, or | 14 to be put into or was part of the continuing education |
| 15 student activity fees, do they pay anything similar to | 15 program of the university? |
| 16 that? | 16 A. How it came into being? |
| 17 A. They do not. | 17 Q. Let me rephrase the question, just clarify a little bit. |
| 18 Q. Do other Oakland University students pay such a fee? | 18 Why was it put into the continuing education department as |
| 19 A. They do not. | 19 opposed to maybe a different department? |
| 20 Q. There's no type of parking fee, student center activities, | 20 A. I don't know. |
| 21 athletic fees? | 21 Q. Do you know who made that decision? |
| 22 A. I'm not knowledgeable about every possible charge that | 22 A. Not with certainty. |
| 23 might go to any individual student. | 23 Q. Who informed you that that is where the program was going |
| 24 Q. I'm asking like generally registered students here at the | 24 to be? |
| 25 university. | 25 A. Katherine Rowley. |

| | |
|---|---|
| 1 A. I just don't know. | 1 Q. And what is Katherine Rowley's title? |
| 2 Q. Were you at all involved in the transitions program that | 2 A. She has changed positions. She at the time she worked for |
| 3 existed before the OPTIONS Program? | 3 the registers office. |
| 4 A. Yes, I was. | 4 Q. Do you know what her title with the registers office was? |
| 5 Q. What was your involvement? | 5 A. I don't exactly what it is or what it was. |
| 6 A. I agreed to arrange to rent space to two different school | 6 Q. What does she do now? |
| 7 districts to use the space on campus. | 7 A. She now works for the graduate office. |
| 8 Q. And what were those school districts? | 8 Q. Were there other departments or areas that this was |
| 9 A. Rochester and Waterford. | 9 considered to house the OPTIONS Program? |
| 10 Q. When you say rent space, were these classrooms, or what | 10 A. Not that I know of. |
| 11 were they? | 11 Q. Were you involved in those discussions at all? |
| 12 A. No, it was basically office space. | 12 A. If there were discussions about a possibility of other |
| 13 Q. Office space? | 13 areas, I was not involved in those. |
| 14 A. Uh-huh. | 14 Q. Do you know who may have been involved in those |
| 15 Q. Did those students sit in on college courses here at the | 15 discussions? |
| 16 university? | 16 A. I do not. |
| 17 A. They did. | 17 Q. Who informed you that you had gotten approval to begin |
| 18 Q. Just to be clear, I believe the plaintiff in this case was | 18 operations of the OPTIONS Program? |
| 19 originally in a transitions program and then switched over | 19 A. I believe it was Mary Otto. |
| 20 to the OPTIONS Program; is that correct? | 20 Q. As originally proposed, in your proposal that you submitted |
| 21 A. That is correct. | 21 to Mary Otto, it had housing as a component to the program? |
| 22 Q. There was an advisory board developed in the creation of | 22 A. No, it did not. |
| 23 the program; is that correct? | 23 Q. It did not have? |
| 24 A. That's correct. | 24 A. It did not. |
| 25 Q. Can you tell me who the participants of that advisory board | 25 Q. Was it your recommendation that housing be part of it? |

## Page 37

1 A. It was not.
2 (EXHIBIT NO. 2 MARKED)
3 Q. (Continuing by Mr. Davis:) I'm going to hand you what's
4 been marked as Exhibit No. 2. Can you please identify what
5 that is?
6 A. That was the proposal I sent to Mary Otto concerning the
7 OPTIONS Program.
8 Q. What's the date on that?
9 A. Date on that is March 19, 2007.
10 Q. Ask you to flip to page three of that document.
11 A. Uh-huh.
12 Q. And if you could read the paragraph at the top there that
13 begins with the word forth.
14 A. Forth, most college campuses have multiple levels of
15 residential housing available that would enable a student
16 to learn to be successful in progressively more independent
17 living situations. The student can start with a dorm room
18 that includes a peer buddy as a room mate with all meals
19 provided in the cafeteria. On the campus where this
20 program would be piloted, on-campus apartments shared by
21 two to four students are available where the student could
22 learn to take responsibility for some shopping, cooking,
23 and cleaning. Ultimately, if appropriate, a student could
24 choose to live alone and take full responsibility.
25 Q. That was included in your proposal?

## Page 38

1 A. It was.
2 Q. But you're saying that that does not suggest that housing
3 should have been included in the program?
4 A. The proposal did not say we needed housing in order to have
5 this program.
6 Q. Would you say that that paragraph certainly pointed out the
7 benefits of housing to such a program?
8 A. That paragraph points out the benefits of housing to any
9 student.
10 Q. Direct your attention now, this is still Exhibit No. 2, and
11 we're going to look at page number one. Talks about three
12 overarching components to the program. Forth paragraph,
13 could you read those three overarching.
14 A. There are three overarching components to the program:
15 Provide enhanced educational opportunities, do this in a
16 setting that strengthens social and community living skills
17 and, provide vocational opportunities in a supportive
18 setting that promotes increasing levels of independence and
19 responsibility on the part of the student. As such, the
20 program addresses the three goals of successful transition
21 from school to work and independent living through
22 collaboration with K-12 educators, university faculty, and
23 community service agencies.
24 Q. Would provision of housing a student in the OPTIONS Program
25 strength social and community living skills for those

## Page 39

1 participants in the OPTIONS Program?
2 A. I can't say, I'm not a housing person.
3 Q. But you were the one who made the proposal for the creation
4 of the OPTIONS Program?
5 A. I was.
6 Q. And did you see housing as a possible benefit in
7 strengthening the social and community living skills of the
8 individuals who were participating in the program?
9 A. I was certainly willing to consider that.
10 Q. In fact, you considered to the point that you mentioned it
11 in the proposal to Mary Otto, correct?
12 A. This is correct.
13 Q. Since putting the program together and making this
14 proposal, are you aware of any other similar programs at
15 any other colleges or universities that have housing as a
16 component?
17 A. Not that I'm aware of.
18 Q. You make any attempt to look at any other programs, similar
19 programs?
20 A. I have not.
21 Q. Why have you not?
22 A. It wasn't something that I was considering.
23 Q. This paragraph that you read a moment ago, the number one,
24 again the word is overarching components to the program,
25 was to provide enhanced educational opportunities, correct?

## Page 40

1 A. That is correct.
2 Q. So there was an educational aspect to the program?
3 A. Yes.
4 Q. An academic aspect of the program?
5 A. That's correct.
6 Q. I'm going back to Exhibit No. 2 and the first paragraph I
7 had you read.
8 A. Uh-huh.
9 Q. And there's a sentence in there, that on-campus housing
10 where this program would be piloted, on-campus apartments
11 shared by two or four students are available where the
12 student could learn to take responsibility for some
13 shopping, cooking, and cleaning. Are you referring to a
14 program at another university or the OPTIONS Program that
15 you are proposing at Oakland University?
16 A. I'm not sure I understand that question.
17 Q. Were you referring to, let me give this to you. That
18 sentence I read, you're referring to the program?
19 A. Right.
20 Q. Is this a, are you discussing a program at a different
21 university or college, or are you referring to the OPTIONS
22 Program having this housing as a component?
23 A. It doesn't say the OPTIONS Program should have housing as a
24 component.
25 Q. It says the program, this program.

**Page 41**

1 A. Well, it says most colleges have multiple levels of
2 residential housing available, and that we happen to have
3 campus apartments where if there was a possibility, that
4 would be someplace where students could learn some things.
5 It doesn't say that the program relies on housing as a
6 necessary component.
7 Q. I didn't ask if it was a necessary component. Was it
8 considered as a component of the OPTIONS Program?
9 A. It was considered.
10 Q. And so you're talking about the program in that sentence
11 that I read, you're referring to the OPTIONS Program
12 correct?
13 A. That's correct.
14 Q. You're not referring to a program at some other university?
15 A. That's correct.
16     MR. DAVIS: Can we take a quick break for a second.
17     (BREAK HAD AT 10:07 A.M. TO 10:15 A.M.)
18 Q. (Continuing by Mr. Davis:) Back on record. These meetings
19 helped formulate and develop the OPTIONS Program, was
20 housing discussed as a component at those meetings?
21 A. Not that I recall.
22 Q. Was there any advertising promoting the program done?
23 A. Aside from the brochure?
24 Q. Aside from the brochure.
25 A. No.

**Page 42**

1 Q. Anything sent out to different communities, particular
2 school districts at all?
3 A. Only the brochure.
4 Q. Was there any public meetings held regarding the creation
5 of the OPTIONS Program?
6     MR. BOONIN: What do you mean?
7 Q. (Continuing by Mr. Davis:) By public meeting, let me
8 clarify that. Were there any public meetings, and by that
9 I mean where comments were suggested from the public, or
10 public notice was given, public comments?
11 A. No.
12 Q. In creation of the OPTIONS Program, were professors asked
13 their opinions about the program and suggestions about the
14 program?
15 A. Not that I recall.
16 Q. Was the housing department ever brought in to discuss the
17 OPTIONS Program what participants may or may not be able to
18 have access to in housing?
19     MR. BOONIN: At what stage?
20 Q. (Continuing by Mr. Davis:) We're talking about during
21 these opening meetings where they're just formulating the
22 program.
23 A. No.
24     (EXHIBIT NO. 3 MARKED)
25 Q. (Continuing by Mr. Davis:) Take a moment to review No. 3,

**Page 43**

1 what's been marked as Exhibit 3. Had a chance to look at
2 it?
3 A. Uh-huh.
4 Q. Please identify what that is?
5 A. That was a letter that I sent to faculty on campus to let
6 them know the students, the participants in the OPTIONS
7 Program were on campus.
8 Q. This did not go outside of the university to your
9 knowledge?
10 A. No, it did not.
11 Q. To your knowledge it did not?
12 A. It was not intended to.
13 Q. But that was an author, that letter was authored by you?
14 A. Yes, it was.
15 Q. And it was dated August 28, 2007?
16 A. That's correct.
17     MR. BOONIN: 28th did you say?
18     MR. DAVIS: Yes, correct, 28th.
19 Q. (Continuing by Mr. Davis:) Was it sent out at that time,
20 or was it, wait around a little bit before it went out?
21 A. I don't recall.
22 Q. All right. Were there any other aspects of the program,
23 the OPTIONS Program when it was being created, that were
24 considered and has since been dropped?
25     MR. BOONIN: Do you mean dropped or not yet

**Page 44**

1 implemented?
2 Q. (Continuing by Mr. Davis:) Let me rephrase it. Are there
3 any other aspects of the OPTIONS Program in those meetings
4 that were creating the program, that were discussed and
5 either not implemented, or are still not yet implemented?
6 A. I guess I want some clarification as to what you mean by
7 the program.
8 Q. The OPTIONS Program.
9 A. Right, right.
10 Q. And one thing that was discussed earlier you said was that
11 there would be a core requirement, and the other thing you
12 said earlier that was discussed was that there might be a
13 certificate of completion. Were there any other aspects of
14 the program that were discussed that have not yet either
15 been implemented yet, or the decision has been made not to
16 implement?
17 A. Of the program as it was approved, I would have to say no.
18 Q. How about in the stage where it was being considered and
19 the discussions in those advisory board meetings?
20 A. One thing that we thought about was whether there was a
21 possibility for student employment on campus.
22 Q. And that has not been implemented?
23 A. It can't be implemented.
24 Q. And why can it not?
25 A. Federal law requires that student workers be degree seeking