**Page 5**

1     correct?
2 A. Yes, I am.
3 Q. What position title do you hold?
4 A. Vice-president for student affairs and enrollment
5     management.
6 Q. How long have you worked in that position?
7 A. Fifteen years.
8 Q. And can you describe your duties?
9 A. I am responsible for the management of all the non, I'm
10    responsible for all of the student life aspects of the
11    university. The health and welfare programs, and the
12    student activities areas, and also the admissions areas
13    which are part of the enrollment management side of the
14    institution.
15 Q. Pursuant to the notice and subpoena that you were given,
16    you brought your Curriculum Vitae with you today which
17    you've given to me. It mentions also among your duties
18    management over the student center, correct?
19 A. Correct.
20 Q. Campus food service, correct?
21 A. Correct.
22 Q. Recreation center?
23 A. Correct.
24 Q. Career services?
25 A. Correct.

**Page 6**

1 Q. I'm not going to list all of these, but a couple that are
2    there, health center?
3 A. Correct.
4 Q. And actually I'm not seeing housing, but is housing
5    included?
6 A. University housing is included.
7 Q. Is it including, maybe I'm missing it. It is included?
8 A. It's the third point, admissions, financial aid, student
9    housing.
10 Q. Okay. What are your degrees, what degrees have you
11    received, is there any specialty that they're in?
12 A. The undergraduate degree is in English, the master's is in
13    student personnel work and higher education, and the Ph.D.
14    was in higher education.
15 Q. Do any of your degrees have any specialty or certification
16    regarding special education?
17 A. No, they do not.
18 Q. Do you have any expertise in or training in post-secondary
19    education opportunities for persons with disabilities?
20 A. Nothing special.
21 Q. Any, what experience do you have on that topic?
22 A. I have overseen the programs that work with enrolled
23    students who are disabled at both my former place of
24    employment, Iowa State University, and I oversee that
25    office that works with enrolled students who are disabled

**Page 7**

1     at Oakland.
2 Q. That office is?
3 A. Office of disability support services.
4 Q. You oversee that part?
5 A. Yes, I do.
6 Q. As overseeing that department as being part of your
7    responsibilities, do you actually make decisions on
8    reasonable accommodation requests?
9 A. No, I do not.
10 Q. And who would usually be involved in making those
11    decisions?
12 A. The director of that program.
13 Q. Who is the current director of that program?
14 A. Linda Sisson.
15 Q. How long has Linda Sisson held that position?
16 A. I don't recall the exact time frame.
17 Q. Is it been since 2000, has it been since November of
18    2007 --
19 A. Yes.
20 Q. -- to the present.
21 A. It has.
22 Q. Do you ever have the opportunity or responsibility to
23    review any of her decisions?
24 A. I have, I can't recall a single decision that I've
25    reviewed.

**Page 8**

1     MR. BOONIN: On accommodations you're talking
2    about?
3 Q. (Continuing by Mr. Davis:) I'm talking about
4    accommodations, yes.
5 A. I have consulted with her once or twice on accommodations.
6    Or I've, let me clarify that, I've consulted, she reports
7    to someone who reports to me.
8 Q. And who is this person that is in between?
9 A. Nancy Schmitz.
10 Q. And what is her title?
11 A. Assistant vice-president for student affairs.
12 Q. And does, is Nancy Schmitz you said?
13 A. Yes, S-C-H-M-I-T-Z.
14 Q. And to your knowledge, does Nancy Schmitz review in Ms.
15    Sisson's decisions at all?
16 A. I am not aware of any particular example.
17     MR. BOONIN: On accommodations?
18 Q. (Continuing by Mr. Davis:) On accommodations.
19 A. Uh-huh.
20 Q. Have you taken any courses or sessions on reasonable
21    accommodations with persons with disabilities?
22 A. This has been discussed in professional organizations at
23    various points in my past. Not within the past eight to
24    ten years.
25 Q. Are there any academic programs that report to you?

Dockets.Justia.com

**Page 21**

1  MR. BOONIN: Did you say September?
2  Q. (Continuing by Mr. Davis:) September of 2007.
3  A. That doesn't --
4  Q. I'm sorry, let me, September 2008.
5  A. That is correct.
6  Q. But prior to that, you met with the family and sent a
7     letter in May of 2008, informing them that you had reviewed
8     the decision and it was standing?
9  A. In August of 2008.
10 Q. So you reviewed this matter?
11 A. Yes, I did.
12 Q. In your reviewing of this matter, did the fact that the
13    application that the plaintiff signed did not mention
14    matriculating, or the number of credit hours, did that
15    factor at all into your decision?
16 A. No.
17 Q. Why not?
18 A. Because he wasn't a student, an enrolled, a matriculated
19    and enrolled student at the university.
20 Q. Did you feel that this document in any way gave him notice
21    of what a student, the university considered to be a
22    student?
23 A. The original application document?
24 Q. The plaintiff signed as his application, yes.
25 A. I believe that the, I don't know whether it gave him

**Page 22**

1     adequate knowledge. I don't know.
2  Q. Would that have played any role in your decision in
3     reviewing this?
4  A. No, it would not.
5  Q. Why not?
6  A. I and others had established, I and Lionel, Mr. Maten had
7     established the fact that he was not an enrolled student at
8     the university.
9  Q. You said earlier that Lionel, when he came in as new
10    housing director, had started conducting review of
11    documents at the university to make sure everything was
12    consistent, correct?
13 A. Correct.
14 Q. Did you ever consider the possibility of approving Micah's
15    application because it was unclear?
16 A. Because the application was unclear?
17 Q. Yes.
18 A. No, I did not.
19 Q. Did you ever consider that the university would make the
20    application more explicit from that day forward, enforce
21    the policy strictly, but would allow Micah in?
22 A. I did not.
23 Q. Why not?
24 A. We, and most colleges and universities that have
25    residential facilities, require individuals who live there

**Page 23**

1     to be part of the academic program of the institution,
2     which involves there having been formally admitted and in a
3     degree program of some kind. So the community has a common
4     focus, and I didn't see that the individual, the plaintiff,
5     had the academic prerequisites and requirements to live in
6     the halls under the industry standard that we operate
7     residential facilities.
8  Q. Did his ability or inability to read and write play any
9     role in your decision making?
10 A. It was a subject of conversation after, when the
11    application was submitted. As I was trying and others,
12    Lionel in particular, were trying to determine whether or
13    not this individual and others in the program were enrolled
14    students. I did ask some individuals whether or not this
15    was a person who could read or write, and I was told no.
16 Q. Why did you consider that an important factor?
17 A. I considered it an important factor in trying to ascertain
18    whether or not the individual had submitted an application
19    for admission, and whether they had been enrolled in
20    classes on a continuing basis as a basic standard of
21    whether or not you are an enrolled student.
22 Q. Was it considered as a factor in whether they could
23    understand the rules and responsibilities of living in a
24    residential setting on campus?
25 A. That wasn't the primary reason the question was asked. The

**Page 24**

1     question was asked trying to, knowing that the individual
2     had a student ID number, trying to ascertain whether or not
3     the student had been formally admitted to the university
4     and progressing in courses according to the standards that
5     are courses required in a degree program. I felt that that
6     would give me some enlightenment whether or not the
7     individual was a matriculated student.
8  Q. You said there were conversations, who were the
9     conversations with?
10 A. The conversations were with Linda Sisson, the director of
11    disability support services, who had occasion to talk with
12    Micah, maybe the family. That would be one example. I
13    asked Mr. and Mrs. Feldman at some point whether Micah
14    could read or write. And I asked Micah, I did not know at
15    the time whether he could or not. Subsequent to all of
16    this, as they were appealing, I asked Micah to give me his
17    name and address on a piece of paper, I asked him for that,
18    and he wasn't able to produce it.
19 Q. Students that are living on campus housing, do they have to
20    sign an agreement that they will be bound by the rules of
21    living in the dorms?
22 A. They sign that they will live by the rules of the residence
23    housing, that they understand and will live according to
24    the rules.
25 Q. And are those rules posted or given to them in some manner?

```
                                                                    41
 1     nonuniversity individuals or university employees?
 2  Q. I'm asking at this point about families of students at the
 3     university.
 4  A. I didn't receive any e-mails.
 5  Q. How about from faculty or staff at the university?
 6  A. Not, I don't recall getting e-mails.
 7  Q. How about letters or correspondence?
 8  A. I don't recall any formal letters or correspondence.
 9  Q. From staff or faculty?
10  A. From staff or faculty.
11  Q. How about from parents?
12  A. I don't recall any.
13  Q. Did you get any letters, e-mails, or correspondence from
14     students saying they didn't want OPTIONS participants in on
15     campus housing?
16  A. I don't recall receiving any from students.
17  Q. Would there be a record kept of any of these type
18     correspondence, either electronic or in written form?
19  A. It's possible.
20  Q. Would you have kept a record?
21  A. I might have kept a record if I received those kinds of
22     correspondence that you're talking about.
23  Q. Did you have any conversations with students, faculty, or
24     staff about OPTIONS participants when they expressed, don't
25     have them in campus housing?
```

```
                                                                    42
 1  A. I did have conversations.
 2  Q. And who were those conversations with?
 3  A. Those conversations were with individuals who questioned
 4     whether or not nonenrolled students should be living in
 5     university housing.
 6  Q. Were these students or were these faculty members?
 7  A. These were staff members.
 8  Q. And what were their names?
 9  A. This would be Linda Sisson, Lionel Maten, Nancy Schmitz.
10     Those are the individuals I recall.
11  Q. Now, just to be clear, you say the subject was discussed
12     with them, or did they express an opinion that they should
13     not be living, that participants of options should not be
14     living in on campus housing?
15  A. In the context of their understanding, that they were not
16     ever students, any of students, the people in the program.
17     The conversations involved discussions that led to the
18     opinions expressed, that they should not be, have access to
19     a university academic programs such as we have in housing,
20     that they should not be allowed to enter into contracts.
21  Q. So are the conversations such that, this is our policy, it
22     should not be altered, or is it that we just don't want
23     these people in our in campus housing?
24  A. It was, this is our policy, why would we open up university
25     housing at this point in time to a policy change of this
```

```
                                                                    43
 1     magnitude, when we had never operated in the past by
 2     allowing nonmatriculated students in an academic degree
 3     program to live in university housing. That was the
 4     conversation that went on.
 5  Q. Going back to financial burden on the university. It's
 6     been suggested that it might create some space problems in
 7     terms of the need for more rooms or that, do you see that
 8     as a problem?
 9  A. It has been a problem in the past three years, that space
10     has been limited. And having individuals who are not
11     formally admitted in the program living on campus, would
12     certainly deny a student who is on a wait list space in the
13     residence halls.
14  Q. Is there a current wait list for students for housing?
15  A. Yes, there is.
16  Q. Do you know how many persons are on that wait list?
17  A. No, I do not.
18  Q. Was there a wait list in the winter of 2009?
19  A. The winter of 2009, no.
20  Q. How about the fall of 2008?
21  A. Wait a minute, that was last winter.
22  Q. January of 2009.
23  A. January of 2009, we do not typically have wait lists in the
24     winter term.
25  Q. So if I'm understanding correctly, tell me if I'm not
```

```
                                                                    44
 1     getting this right. The start of the semester, start of
 2     the school year generally in the fall in September, you
 3     have wait lists?
 4  A. That is correct.
 5  Q. Usually by the winter term, January of that academic year,
 6     the wait list is no longer, there's no longer a wait list?
 7  A. That's correct, because of attrition.
 8  Q. In the winter terms, can you give me a general number of
 9     how many rooms are open and available?
10  A. I don't have a number.
11  Q. Do you think it's more than five or less than five?
12  A. I think it's more than five.
13  Q. So if you agreed to allow students from the OPTIONS, excuse
14     me, participants from the OPTIONS Program to live on
15     campus, how would there be a space problem, I mean there's
16     only nine, I think there's only nine participants currently
17     in the OPTIONS Program, and my understanding there is not
18     all of them applied to live on campus housing, how would
19     that create a space problem for you?
20  A. The question is if we allowed them.
21  Q. Right.
22  A. We're not in a position to take their contract applications
23     because they aren't students anymore than --
24  Q. If you granted the request to waive that rule, I'm trying
25     to ascertain what financial burden that's going to create
```

1  A.   Correct.
2  Q.   And it would appear from this e-mail that his application
3       has been approved; is that correct?
4  A.   I don't see anything that stipulates that it's been
5       approved.
6  Q.   It would seem from this e-mail that Ms. Fisher is operating
7       under the assumption that it's been approved?
8  A.   Yes, I would agree.
9  Q.   And I believe you said earlier Lionel Maten had approved,
10      or his application, and then you said it had to be
11      rejected; is that correct?
12 A.   I don't recall saying that.
13 Q.   Does Roxanne Fisher approve housing applications?
14 A.   I don't believe she approves, I believe she processes
15      applications.
16 Q.   She processes. Is there someone who gives a final approval
17      on it?
18 A.   The director of university housing would give a final
19      approval.
20 Q.   Is it the practice of the housing department to more
21      forward and giving people move in dates on applications
22      that have not yet been approved?
23 A.   It's the practice of housing to accept an application when
24      there is an administrative data trigger that implies that
25      this is a student who's been formally admitted to the

49

1       university.
2  Q.   A data trigger, I'm not sure what you mean.
3  A.   In the student data base, there's a, once the admission
4       process takes place and the student has been formally
5       admitted, there is a process by which an ID number is
6       assigned, and that in turn goes into the student data base.
7  Q.   Okay. And then the housing staff who are processing this
8       application would verify that this --
9  A.   Correct.
10 Q.   -- applicant is in that student data base?
11 A.   Correct.
12 Q.   This would appear to indicate that Roxanne has verify that
13      Micah, the plaintiff, was in that student data base, was in
14      the process of processing the application?
15 A.   It appears that whatever process she follows in taking
16      applications was followed, and she made the assumption,
17      which was incorrect, that he was an enrolled student.
18 Q.   Okay. The normal way of checking whether someone is an
19      enrolled student is to pull up a student data base?
20 A.   That is correct.
21 Q.   That would have been the normal procedure to verify that
22      Micah, the plaintiff, was in that student data base?
23 A.   Correct.
24 Q.   Did you ever go and look at the student data base and see
25      if Micah is in that student data base?

50

1  A.   I did not look personally.
2  Q.   Did anybody tell you that, yes, they checked and he was in
3       the student data base?
4  A.   The registers office checked and said that he was not in
5       the student data base as a formally admitted student.
6  Q.   Was he in the data base?
7  A.   He was in that data base as a continuing education student.
8  Q.   Do the housing staff have access to that part of the data
9       base that makes that distinction?
10 A.   I do not know that.
11 Q.   Are they told to check whether they are continuing
12      education students or a formally enrolled student?
13 A.   They are told --
14           MR. BOONIN: During what period of time are you
15      talking about?
16           MR. DAVIS: In 2007 when this application was being
17      processed.
18 A.   I do not know whether or not the distinction was made at
19      that time between a student who is a continuing education
20      student, and a formally admitted student who had a student
21      ID number, that you couldn't differentiate during a period
22      of time between the two is my understanding.
23 Q.   (Continuing by Mr. Davis:) A continuing education -- let
24      me restart that question.
25           Up until October of 2007, a continuing education

51

1       student is given a student ID number?
2  A.   My understanding is, no, they were not up until, I don't
3       know what date. But there was a point in there where
4       students, individuals who wanted to take continuing ed
5       courses were placed into the student data base with an ID
6       number. But the student data base, as they called them
7       scripts, to differentiate different kinds of students,
8       hadn't been applied yet during the period where the OPTIONS
9       students were put into the system, hadn't been applied yet
10      to indicate to the person in the data base that this was
11      continuing ed versus a formally enrolled student. That was
12      my understanding of what was Transpiring during that period
13      of time.
14 Q.   Prior to this, is it possible other continuing education
15      students that were not in matriculated program got admitted
16      to housing?
17 A.   No, because they weren't getting any kind of an ID, a
18      formal university identification number.
19 Q.   Okay. They were just in the data base without a student ID
20      number?
21 A.   I'm not sure how we maintained the data, but they did not
22      have a formal university ID number in the data base.
23 Q.   Were there given anything, so that if they were on campus,
24      that they could show that they had a purpose for being
25      there, that they weren't just somebody wandering on the

52

**Page 53**

1 campus for security purpose or any reason?
2 A. I don't know the answer to that question.
3 Q. Do you know who might know the answer to that question?
4 A. The register of the university.
5 Q. So just to clarify, is it possible that they could give a
6 move in date before the application has been approved in
7 October or November of 2007?
8 A. It's possible.
9 Q. It's possible Micah's case just to clarify, was he approved
10 and then rejected or was this process in the works and then
11 but the application was rejected I just want to clarify?
12 A. Can you clarify that question.
13 Q. I'm trying to understand was he approved and then the
14 approval withdrawn?
15 A. His contract was denied by Mr. Maten as the person who has
16 the delegated authority to approve or deny contracts. And
17 it's possible that the G number led the clerical staff to
18 put him into the system and issue this kind of a response
19 to him with we look at these things on a regular basis and
20 are constantly kind of auditing our own decision making
21 process and student status, that at the point where the
22 director learned that perhaps with the G number, the
23 OPTIONS individuals were slipping through, this wasn't an
24 enrolled student, and he later on denied with the student
25 housing.

**Page 54**

1 Q. Did Lionel ever tell you how this came to his attention?
2 A. He told me that it came to the attention of his associate
3 director, and that she brought it to him.
4 Q. And who is that?
5 A. Rebecca Wickham, W-I-C-K-H-A-M.
6 Q. Do you know when that was, when she brought it to his
7 attention?
8 A. I don't know an exact date.
9 Q. Did Lionel ever meet with the family and discuss housing,
10 meet with the plaintiff's family and discuss housing for
11 OPTIONS students?
12 A. Lionel and I met with the parents of Micah the following
13 year in August of 2008. It wasn't at this time. I do not
14 know if Micah met with the family during this period.
15     MR. BOONIN: Mr. Maten.
16 A. I'm sorry, Mr. Maten, whether or not he met with --
17 Q. (Continuing by Mr. Davis:) You don't know?
18 A. -- Mr. Feldman, Mr. and Mrs. Feldman, I do not know.
19     (EXHIBIT NO. 4 MARKED)
20 Q. (Continuing by Mr. Davis:) You had an opportunity to look
21 at that?
22 A. Yes, I have.
23 Q. Simply identify what Exhibit No. 4 is?
24 A. This is a letter from Mary Beth Snyder, myself, to
25 Mr. Micah Fialka-Feldman.

**Page 55**

1 Q. And what is the date of that letter?
2 A. May 23rd, 2008.
3 Q. And the first sentence of that letter would indicate that
4 you met with him, that you and Mr. Maten met with him and
5 his family to discuss housing?
6 A. It was just Mr. Micah Feldman, his family wasn't present.
7 Q. So I'm trying to get the timeline clear in my head. So
8 there was a meeting between just you and Micah in May of
9 2008, and then there was a follow-up meeting in August of
10 2008?
11 A. With the parents of Micah alone, Micah was not present at
12 that meeting.
13 Q. Micah was not present at that meeting. So it was the
14 parents, yourself, anyone else at that August meeting?
15 A. No.
16 Q. Okay. How did the May meeting come about?
17 A. I can only assume that Micah asked. I don't recall whether
18 it was the parents or Micah who requested the meeting.
19 Q. Are you aware that there was a petition circulating and
20 given to president Russi regarding this matter?
21 A. Yes, I am.
22 Q. Do you know approximately when that was given to president
23 Russi?
24 A. I do not have the timeline for that.
25 Q. Did president Russi ever assign you, or ask you to review

**Page 56**

1 this matter, as a result of that petition?
2 A. No, he did not.
3     (EXHIBIT NO. 5 MARKED)
4 Q. (Continuing by Mr. Davis:) You had an opportunity to
5 review what is marked as Exhibit 5?
6 A. Yes.
7 Q. What is that?
8 A. This is a letter dated September 24, 2008 from me to Micah
9 Fialka-Feldman.
10 Q. And it talks about the Oakland University board of trustees
11 meeting; is that correct?
12 A. Correct.
13 Q. My understanding was is that, or let me rephrase that.
14     At that Oakland board of trustees meeting in September
15 of 2008, did they refer this matter back to you to review
16 it one more time?
17 A. They referred the letter to the university administration
18 to review, for further review.
19 Q. All right. And the board chair asked the administration to
20 review it. Was that you who conducted that review, or was
21 it someone else in administration that conducted that
22 review?
23 A. It was me that conducted the review.
24 Q. And in conducting your review, what, what did you look at
25 in conducting your review?

**Page 57**

1  A. I looked at the university housing eligibility criteria and
2  determined that nothing had changed in his relationship to
3  the university, and therefore I denied his eligibility for
4  university housing.
5  Q. Did you look at any other programs, post-secondary
6  education programs for individuals with disabilities, at
7  other colleges or universities?
8  A. Mr. Feldman in August had sent to me a link for a
9  university, a college program, and I believe it was in New
10 Jersey, and I took a look at their web site.
11 Q. Did that program have housing?
12 A. I don't recall.
13 Q. Did you look at any other colleges or universities?
14 A. I did look at one, and I can't remember which one. It
15 might have been one that Professor Wiggins eluded to at
16 Northwestern University. And that one, as I recall at this
17 time, did not offer housing on campus.
18 Q. Did you look at any literature on the subject at all?
19 A. No, I did not.
20 Q. Did you look at any literature regarding housing for
21 persons with disabilities on campus?
22 A. Well, I have a long-standing knowledge about students with
23 disabilities living in university housing. So I'm familiar
24 with some of that literature.
25 Q. What would you consult if you needed to review something?

**Page 58**

1  A. I would consult cases, precedents, court cases that come up
2  in my professional organization that have to do with
3  reasonable accommodations for enrolled students.
4  Q. Any US Department of Education guidelines on the subject?
5  A. That, I didn't consult with them, but I know those
6  materials are out there.
7  Q. Any materials regarding Section 504 of the Rehabilitation
8  Act?
9  A. I'm familiar with that act, and understand in general the
10 need to accommodate enrolled students and what some of
11 those accommodations entail.
12 Q. Do you ever consult a guidance manual regarding Section 504
13 of the Rehabilitation Act?
14 A. I have not in recent memory.
15 Q. So you didn't review it in regard to this matter?
16 A. No, I did not.
17 Q. Would you consider a waiver of matriculated student
18 requirements as a reasonable accommodation?
19 A. Could you repeat.
20 Q. In regard to housing policies, would you consider a waiver
21 of matriculating student eligibility requirement a
22 reasonable accommodation?
23 A. No, I wouldn't.
24    MR. BOONIN: Objection, asking for a legal
25 conclusion as to whether or not that would even be

**Page 59**

1  required. Go ahead and answer.
2  A. To the extent I understand the law and the question, the
3  law specifically around reasonable accommodations, I would
4  not waive that, the university housing as an accommodation
5  for a nonmatriculated student.
6  Q. (Continuing by Mr. Davis:) You said in preparing for
7  today's deposition, that you reviewed your written
8  statement you wrote for the November 5th, 2008 board
9  meeting; is that correct?
10 A. Yes, I did.
11 Q. Do you have a copy of that in your records?
12 A. Yes, I do.
13 Q. In reviewing this matter at the board's direction, did you
14 consult with any university faculty or staff?
15    MR. BOONIN: Before that presentation?
16 Q. (Continuing by Mr. Davis:) I'm referring back to the note,
17 the September 17th, 2008 board of trustees meeting when
18 they referred this to be reviewed by the administration.
19 When you were conducting that review, did you consult with
20 any faculty or staff?
21 A. I wrote the testimony, and I asked the general counsel to
22 review it before I spoke it.
23 Q. Before the November, before you wrote your letter on
24 September 24th, did you consult with any faculty or staff?
25 A. I don't recall that I did. I don't recall whether I did or

**Page 60**

1  not.
2  Q. Did you consult with Robert Wiggins?
3  A. No.
4  Q. Dean Otto?
5  A. No.
6  Q. Any staff members of the OPTIONS Program?
7  A. No.
8  Q. Any staff of the housing program?
9  A. I don't recall. If I did, it would have been Lionel, but I
10 don't recall specifically that I talked to him. I may have
11 informed him that my decision held, it wasn't going to
12 change.
13 Q. What was entailed in the review that you did?
14 A. The review was to ascertain whether or not his status in
15 any way had changed with the university. Whether he had
16 applied to the university, whether he was enrolled in a
17 degree program at that point. And no, did I consult with
18 anyone, I probably talked to someone in the registers
19 office to ascertain whether or not any change had occurred.
20 Q. Other than reviewing his student status, did you do any
21 other review?
22 A. No, I didn't.
23    MR. DAVIS: Take a quick break. I think we'll be
24 able to finish up fairly quickly after that.
25    (BREAK HAD AT 2:48 P.M. TO 3:00 P.M.)

1 Q. (Continuing by Mr. Davis:) We're back on the record. And
2    I have a few questions for you. Lionel Maten is no longer
3    the director of the housing; is that correct?
4 A. Yes.
5 Q. Who is the current director?
6 A. The interim director is Debra Middlebrook,
7    M-I-D-D-L-E-B-R-O-O-K.
8 Q. And is there currently a search going on to find a
9    permanent?
10 A. Yes, there is.
11 Q. Is there any idea when that decision will be made?
12 A. No.
13        MR. DAVIS: That's all the questions I have.
14        MR. BOONIN: I want to clarify one point.
15
16                    EXAMINATION
17
18 BY MR. BOONIN:
19 Q. Ms. Snyder, you testified that, about certain types of
20    burdens that would exist if you were to allow
21    nonmatriculated students into the dorms. I believe you
22    said something that there could be space burdens, there
23    could be financial burdens, there could be administrative
24    burdens?
25 A. I did.

61

1 Q. Did you, are those all of the types of burdens?
2 A. I can't say that those are all the types of burdens. I
3    never did an analysis of the burdens because these OPTIONS
4    people weren't students. I was never asked to do a full
5    analysis.
6 Q. And do you, never mind.
7        MR. BOONIN: That it's then. That's all I wanted
8    to clarified. Thank you.
9
10
11    (WHEREUPON THE DEPOSITION CONCLUDED AT 3:08 P.M.)
12
...

62

                    C E R T I F I C A T E
STATE OF MICHIGAN }
                  } ss:
COUNTY OF MACOMB  }

   I, Amanda L. Grosshans, Certified Court Reporter,
Registered Professional Reporter, a notary public in and for the
aforesaid county and state, do hereby certify that the witness,
MARY BETH SNYDER, was duly sworn by me prior to the taking of
testimony as to the truth of the matters attested to and
contained therein, that the testimony of said witness was taken
by me in machine shorthand and was thereafter reduced to
typewritten form by me or under my direction and supervision,
that the foregoing transcript is a true and accurate record of
the testimony given to the best of my understanding and ability.

   I FURTHER CERTIFY that I am neither counsel for, related
to, nor employed by any of the parties to the action in which
this proceeding was taken; and, further, that I am not a
relative or employee of any attorney or counsel employed by the
parties hereto, nor financially interested, or otherwise, in the
outcome of this action; and that I have no contract with the
parties, attorneys, or persons with an interest in the action
that affects or has a substantial tendency to affect
impartiality, that requires me to relinquish control of an
original deposition transcription or copies of the transcript
attorney, or that requires me to provide any service not made
available to all parties to the action.

                    _____
                    Amanda L. Grosshans, CSR 3853
                    Notary Public

My commission expires: 9/20/2010

63

**08-CV-14922** 1:9.
**1** 2:23, 16:8, 16:10, 20:9.
**1.** 19:10.
**100** 1:27.
**12:45** 3:3, 3:3.
**14th** 48:8.
**16** 2:23.
**17th** 59:17.
**18** 2:24.
**2** 2:24, 18:24, 19:2.
**2.** 18:23.
**200** 1:38.
**2000** 7:17.
**2007** 7:18, 14:1, 14:12, 20:24, 48:8, 51:16, 51:25, 53:7.
**2007.** 21:2.
**2007/2008** 19:4.
**2008** 2:26, 2:27, 4:21, 4:22, 21:7, 21:9, 43:20, 48:24, 55:2, 55:9, 55:10, 56:15, 59:8, 59:17.
**2008.** 54:13.
**2009** 43:18, 43:19, 43:23.
**2009.** 43:22.
**2200** 1:26.
**23** 2:26.
**23rd** 55:2.
**24** 2:27.
**24th** 59:24.
**29200** 1:38.
**2:03** 46:1, 46:1.
**2:17** 46:1, 46:1.
**2:48** 60:25, 60:25.
**3** 2:15, 2:25, 48:2.
**3.** 48:4.
**300** 1:45.
**350** 1:45.
**3853** 1:49,

**63:34.**
**3:00** 60:25, 60:25.
**3:08** 62:11, 62:11.
**4** 2:26, 54:19, 54:23.
**48** 2:25.
**48104** 1:46.
**48152** 1:39.
**48309** 1:28.
**5** 2:27, 56:3, 56:5.
**504** 58:7, 58:12.
**54** 2:26.
**56** 2:27.
**5th** 4:22, 59:8.
**61** 2:16.
**6th** 48:24.

**<A>.**
**A.** 1:44.
**abide** 25:7, 34:7, 34:15.
**ability** 4:4, 11:10, 23:8, 25:14, 63:17.
**able** 24:18, 25:9, 60:24.
**absolute** 19:18.
**academic** 8:25, 9:4, 9:5, 9:12, 9:13, 9:14, 9:15, 9:16, 9:21, 10:6, 10:9, 10:14, 10:14, 10:16, 10:17, 10:19, 11:7, 11:9, 11:10, 12:25, 23:1, 23:5, 26:18, 26:20, 27:17, 29:8, 33:3, 33:6, 42:19, 43:2, 44:5, 45:21.
**accept** 46:18, 49:23.

**acceptance** 46:17.
**accepted** 35:9.
**access** 42:18, 51:8.
**accessible** 12:6.
**accommodate** 58:10.
**accommodated** 12:7.
**accommodation** 7:8, 11:25, 12:13, 26:1, 38:18, 45:8, 45:16, 45:23, 58:18, 58:22, 59:4.
**accommodations** 8:1, 8:4, 8:5, 8:17, 8:18, 8:21, 25:19, 58:3, 58:11, 59:3.
**according** 24:4, 24:23, 25:6, 26:14, 26:19, 38:21.
**accurate** 63:16.
**achieve** 9:21.
**achievement** 9:15.
**achieving** 9:16, 10:9, 27:17.
**acknowledging** 25:2, 25:24.
**across** 29:10.
**Act** 58:8, 58:9, 58:13.
**action** 36:23, 63:20, 63:24, 63:25, 63:30.
**activities** 5:12, 32:19.
**activity** 26:21, 26:23, 29:17.
**actually** 6:4, 7:7, 16:24, 27:25, 47:16.
**added** 17:21,

**17:23.**
**additional** 34:1, 38:17, 40:5.
**address** 24:17, 48:10.
**adequate** 22:1.
**administration** 56:17, 56:19, 56:21, 59:18.
**administrative** 30:21, 30:25, 31:8, 31:10, 33:22, 34:1, 34:3, 49:24, 61:23.
**admission** 23:19, 26:2, 50:3.
**admissions** 5:12, 6:8, 11:8, 28:7.
**admit** 38:9.
**admitted** 12:15, 15:7, 15:17, 16:3, 17:4, 17:5, 23:2, 24:3, 26:8, 29:17, 35:18, 36:5, 36:9, 36:11, 43:11, 49:25, 50:5, 51:5, 51:20, 52:15.
**ADVOCACY** 1:36.
**affairs** 5:4, 8:11, 19:17.
**affect** 63:26.
**affected** 28:1.
**affects** 63:26.
**affirmed** 3:11.
**aforesaid** 63:10.
**age** 4:7, 33:14.
**agree** 25:7, 30:5, 30:6, 34:7, 49:8.
**agreed** 44:13.
**agreement** 24:20, 34:19.
**agreements**

64