| | |
|---|---|
| 1 Q. | Why was there a need to add that? |
| 2 A. | We were, we were continuing to grow the academic component |
| 3 | of the, of the residence halls. And my feeling, from my |
| 4 | expertise in working in this profession, it was critical |
| 5 | that students was focused on their academic, their academic |
| 6 | progress to remain in the residence halls. So one way to |
| 7 | do that is to have some criteria and standards that |
| 8 | students were responsible for and working towards. |
| 9 Q. | Okay. |
| 10 | (BREAK HAD AT 10:31 A.M. TO 10:33 A.M.) |
| 11 | (EXHIBIT NO. 1 MARKED) |
| 12 Q. | (Continuing by Mr. Davis:) I'm going to hand you what's |
| 13 | been marked as Exhibit No. 1. Take a moment to look at |
| 14 | that. Let me know when you've had a chance to review it. |
| 15 | MR. BOONIN: Copy for me? |
| 16 | MR. DAVIS: Actually I only made one extra copy. |
| 17 A. | Okay. |
| 18 Q. | (Continuing by Mr. Davis:) I want to direct your attention |
| 19 | to paragraph number nine there. And in that paragraph, |
| 20 | actually the second sentence, I, began discussing the |
| 21 | university's retention rates and how they were negatively |
| 22 | affected by the number of credit hours a student was |
| 23 | required to carry to be eligible to live in student |
| 24 | housing. What was that discussion about, and how did the |
| 25 | credits affect retention rates? |

21

| | |
|---|---|
| 1 A. | There was always a credit requirement to live in our |
| 2 | residential facilities. However, that requirement was one |
| 3 | students could initially start with, with what the |
| 4 | university termed a full load for the undergraduate |
| 5 | student, which was twelve hours, and they could actually |
| 6 | reduce their number of hours all the way down to one hour |
| 7 | and could continue to live in the residential facilities. |
| 8 | That student was not focused on their academic pursuit, |
| 9 | making academic progress I felt towards a degree. And our |
| 10 | goal in continuing to grow the academic program in the |
| 11 | residence halls was for students to, to focus on academic |
| 12 | pursuits. And so that's how that discussion started with, |
| 13 | at that time. |
| 14 Q. | Okay. So a decision was to increase the number of academic |
| 15 | hours that was required? |
| 16 A. | That was required to live in the residential facilities? |
| 17 Q. | Yes. Is that correct? |
| 18 A. | Yes. |
| 19 Q. | And it went from a minimum of at least one up to what's now |
| 20 | in the current contract application? |
| 21 A. | Uh-huh. |
| 22 Q. | Which is I think about eight; is that correct? |
| 23 A. | Eight. Are you talking, is your question eight? |
| 24 Q. | What's the current credit application requirements? |
| 25 A. | It's eight during the fall and winter semester, and four |

22

| | |
|---|---|
| 1 | during the summer term. |
| 2 Q. | So you increased them from one up to eight, and four for |
| 3 | the respective semesters? |
| 4 A. | Increased the number of credits? |
| 5 Q. | Increased the required number of credit hours that the |
| 6 | students had to carry to live in housing on campus, from |
| 7 | one up to eight or four, depending on the respective |
| 8 | semester? |
| 9 A. | Yes. |
| 10 Q. | How did that improve the retention rates? |
| 11 A. | There are, there's antidotal, maybe mispronouncing that |
| 12 | word wrong, data that supported, we saw increases in |
| 13 | student GPA's, and we saw our retention numbers from the |
| 14 | first to second year of students residing in the residence |
| 15 | halls increase as well. |
| 16 Q. | What did they increase from? |
| 17 A. | I do not have that data to memory. |
| 18 Q. | You say it's antidotal, so the data is not available, was |
| 19 | it collected? |
| 20 A. | The data, yes. |
| 21 Q. | Okay. But again, looking at that paragraph number nine. |
| 22 | It says, at the time if a person was a student enrolled in |
| 23 | a one credit course, they were eligible to live in student |
| 24 | housing. We ultimately decided to increase the minimum |
| 25 | credit hour required to be eight hours for the fall and |

23

| | |
|---|---|
| 1 | winter semester, and four credit hours for the then spring |
| 2 | and summer semesters, and to implement those changes for |
| 3 | the following fall 2008 semester, correct? |
| 4 A. | Correct. |
| 5 Q. | So when Micah applied in the fall of 2007, the actual |
| 6 | policy was that he had to be enrolled for at least one |
| 7 | credit hour at the university, correct? |
| 8 A. | Our policy states that students must be enrolled as a |
| 9 | student, matriculating student, working towards a degree. |
| 10 | And if that student was accepted, we perceived a student in |
| 11 | our operations having been admitted through admissions and |
| 12 | going through the admissions process from the university |
| 13 | and from a housing perspective, that is really how our |
| 14 | process operated. |
| 15 Q. | But that's not what you said in paragraph number nine of |
| 16 | your affidavit, is it? |
| 17 A. | We said that a person was a student enrolled, and again |
| 18 | enrollment to housing was a student who had gone through |
| 19 | the admissions process, and been admitted to the |
| 20 | university, and pursuing an academic, working towards the |
| 21 | pursuit of an academic degree. |
| 22 Q. | Did that language appear anywhere in the application that |
| 23 | was being used in the fall of 2007 to your recollection? |
| 24 | MR. BOONIN: Let the record reflect he doesn't have |
| 25 | the contract in front of him. |

24

## Page 25

1  Q.   (Continuing by Mr. Davis:)  We can give you the contract if
2       you would like to have that to refresh your memory.  We'll
3       have it marked as Exhibit No. 2.
4                 (EXHIBIT NO. 2 MARKED)
5  A.   Again, I look at this to reflect that again, a
6       matriculating student.
7  Q.   (Continuing by Mr. Davis:)  But does it say in the
8       application that Micah signed anything about being
9       matriculating?
10 A.   In my years of, does it, in my years of experience in
11      working on college campuses, I clearly understand what my
12      definition, my vision for the department of what a student
13      was.
14 Q.   I understand what you're thinking was, and what your
15      understanding was.  But since it wasn't in the application
16      or contract, how would anybody else understand what you're
17      thinking.  So my question is, does it mention matriculating
18      at all on this application that's been marked as Exhibit
19      No. 2?
20 A.   Does it mention the word matriculating?
21 Q.   Yes.
22 A.   No.
23 Q.   Okay.  And in your affidavit that you gave, which has been
24      marked as Exhibit No. 1, paragraph nine you state what the
25      policy is, you don't mention matriculating there either; is

## Page 26

1       that correct?
2            MR. BOONIN:  The word matriculating?
3            MR. DAVIS:  Right.
4            MR. BOONIN:  Or the concept?
5            MR. DAVIS:  The word matriculating.
6  A.   It does not mention the word matriculating.
7  Q.   (Continuing by Mr. Davis:)  Do you believe it embodied the
8       concept of matriculating student?
9  A.   Can you explain your question again?
10 Q.   Your understanding what a matriculating student is, do you
11      believe that this includes a matriculating student as what
12      you put in your affidavit, paragraph number nine?
13 A.   Yes.
14 Q.   Okay.  How so?
15 A.   It clearly reflects retention rates, and you had to be a
16      student working towards a college degree to, to reflect
17      retention.
18 Q.   You wanted to improve retention rates by changing the
19      policy, but the policy at the time in fall of 2007 you
20      talked about students enrolled, how did that embody a
21      matriculating student?
22 A.   Again, it was focused on retention rates, not embody a
23      matriculating student.  You had to be a student in ordered
24      to be, to be figured into the retention numbers of the
25      university.

## Page 27

1  Q.   And what did you consider to be a student?
2  A.   A student was an individual who was accepted through the
3       university admission guidelines, and who was working
4       towards the academic pursuit towards an academic degree,
5       making a satisfactory pursuit towards an academic degree.
6  Q.   Any of that language appear in the application, again,
7       we're referring back now to Exhibit No. 2.  Does any of
8       that language you just say appear in this application at
9       all?
10 A.   Does the words appear in the contract or does, or does this
11      contract embody that language?
12 Q.   My first question would be, do the words appear?
13           MR. BOONIN:  I'm not sure which words you're
14      looking for at this point.
15 Q.   (Continuing by Mr. Davis:  Well, he gave his definition.
16      So we talked about enrolled, matriculating, I think we've
17      covered matriculating, working towards a degree, academic
18      degree.  You can, actually on that one you can make marks
19      if you want.
20 A.   Can you repeat the words you want me to seek out.
21 Q.   Yes.  Academic, working towards a degree, matriculating if
22      you see that there now in case you missed it before, any
23      type of GPA requirement.
24           MR. BOONIN:  You're asking the witness if those
25      specific words appear there as opposed to the concepts?

## Page 28

1  Q.   (Continuing by Mr. Davis:)  I'm asking if those specific
2       words appear there.
3  A.   The aforementioned words that you mentioned do not appear.
4  Q.   Do you believe that the application contract, which is
5       marked as Exhibit 2, do you believe those concepts, I'll
6       repeat the concepts in a moment.  Do you believe that those
7       concepts are embodied in this, those concepts being
8       matriculating student working towards a degree, enrolled,
9       maintaining a certain GPA, do you believe that those
10      concepts are embodied in this exhibit, and if so, where so?
11 A.   Yes, and it's under the heading eligibility, enrolled
12      appears there.
13 Q.   So that's a paragraph Roman numeral I, begins with
14      eligibility, correct?
15 A.   Roman numeral I.
16 Q.   And then the word eligibility is in caps?
17 A.   Yes.
18 Q.   Okay, all right.  The student housing handbook that was out
19      in the fall of 2007, did you participate in revising that?
20 A.   I can't recollect if it did or not.
21 Q.   Let me go back and talk a little bit about housing in
22      general here.  Do you remember what the occupation rates
23      were in the fall of, let me rephrase this.
24           Was housing generally full, or were there waiting
25      lists for housing in the fall semester of each year?

### Page 33

1     students that just audited courses.
2 Q. How did Rebecca know about the program, do you recall her
3     telling you that?
4 A. She had a conversation with Dr. Wiggins.
5 Q. She had a conversation with Dr. Wiggins prior to you having
6     a conversation with Dr. Wiggins; is that correct?
7 A. That is correct, yes.
8 Q. So did you speak again with Dr. Wiggins regarding the
9     OPTIONS Program, did you speak again with Dr. Wiggins?
10 A. Yes.
11 Q. And did you, at that time, just inform him that after your
12     conversation with Rebecca that it's not possible to have a
13     housing component?
14 A. Yes.
15 Q. Did you discuss any possibilities of ways that it could be
16     made to work or was --
17 A. Ways the OPTIONS Program could make it work?
18 Q. Yes.
19 A. No.
20 Q. How about, was there any discussions at all about how there
21     could be a housing component added?
22         MR. BOONIN: Between him and Dr. Wiggins?
23 Q. (Continuing by Mr. Davis:) Yes.
24 A. Rephrase your question.
25 Q. Did you and Dr. Wiggins have any further discussions, after

### Page 34

1     you told him initially, this isn't going to work, was there
2     any additional discussions about how this might be able to
3     made to work in the future?
4 A. Dr. Wiggins had his ideas, but my stance was no.
5 Q. And what ideas did Mr. Wiggins have?
6         MR. BOONIN: If you know.
7 A. Hum.
8         MR. BOONIN: If you know his ideas.
9 Q. (Continuing by Mr. Davis:) I'll ask him what he shared
10    with you.
11 A. I don't necessarily know if he shared ideas, other than,
12    you know, really motivating me, trying to motivate me to,
13    to waiver on the policy of the university. That was the
14    extent of those conversations.
15 Q. Do you recall when these conversations took place?
16 A. Again, some of those, as previously mentioned, sometime
17    during the fall 2006, winter 2007.
18 Q. Did discussions continue at all into the summer of 2007?
19 A. I cannot recall.
20 Q. Was the conversations with Dr. Wiggins, did you report that
21    to vice-president Snyder?
22 A. I do not recall.
23 Q. Did you ever have any conversations with vice-president
24    Snyder about the OPTIONS Program prior to the fall of 2007?
25 A. At this current time, I do not recall.

### Page 35

1 Q. Do you recall having any conversations with doctor, or with
2    vice-president Snyder prior to Micah's application in
3    November of 2007?
4 A. At this current time, I do not recall.
5 Q. How many conversations did you have with Dr. Wiggins in
6    2006, 2007 academic year?
7        MR. BOONIN: You're not including the summer now?
8 Q. (Continuing by Mr. Davis:) I believe your earlier comments
9    was you didn't recall any conversations in the summer,
10   correct?
11 A. Uh-huh.
12 Q. So do you recall how many conversations you had in that
13   2006, 2007, fall and winter academic year?
14 A. I'm trying to think, I mean that's a while back. I'm
15   trying to play this stuff through my head. Okay. I cannot
16   provide a hard number of how many conversations.
17 Q. There were at least two?
18 A. Yes.
19 Q. At least the initial one and then the follow-up one,
20   correct?
21 A. Yes.
22 Q. You think there were more than that?
23       MR. BOONIN: These are one on one conversations?
24       MR. DAVIS: Any conversations.
25 A. Yes.

### Page 36

1 Q. (Continuing by Mr. Davis:) Were there conversations
2    involving other persons, let me rephrase that question.
3       When you had these conversation with Dr. Wiggins, were
4    there other persons involved in the conversations as well?
5 A. Present at the conversations?
6 Q. That were present at the conversations, involved in the
7    conversations?
8 A. Yes.
9 Q. Who were those persons?
10 A. They were, the one that comes to mind for me was the, I'm
11   not for certain particulars correct title of the actual
12   forum, but I would label it as an assessment meeting, or an
13   evaluation meeting. Again, there may be a more
14   professional term used for that. In that particular
15   meeting that Dr. Wiggins asked me to attend, there were
16   Micah, his mother and father, Dr. Wiggins, maybe one or
17   more other professionals, and one or more students.
18 Q. Does the term person centered planning meeting, does that
19   recall?
20       MR. BOONIN: What was the first word?
21       MR. DAVIS: Person centered planning meeting.
22 Q. (Continuing by Mr. Davis:) Does that sound familiar at all
23   to you?
24 A. No.
25 Q. Did you speak at this, at this assessment meeting?

## Page 37

1  A. Yes.
2  Q. What did you have to say?
3  A. I answered questions related to housing.
4  Q. And what, this assessment meeting, when did that take
5     place, do you recall?
6  A. I do not remember the exact date or time.
7  Q. Was it in the winter of 2007?
8  A. Again, I don't recall.
9  Q. Is it possible it was before the fall of 2007?
10 A. I don't recall the time and place.
11        MR. BOONIN: I believe he said, I thought this was
12    still within the academic year of 06/07 he was talking
13    about the conversations that he had during that period.
14    One of he said other people were present.
15 A. The question is, that you asked, this meeting that I was
16    invited to attend. And when that meeting occurred, I do
17    not know the time, remember the time or place.
18        MR. BOONIN: I just understood it to be one of the
19    two meetings or discussions that you had with Dr. Wiggins
20    but if it's not.
21 Q. (Continuing by Mr. Davis:) Do you recall what questions
22    you answered regarding housing at this assessment meeting?
23 A. Some.
24 Q. And what were those questions?
25 A. One was, and this is not verbatim.

## Page 38

1  Q. I understand.
2  A. One was, you know, what is the, the, could Micah reside in
3     the, in the residential facility. And my answer to that
4     was, you know, was that he needed to actually be a student
5     admitted to the university, and so that was one such
6     question. One was, could we get a tour of the facility
7     and, again, what is the opportunity for Micah to, to give
8     it a try and reside in the facilities.
9  Q. And in regard to that last question, what was your answer
10    to that, do you recall?
11 A. That if, we have a policy, we have actually, my response
12    was steamed around our current policy, our current guest
13    policy and overnight policy, and that is if someone was
14    willing to sign him in, we have a policy in place that he
15    could stay in the facilities.
16 Q. And in regard to giving him a tour of the facilities, did
17    you agree to do that?
18 A. A tour of the residential facilities?
19 Q. Yes.
20 A. Yes.
21 Q. And did that tour in fact take place?
22 A. Yes.
23 Q. Did you conduct the tour, or did you have somebody do that?
24 A. I cannot recall now, I tried to, but I can't recall if I
25    did.

## Page 39

1  Q. Were there any discussions about how the OPTIONS Program
2     might satisfy the enrolled student requirement?
3  A. Is there any discussion?
4        MR. BOONIN: During that meeting?
5  Q. (Continuing by Mr. Davis:) Yes. I'm still talking about
6     the assessment meeting.
7  A. Can you rephrase your question, please.
8  Q. Were there any discussions about how the OPTIONS Program
9     might be able to satisfy the housing requirements of being
10    an enrolled student?
11 A. Could be satisfied. I'm trying to remember the last part
12    of your question.
13 Q. Were there any discusses at this assessment meeting about
14    how the OPTIONS Program, if Micah was in the OPTIONS
15    Program, how that might satisfy the housing department's
16    requirement of being an enrolled student for housing?
17 A. Yes, if he was an enrolled student.
18 Q. Did you indicate that being in the OPTIONS Program would be
19    sufficient to satisfy the enrolled student requirement?
20 A. No.
21 Q. Okay. At that time was there any discussion about, I'm
22    talking again about this assessment meeting, the OPTIONS
23    Program having a certificate of completion?
24 A. Not to my, I do not recall at this current time.
25 Q. At this assessment meeting, you agreed to give a tour, but

## Page 40

1     why did you agree to give a tour if he wasn't going to be
2     eligible for the housing?
3  A. Our standard, why did I agree to give a tour. Our standard
4     process is to provide tours to anyone who seeks it, who
5     seeks them.
6  Q. You're saying you made it clear that he's not eligible?
7  A. I, yes.
8  Q. In addition to the assessment meeting, did you have any
9     other meetings with the family members, by family members
10    let's be specific, I'm talking about Rick Feldman, Micah
11    Fialka-Feldman, or Janis Fialka, that's his mother and
12    father and himself?
13 A. Yes.
14 Q. Were these meetings prior to or after that assessment
15    meeting?
16 A. To my knowledge, they were, they were after the assessment
17    meeting.
18 Q. How many meetings did you have?
19 A. Can you, can you define meetings?
20 Q. Well, let's just say, did you have any conversations with
21    the family members?
22        MR. BOONIN: Any other family members?
23        MR. DAVIS: Any of the family members.
24 A. Yes.
25 Q. (Continuing by Mr. Davis:) And who, which family members

**Page 41**

1  did you have conversations with?
2  A.  I can't remember the mother and father's name, I know
3       Richard.
4  Q.  Okay.
5  A.  The mother and Micah.
6  Q.  Did you have some meeting, did you have meetings with just
7       Micah alone?
8  A.  I need you to define meeting.
9  Q.  Did you have any conversations with Micah alone?
10 A.  And conversations, just voice to voice conversations.
11 Q.  Okay. Let me be more specific. Did you have any
12      conversations with Micah regarding housing specifically,
13      I'm not talking about seeing each other on campus and
14      saying hi to each other, did you have any conversations
15      with Micah regarding housing?
16          MR. BOONIN: Just the two of them present?
17          MR. DAVIS: Just the two of them.
18 A.  Not to my recollection, no.
19 Q.  (Continuing by Mr. Davis:) Did you have meetings with,
20      okay. After this assessment meeting in which you had, what
21      was the first conversation or meeting that you had with the
22      family members?
23 A.  Again, I need you to define meetings.
24 Q.  A meeting where you either met in person or by a conference
25      phone call?

**Page 43**

1  things going that, you know, he has, that it was just a
2  general meeting between two individuals who have just
3  become aware of each other.
4  Q.  So it was just a general hi, how are you doing?
5  A.  Uh-huh.
6  Q.  Did you have any communications with Rich Feldman after the
7       tour and prior to Micah filing his application?
8  A.  At this current time, to my recollection, I do not
9       remember.
10 Q.  Did you have any communications with Janis Fialka after the
11      tour and prior to Micah's application?
12 A.  At this current time to my recollection I cannot remember.
13 Q.  And other than, did you have any conversation, or any
14      communications with Micah, specifically regarding housing
15      prior to his application after his tour?
16 A.  If you can define communication with Micah as to what you
17      mean by that.
18 Q.  By communications, I'm talking about telephone
19      conversations, written correspondence, e-mails, any type of
20      way two people can communicate, did you have any type of
21      communications with Micah regarding housing between the
22      tour and his application?
23 A.  I had a one-sided communication.
24 Q.  Okay. What was that one-sided communication?
25 A.  Micah saying to me that he wanted to live on campus.

**Page 42**

1  A.  And I don't know if I'm still clear as to what you mean by
2       meeting.
3  Q.  Did they ever pick up a phone and call you to discuss
4       housing?
5  A.  Yes.
6  Q.  Who?
7  A.  Richard Feldman.
8  Q.  And what happened, what did you discuss in that
9       conversation?
10 A.  Setting up a tour.
11 Q.  Okay. Did you have any conversation, did you hear from
12      them at all after the tour, any of the family members?
13 A.  Can you define hear?
14 Q.  Did they call you, did they write you, did they speak to
15      you in person, any communication whatsoever?
16 A.  Yes.
17 Q.  When was the next communication you had with a family
18      member?
19 A.  I can't give you an actual date.
20 Q.  Who did you have the communication with, and what form was
21      the communication?
22 A.  In my conversation in passing Micah on the campus
23      community, in the campus community.
24 Q.  And how did that conversation go?
25 A.  It was a standard Micah's, you know, greeting of how are

**Page 44**

1  Q.  Was this a conversation, e-mail, or what was the
2       communication?
3  A.  It was a verbal conversation in passing.
4  Q.  At the assessment meeting, was there any discussion to your
5       recollection regarding Micah's ability to live on campus?
6  A.  Define ability?
7  Q.  Could he live, could he handle living in a dormitory on
8       campus?
9          MR. BOONIN: Ability other than his enrollment
10      status are you talking?
11 Q.  (Continuing by Mr. Davis:) I'm talking about his ability
12      to handle living independently on his own in a dormitory
13      setting.
14 A.  Was there any?
15 Q.  Was there any discussion, I'm talking about the assessment
16      meeting, about Micah's ability to live independently in a
17      dormitory setting?
18 A.  At this current time, I don't recall any specifics.
19 Q.  It was discussed, but you don't remember specifics, or you
20      don't recall it being discussed at all?
21 A.  At this current time, I don't recall there being a
22      discussion about Micah's abilities.
23 Q.  Micah, I'm looking at Exhibit No. 2. I believe Micah filed
24      his application in November of, November, I think it's
25      dated October 7th, 2007, but there's another copy of this

1  that has a stamp on it of November 1st that we've used
2  before. But in regards to this application, marked as
3  Exhibit 2, do you know how the, who accepted the
4  application at the housing department?
5 A. Define to me acceptance?
6 Q. Just took the application. I'm not talking about approving
7  the application, I'm just talking about physically taking
8  the application from him for review.
9 A. No.
10 Q. When did you first learn of the fact that Micah had
11  submitted an application?
12 A. I do not recall the date and time.
13 Q. Did it ever, did you ever learn that the housing department
14  staff were discussing with Micah a move-in date for a
15  dormitory room?
16 A. Define, can you just clarify your question?
17 Q. Did you ever learn that a housing staff member, any house
18  staff member, was discussing with Micah a move-in date for
19  a dormitory room on campus?
20 A. Again, I need to understand what the discussion is.
21 Q. When did you learn, did you ever learn of an e-mail from
22  Roxanne, who works in your housing department, correct?
23 A. Yes.
24 Q. Roxanne works in the housing department?
25 A. Uh-huh.

45

1 Q. Drawing on blank on Roxanne's last name at the moment.
2 A. Fisher.
3 Q. Ms. Fisher. Did you ever see an e-mail from her to Micah
4  discussing a move-in date for a dormitory room for Micah?
5    MR. BOONIN: Prior to the lawsuit or ever?
6    MR. DAVIS: Prior to the lawsuit.
7 A. Did I ever see the e-mail?
8 Q. (Continuing by Mr. Davis:) My question is isn't did you
9  see the e-mail, let me rephrase that.
10   Did you ever learn that someone was processing an
11  application, or did you ever learn of an e-mail from
12  Roxanne to Micah concerning housing, moving into the
13  housing dormitory room?
14 A. Micah moving into the dormitory room, yes.
15 Q. Do you recall when you learned of that?
16 A. I do not at this current time do I recall the date and
17  time.
18 Q. Was it prior to you sending out the rejection letter of
19  November the 29th, 2007?
20 A. Yes.
21 Q. And what did you do when you learned of that communication?
22 A. I, when I learned of the communication, what did I do. I
23  informed Rebecca Wickham to, to take that communication to
24  a committee that she sat on addressing students who were
25  matriculating students, who were on a program where we were

46

1  doing with students with Asperger's, and to get further
2  clarification as to if, if Micah in fact met the enrollment
3  requires of the university to reside in the residence.
4 Q. You asked for further clarification on Micah's enrollment
5  status?
6 A. On Micah's, on whether or not Micah had made satisfactory,
7  had gone through the satisfactory process of being accepted
8  as an enrolled student at the university.
9 Q. Did you discuss it with vice-president Snyder at all?
10 A. Did I discuss?
11 Q. Did you discuss the situation with vice-president Snyder at
12  all, I'm talking about while this application was pending,
13  before your rejection letter?
14 A. Yes.
15 Q. You recall when you had the discussions with vice-president
16  Snyder?
17 A. Date and actual time, I do not, I cannot recall.
18 Q. Do you recall what the nature of the conversation was?
19 A. It was, it was, had conversation was, yes.
20 Q. And what did the two of you discuss in this conversation?
21 A. Did Micah's application, or had, did Micah complete the
22  necessary requirements of the university to going through
23  the admissions process to qualify himself as a
24  matriculating student pursuing a college degree.
25 Q. At this time, did you understand that OPTIONS students were

47

1  not matriculating students?
2    MR. BOONIN: Prior to the meeting?
3 Q. (Continuing by Mr. Davis:) At the time you met with
4  doctor, or with vice-president Snyder, did you know that
5  the OPTIONS students were not matriculating students?
6 A. Yes.
7 Q. And it was a firm policy of the university, of the housing
8  department, that matriculating students, nonmatriculating
9  students were not eligible for housing, correct?
10 A. During the time I was employed, I embody those policies of
11  the institution, of the institution, yeah.
12 Q. So that was a firm policy of the university?
13 A. Yes.
14 Q. So why was there a need to have a conversation with
15  vice-president Snyder?
16 A. There was, because, because for the first time, I mean our
17  process for admission into housing was to when we got the
18  contract, was to go in and see of the student had a G
19  number, and, and Micah showed that he had a G number.
20 Q. So you now were questioning whether OPTIONS students were
21  matriculating students?
22 A. Yes.
23 Q. And how do you know Micah had a G number?
24 A. It was included on his contract.
25 Q. Was --

48

**Page 57**

1 taken care of, we could not assign you for housing. In
2 that vein, yes, those things did occur.
3 Q. Okay. Do you recall how many times that may have happened?
4 A. In the nature of my job, again, that wasn't something that
5 I kept count of.
6 Q. When a contract is received and it's being processed, do
7 you know how many people in your department usually are
8 involved in that process?
9 A. Once the contract is handed over to the staff member?
10 Q. Once the contract is handed over to the staff member.
11 A. Two, as many as three.
12 Q. Who would be the first person?
13 A. Under my leadership, as I recall, the first person would
14 have been Roxanne Fisher.
15 Q. What does she do with it?
16 A. She gets the contract, she verifies that all of the
17 information is filled out accurately, then she, she
18 verifies the data that should be on the contract. She
19 checks to see if they have a G number, and whether or not,
20 again in 2006 that was a trigger to us that the student
21 was, you know, our standard process was that the student
22 was admitted to the university through the admissions
23 process. She would verify that, and then there's a letter
24 that goes out to that student with whatever information
25 contained in it, the specifics of that. Again having gone

**Page 58**

1 to another university, I don't recall the specifics.
2 Q. Who is the next person that handles it?
3 A. She places that in the file cabinet in Melissa Mitchell's
4 cubicle and at the point, so she places it there, yeah.
5 Q. What does Melissa do with it?
6 A. Then at the time Melissa is making an assignment, she will
7 then gather all contracts contained in her files. She then
8 goes back to another check to verify again that the student
9 is satisfied, has satisfied all of the requirements and
10 there isn't any financial holds or all of those things that
11 would be a burden, a burden to that student. And then she
12 in turn will look at the different students and try to
13 match students according to their interests.
14 Q. And then when she's done with doing her portion of it, does
15 it go on to someone else?
16 A. It does not, only if she has, it does not.
17 Q. Who sends out the final official rejection or acceptance
18 letter?
19 A. Who sends?
20 Q. Who sends out the final official rejection or acceptance
21 letter?
22 A. Clerical staff processes it, but it's under my signature.
23 Q. Does Melissa do that or does Roxanne do that?
24 A. Do which?
25 Q. Compiles the letter for your signature?

**Page 59**

1 A. Roxanne will be the person that sends out a letter saying,
2 we're in receipt of your application, or your contract.
3 And I use application because in my current institution we
4 use the word application, so if I detour that, that's
5 because I'm in that mind set. There, she will actually
6 send out a letter saying that we're in receipt of your
7 contract and whatever else is contained in that letter.
8 And then at the point the assignment is made, Melissa is
9 the person that actually creates those letters, and she
10 actually, I mean it may take the whole staff to stuff the
11 envelopes.
12 Q. Okay. We talked a little bit about, was there any
13 consideration ever given to making an exception for the
14 OPTIONS Program to allow students into the housing program?
15 A. Any consideration to exception?
16 Q. I'm just asking if it was considered.
17 A. At this current time, to my knowledge, no.
18 Q. So you were not, did you ever consider it?
19 A. At this current time, to my knowledge, no. The university
20 policy said they had to be officially enrolled through the
21 admissions process.
22 Q. Did you have any conversations with Mary Beth Snyder
23 regarding where this was considered?
24 A. At the current time, to my knowledge, when you say
25 considered?

**Page 60**

1 Q. That you were considering, or it was discussed making an
2 exception to the policy that would allow OPTIONS students?
3 A. At this current time, to my knowledge, no.
4 Q. Just to clarify. You didn't participate in any
5 conversations?
6 A. I'm sorry.
7 Q. You didn't participate in any conversations, or you don't
8 remember participating in any conversations?
9 A. I'm sorry.
10 Q. I'm asking you to clarify your answer to the last question.
11 I'm a little unclear. Are you saying that you definitely
12 didn't participate in any conversations, or you don't have
13 any recollection of any conversations?
14 A. Based on, as I understood your question to be is, was I
15 involved in any conversation with Mary Beth Snyder about
16 considering lifting our housing policies and procedures to
17 allow a nonmatriculating student to reside in the
18 facilities. I don't think we ever discussed lifting that
19 process. I cannot recall such a discussion.
20 Q. Did the family, did Micah file, the plaintiff in this case,
21 did he ever ask you to make an exception for the OPTIONS
22 students and allow them into the housing program, make
23 exception to or waiver of the university's policy?
24 A. To waiver the housing policy?
25 Q. Yes.

| | | | | |
|---|---|---|---|---|
| 1 | A. | Yes. | | |
| 2 | Q. | Did his father, Rich, ever make that request to you? | | |
| 3 | A. | I don't recall if it was him, or his wife, or both. | | |
| 4 | Q. | Micah's request, did he make that prior to the filing of | | |
| 5 | | this lawsuit? | | |
| 6 | A. | I don't remember the time and the place when that was going | | |
| 7 | | on, and I really don't recall when the lawsuit was filed. | | |
| 8 | | And so Micah definitely was vocal that he wanted to live in | | |
| 9 | | a residence house, but was that before the lawsuit. I will | | |
| 10 | | be honest, I can't recollect exactly the time and place. | | |
| 11 | Q. | If I told you the lawsuit was filed in November of 2008, a | | |
| 12 | | year after the application had been submitted. | | |
| 13 | A. | Uh-huh. | | |
| 14 | Q. | Would you recall any, if Micah made his request any time | | |
| 15 | | prior to November of 2008? | | |
| 16 | A. | Yes. | | |
| 17 | Q. | You said you weren't sure if it was Rich Feldman or Janis | | |
| 18 | | Fialka, or if it was them together, do you recall the | | |
| 19 | | parents making that request prior to November of 2008? | | |
| 20 | A. | I can't, I can't, to my, to the best of my recollection I | | |
| 21 | | can't remember the exact time and place. | | |
| 22 | Q. | What granting, if you had granted his requested to waiver, | | |
| 23 | | what problems would that have caused for you as director of | | |
| 24 | | housing and administering the program? | | |
| 25 | A. | I can't speculate as to what that process would be because | | |

Page 61

1  the OPTIONS students did not qualify to live in the
2  residential facilities.
3  Q. You didn't make any inquiry into what that would look like,
4     or you just pretty much said, that's the policy, it's not
5     changing, I'm not making any further inquiry into it?
6  A. I think we discussed earlier as to how that process
7     occurred with Mary Beth and, you know, my question going to
8     Mary Beth, and that's the process that I followed and that
9     was the extent of the process.
10 Q. Did you ever talk with anybody from disability support
11    services in that department at all about this?
12 A. Yes.
13 Q. Who did you talk with here?
14 A. Linda Sisson.
15 Q. And what did you discuss with Linda?
16 A. That meeting, whether or not, whether or not Micah met the
17    enrollment, met the enrollment guidelines or policies and
18    procedures and process to be a matriculated student at the
19    university.
20 Q. But did you discuss at all waiving that policy with her as
21    an accommodation of a disability or anything of that
22    nature?
23 A. To the best of my knowledge at this current time I do not
24    remember.
25 Q. Did you ever discuss with any organization, outside of

Page 62

1     Oakland University, the possibility of on campus housing
2     for participants in the OPTIONS Program?
3  A. To the best of my knowledge, no.
4  Q. Did you discuss with any organizations about off campus
5     housing for participants in the OPTIONS Program?
6  A. No.
7  Q. What about the transitions program?
8  A. When you say outside organizations.
9  Q. Any organization outside of Oakland University, did you
10    discuss the possibility of off campus housing with them,
11    either for the OPTIONS Program or the transitions program?
12 A. To the best of my knowledge, no.
13 Q. I'm going to ask you to look at your deposition exhibit,
14    again, I believe it was marked as Exhibit 1. And in there
15    on paragraph fifteen it talks, give you a moment to look at
16    that. What I want to direct your attention to, it makes
17    mention of other colleges or universities that have an
18    affiliation agreement with the university. Are there any
19    such colleges or universities while you were the housing
20    director?
21 A. Other colleges or universities that have affiliation
22    agreements?
23 Q. For housing.
24 A. Agreements for housing?
25 Q. For housing students of those universities or colleges?

Page 63

1  A. For students attending academic programs, and of course as
2     students, those students would be housed in, or could be
3     housed in our residential facilities because they were
4     matriculating students.
5  Q. My question was, do you have any such agreements?
6  A. Do I have an agreement with another housing program?
7  Q. Does Oakland University, when you were the housing director
8     at Oakland University housing department --
9  A. Have an agreement?
10 Q. -- with any other college or university?
11 A. Oakland University housing department have an agreement
12    with another university housing program or just university
13    period?
14 Q. It was your affidavit. You're referring there to a degree
15    program at another college or university has an affiliation
16    agreement with the university, I'm assuming the university
17    means Oakland University, correct?
18 A. Yes, the university had an affiliation agreement.
19 Q. Oakland University?
20 A. To the best of my knowledge, yes.
21 Q. Who did they have affiliation agreements with?
22 A. I cannot recall all of those affiliation agreements.
23 Q. Did you ever --
24 A. The process.
25 Q. As you are the housing director, have you ever signed any

Page 64