RICHARD FELDMAN
October 19, 2009

Page 37

1 Q. Okay.
2 A. Maybe it was '4.
3 Q. I'm not suggesting that it is. Somewhere in 2003,
4    '04?
5 A. Yeah.
6 Q. So two weeks into the term?
7 A. The program got initiated in O.U. because Rochester
8    agreed to become the center base for this initiative,
9    and O.U. agreed to give space to Rochester Schools.
10 Q. So this is the Transitions program?
11 A. This is the Transitions program.
12 Q. Okay. Now, you said that your wife was involved in a
13    lot of this planning. Is there like a -- for lack of
14    a better term -- like a division of labor between you
15    and your wife as to this is what she does and this is,
16    more or less, what you do in terms of helping Micah
17    navigate through these programs?
18 A. I don't think there is a defined division of labor.
19    Janice has different resources and relationships. I
20    have a full-time job. I do what I can do, and she
21    does what she can do. We're both coparents in raising
22    our children, both Micah and Emma.
23 Q. When there is meetings at the university, does one of
24    you attend them more often than the other?
25 A. It depends who is available. Sometimes we would both

Page 38

1    go. There are no rules to the game.
2 Q. So what's your understanding as to how OPTIONS
3    evolved?
4 A. What happened was Rochester Schools decided that it
5    was not in their interest to have out-of-district
6    students being their responsibility. We're from
7    Berkley Schools. There were students from Birmingham
8    Schools, there were students from other districts in
9    Oakland County, and Rochester became the center for
10    all of them as well as their own students from
11    Rochester. They decided it wasn't beneficial to them
12    to have the responsibility. They were having some
13    cutbacks. They were not satisfied with some of their
14    expectations. They were -- they had -- they decided
15    at the end of two or three years to end the program
16    and made Rochester Schools only accessible to students
17    from the Rochester District, and then there was a
18    transition year of Micah and other students who were
19    in the Transitions program to continue to go to
20    classes under more of the direction of their
21    district-based space, and then arises the OPTIONS
22    program.
23 Q. Do you know how that was initiated?
24 A. The OPTIONS-based program?
25 Q. Yes.

Page 39

1 A. Yeah. Essentially, Professor Bob Wiggins has always
2    been, from the very beginning, totally supportive of
3    creating an inclusive program at the university.
4 Q. What do you mean by "inclusive program"?
5 A. "Inclusive program" means where students with
6    cognitive disabilities are part of classes, where
7    students with cognitive disabilities are part of
8    services, where students with cognitive disabilities
9    are part of clubs, where students with cognitive
10    disabilities, when they would start paying full
11    tuition, would be part of housing. He had a dream
12    that inclusion meant the full college life experience.
13 Q. Professor Wiggins?
14 A. Professor Wiggins. And if you would watch the film --
15    and I hope you have a chance to watch the film --
16    you'll see the love and the belief that he had in
17    where this OPTIONS -- where the Transitions program
18    was going and the OPTIONS program. What he didn't
19    like was the involvement of different school
20    districts, and, therefore, wanted to create something
21    that O.U. didn't have to deal with superintendents
22    from other schools.
23 Q. The participants in the OPTIONS program are no longer
24    connected to their home school districts?
25 A. Some are and some aren't. Micah still has an IEP.

Page 40

1 Q. How is -- doesn't he have a Certificate of Completion?
2 A. He still has an IEP.
3 Q. Does Micah have a Certificate of Completion?
4 A. I think he does, but he still has an IEP.
5 Q. When did he get a Certificate of Completion?
6 A. I don't know.
7 Q. When was the last time he was at an IEPC?
8 A. We have an IEP every year, so it must have been last
9    June of -- June of 2009.
10 Q. Who was present of that IEPC?
11 A. That one was Sharon Berke from Berkley High School and
12    the super -- Special Ed. Director Jeff Montgomery, and
13    Micah and myself maybe -- Micah and myself. The year
14    before, Bob Wiggins was at the IEP as well as Kim
15    Dembrosky. Bob has always been supportive of this
16    movement towards a full inclusive experience.
17 Q. Does Micah receive any financial support from Berkly?
18 A. No, he does not receive any financial support from
19    Berkley.
20 Q. Any services from Berkley, other than the IEP?
21 A. He receives consulting for speech sometimes, where
22    it's available. I'm not sure he has utilized it this
23    year. And he meets with his consultant teacher,
24    Ms. Berke.
25 Q. How often does he meet with her?



Page 41

1    A. It's based on their schedules and based on their
2       decisions and needs.
3    Q. Is it weekly?
4    A. No, it's not weekly.
5    Q. Is it monthly?
6    A. It could be.
7    Q. Do you or Micah or your family receive any financial
8       support for the fees that are paid to Oakland
9       University?
10   A. No. We receive no financial support from anyone for
11      the fees that we paid -- for the tuition that we pay
12      of well over $10,000 per year. It's called tuition.
13      It's not called fees, sir.
14   Q. You're not eligible for any kind of federal financial
15      aid, are you, or your son?
16   A. I have never applied for financial or federal aid for
17      Micah.
18   Q. You know that you're not eligible for that. Isn't
19      that true?
20   A. I don't know that. Do you know that?
21   Q. In a deposition, I ask the questions, sir.
22   A. I see. Thank you. But you assumed I knew it, so I
23      didn't understand. So it wasn't a question.
24   Q. So Professor Wiggins decided to try to develop the
25      OPTIONS program. Correct?

Page 42

1    A. Professor Wiggins instituted a series of monthly
2       meetings with parents, with professionals, with people
3       from Oakland Schools, with people from other school
4       districts to discuss what the OPTIONS program would
5       be.
6    Q. Were you involved in those meetings?
7    A. I went to a couple of them, yes.
8    Q. How many?
9    A. I would say a couple of them I went to.
10   Q. Do you recall when?
11   A. I don't remember which ones I went to.
12   Q. What was discussed at these meetings that you
13      attended?
14   A. At those particular meetings, they discussed the
15      contributions O.U. had versus the contributions that
16      Oakland Community College had, because they had a
17      speaker from Oakland Community College there one time.
18      They discussed developing their purposes and
19      principles to guide the OPTIONS program. I can't
20      recall anything in particular.
21   Q. And ultimately, the OPTIONS program was started?
22   A. The OPTIONS program was started, and the OPTIONS
23      program was started, I think, in September of 2007.
24      So I guess the meetings I went to were in the spring
25      of 2007, possibly the fall of 2006. And the -- in the

Page 43

1    spring of 2007, before the OPTIONS program came about,
2    the discussions that I often had with Professor
3    Wiggins were that once we paid tuition, he would have
4    the opportunity to live in the dormitory because he
5    would be a full student.
6    Q. And we'll get to that in a moment.
7       During this process of starting up the
8       OPTIONS program, did you see or review any documents
9       or see any documents regarding the program?
10   A. I received the minutes and calls for the meetings that
11      Bob would send out.
12   Q. These are the minutes of the Advisory Board?
13   A. Yes.
14   Q. Anything else?
15   A. I don't -- can't recall.
16   Q. And at some point, you signed up for -- or Micah
17      signed up to be a participant in the program.
18      Correct?
19   A. That's correct.
20   Q. Did you review any documents while that was occurring?
21   A. We went to some meeting in the spring of 2007, I
22      think, late spring, but I don't remember what the
23      documents say or what they looked like.
24   Q. Would there be an application form or something like
25      that?

Page 44

1    A. They were very basic, typewritten pieces.
2    Q. Did you ever see a brochure about the OPTIONS program?
3    A. I have seen OPTIONS program brochures.
4    Q. Prior to September of '07, did you see any brochures?
5    A. They were Transitions' brochures, and I think Micah's
6       picture was on the brochure, if I remember correctly.
7    Q. So I'm asking about the OPTIONS brochure in
8       particular. Do you recall the first time that you --
9    A. The first time I saw it, no, I don't recall the first
10      time I saw it.
11   Q. Do you recall whether it was before or after Micah
12      actually applied to be a part of the program?
13   A. I don't recall.
14   Q. When is the first time that the topic of housing -- of
15      your son living in university housing came up, to your
16      recollection, or the OPTIONS program or OPTIONS
17      participants in general?
18   A. It came up definitely at the PCP, in the
19      person-centered planning, in the spring of 2007. It
20      came up in conversations that I had with Bob Wiggins
21      at Starbucks Restaurant as well as other
22      conversations, where the whole premise of now paying
23      tuition of -- Bob's whole goal was to get the students
24      from being what he called guest students in the
25      Transitions program to full students, fully enrolled



Page 45

1  students paying tuition, and once they could make that
2  change, he would be eligible for housing, and that's
3  why Bob brought and introduced Lionel Maten to our
4  person-centered planning, and that's where the journey
5  was going. It was the journey to full inclusion, the
6  full college experience, including housing.
7  Q.  Who was talking about this issue of needing to be a
8      fully enrolled student as a condition for being in the
9      university housing?
10 A.  Bob. Bob Wiggins.
11 Q.  What did he say about that?
12 A.  Essentially, that once Micah was paying full tuition,
13     all the obstacles to housing, to having to get any
14     extra clearance to use any of the services would all
15     go away. Everything would be opened to Micah,
16     including housing.
17 Q.  And in his opinion, that's what he told you would
18     happen?
19 A.  In my opinion, as the highest person we were dealing
20     with at the university, at Oakland University. He was
21     the spokesperson of the university.
22 Q.  And why -- who is equating -- sorry.
23         What is your understanding as to what
24     "fully enrolled" means?
25 A.  "Fully enrolled" meant that Micah would be paying full

Page 46

1  tuition --
2  Q.  That's the only --
3  A.  -- as every other student, and would be eligible,
4      because O.U. and Bob Wiggins had a belief and a vision
5      that inclusive education at the college level for kids
6      with cognitive disabilities meant the full college
7      experience and that housing was part of that
8      experience.
9  Q.  Is it your view, sir, that just paying full tuition
10     means that you're fully enrolled in the university?
11 A.  What's the question?
12 Q.  Is it your position, is it your view that just as
13     anyone pays full tuition, they're automatically fully
14     enrolled?
15 A.  No. It was Bob Wiggins' position that the OPTIONS
16     program, when instituting full payment and tuition,
17     would open up housing for students with cognitive
18     disabilities to live in the dormitory. That's what
19     opened the door to this entire discussion. It was not
20     anybody else.
21 Q.  So you did not want to --
22 A.  Oh, we wanted it.
23 Q.  -- live in the dorms?
24 A.  Micah wanted to live in the dorms. No question about
25     it. But what made it an agenda item is your

Page 47

1  university putting it on the front burner of the
2  agenda once the OPTIONS program became a reality.
3  That's what made it the issue.
4  Q.  Because Dr. Wiggins wanted to see if it were possible
5      to happen?
6  A.  Because Dr. Wiggins and his commitment to inclusive
7      education and the journey that he had been part of
8      with our family and with other families at Oakland
9      University was to go towards that and reach that goal.
10 Q.  Okay. Now, you understand that the OPTIONS -- the
11     individuals participating in the OPTIONS program don't
12     earn any college credit for the courses that they
13     attend. Is that true?
14 A.  Micah does not earn college credit for the courses
15     that he attends, that's correct, which was not very
16     significant, because education to me and education to
17     Bob and education to anybody who lives in the 21st
18     century is not about credits. It is about people
19     growing and having the opportunity to reach their
20     potential. And Bob Wiggins understood, as Dean Otto
21     when she implemented the program, understood that
22     education for students with cognitive disabilities and
23     all the higher-act education programs that are now
24     coming out from the federal government are about
25     individuals reaching their human potential. That's

Page 48

1  what education is about. It's not about credits.
2  Q.  Or grades?
3  A.  It's about human beings growing to the best of their
4      ability to reach their human potential.
5  Q.  You said Dean Otto believed that?
6  A.  I think she was very excited from those early meetings
7      about the possibility of what inclusive education
8      could mean.
9  Q.  What is the basis of your knowledge of what Dean Otto
10     believed?
11 A.  Just the conversations and the warmth in which --
12 Q.  Conversations with who?
13 A.  With Dean Otto and, you know, in the very beginning.
14     And, basically, she was Professor Wiggins' boss, so I
15     didn't assume that Professor Wiggins was doing
16     anything without his boss being aware of it.
17 Q.  You said there was a meeting with Lionel Maten.
18     Correct?
19 A.  Yes.
20 Q.  How many times did you meet with him?
21 A.  I met with Lionel -- Lionel came to the
22     person-centered planning in the spring of 2007. I had
23     the chance to meet him when Micah was given the tour
24     in the fall -- in the spring of 2007. I had the
25     chance to meet Lionel in the fall of 2007 at the O.C.,



Page 49

1   when I had just -- I was either picking up Micah or
2   dropping him off, and we had a chance to talk there.
3   So I would say three times I had the chance to have
4   conversations with Mr. Maten.
5   Q.  Okay.  What was the first conversation?  At the PCP, I
6       think you said it was.
7   A.  The first conversation at the PCP was him being very
8       warm and very exited that he could be part of this
9       process of attending the PCP.  He talked about his
10      experience at Wright University and working in
11      disability services, and there is a part of me -- and
12      I might be wrong, but there is a part of me that
13      thinks he referenced having a nephew or niece with a
14      disability and having some sense of sensitivity
15      towards what it meant to be a relative of a parent,
16      and then he warmly welcomed us to the housing
17      office --
18  Q.  Okay.
19  A.  -- and introduced us to the student who gave us the
20      tour --
21  Q.  I'm still talking about the first meeting.  Let's not
22      go to the second one yet.
23          Is there anything else he said in that PCP
24      meeting that you recall?
25  A.  Just that he was glad to be part of the process.

Page 50

1   Q.  Do you recall him saying that to be in the dorms, the
2       individual has to be a student?
3   A.  Not at all.  And subsequently, he was at the meeting
4       where it was all about paying tuition and the OPTIONS
5       program being eligible.  He never said that to me.
6   Q.  Okay.
7   A.  And Micah was a student.  Micah was an enrolled
8       student, so --
9   Q.  Now, the PC [sic] process is controlled by whom?
10  A.  PCP.  It's person-centered planning.  The PCP process
11      is controlled or organized by Micah and Kim Dembrosky.
12  Q.  Who is that?
13  A.  Kim Dembrosky is Micah's MORC advocate, Macomb-Oakland
14      Regional -- MORC something.  The two of them invite
15      people from the university, they invite peers, they
16      invite students, we invite community people, and it's
17      a way to assess Micah's previous year and make plans
18      for his upcoming year.  It's a way -- it's an expanded
19      version of what is called the Circle of Friends,
20      Circle of Support, and the IEP -- where folks from the
21      community get involved in discussing the possibilities
22      and the obstacles that need to be overcome.
23  Q.  So it is not a university event?  The university
24      doesn't control and run the program?
25  A.  The university does not control it.  They did have

Page 51

1       representatives there.
2   Q.  They were invited by you and your family and the
3       school, or MORC, to attend?
4   A.  That's correct.
5   Q.  And they did?
6   A.  That's correct.  They were invited by us to attend.
7   Q.  Just as other community members who were invited
8       attended?
9   A.  That's correct.
10  Q.  Okay.
11  A.  And they come as people who know Micah as well as
12      spokespersons for the particular responsibility they
13      have, because that's why they were invited.
14                  MARKED BY THE REPORTER:
15                  DEPOSITION EXHIBIT 1
16                  3:42 P.M.
17  BY MR. BOONIN:
18  Q.  Before you is a document that has been marked as
19      Exhibit 1.  That's a three-page document that was
20      provided to us through your attorney.  It appears to
21      be a PCP report or summary of some event.  Do you
22      recognize this?
23  A.  Let me read it for a minute here.
24          Okay.  I know it is part of -- it looks
25      like it is part of a MORC thing.  Is that right?

Page 52

1   Q.  Well, it has to do with PCP.
2   A.  It must be MORC.  Okay.
3   Q.  It is something that you provided.
4           Does this reflect what was discussed at
5       that meeting?
6   A.  The concept of replacing guest student status with
7       enrollment to increase access to community housing,
8       supports, and services, I think that was part of the
9       discussion.
10  Q.  And that would be explored, according to what it says
11      on the first page.  Correct?
12          THE WITNESS:  Is that the same thing?
13          MR. DAVIS:  Appears so.
14          THE WITNESS:  Oh, okay.
15  A.  Well, the PCP isn't in a position to force anybody to
16      do anything.
17  BY MR. BOONIN:
18  Q.  Okay.  In looking at the last page under "Obstacles,"
19      it says, "Oakland University needs to develop a policy
20      to allow Micah to enroll as a registered student
21      before he will be able --
22  A.  There's the page.  I'm sorry?
23  Q.  "-- to access campus housing/services support," toward
24      the bottom of the page under "Obstacles."
25  A.  That's correct.

Page 53

1   Q.  So that was discussed at that meeting?
2   A.  Absolutely. The whole concept of registering -- I'm
3       not sure that the phrase "registered student," what
4       that actually means. To us, what it meant was that he
5       would be paying full tuition and no longer be a guest
6       student. That's what it meant with the discussions
7       with Bob and Mr. Maten.
8   Q.  That was your understanding?
9   A.  No, that was Bob's understanding, and that's why Bob
10      was so -- let me take a deep breath -- why Bob was so
11      surprised when he got the e-mail, when Vice President
12      Snyder or somebody said, no, no, no, you've gone too
13      far.
14          So let's be very clear what happened. You
15      may disagree, and I don't have a problem with that --
16  Q.  I'm not arguing with you today.
17  A.  I'm not arguing.
18  Q.  You have answered the question.
19  A.  What was the question?
20  Q.  I think you have already answered it.
21  A.  What was the question, so I make sure I did?
22  Q.  That this was discussed at the meeting.
23  A.  What was discussed at the meeting very clearly was
24      that once Micah started paying full tuition, he would
25      move from a guest student to a registered student and

Page 54

1       be eligible for housing. That was very clear, and
2       that's why we moved forward with the application.
3          MR. DAVIS: I would like to take a break
4       for a moment.
5          MR. BOONIN: Not quite yet, if we can
6       finish this line. Can we?
7          MR. DAVIS: Let's take a break for a
8       moment. Just real quick.
9          MR. BOONIN: Go ahead.
10         (Recess taken at 3:46 p.m.)
11         (Back on the record at 3:52 p.m.)
12  BY MR. BOONIN:
13  Q.  You understand you're still under oath?
14  A.  Absolutely, sir.
15  Q.  You said that you next met with -- or had an
16      opportunity to meet with Mr. Maten when he arranged
17      for you to take a tour --
18  A.  That's correct.
19  Q.  -- of the housing?
20  A.  That's correct.
21  Q.  So what was his involvement in those arrangements, to
22      your knowledge?
23  A.  We had a couple of e-mails back and forth to arrange
24      the tour of he and Micah, or Micah, he, and myself.
25      I'm not sure if I was cc'd or not. We met -- I met

Page 55

1       with Micah at the university. We walked over to his
2       housing office. He welcomed us -- warmly welcomed us,
3       introduced us to a student. We went on a tour with
4       the student; saw the dormitory. I think we saw two,
5       possibly three different kinds of rooms, and then we
6       returned to the office and thanked Mr. Maten for the
7       tour, and that was it.
8   Q.  And was there anything else discussed about housing or
9       housing eligibility by Mr. Maten at that time?
10  A.  Nothing by Mr. Maten. I might have had with him -- I
11      probably did have with him -- the conversation that I
12      often had, and Bob Wiggins, that we often had, was
13      that Micah was not going to displace a full student
14      enrolled, matriculating student, in the fall of the
15      year and understood that he would be given the chance
16      to live in the dormitory when there was available
17      space, which we understood to be in the winter term;
18      so we always understood that.
19  Q.  Why did you have that understanding?
20  A.  Because that was the conversation that we always had
21      with Bob and that we always had with Mr. Maten, that
22      he was not put on the waiting list as such. He would
23      not -- it would be after -- when there was openings in
24      the dormitory, opportunities, he would have a chance
25      to be there, because he was now paying full tuition

Page 56

1       and was now a fully enrolled student.
2   Q.  But he would be only eligible if only all of the other
3       matriculating students had a room?
4   A.  That was our understanding, and we had no problem with
5       that, and that's why we were so shocked when
6       everything changed.
7   Q.  And when do you believe that you discussed that with
8       Mr. Maten, if at all?
9   A.  After the PCP had that conversation -- had that
10      conversation on the phone with Mr. Maten --
11  Q.  Do you recall saying that to him, or do you just
12      believe because you said that to other people that you
13      probably said that to him?
14  A.  No, I had that conversation, because we asked the
15      questions, how does it look for housing, how does
16      it -- how long is the waiting list, what's happening.
17      And as it got towards the winter, you know, we were
18      curious to see how the housing numbers were going.
19  Q.  You applied in --
20  A.  In the fall. The fall for the winter term, right. So
21      as the fall discussions came up, you know, we were
22      curious to see, you know --
23  Q.  How many discussions did you have with Mr. Maten?
24  A.  Just a couple.
25  Q.  And by telephone or by e-mail or other?

Page 57

1   A. All of the above.
2   Q. And you said that you believed you talked to him at
3       the PCP meeting. You said that you had a discussion
4       with him when you went there for the tour, and you
5       said that you had a discussion with him once when you
6       bumped into him at the O.C.?
7   A. That's right. That was in person. Those were in
8       person. Then we had e-mails and phone conversations
9       as well.
10  Q. How many telephone conversations?
11  A. A couple.
12  Q. And were they prior to the tour or after the tour?
13  A. I can't recall.
14  Q. Was your wife involved in any of these discussions
15      with Mr. Maten?
16  A. No. The division of labor, I was taking
17      responsibility for the housing, setting up the tour
18      with Micah and Mr. Maten, or following up on that.
19  Q. You said there were e-mails that you had with
20      Mr. Maten?
21  A. Uh-huh. Yes. There were e-mails.
22  Q. Do you have copies of those e-mails?
23  A. I doubt it. It was many years ago. I don't keep
24      e-mails that are three or four years old.
25  Q. And then the next time you saw him was at the O.C.,

Page 58

1   which is the student union. Correct?
2   A. It was the next time I talked with him. I might have
3       seen him somewhere else, but that was the next time I
4       talked to him.
5   Q. What did you discuss at that time that you met with
6       him at the O.C.?
7   A. Essentially that we were looking forward to the
8       housing opportunity in the winter.
9   Q. When was this discussion?
10  A. The fall of 2000 -- 2007?
11  Q. So before or after Micah applied for housing?
12  A. Before.
13  Q. Do you know who at the university is responsible for
14      housing policies and housing operations?
15  A. Now I know. It's Vice President Snyder. Did I know
16      then who was responsible? No.
17  Q. Did you have any idea who was responsible?
18  A. I assumed Mr. Maten was the Director of Housing and
19      that Mr. Maten, plus the Chairman of Education --
20      Department of Education -- that's not called the
21      Department of Education. Bob Wiggins was the
22      Assistant Dean or --
23  Q. Associate Dean of the School of Education?
24  A. School of Education. I'm sorry. School of Education.
25      Between the two of them, they were pretty high

Page 59

1   officials capable of representing the university's
2   position.
3   Q. You understood, though, that Professor Wiggins was not
4       the housing person? You understand that, didn't you?
5   A. I understood that Professor Wiggins was the person
6       driving the OPTIONS program towards a fully inclusive
7       college experience which included housing as part of
8       his desire, as a spokesperson for the university, and
9       that Maten was the Director of Housing, and the two of
10      them sat in that meeting in the spring of 2007, giving
11      hope to a new step in this journey for inclusion.
12  Q. Was anything else said at that PCP meeting that you
13      have not already testified to?
14  A. I'm sure there were a lot of other things said, but
15      that's what I -- I'm sure we talked about his classes
16      and we talked about other things but --
17  Q. With respect to housing.
18  A. Oh, with respect to housing? Not that I can recall.
19  Q. Now, have you, your wife, or your son been looking
20      into other housing options for Micah while he has been
21      participating in the OPTIONS program?
22  A. There was a short moment -- there's two stages to
23      that. Immediately after the university took the
24      position that he could not live in the housing, the
25      dormitory, there was some discussion with Bob and Lea,

Page 60

1   who worked in the OPTIONS program, about finding some
2   apartments, but when I called Lea, she was very clear
3   that these apartments were a disgrace and were not
4   worth pursuing. So we did not have any further
5   discussion with people from O.U. about housing.
6       Since that time, Micah had put up some
7   flyers, looking for -- while he is waiting to live in
8   the dormitory, waiting for the opportunity for that to
9   happen, has put up some flyers, looking to see if
10  there is someone who would like a roommate so he can
11  move forward on this other part of a more fully
12  inclusive life.
13  Q. And when did he post these flyers?
14  A. Say last spring, the spring of 2009.
15  Q. Any other time that he was seeking a roommate?
16  A. Well, on the day of this PCP, where Bob had sent the
17      e-mail saying that he had bad news and was very
18      saddened and disappointed, that the housing
19      opportunity was going down the drain -- my words, not
20      his -- at that meeting --
21  Q. I'm sorry. That was at a PCP meeting?
22  A. Oh, that was the next PCP meeting --
23  Q. Okay.
24  A. -- in November of 2007, or December -- it must have
25      been the winter. It was getting towards the winter,

Page 89

1 Q. I'm sorry. You don't recall the person's name at all?
2 A. That's correct. You will have to ask Micah.
3 Q. Do you recall where she lived?
4 A. One of the big dormitories. I forget which one.
5 Q. Do you know which one?
6 A. No, I don't.
7 Q. Do you know how long she was here?
8 A. A semester or a year. I forget if it was a semester
9   or a year. You can ask Micah, and he'll give you the
10   information at trial.
11       See, I think he was correct where he
12   acknowledges that Micah selected night classes -- oh,
13   that's me. Micah selected night classes and a.m.
14   classes based on that he would be in the dormitory
15   commitment.
16       So I wonder where he got that commitment.
17   Why would he take a night class and an 8 o'clock class
18   if it wasn't because everybody at the university said
19   he would be living in the dormitory? I just want you
20   to know who started this discussion.
21       MARKED BY THE REPORTER:
22       DEPOSITION EXHIBIT 5
23       4:52 P.M.
24 BY MR. BOONIN:
25 Q. Before you is a document marked as Exhibit 5. It's

Page 90

1   right there, Mr. Feldman.
2 A. I won't write on it.
3 Q. Do you recognize it?
4 A. It is from Kathryn Miller to me, and Kathryn Miller, I
5   guess, was somebody I met through Micah who did
6   something at Oakland University as a student. I think
7   she was an R.A. Is that right?
8 Q. How did you get in touch with her? How do you know
9   her?
10 A. I'm reading. Sorry. How we met her? I think she --
11   either Micah knew her as an R.A., or she may have been
12   the young woman who Micah and I met, having dinner at
13   one of those restaurants across from the university,
14   and I think she was a waitress and we were starting --
15   Micah introduced me and we were talking, so --
16       I'm not sure how we met her.
17 Q. Do you know what prompted this e-mail?
18 A. Why I wrote this?
19 Q. Yes.
20 A. I think it's pretty obvious. She indicated to me in
21   our conversation that she was either an R.A. at some
22   point or lived in the dormitory, and I asked if she
23   knew of folks that would contradict this new policy
24   that was being initiated and created out of the blue,
25   post tour, post application, post everything, around

Page 91

1   this B.A. stuff. So we were writing around trying to
2   get more information, and this is what she wrote back.
3 Q. Have you had any contact with her since receiving
4   this?
5 A. I don't think so, no. No.
6 Q. Do you know where she is now?
7 A. Not a chance. Don't have the slightest idea.
8 Q. Do you expect her to testify at this trial?
9 A. I don't make the decision of who testifies at the
10   trial.
11 Q. Do you have -- are any of the people that she is
12   referring to in here the Turkish student that you were
13   talking about? Do you know?
14 A. No.
15 Q. You don't know or --
16 A. No, they're not.
17 Q. Do you have -- sorry.
18       Is it fair to say you and your wife and
19   Micah developed a campaign to try to get the
20   university to change its mind?
21 A. It is with great honor that we tried to figure out how
22   to get to yes with the university, by meeting with
23   Vice President Snyder, by sending letters of support,
24   trying to figure out what was the real issue. Little
25   did I know that you changed the application.

Page 92

1 Q. Pardon me?
2 A. Little did I know that the university changed the
3   application on the website to create different
4   criteria afterwards.
5 Q. It has been your effort, your desire to have the
6   university waive the matriculated student requirement?
7 A. There was never a matriculated requirement for
8   students based on the application that Micah filled
9   out.
10 Q. But you really have no personal facts to establish
11   that there was -- there has not always been a
12   matriculation requirement. Isn't that true?
13 A. I do know that English-as-a-Second-Language students
14   would live in the university housing, when it was
15   available, and I know there was also never an OPTIONS
16   program raising this question. So the whole
17   discussion is very different from what you're raising,
18   as though the world was the same pre-OPTIONS program.
19 Q. So the application that you signed was developed
20   before there was ever an OPTIONS program, as far as
21   you know?
22 A. The application we signed was based on Professor
23   Wiggins being very clear that once we started paying
24   full tuition, Micah would be eligible to live in the
25   housing, and that's why he had a move-in date, that's



Page 93

1    why you took his money, that's why Bob was so
2    distraught that it took place, and that's why you come
3    up with this amazing story post -- post December of
4    that year.
5    Q.  Now try to answer question.
6    A.  What is your question?
7            MR. BOONIN:  Read the question back.
8            (The requested portion of the record was
9            read by the reporter at 4:57 p.m.:
10           Q.  So the application that you signed was
11           developed before there was ever an OPTIONS
12           program, as far as you know?)
13   A.  I don't know when that application was developed.  I
14       just know what I signed and what appeared on that
15       piece of paper.
16   BY MR. BOONIN:
17   Q.  And other than this one ESL student that you can't
18       remember the name of, tell me where she lived, you
19       know of no other non-matriculated student who has
20       lived in the dorm.  Isn't that true?
21   A.  No, that's not true either.  I said I know of one
22       student from Turkey.  I also know there are English As
23       a Second As a Language, a whole department, that used
24       to have students stay at the university, and the
25       policy was recently changed after you changed the

Page 94

1    application process, and this has been discussed at
2    the board meetings.
3    Q.  Why do you believe that the
4    English-as-a-Second-Language students who were guests,
5    is what you're saying, were allowed to live in the
6    dorms?  What facts do you have to support that belief?
7    A.  Because it says on the application, pre-December 2008,
8    on those applications, when housing is available, you
9    can live in the housing.  That's what folks did.  And
10   if you talked to anybody in the department -- ask the
11   legal counsel to talk to people in the department
12   about what the policy was and what was happening, and
13   now how you've created a more detrimental policy.
14   Q.  Who have you -- have you talked to someone in the ESL
15   department?
16   A.  I just saw some letters of the changing of the
17   application for English as a Second Language from one
18   year to the next, as this whole story has evolved for
19   O.U. to keep Micah out.
20   Q.  So your belief, sir, is that the OPTIONS students are
21   the same as English-as-a-Second-Language students?
22   A.  Uh-uh-uh-uh.  Not at all do I think the OPTIONS
23   students are the same as the
24   English-as-a-Second-Language students.  I think the
25   University, had an OPTIONS program.  I think that the

Page 95

1    university, under the leadership of Bob Wiggins and
2    the Director of Housing had a clear understanding that
3    Micah could live in the dormitory based on the fact
4    that he was now a fully enrolled student, paying full
5    tuition, and then for some reason, this Mary Beth
6    Snyder with legal counsel and anybody else who got
7    involved decided there was something dangerous or
8    scary or descrim -- or unhealthy, that Micah should
9    not live in the dormitory.
10   Q.  Okay.  And other than fact that the application form
11   changed, do you have any facts that would support that
12   belief?
13   A.  I think that Ms. -- Ms. Mary Beth Snyder, when she
14   spoke at the November meeting on -- a November board
15   meeting, begins to very clearly state that Micah will
16   be an added problem, is not capable of living in the
17   dormitory, and there is something about his disability
18   that makes it not a good idea for him to be in O.U.
19   housing, and then she went on to make some statements.  I
20   can remember hearing her after the extensive
21   conversations that other people put forward about why
22   Micah couldn't live in the dormitory and why they
23   needed to change this policy.  After -- two months
24   after, Richard Bernstein and Liz Bauer believed that
25   their statements at the previous board meeting would

Page 96

1    lead to getting to yes.  We had always believed that
2    we could get to yes and we could find a pilot program;
3    we could find a way that Micah could live in the
4    dormitory.
5    Q.  Other than the statement that Vice President Snyder
6    made to the Board of Trustees, are you aware of any
7    other facts that would support your contention that
8    the application form, the contract form, was changed
9    for reasons other than what the university has said?
10   A.  I think when Janice and I met with Vice President
11   Snyder in August of 2008 -- Micah met with her in the
12   spring, and Mr. Maten, and then Janice and I met with
13   Vice President Snyder in August, that when she -- the
14   meeting started at 8:30, and when she handed us the
15   application, and she said the application says Micah
16   cannot live in the dormitory, he is not eligible, she
17   knew that she was giving me a different application
18   form.  So she knew that she had changed the
19   application form on the web, and she knew, and it's so
20   sad that she understood exactly what she was doing.
21   She thought she could win this argument based on the
22   application form, and now that isn't working enough,
23   so you come up with all these other stories to figure
24   out how to come up with housing discussions and
25   academia and other garbage.

Page 97

1  Q.  What happened during that meeting that you just
2      described? I think you said it was in November, or
3      August.  August?
4  A.  It was August of 2008. Janice and I wanted to meet
5      with Vice President Snyder.
6  Q.  Is that the only time you met with her?
7  A.  The only time we have met with Dr. Snyder.
8  Q.  Okay.
9  A.  We wanted to meet to see if there was any way that we
10     could find a way to have a conversation about what we
11     would say to get to yes so Micah could have an
12     opportunity to live in the dorm without them having to
13     change all their policies or accept the changed
14     policy, or whatever they were coming up with at this
15     point, and it wasn't five minutes into the
16     conversation that it was clear it was not a
17     conversation. It was just them allowing us to be in
18     the room with the two of them, and during the
19     conversation, you could see that Mr. Maten was in the
20     office with his vice president, and he had made a big
21     mistake, because out of his mouth came this absurd
22     discussion that he never knew Micah really wanted to
23     live in the dormitory; he only thought Micah wanted to
24     learn to cook in the dormitory. And both Janice and I
25     looked at him and said, what are you talking about?

Page 98

1      This isn't about cooking. But they were making up
2      stories.
3  Q.  What else was said during the meeting?
4  A.  What else was said? We talked a lot about how this
5      was a benefit to both Micah and to the other students,
6      that other students learn a tremendous amount from
7      Micah's participation in their classes and would learn
8      a tremendous amount from living in the same dormitory
9      with Micah, that Micah was clearly capable of living
10     in the dormitory, that O.U. had an opportunity to take
11     another step forward in this journey for pioneering
12     inclusive education, because the film had received
13     such wonderful praise and respect around the country,
14     and we let Mrs. -- Ms. Snyder know that we would be
15     pursuing whatever means were necessary to support
16     Micah's dream and his right to live in the dormitory,
17     and we would be going to the board meetings, and that
18     was -- we wanted to be very up front what we were
19     going to do, because we believed in the principled
20     discussion about this.
21 Q.  What did she say?
22 A.  I don't remember anything of substance.
23 Q.  You don't remember her saying anything during the
24     meeting?
25 A.  Just that that was the policy.

Page 99

1  Q.  What did she tell you the policy was?
2  A.  That he was not a matriculated student.
3  Q.  Other than what you have already testified to today,
4      do you have any facts that would suggest that that's
5      not the true reason?
6  A.  What's the question?
7  Q.  Other than what you have already testified to today,
8      are you aware of any facts that would support --
9  A.  Yes.
10 Q.  -- a belief that that's not a true statement?
11 A.  Absolutely. Professor Bob Wiggins and Lionel Maten
12     were both very clear that Micah was an enrolled
13     student at the OPTIONS program and that he would be
14     eligible to live in the dormitory based on us paying
15     full tuition. That's the facts.
16 Q.  You already testified to that. Are there any other
17     facts?
18 A.  No. Those are the facts.
19         MR. DAVIS:  Can we take a break here?
20         MR. BOONIN:  Sure.
21         (Recess taken at 5:07 p.m.)
22         (Back on the record at 5:16 p.m.)
23 BY MR. BOONIN:
24 Q.  Do you know who Henry Baskin is?
25 A.  Henry Baskin is the Vice Chairman of the Board of

Page 100

1      Oakland University, Board of Trustees.
2  Q.  You sent him a number of correspondence, a number of
3      items?
4  A.  That's correct.
5  Q.  Why did you send items to him?
6  A.  Because Richard Bernstein, who I talked with,
7      suggested that Mr. Baskin was on the board and might
8      be of interest and supportive of Micah's case. So I
9      put together a package of -- a package very similar to
10     what we sent to Vice President Snyder, and that's why.
11 Q.  Did you get a response?
12 A.  I think we spoke once on the phone, and then I never
13     met with him to have a conversation. I met -- I saw
14     him for the first time at the November Board of
15     Trustees meeting, so I did not give any kind of
16     substantive response, other than I've got your
17     materials.
18 Q.  And that was over the phone?
19 A.  I got -- on the phone or from the secretary. I'm not
20     sure. It was so insignificant.
21 Q.  Have you had contact with any of the other trustees at
22     the university?
23 A.  At the board meetings, and we sent packages of
24     materials to all of the Board of Trustees folks, and I
25     wanted to have a conversation with the chairman of the