Page 49

1  expectations for students with disabilities. That's
2  what I mean by forward thinking.
3  Q. And this was the beginning of the Transitions
4     programs?
5  A. I don't know what it was called then, truthfully. It
6     was run through Rochester School District, although
7     not at that point. It was still, you know, brewing,
8     but it was a transition service. Whether or not it
9     was given that name, truthfully, I don't know.
10 Q. Were you involved in the development of the Options
11    program?
12 A. Well, in that, I was -- I had a few -- a couple of
13    meetings over those next couple of years sharing
14    information, talking about what was being done
15    nationally. I think it then eventually became much
16    more of an organized group to develop a new program
17    that Oakland University would run, which was different
18    than the first, what, two or three years prior to
19    that. So I think I attended one meeting only because
20    I was meeting with Bob after that meeting, so...
21 Q. Bob Wiggins?
22 A. Yeah, I'm sorry. Yeah, Dr. Wiggins.
23 Q. Okay. What was that meeting about?
24 A. The meeting around the formation of a new program,
25    that meeting?

Page 50

1  Q. Well, why were you meeting with Dr. Wiggins to begin
2     with?
3  A. Oh, I was coordinating a conference, a symposium on
4     post-secondary education. I was hired by the
5     Developmental Disabilities Institute at Wayne State
6     University to organize a symposium bringing in some of
7     the national leaders as well as local people. So at
8     that point -- and Oakland University was one of the
9     members of the advisory group that we had established
10    to help create the symposium. So I was meeting with
11    him to talk about that.
12 Q. Okay. And then you also attended a meeting regarding
13    Options?
14 A. Yeah, because the meeting was happening prior to our
15    meeting and they said, you know, why don't you come
16    in.
17 Q. And when was this, do you recall?
18 A. That's going to take a little bit of work. You know,
19    I'm guessing it would be -- I'm not very -- 2000
20    and -- - end of 2007, something like that. It would
21    have to be before the symposium. And I know you're
22    going to ask me when the symposium was, but I'm not
23    exactly sure when that was.
24 Q. Let's have as a date, a benchmark, the -- your son --
25 A. Oh, right.

Page 51

1  Q. -- was trying to get into housing in the fall of '07.
2  A. Yes.
3  Q. That's when he applied, for the winter of '08.
4  A. Right, correct.
5  Q. Okay. Does that help you put it in the time-frame?
6  A. Yeah. So let's see, the symposium must have been --
7     I'm really drawing a blank.
8  Q. Okay. Who else was present at the meeting?
9  A. I know that there was a faculty person from Oakland
10    Community College. I remember sitting across -- a
11    male. I don't know his name. My memory's not that
12    good. Maybe Oakland -- I'm guessing there was someone
13    from Oakland Schools and probably community mental
14    health, but I don't know.
15 Q. How long was the meeting?
16 A. Well, I was only there for about 45 minutes.
17 Q. What was discussed while you were there?
18 A. I think it was more about cri -- I think it was about
19    criteria, who would be allowed to enter the -- the
20    program or programs, whatever they might be.
21 Q. Do you know what criteria they were discussing?
22 A. No. I don't recall now.
23 Q. Did your son meet all the criteria for being an
24    Options student?
25 A. I assume so. I -- he was a paying member so...

Page 52

1  Q. Has he completed high school?
2  A. He's still under the auspices. This is -- I feel
3     vague about this. He has -- he can receive services
4     until he's the age of 26. He does have a certificate
5     of completion, as far as I understand. There is this
6     sort of diploma-looking certificate he has.
7  Q. You can still -- one can still receive services after
8     receiving a certificate of completion?
9  A. Well, I -- I question -- I -- I don't know. But I
10    know that he's doing -- I know that he's still, you
11    know, on the -- he's still under the auspices, is the
12    way I see it, of Berkley High School.
13 Q. What services do they provide?
14 A. He has an IEP, an individual educational plan. He
15    meets with his teacher, Sharon Berke, who's sort of
16    the coordinator of that, of his services. They
17    identify what goals he'll work on, assist with that.
18    If there are additional services needed, he would --
19    you know, he could be, you know, assessed as to
20    whether or not that's needed. So it's sort of, like,
21    a -- in my understanding, a coordinator of services.
22 Q. Do they provide any financial support?
23 A. No.
24 Q. Do the -- the person that you dealt -- deal with at
25    Berkley is Sharon Berke you said?



Page 69

1  time?
2  A. It was a brand new program, similar sort of features.
3  Q. That it was a pilot?
4  A. I don't know if I had that sense of it was a pilot. I
5     mean, he had -- he was on campus. He had been on
6     campus, so it didn't feel new to us because he was
7     moving.
8  Q. Was he already in class in September, attending
9     classes in September when you got word that he could
10    apply to housing, do you know?
11 A. Oh, he -- I would guess. I remember we sat the first
12    day of the Options program when we met with Bob
13    Wiggins and maybe Leeann and got the classes. They
14    needed some help in terms of finding faculty because
15    it was -- Leeann had just started, so we got -- I
16    remember that meeting. And then -- you know, after
17    that meeting, maybe, I don't know, a couple months or
18    so maybe, he -- he actually knew that he could apply.
19 Q. Why didn't he apply for housing in the fall?
20 A. Well, it was a -- this was the first time he --
21    everything -- every step of the way was -- was new. I
22    mean, they -- this was the first time we were having
23    to pay tuition. So it was like everything was
24    unfolding and plus I guess now the idea was that I
25    don't think he could apply for the winter until after

Page 70

1  the -- you know, until after students got into the
2  program.
3  Q. Why is that?
4  A. Well, somehow the idea that they were just getting
5     students in for the fall and then they would know.
6     What we learned is that -- because in my mind, I
7     remember thinking, well, he's not going to be able to
8     move in, because there won't be any spaces available,
9     right, because I was naive enough to just think kids
10    would go the whole year. So I remember being informed
11    that some of the kids will drop out, so there will be
12    spaces. And so I remember being informed, instructed
13    about that.
14 Q. Okay. And you understood that the regularly enrolled
15    students would have priority rights to dorm rooms?
16 A. I don't -- there was some discussion about that. It
17    was confusing to me. So I don't know what -- what I
18    just remember is -- sorry to sound like I'm repeating
19    myself -- is that Micah could apply for the winter
20    because there will be space available and he now --
21    and we now are paying tuition. That was the -- that
22    was the basic information that I needed to know as a
23    parent.
24 Q. Okay. So at some point, he applied for housing,
25    correct?

Page 71

1  A. Uh-huh.
2  Q. Were you involved in the completion of that form?
3  A. I think he did that with a friend. He was very proud
4     and didn't want us to be involved in it and we
5     supported that 100 percent. I think he wrote -- if I
6     remember correctly, you know, he has a distinct
7     handwriting, and he put his name on the application,
8     and then filled it out with a friend.
9  Q. Are you comfortable with him signing contracts?
10 A. Absolutely. I'll tell you why. Because he is very
11    cautious and will ask the help of, you know,
12    appropriate people, if he has a question. It's a
13    great skill he has.
14 Q. All right. So he completed the contract. What
15    happened next in regard to the housing issue? You
16    said you had a phone call from Roxanne about meal
17    plans?
18 A. Right. So he went to -- so I said, you know,
19    really -- usually what I say when people ask us
20    questions is either here's Micah's cell phone number
21    or I -- call the home phone number and I won't pick up
22    on the answering machine. You can leave him a
23    message. So that's standard protocol, if you will, at
24    our home. Then he -- what I remember is that he and
25    Kim went to the housing department, I guess, or office

Page 72

1  to learn about the meal plan and to select. And I
2  think he talked to -- because just as she started
3  talking, it was certainly different kinds of meal
4  plans than what I had when I went to school. It was
5  very complicated in my mind. So he also talked to
6  some of his friends who are living in the dorm to say,
7  you know, what should I do here. So he was getting
8  the information he needed to make a good decision.
9  Q. What was Kim's involvement?
10 A. I think to learn what he was learning about.
11 Q. Okay. What happened next with regard to housing, to
12    your recollection?
13 A. I think he picked a -- as far as I know, he picked a
14    plan and then I either got a letter or an e-mail
15    indicating that his move-in date was the 6th, I think,
16    of January, 2008.
17 Q. After receiving that, what was the next thing that
18    happened?
19 A. On the morning of the PCP or IEP -- I think it's a
20    PCP, the PCP, I'm pretty sure we got an e-mail from
21    Dr. Wiggins, it was fairly early in the morning,
22    indicating that there was some issue and Micah would
23    not be able to move into the dorm on January 6th.
24 Q. What was your understanding as to what the reason was?
25 A. I don't think I under -- was given a reason. I think

Page 73

1  I remember seeing the word policy, a policy or
2  something like that.
3  Q. Did you have any further communication after receiving
4  that e-mail?
5  A. Not that I recall. We knew we were going to be at the
6  meeting that -- later that afternoon.
7  Q. Okay. Where was that meeting?
8  A. At Oakland University, the student center on the lower
9  level.
10 Q. Who was present at that meeting?
11 A. Dr. Wiggins probably -- I'm not sure if Sharon Berke
12 was there or not. There was one she wasn't able to
13 attend. I mean, if you have the form -- but he had
14 several of his friends, a couple neighbors.
15 Obviously, Mike, who's nicknamed Buddha was there,
16 because that was where the idea of staying one night
17 came. Maybe two people from MORC, couple other
18 students, maybe Jean Ann Miller. I'm not sure. Maybe
19 Sandy Laham was there.
20 Q. Who's that?
21 A. I mentioned her earlier. She teaches at Oakland
22 University. Richie and me.
23 Q. Any Oakland University administrators?
24 A. I don't know if Jean Ann Miller is considered an
25 administrator, and I think she was there, but I don't

Page 74

1  know. I'd have to review the record.
2  Q. Okay. Dr. Wiggins?
3  A. Uh-huh.
4  Q. He was there?
5  A. Yes, absolutely.
6  Q. Okay. Was the housing issue discussed during that
7  meeting?
8  A. Yes.
9  Q. Okay. And other than the fact that Buddha volunteered
10 to have Micah stay at his place, what else was
11 discussed?
12 A. Well, I remember one of the students saying this
13 doesn't have to be the end. How about if we write
14 some letters. Micah should be able to be in the dorm
15 and Micah said that was a good idea. So there was a
16 spirit of let's keep looking at this, you know,
17 options. And -- yep. There were other issues talked
18 about, but that was -- that's -- let's continue to
19 have conversations was sort of the theme.
20         MARKED BY THE REPORTER:
21         DEPOSITION EXHIBIT 2
22         11:57 a.m.
23 BY MR. BOONIN:
24 Q. Were you aware of any explanation or rationale for the
25 university's decision at that time, was that

Page 75

1  discussed?
2  A. I don't recall that.
3  Q. Okay. What happened next?
4  A. Well, I know that Micah met with some of his friends
5  and -- about this idea of letter writing and getting
6  supporting letters, documentation that Micah is
7  capable from the student's perspective. And then he
8  got letters from adults, you know, people with
9  credibility who knew of him, would speak to his
10 ability to live in a dorm. I think Rich had a couple
11 of conversations with Bob, Dr. Wiggins, about, you
12 know, what's -- how do we continue to -- how do we
13 keep the conversation going so that we can look at
14 what is needed to move this forward.
15 Q. What's your understanding as to what they discussed,
16 little more detail?
17 A. You mean Rich and Dr. Wiggins?
18 Q. Yes.
19 A. That -- well, I think Rich -- I wasn't there, so I
20 don't know. What I know is that Micah wanted to
21 continue to try to have conversations with people so
22 that this could be looked at. You know, sometimes
23 people aren't -- because he wanted to live in the
24 dorm.
25 Q. Now, he did receive a letter from Mr. Maten at some

Page 76

1  point, didn't he?
2  A. I know he got one from, you know, Mary Beth Snyder.
3  Q. Do you recall receiving one from Mr. Maten saying that
4  his -- he's not eligible to be in the dorms?
5  A. That sounds reasonable. I don't remember that letter,
6  but that sounds reasonable.
7  Q. And that was because he wasn't registered as a student
8  for the winter term, do you recall that in the letter?
9  A. It's reasonable. I don't remember the letter.
10 Q. Do you recall that being the reason the university was
11 denying him the ability to be in the dorms?
12 A. No, I don't. I recall that -- I mean, at that point,
13 he was his -- see, in my mind, he was accepted into
14 the dorm. So we -- that's what we knew. So it didn't
15 make sense that he all of a sudden wasn't.
16 Q. And what was your understanding as to what the
17 university's reasons were or not?
18 A. I didn't understand them.
19 Q. Well, what was the -- I'm not saying whether you
20 understood them or not, but what was the university
21 telling you at that time?
22 A. At that time, I don't know. Eventually, I don't -- I
23 don't know. I don't remember. I'm sorry. I don't
24 remember.
25 Q. Okay. Before you is a document marked Exhibit 2,

JANICE FIALKA
October 20, 2009

JANICE FIALKA
October 20, 2009

Page 77

1  which, Counselor, is the same as Exhibit 4 in
2  Mr. Feldman's deposition. It's a series of e-mails.
3  A. Okay. Do you want me to read them, is that --
4  Q. Well, do you recognize it?
5  A. This one?
6  Q. Okay.
7  A. I remember that one.
8  Q. The first one?
9  A. Uh-huh.
10 Q. Do you recognize the other e-mails here that are
11    between your husband and Professor Wiggins?
12 A. That one looks -- the second one looks familiar. Do
13    you want me to give you a date or are you following
14    along?
15 Q. I'm just asking you if the others look familiar or
16    not. Did your husband share these with you when they
17    were received?
18 A. Sometimes he would. Sometimes I would choose not to
19    read them just so I wouldn't get so upset, you know.
20    This was a big thing to Micah. Overall, we stayed in
21    close communication.
22        I remember that. Uh-huh. I guess I'm
23    reading too fast. I don't see registered student in
24    this.
25 Q. I'm not suggesting that it's in this document.

Page 78

1  A. Oh, okay. Uh-huh, I remember this. Uh-huh, and --
2     yes, okay. This is Lionel Maten is still willing to
3     meet with me to discuss this. I will keep the issue
4     on the table.
5  Q. There's a statement on one two -- on the fourth page,
6     the last paragraph, where he says he found out --
7     here's the quote, it has been university practice for
8     some time that the dorm facilities are restricted to
9     students who are pursuing a degree.
10 A. Uh-huh.
11 Q. Do you recall hearing that yourself?
12 A. I eventually did hear that. Degree-seeking student
13    was the term.
14 Q. Okay. Do you have -- are you aware of any facts that
15    would suggest that Dr. Wiggins' statement here is not
16    true?
17 A. We were told by a couple of students that some of the
18    students were -- and were -- were foreign students,
19    students from outside the United States, who are not
20    degree seeking who are living in the dorm.
21 Q. Okay. Who told you that?
22 A. One of the students who was from another country,
23    perhaps Turkey. I'm not sure.
24 Q. A student told you that herself?
25 A. Yes, uh-huh.

Page 79

1  Q. Do you recall her name?
2  A. It was a male name. Male in our -- Dennis maybe, but
3     I don't remember a last name.
4  Q. When was this?
5  A. Well, it was during this period after --
6  Q. How did you know this person?
7  A. She was a student who met Micah through another
8     student.
9  Q. How old was she?
10 A. I assume she was college age. I don't know.
11 Q. Do you know why she was here?
12 A. No, I -- studying, that's what I know.
13 Q. Okay. Do you know where she is now?
14 A. Back in her home country. At least that's the last I
15    knew of her.
16 Q. Did she go back to go to college in her home country?
17 A. I don't know.
18 Q. Do you know if she was enrolled in college when she
19    was here?
20 A. Well, I -- she told me that she was not a
21    degree-seeking student, so...
22 Q. At Oakland University?
23 A. Correct.
24 Q. Do you know if she was enrolled in college in Turkey?
25 A. I don't know. No, the impression she gave me is I'm

Page 80

1     not a degree-seeking student, but that's --
2  Q. How long was she in the United States?
3  A. I don't know. Maybe for a semester or two.
4  Q. Do you know why?
5  A. She was studying. That's as much as I know.
6  Q. Do you have any other facts that you believe would
7     suggest that what Dr. Wiggins is saying in this e-mail
8     is not true?
9  A. There was some discussion about the office that
10    supports students who are from other countries who
11    come to Oakland University to learn. So there was
12    information that was shared with -- you know, Rich or
13    Micah that said you do not have to be a degree-seeking
14    student to live in the dorm. And then there was a
15    memo that was later on distributed to staff, which
16    said there will no longer be -- students who are from
17    other countries will no longer be able to live in the
18    dorm. That was what was told to us from -- somehow
19    through faculty. So it -- it gave the impression to
20    us that students who were not degree-seeking students
21    were living in the dorm.
22 Q. Have you ever seen that document, that memo?
23 A. I don't recall.
24 Q. Do you have a copy of it?
25 A. Do I have a copy of it?



Page 85

1 Q. Does he live in a cabin with other campers?
2 A. Uh-huh.
3 Q. Is that a yes?
4 A. Yes. Oh, I'm sorry. Yes. Yes.
5 Q. Okay. And how old are the other campers?
6 A. You know, I don't know. How old is he, 20? Some of
7    them are his age.
8 Q. So after the summer, he still wants to live in the
9    dorms, so now we're -- are we in August?
10 A. Yes. Yes.
11 Q. Okay. What happens next?
12 A. So then we felt that we wanted to go directly to
13    Dr. Snyder to let her know that Micah really wanted to
14    pursue that. So we talked with Micah about you've met
15    with, you know, Dr. Snyder. Are you okay with us
16    meeting with her. And he says yeah, and I said will
17    you come with us. And he says why don't the two of
18    you go. So we respected that and went and met with
19    her at -- to indicate to her -- to try to, you know,
20    clarify once again, because it still was unclear to us
21    what this meant, because he was paying tuition, he had
22    moved into the -- his application was expected --
23    accepted. He was given a date. All -- all indicators
24    were -- for us meant that he was moving into the dorm.
25    It did not make sense to us. So we wanted to be clear

Page 86

1    about it. We wanted her to understand our situation
2    and make sure that there wasn't misunderstandings. I
3    mean, we -- I mean, I make a living at trying to
4    negotiate issues, so I respect the need to have
5    conversations with people.
6 Q. Did she tell you that his acceptance of his
7    application was a mistake?
8 A. I don't recall her ever using that word, mistake.
9 Q. What did she say?
10 A. Well, within two minutes, she said he's not moving in
11    the dorm. She handed us a form, the housing
12    application form, which we assumed was the one that
13    Micah had signed. And indicating that here's the
14    policy, it's on the back. Read it.
15 Q. Isn't it true she didn't have a form at that meeting?
16 A. We left -- no, that's not true. We did -- she sent us
17    a form ahead of time so that we would review it. She
18    handed the form. She had the form in front of us and
19    we said, as I remember it, you did send us the form.
20    Thank you for sending us that form.
21 Q. Okay. So did she explain any further why he was not
22    eligible to live in the dorms?
23 A. I think that's when I began to hear that word
24    degree-seeking student.
25 Q. Okay.

Page 87

1 A. And, yeah. So that's...
2 Q. Anything else said during that meeting?
3 A. We had a conversation about, you know, how much
4    everybody had grown because of Oakland's willing --
5    you know, openness to have students with cognitive
6    disabilities on the campus.
7 Q. You understood that Oakland didn't have an obligation
8    to have the Options program at all, correct?
9 A. An obligation? Is it a requirement by law? No, it's
10    not a requirement.
11 Q. Okay. And you were appreciative of the fact that
12    Oakland created this program?
13 A. Always been very public about that. I've always been
14    very public.
15 Q. You want that program, though, to include housing?
16 A. Pardon me?
17 Q. But you want that program to include housing?
18 A. Well, that was what we all talked about from the
19    beginning, to have the full college experience. I
20    mean, from, you know, once the issue of housing became
21    on the table.
22 Q. And you were hoping that Dr. Snyder would waive the
23    requirement that students be pursuing degrees as a
24    condition for being in the housing?
25 A. I -- I can't say that it was about waiving a

Page 88

1    requirement. It -- it was not -- it wasn't a
2    requirement by action. Micah had been accepted to
3    live in the dorm and we were paying tuition. So we --
4 Q. You were paying tuition, but that doesn't cover
5    housing.
6 A. No. And that's why it was clearly stated we would pay
7    the housing, and that was -- there was not going to be
8    any -- there was discussions of that at various
9    points, that, you know, the schools wouldn't pay for
10    it, the Options program wouldn't pay for it. The
11    parents would have to pay for it.
12 Q. And Dr. Snyder decided that -- gave you the -- told
13    you that he was not eligible to live in housing?
14 A. Based on her -- yes. Based on her understanding,
15    based on this new form that she gave us or different
16    form, let me say, than what Micah had signed.
17 Q. Did she ever indicate that the policy was changing?
18 A. That it was changing, no. That it was changing, I'm
19    not sure I know what that means. I'm sorry.
20 Q. Did she ever indicate that it -- the policy used to be
21    something other than you had to be an enrolled student
22    pursuing a degree?
23 A. No, I was led to believe that he had signed a form
24    that was an accurate statement of their policy.
25 Q. How long did that meeting last?

**Page 89**

1 A. I think we were told within the first two minutes, and
2 I only know that because I was looking at the clock,
3 but then we continued to have conversation for
4 probably about another 40 minutes, something like
5 that.
6 Q. Do you recall anything else about the meeting other
7 than what you've already testified to?
8 A. Do I know -- remember anything else?
9 Q. Yes.
10 A. Can I take a break? Can I talk to --
11     MR. DAVIS: You have to answer a question
12 while it's posed.
13     THE WITNESS: Okay. Well, here's the part
14 I remember that was very frustrating to me was that
15 Mr. Maten had said that the reason that Micah wanted
16 to live in the dorm was because he wanted to learn how
17 to cook. And I looked at him and I said to him, then
18 he wouldn't move into a dorm, because you don't cook
19 in a dorm. So maybe a minor point to you, but it was
20 a frustrating point to a parent.
21 BY MR. BOONIN:
22 Q. Anything else?
23 A. We wanted her to know that, again, we respected what
24 she did, and that Micah would make a decision based on
25 what he wanted to do next.

**Page 90**

1 Q. What happened next with regard to the housing issue?
2 A. Well, we met with -- I mean, not met. We -- you know,
3 we talked with Micah saying that she said no to us as
4 well, and so clearly that was her position and I think
5 at that point he said, you know, I want to live in the
6 dorm. I mean, he was very clear about that. So we
7 made contact with a number of people who would provide
8 us with information, this was a very new issue for us,
9 to talk more about what options are available, what
10 are Micah's rights, what should we know, what should
11 we understand.
12 Q. Who did you talk to?
13 A. Richard Bernstein, a lawyer, who's known for his work
14 with disability issues. We talked -- I talked with --
15 at some point talked with Mark McWilliams from
16 Michigan Protection & Advocacy; Elizabeth Bauer, who's
17 on the State Board of Education, a member of the State
18 Board of -- yeah, Michigan Education; Meg Grigal, who
19 is one of the leading experts in the field of post
20 secondary education is what it's called; probably Deb
21 Hart, both of those two, as you know, coordinate the
22 federally funded projects that are researching post
23 secondary education. Those are the names that come
24 to -- you know, immediately to my mind.
25 Q. When did you speak with -- well, who's Richard

**Page 91**

1 Bernstein?
2 A. He's a lawyer.
3 Q. How do you know him?
4 A. We've been -- had conversations, been at same
5 gatherings around primarily disability issues. He's
6 someone -- someone knew him when -- at -- knew Richard
7 Bernstein when Micah was in high school, suggested
8 that Micah meet Mr. Bernstein, to know another sort
9 of -- you know, possibly be a mentor, you know -- you
10 know, Micah who is living this inclusive life and sort
11 of adhered to the principles that he understood
12 Mr. Bernstein to have.
13 Q. Had Micah and Mr. Bernstein gotten together often?
14 A. Not often.
15 Q. All right. What did you talk to him about,
16 Mr. Bernstein?
17 A. Well, I think Richie --
18     MR. DAVIS: Just caution.
19     THE WITNESS: Oh.
20     MR. DAVIS: Actually, you can answer that
21 question.
22     THE WITNESS: I -- yeah. I was not at that
23 meeting, you know, conversation, so...
24 BY MR. BOONIN:
25 Q. What's your understanding as to what happened at that

**Page 92**

1 meeting?
2 A. Well, I think that's my understanding. I don't know.
3 I don't know. Mr. Bernstein did attend the Board of
4 Directors meeting and give -- what would be the word?
5 Give a statement about why OU should open -- why Micah
6 should be able to live in the dorm.
7 Q. You said that you -- was it you or your husband had a
8 conversation with Mr. Bernstein?
9 A. Yes. I -- oh, Richie did.
10 Q. Okay. And what did your husband tell you about his
11 conversation with Mr. Bernstein?
12 A. That he was willing to come and testify and support
13 Micah's efforts to live in the dorm.
14 Q. To testify where?
15 A. Well, to testify -- I'm sorry if I'm using the wrong
16 word -- to stand before the Board of Trustees and give
17 a statement of support.
18 Q. University trustees?
19 A. Correct.
20 Q. Other than that, is there anything else that you were
21 aware of that was discussed?
22 A. No. At that point, that was sort of what made sense
23 to do. So that was the -- the next step.
24 Q. Have you had contact or your husband have contact with
25 Mr. Bernstein since?