**Page 57**

1 A. I looked at the university housing eligibility criteria and
2 determined that nothing had changed in his relationship to
3 the university, and therefore I denied his eligibility for
4 university housing.
5 Q. Did you look at any other programs, post-secondary
6 education programs for individuals with disabilities, at
7 other colleges or universities?
8 A. Mr. Feldman in August had sent to me a link for a
9 university, a college program, and I believe it was in New
10 Jersey, and I took a look at their web site.
11 Q. Did that program have housing?
12 A. I don't recall.
13 Q. Did you look at any other colleges or universities?
14 A. I did look at one, and I can't remember which one. It
15 might have been one that Professor Wiggins eluded to at
16 Northwestern University. And that one, as I recall at this
17 time, did not offer housing on campus.
18 Q. Did you look at any literature on the subject at all?
19 A. No, I did not.
20 Q. Did you look at any literature regarding housing for
21 persons with disabilities on campus?
22 A. Well, I have a long-standing knowledge about students with
23 disabilities living in university housing. So I'm familiar
24 with some of that literature.
25 Q. What would you consult if you needed to review something?

**Page 58**

1 A. I would consult cases, precedents, court cases that come up
2 in my professional organization that have to do with
3 reasonable accommodations for enrolled students.
4 Q. Any US Department of Education guidelines on the subject?
5 A. That, I didn't consult with them, but I know those
6 materials are out there.
7 Q. Any materials regarding Section 504 of the Rehabilitation
8 Act?
9 A. I'm familiar with that act, and understand in general the
10 need to accommodate enrolled students and what some of
11 those accommodations entail.
12 Q. Do you ever consult a guidance manual regarding Section 504
13 of the Rehabilitation Act?
14 A. I have not in recent memory.
15 Q. So you didn't review it in regard to this matter?
16 A. No, I did not.
17 Q. Would you consider a waiver of matriculated student
18 requirements as a reasonable accommodation?
19 A. Could you repeat.
20 Q. In regard to housing policies, would you consider a waiver
21 of matriculating student eligibility requirement a
22 reasonable accommodation?
23 A. No, I wouldn't.
24     MR. BOONIN: Objection, asking for a legal
25 conclusion as to whether or not that would even be

**Page 59**

1 required. Go ahead and answer.
2 A. To the extent I understand the law and the question, the
3 law specifically around reasonable accommodations, I would
4 not waive that, the university housing as an accommodation
5 for a nonmatriculated student.
6 Q. (Continuing by Mr. Davis:) You said in preparing for
7 today's deposition, that you reviewed your written
8 statement you wrote for the November 5th, 2008 board
9 meeting; is that correct?
10 A. Yes, I did.
11 Q. Do you have a copy of that in your records?
12 A. Yes, I do.
13 Q. In reviewing this matter at the board's direction, did you
14 consult with any university faculty or staff?
15     MR. BOONIN: Before that presentation?
16 Q. (Continuing by Mr. Davis:) I'm referring back to the note,
17 the September 17th, 2008 board of trustees meeting when
18 they referred this to be reviewed by the administration.
19 When you were conducting that review, did you consult with
20 any faculty or staff?
21 A. I wrote the testimony, and I asked the general counsel to
22 review it before I spoke it.
23 Q. Before the November, before you wrote your letter on
24 September 24th, did you consult with any faculty or staff?
25 A. I don't recall that I did. I don't recall whether I did or

**Page 60**

1 not.
2 Q. Did you consult with Robert Wiggins?
3 A. No.
4 Q. Dean Otto?
5 A. No.
6 Q. Any staff members of the OPTIONS Program?
7 A. No.
8 Q. Any staff of the housing program?
9 A. I don't recall. If I did, it would have been Lionel, but I
10 don't recall specifically that I talked to him. I may have
11 informed him that my decision held, it wasn't going to
12 change.
13 Q. What was entailed in the review that you did?
14 A. The review was to ascertain whether or not his status in
15 any way had changed with the university. Whether he had
16 applied to the university, whether he was enrolled in a
17 degree program at that point. And no, did I consult with
18 anyone, I probably talked to someone in the registers
19 office to ascertain whether or not any change had occurred.
20 Q. Other than reviewing his student status, did you do any
21 other review?
22 A. No, I didn't.
23     MR. DAVIS: Take a quick break. I think we'll be
24 able to finish up fairly quickly after that.
25     (BREAK HAD AT 2:48 P.M. TO 3:00 P.M.)

Dockets.Justia.com

## Page 61

1  Q.  (Continuing by Mr. Davis:) We're back on the record. And
2      I have a few questions for you. Lionel Maten is no longer
3      the director of the housing; is that correct?
4  A.  Yes.
5  Q.  Who is the current director?
6  A.  The interim director is Debra Middlebrook,
7      M-I-D-D-L-E-B-R-O-O-K.
8  Q.  And is there currently a search going on to find a
9      permanent?
10 A.  Yes, there is.
11 Q.  Is there any idea when that decision will be made?
12 A.  No.
13     MR. DAVIS: That's all the questions I have.
14     MR. BOONIN: I want to clarify one point.
15
16                          EXAMINATION
17
18 BY MR. BOONIN:
19 Q.  Ms. Snyder, you testified that, about certain types of
20     burdens that would exist if you were to allow
21     nonmatriculated students into the dorms. I believe you
22     said something that there could be space burdens, there
23     could be financial burdens, there could be administrative
24     burdens?
25 A.  I did.

## Page 62

1  Q.  Did you, are those all of the types of burdens?
2  A.  I can't say that those are all the types of burdens. I
3      never did an analysis of the burdens because these OPTIONS
4      people weren't students. I was never asked to do a full
5      analysis.
6  Q.  And do you, never mind.
7      MR. BOONIN: That it's then. That's all I wanted
8      to clarified. Thank you.
9
10
11     (WHEREUPON THE DEPOSITION CONCLUDED AT 3:08 P.M.)

## Page 63

CERTIFICATE

STATE OF MICHIGAN }
                  } ss:
COUNTY OF MACOMB  }

I, Amanda L. Grosshans, Certified Court Reporter, Registered Professional Reporter, a notary public in and for the aforesaid county and state, do hereby certify that the witness, MARY BETH SNYDER, was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein, that the testimony of said witness was taken by me in machine shorthand and was thereafter reduced to typewritten form by me or under my direction and supervision, that the foregoing transcript is a true and accurate record of the testimony given to the best of my understanding and ability.

I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcription or copies of the transcript attorney, or that requires me to provide any service not made available to all parties to the action.

_____
Amanda L. Grosshans, CSR 3853
Notary Public

My commission expires: 9/20/2010

## Page 64 (Index)

08-CV-14922 1:9
1 2:23, 16:8, 16:10, 20:9
1. 19:10
100 1:27
12:45 3:3, 3:3
14th 48:8
16 2:23
17th 59:17
18 2:24
2 2:24, 18:24, 19:2
2. 18:23
200 1:38
2000 7:17
2007 7:18, 14:1, 14:12, 20:24, 48:8, 51:16, 51:25, 53:7
2007. 21:2
2007/2008 19:4
2008 2:26, 2:27, 4:21, 4:22, 21:7, 21:9, 43:20, 48:24, 55:2, 55:9, 55:10, 56:15, 59:8, 59:17
2008. 54:13
2009 43:18, 43:19, 43:23
2009. 43:22
2200 1:26
23 2:26
23rd 55:2
24 2:27
24th 59:24
29200 1:38
2:03 46:1, 46:1
2:17 46:1, 46:1
2:48 60:25, 60:25
3 2:15, 2:25, 48:2
3. 48:4
300 1:45
350 1:45
3853 1:49,

63:34
3:00 60:25, 60:25
3:08 62:11, 62:11
4 2:26, 54:19, 54:23
48 2:25
48104 1:46
48152 1:39
48309 1:28
5 2:27, 56:3, 56:5
504 58:7
58:12
54 2:26
56 2:27
5th 4:22, 59:8
61 2:16
6th 48:24

<A>
A. 1:44
abide 25:7, 34:7, 34:15
ability 4:4, 11:10, 23:8, 25:14, 63:17
able 24:18, 25:9, 60:24
absolute 19:18
academic 8:25, 9:4, 9:5, 9:12, 9:13, 9:14, 9:15, 9:16, 9:21, 10:6, 10:9, 10:14, 10:14, 10:16, 10:17, 10:19, 11:7, 11:9, 11:10, 12:25, 23:1, 23:5, 26:18, 26:20, 27:17, 29:8, 33:3, 33:6, 42:19, 43:2, 44:5, 45:21
accept 46:18, 49:23

acceptance 46:17
accepted 35:9
access 42:18, 51:8
accessible 12:6
accommodate 58:10
accommodated 12:7
accommodation 7:8, 11:25, 12:13, 26:1, 38:18, 45:8, 45:16, 45:23, 58:18, 58:22, 59:4
accommodations 8:1, 8:4, 8:5, 8:17, 8:18, 8:21, 25:19, 58:3, 58:11, 59:3
according 24:4, 24:23, 25:6, 26:14, 26:19, 38:21
accurate 63:16
achieve 9:21
achievement 9:15
achieving 9:16, 10:9, 27:17
acknowledging 25:2, 25:24
across 29:10
Act 58:8, 58:9, 58:13
action 36:23, 63:20, 63:24, 63:25, 63:30
activities 5:12, 32:19
activity 26:21, 26:23, 29:17
actually 6:4, 7:7, 16:24, 27:25, 47:16
added 17:21,

17:23
additional 34:1, 38:17, 40:5
address 24:17
addressed 48:10
adequate 22:1
administration 56:17, 56:19, 56:21, 59:18
administrative 30:21, 30:25, 31:8, 31:10, 33:22, 34:1, 34:3, 49:24, 61:23
admission 23:19, 26:2, 50:3
admissions 5:12, 6:8, 11:8, 28:7
admit 38:9
admitted 12:15, 15:7, 15:17, 16:3, 17:4, 17:5, 23:2, 24:3, 26:8, 29:17, 35:18, 36:5, 36:9, 36:11, 43:11, 49:25, 50:5, 51:5, 51:20, 52:15
ADVOCACY 1:36
affairs 5:4, 8:11, 19:17
affect 63:26
affected 28:1
affects 63:26
affirmed 3:11
aforesaid 63:10
age 4:7, 33:14
agree 25:7, 30:5, 30:6, 34:7, 49:8
agreed 44:13
agreement 24:20, 34:19
agreements