Page 93

1 why you took his money, that's why Bob was so
2 distraught that it took place, and that's why you come
3 up with this amazing story post -- post December of
4 that year.
5 Q. Now try to answer question.
6 A. What is your question?
7 MR. BOONIN: Read the question back.
8 (The requested portion of the record was
9 read by the reporter at 4:57 p.m.:
10 Q. So the application that you signed was
11 developed before there was ever an OPTIONS
12 program, as far as you know?)
13 A. I don't know when that application was developed. I
14 just know what I signed and what appeared on that
15 piece of paper.
16 BY MR. BOONIN:
17 Q. And other than this one ESL student that you can't
18 remember the name of, tell me where she lived, you
19 know of no other non-matriculated student who has
20 lived in the dorm. Isn't that true?
21 A. No, that's not true either. I said I know of one
22 student from Turkey. I also know there are English As
23 a Second As a Language, a whole department, that used
24 to have students stay at the university, and the
25 policy was recently changed after you changed the

Page 94

1 application process, and this has been discussed at
2 the board meetings.
3 Q. Why do you believe that the
4 English-as-a-Second-Language students who were guests,
5 is what you're saying, were allowed to live in the
6 dorms? What facts do you have to support that belief?
7 A. Because it says on the application, pre-December 2008,
8 on those applications, when housing is available, you
9 can live in the housing. That's what folks did. And
10 if you talked to anybody in the department -- ask the
11 legal counsel to talk to people in the department
12 about what the policy was and what was happening, and
13 now how you've created a more detrimental policy.
14 Q. Who have you -- have you talked to someone in the ESL
15 department?
16 A. I just saw some letters of the changing of the
17 application for English as a Second Language from one
18 year to the next, as this whole story has evolved for
19 O.U. to keep Micah out.
20 Q. So your belief, sir, is that the OPTIONS students are
21 the same as English-as-a-Second-Language students?
22 A. Uh-uh-uh-uh. Not at all do I think the OPTIONS
23 students are the same as the
24 English-as-a-Second-Language program. I think that the
25 University, had an OPTIONS program. I think that the

Page 95

1 university, under the leadership of Bob Wiggins and
2 the Director of Housing had a clear understanding that
3 Micah could live in the dormitory based on the fact
4 that he was now a fully enrolled student, paying full
5 tuition, and then for some reason, this Mary Beth
6 Snyder with legal counsel and anybody else who got
7 involved decided there was something dangerous or
8 scary or descrim -- or unhealthy, that Micah should
9 not live in the dormitory.
10 Q. Okay. And other than that the application form
11 changed, do you have any facts that would support that
12 belief?
13 A. I think that Ms. -- Ms. Mary Beth Snyder, when she
14 spoke at the November meeting on -- a November board
15 meeting, begins to very clearly state that Micah will
16 be an added problem, is not capable of living in the
17 dormitory, and there is something about his disability
18 that makes it not a good idea for him to be in O.U.
19 housing, and she begins to make some statements. I
20 can remember hearing her after the extensive
21 conversations that other people put forward about why
22 Micah couldn't live in the dormitory and why they
23 needed to change this policy. After -- two months
24 after, Richard Bernstein and Liz Bauer believed that
25 their statements at the previous board meeting would

Page 96

1 lead to getting to yes. We had always believed that
2 we could get to yes and we could find a pilot program;
3 we could find a way that Micah could live in the
4 dormitory.
5 Q. Other than the statement that Vice President Snyder
6 made to the Board of Trustees, are you aware of any
7 other facts that would support your contention that
8 the application form, the contract form, was changed
9 for reasons other than what the university has said?
10 A. I think when Janice and I met with Vice President
11 Snyder in August of 2008 -- Micah met with her in the
12 spring, and Mr. Maten, and then Janice and I met with
13 Vice President Snyder in August, that when she -- the
14 meeting started at 8:30, and when she handed us the
15 application, and she said the application says Micah
16 cannot live in the dormitory, he is not eligible, he
17 knew that she was giving me a different application
18 form. So she knew that she had changed the
19 application form on the web, and she knew, and it's so
20 sad that she understood exactly what she was doing.
21 She thought she could win this argument based on the
22 application form, and now that isn't working enough,
23 so you come up with all these other stories to figure
24 out how to come up with housing discussions and
25 academia and other garbage.



Page 45

1  students paying tuition, and once they could make that
2  change, he would be eligible for housing, and that's
3  why Bob brought and introduced Lionel Maten to our
4  person-centered planning, and that's where the journey
5  was going. It was the journey to full inclusion, the
6  full college experience, including housing.
7  Q. Who was talking about this issue of needing to be a
8  fully enrolled student as a condition for being in the
9  university housing?
10 A. Bob. Bob Wiggins.
11 Q. What did he say about that?
12 A. Essentially, that once Micah was paying full tuition,
13 all the obstacles to housing, to having to get any
14 extra clearance to use any of the services would all
15 go away. Everything would be opened to Micah,
16 including housing.
17 Q. And in his opinion, that's what he told you would
18 happen?
19 A. In his opinion, as the highest person we were dealing
20 with at the university, at Oakland University. He was
21 the spokesperson of the university.
22 Q. And why -- who is equating -- sorry.
23       What is your understanding as to what
24 "fully enrolled" means?
25 A. "Fully enrolled" meant that Micah would be paying full

Page 46

1  tuition --
2  Q. That's the only --
3  A. -- as every other student, and would be eligible,
4  because O.U. and Bob Wiggins had a belief and a vision
5  that inclusive education at the college level for kids
6  with cognitive disabilities meant the full college
7  experience and that housing was part of that
8  experience.
9  Q. Is it your view, sir, that just paying full tuition
10 means that you're fully enrolled in the university?
11 A. What's the question?
12 Q. Is it your position, is it your view that just as
13 anyone pays full tuition, they're automatically fully
14 enrolled?
15 A. No. It was Bob Wiggins' position that the OPTIONS
16 program, when instituting full payment and tuition,
17 would open up housing for students with cognitive
18 disabilities to live in the dormitory. That's what
19 opened the door to this entire discussion. It was not
20 anybody else.
21 Q. So you did not want to --
22 A. Oh, we wanted it.
23 Q. -- live in the dorms?
24 A. Micah wanted to live in the dorms. No question about
25 it. But what made it an agenda item is your

Page 47

1  university putting it on the front burner of the
2  agenda once the OPTIONS program became a reality.
3  That's what made it the issue.
4  Q. Because Dr. Wiggins wanted to see if it were possible
5  to happen?
6  A. Because Dr. Wiggins and his commitment to inclusive
7  education and the journey that he had been part of
8  with our family and with other families at Oakland
9  University was to go towards that and reach that goal.
10 Q. Okay. Now, you understand that the OPTIONS -- the
11 individuals participating in the OPTIONS program don't
12 earn any college credit for the courses that they
13 attend. Is that true?
14 A. Micah does not earn college credit for the courses
15 that he attends, that's correct, which was not very
16 significant, because education to me and education to
17 Bob and education to anybody who lives in the 21st
18 century is not about credits. It is about people
19 growing and having the opportunity to reach their
20 potential. And Bob Wiggins understood, as Dean Otto,
21 when she implemented the program, understood that
22 education for students with cognitive disabilities and
23 all the higher-act education programs that are now
24 coming out from the federal government are about
25 individuals reaching their human potential. That's

Page 48

1  what education is about. It's not about credits.
2  Q. Or grades?
3  A. It's about human beings growing to the best of their
4  ability to reach their human potential.
5  Q. You said Dean Otto believed that?
6  A. I think she was very excited from those early meetings
7  about the possibility of what inclusive education
8  could mean.
9  Q. What is the basis of your knowledge of what Dean Otto
10 believed?
11 A. Just the conversations and the warmth in which --
12 Q. Conversations with who?
13 A. With Dean Otto and, you know, in the very beginning.
14 And, basically, she was Professor Wiggins' boss, so I
15 didn't assume that Professor Wiggins was doing
16 anything without his boss being aware of it.
17 Q. You said there was a meeting with Lionel Maten.
18 Correct?
19 A. Yes.
20 Q. How many times did you meet with him?
21 A. I met with Lionel -- Lionel came to the
22 person-centered planning in the spring of 2007. I had
23 the chance to meet him when Micah was given the tour
24 in the fall -- in the spring of 2007. I had the
25 chance to meet Lionel in the fall of 2007 at the O.C.,

Page 49

1   when I had just -- I was either picking up Micah or
2   dropping him off, and we had a chance to talk there.
3   So I would say three times I had the chance to have
4   conversations with Mr. Maten.
5   Q.  Okay.  What was the first conversation?  At the PCP, I
6   think you said it was.
7   A.  The first conversation at the PCP was him being very
8   warm and very exited that he could be part of this
9   process of attending the PCP.  He talked about his
10  experience at Wright University and working in
11  disability services, and there is a part of me -- and
12  I might be wrong, but there is a part of me that
13  thinks he referenced having a nephew or niece with a
14  disability and having some sense of sensitivity
15  towards what it meant to be a relative of a parent,
16  and then he warmly welcomed us to the housing
17  office --
18  Q.  Okay.
19  A.  -- and introduced us to the student who gave us the
20  tour --
21  Q.  I'm still talking about the first meeting.  Let's not
22  go to the second one yet.
23          Is there anything else he said in that PCP
24  meeting that you recall?
25  A.  Just that he was glad to be part of the process.

Page 50

1   Q.  Do you recall him saying that to be in the dorms, the
2   individual has to be a student?
3   A.  Not at all.  And subsequently, he was at the meeting
4   where it was all about paying tuition and the OPTIONS
5   program being eligible.  He never said that to me.
6   Q.  Okay.
7   A.  And Micah was a student.  Micah was an enrolled
8   student, so --
9   Q.  Now, the PC [sic] process is controlled by whom?
10  A.  PCP.  It's person-centered planning.  The PCP process
11  is controlled or organized by Micah and Kim Dembrosky.
12  Q.  Who is that?
13  A.  Kim Dembrosky is Micah's MORC advocate, Macomb-Oakland
14  Regional -- MORC something.  The two of them invite
15  people from the university, they invite peers, they
16  invite students, we invite community people, and it's
17  a way to assess Micah's previous year and make plans
18  for his upcoming year.  It's a way -- it's an expanded
19  version of what is called the Circle of Friends,
20  Circle of Support, and the IEP -- where folks from the
21  community get involved in discussing the possibilities
22  and the obstacles that need to be overcome.
23  Q.  So it is not a university event?  The university
24  doesn't control and run the program?
25  A.  The university does not control it.  They did have

Page 51

1   representatives there.
2   Q.  They were invited by you and your family and the
3   school, or MORC, to attend?
4   A.  That's correct.
5   Q.  And they did?
6   A.  That's correct.  They were invited by us to attend.
7   Q.  Just as other community members who were invited
8   attended?
9   A.  That's correct.
10  Q.  Okay.
11  A.  And they come as people who know Micah as well as
12  spokespersons for the particular responsibility they
13  have, because that's why they were invited.
14          MARKED BY THE REPORTER:
15          DEPOSITION EXHIBIT 1
16          3:42 P.M.
17  BY MR. BOONIN:
18  Q.  Before you is a document that has been marked as
19  Exhibit 1.  That's a three-page document that was
20  provided to us through your attorney.  It appears to
21  be a PCP report or summary of some event.  Do you
22  recognize this?
23  A.  Let me read it for a minute here.
24          Okay.  I know it is part of -- it looks
25  like it is part of a MORC thing.  Is that right?

Page 52

1   Q.  Well, it has to do with PCP.
2   A.  It must be MORC.  Okay.
3   Q.  It is something that you provided.
4          Does this reflect what was discussed at
5   that meeting?
6   A.  The concept of replacing guest student status with
7   enrollment to increase access to community housing,
8   supports, and services, I think that was part of the
9   discussion.
10  Q.  And that would be explored, according to what it says
11  on the first page.  Correct?
12          THE WITNESS:  Is that the same thing?
13          MR. DAVIS:  Appears so.
14          THE WITNESS:  Oh, okay.
15  A.  Well, the PCP isn't in a position to force anybody to
16  do anything.
17  BY MR. BOONIN:
18  Q.  Okay.  In looking at the last page under "Obstacles,"
19  it says, "Oakland University needs to develop a policy
20  to allow Micah to enroll as a registered student
21  before he will be able --
22  A.  There's the page.  I'm sorry?
23  Q.  "-- to access campus housing/services support," toward
24  the bottom of the page under "Obstacles."
25  A.  That's correct.