UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**MICAH FIALKA-FELDMAN,**

                  Plaintiff,

v.

**OAKLAND UNIVERSITY BOARD
OF TRUSTEES, GARY D. RUSSI, MARY BETH
SNYDER,** and **LIONEL MATEN,** in their
official capacities,

                  Defendants.

Case Number 08-CV-14922
Hon. Patrick J. Duggan

_____/

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUBSTITUTION OF
DEFENDANT, SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

i

Dockets.Justia.com

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION ..............................................................................................1

ARGUMENT ...................................................................................................2

I.      Plaintiff Has No Evidence That OU Denied Him Housing *Solely* Because Of His Disability, As Required By Law To Prove His Disparate Treatment Claims. ............2

II.     Plaintiff Is Not Entitled To Summary Judgment On His Disparate Treatment Claims, Because Plaintiff Is Not A Qualified Individual With A Disability................5

        A.      Plaintiff Has No Admissible Evidence That He Was An Enrolled Student.....7

        B.      Plaintiff Has Admitted That He Is Not An "Enrolled Student."......................9

III.    Plaintiff Has No Evidence Of Pretext. ........................................................10

        A.      Dr. Wiggins Has No Authority To Speak On Behalf Of The University On The Issue Of Housing...........................................................................10

        B.      From Its Genesis, The OPTIONS Program Never Had A Housing Component...................................................................................12

        C.      Plaintiff's Reliance On The Revised Housing Contract Is A "Red Herring." .................................................................................................13

        D.      Dr. Wiggins' Email To Plaintiff's Father Is Not Evidence Of Pretext...........14

        E.      OU Did Not Treat Plaintiff Differently Than Any Other Continuing-Education Student And Therefore Plaintiff's Discrimination Claim Fails....15

IV.     Plaintiff Never Requested, And The University Did Not Deny Him, A Reasonable Accommodation..................................................................................16

V.      Plaintiff's Requested Accommodation Is Unrelated To His Disability. ...................18

VI.     Plaintiff Is Not Entitled To A Permanent Injunction.................................................19

CONCLUSION ...............................................................................................20

## STATEMENT OF ISSUES PRESENTED

I.      **Is Summary Judgment for Plaintiff warranted on Counts II, III, V, and VI of Plaintiff's Second Amended Complaint since Plaintiff has no evidence that he is a qualified individual with a disability?**

II.     **Is Summary Judgment warranted for Plaintiff on Plaintiff's disparate treatment claims since Plaintiff has no evidence that Defendants' legitimate, non-discriminatory reason for declining his request for on-campus housing was a pretext for disability discrimination?**

III.    **Is Summary Judgment warranted for Plaintiff on Plaintiff's claim that Defendants failed to provide him with a reasonable accommodation where the accommodation that Plaintiff requested was unreasonable and unrelated to his disability?**

       **Defendants answer "no" to each of these questions.**

# CONTROLLING AUTHORITY

## CASES

*Divito v. Oakland Univ.*, Case No. 229738, Michigan Court of Appeals, May 31, 2002 ............ 12

*Dollar Corp. v. Zebedee (In re Dollar Corp.)*, 25 F.3d 1320 (6th Cir. 1994) ................................ 5

*Gratz v. Bollinger*, 539 U.S. 244 (2003) ................................................................................. 17

*Jones v. City of Monroe,* 341 F.3d 474 (6th Cir. 2003) ............................................................ 6

*Kaltenberger v. Ohio College of Podiatric Medicine,* 162 F.3d 432 (6th Cir. 1998) ................... 17

*Kaplan v City of Huntington Woods,* 357 Mich 612 (1959). ..................................................... 11

*Marbly v. Home Props. of N.Y.*, 205 F. Supp. 2d 736 (E.D. Mich. 2002) ................................... 6

*McCann v. State of Michigan*, 398 Mich. 65 (1976) ................................................................ 11

*McPherson v. Michigan High School Athletic Association, Inc.*, 119 F.3d 453 (6th Cir. 1997) ................................................................................................................................ 16

*Oxford House-C v. City of St. Louis,* 77 F.3d 249 (8th Cir. 1996) ............................................. 3

*Oxford House-C v. City of St. Louis,* 843 F. Supp. 1556 (E.D. Mo. 1994) ................................. 2

*Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002) .......... 6, 10

*Robinson v. Univ. of Akron Sch. of Law*, 307 F.3d 409 (6th Cir. 2002) ...................................... 7

*Schanz v. Village Apartments*, 998 F. Supp. 784 (E.D. Mich. 1998) ................................................................................... 18, 19

*Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781 (6th Cir. 1996). ....................................... 19

*Sutton v. Piper*, 2009 U.S. App. LEXIS 17201 (July 30, 3009) .................................................................................. 19

*Township of Lake v. Millar*, 257 Mich. 135 (1932) ................................................................. 12

*Zibbell v. Michigan Dep't of Human Servs.*, 313 Fed. Appx. 843 (6th Cir. 2009) ................. 6, 10

*Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041 (9th Cir. 1999). ................................... 16, 17

## STATUTES

M.C.L. § 390.153....................................................................................................................11

M.C.L. § 390.154....................................................................................................................11

## REGULATIONS

45 C.F.R. Part 84 Appendix A; 45 C.F.R. § 84.3.........................................................................6

# INTRODUCTION[1]

Plaintiff applied to participate in only one program at Oakland University ("OU" or the "University") – the OPTIONS program. Since its inception, the OPTIONS program has been a continuing-education program, and just like all continuing-education programs at OU, it does not offer on-campus housing to its participants. With this lawsuit, Plaintiff is effectively asking this Court to redesign the OPTIONS program (and potentially all of OU's other continuing-education programs) into something that OU never offered, never intended to offer, and never has offered-- a continuing-education program that includes on-campus housing.

Contrary to Plaintiff's claim, this case has nothing to do with disability discrimination, failing to accommodate Plaintiff's disability, or prejudices against individuals who cannot read or write. Indeed, Plaintiff's reading and writing impairments have nothing to do with the reason he cannot live in OU's dorms. In fact, in the Fall 2009 semester alone, nearly 20% of OU's self-identified disabled students live in the dorms, and of those, 41% have reading and/or writing impairments.

This case is about nothing more than Plaintiff seeking a preference above every other continuing-education student at OU because of his disability. In other words, because he has a disability, he wants to be given a right that no other continuing-education student has. Accordingly, as set forth below and in Defendants' Brief in Support of their Motion for Summary Judgment, there is no factual or legal basis for granting Plaintiff's Motion for

---

[1] Defendants have provided this Court with a comprehensive statement of facts in its Brief in Support of Motion for Summary Judgment. For the sake of brevity, Defendants incorporate those facts by reference herein in lieu of including a counter-statement of facts. Facts critical to this Response are, however, stated herein.

Summary Judgment. For these reasons, Plaintiff's Motion should be denied, and Defendants' Motion should be granted.[2]

## ARGUMENT[3]

**I.     Plaintiff Has No Evidence That OU Denied Him Housing *Solely* Because Of His Disability, As Required By Law To Prove His Disparate Treatment Claims.**

Citing an overruled case, Plaintiff incorrectly argues that he is entitled to summary judgment if he has evidence that his disability was *a motivating factor* in the University's decision. (Plaintiff's Brief, p. 10) That is the wrong legal standard. Plaintiff cannot obtain summary judgment on his disparate treatment claim without evidence upon which a reasonable juror would conclude that OU denied him housing *solely* because of his disability. Plaintiff has no such evidence.

The only evidence Plaintiff cites in support of his claim that the University denied him housing because of his disability (though not solely because of his disability) are statements made by Mary Beth Snyder, Vice President for Student Affairs and Enrollment Management. Plaintiff claims that these statements are evidence that Vice President Snyder harbored "stereotypes, unfounded fears, misperceptions and archaic attitudes as well as simply prejudice" about the OPTIONS students. (Plaintiff's Brief, p. 10)

Plaintiff cites *Oxford House-C v. City of St. Louis,* 843 F. Supp. 1556 (E.D. Mo. 1994), as the sole support for his claim that Vice President Snyder's statements entitle him to summary judgment. The decision relied upon by Plaintiff, though, was reversed by the Court of Appeals

---

[2] Plaintiff filed his Motion on December 1, 2009, which was one day late. Therefore, his Motion is untimely and should be denied on this basis, as well.

[3] Plaintiff concedes in his Reply Brief to Defendants' Motion for Summary Judgment that Counts I and VI of his Complaint claiming Disparate Impact Discrimination should be dismissed.

in *Oxford House-C v. City of St. Louis,* 77 F.3d 249 (8th Cir. 1996), and rather than supporting Plaintiff's argument, the Court of Appeals' decision actually refutes it.

*Oxford House-C* involved the City of St. Louis' zoning ordinance that allowed no more than eight unrelated disabled adults to live in a single-family dwelling, but two of Oxford House's group homes had apparently violated by having more than eight recovering substance abusers as residents. *Id.* at 250. The City cited Oxford House for zoning violations, and Oxford House sued the City for disparate treatment discrimination under Section 504 and the FHA, among other claims. The district court found in favor of Oxford House and enjoined the City from enforcing the zoning ordinance. The City appealed, and the Eighth Circuit reversed.

In its opinion, the Court of Appeals specifically rejected the district court's conclusion that a statement made by one City official that the Oxford Houses might cause "flight from the City" and a statement made by another City official that he would not want to live next door to an Oxford House and "expressed concern about transiency and property values" were evidence of disparate treatment discrimination:

> Having concluded Oxford House did not show the City treated the Oxford Houses differently from any other group, we believe the City's enforcement actions were lawful regardless of whether some City officials harbor prejudice or unfounded fears about recovering addicts * * * We do not believe these isolated comments reveal City officials enforced the zoning code against the Oxford Houses because of the residents' handicaps, especially considering the Oxford Houses were plainly in violation of a valid zoning rule and City officials have a duty to ensure compliance.

*Id.* at 252. The Court of Appeals also reiterated that the proper standard to be applied in a disparate treatment case was whether the City had limited the Oxford House residents "*solely* by reason of their disability." *Id.* at 253 (emphasis added).

The appellate court's decision in *Oxford House-C* supports OU's position and provides a basis for denying Plaintiff's Motion. Even if Vice President Snyder did harbor "prejudice or unfounded fears" about disabled individuals--particularly those who cannot read or write--living in the dorms (and she did not), her alleged isolated comments in this regard are not evidence that OU denied Plaintiff housing solely because of his disability. This is especially true when Plaintiff has no admissible evidence that the University has treated him differently than any other continuing-education student or that the University did anything other than enforce its rule that only enrolled students are permitted to live in on-campus housing.[4]

While Vice President Snyder admits making the statements in the transcript of her address to the University's Board of Trustees, she does not recall making the statements attributed to her by Sharon Howell. In any event, Vice President Snyder denies that any of her statements suggest discriminatory bias. The University's Board of Trustees appointed Mary Beth Snyder as the Vice President of Student Affairs and Enrollment Management. In that capacity, she has authority over all on-campus housing and enrollment, and as such, the University speaks through her on housing and enrollment issues. (Ex. 1, Snyder Deposition, pp. 5-6) Under her leadership, the number of enrolled, self-identified disabled students living in on-campus housing, and even more specifically, enrolled, self-identified disabled students with

---

[4] Plaintiff submitted the affidavit of Sharon Howell, a University employee, who testified that OU has housed high school students in the dorms for residential journalism programs and possibly students for other "special programs." (*See* Ex. 15 to Plaintiff's Brief, ¶ 10) OU does not provide housing for the journalism program. The only "special programs" during which individuals would live in campus housing are summer camp programs which utilize unused floors/space in OU's dorms typically for one week or less during the summer when the dorms are not being used as part of the regular academic program, and students enrolled in degree-granting programs at other institutions with which OU has a reciprocity agreement. (Ex. 2, Middlebrook Affidavit)

reading and writing impairments has steadily increased over the past four years. Consider the following OU Disability Support Services statistics (Ex. 3, Sisson Affidavit):

| Semester | Number of Enrolled, Self-Identified Disabled Students | Number of Enrolled, Self-Identified Disabled Students Living in On-Campus Housing | Number of Enrolled, Self-Identified Disabled Students with Reading and/or Writing Expression Disabilities Living in On-Campus Housing |
|---|---|---|---|
| Summer/Fall 2005 Winter/Spring 2006 | 398 | 10 | 1 |
| Summer/Fall 2006 Winter/Spring 2007 | 427 | 20 | 4 |
| Summer/Fall 2007 Winter/Spring 2008 | 441 | 30 | 6 |
| Summer/Fall 2008 Winter/Spring 2009 | 422 | 43 | 16 |
| Fall 2009 | 383 | 75 | 31 |

These statistics dispel any notion that Vice President Snyder or the University harbor any discriminatory animus against disabled students or disabled students with reading and/or writing impairments, as it relates to on-campus housing (or in any other program for that matter).

Plaintiff simply has no evidence to prove that the University denied him housing *solely* on the basis of his disability. Consequently, he is not entitled to summary judgment. *See e.g. Stewart v. Barnhart,* 2005 WL 3088543 (Nov. 14, 2005 W.D. KY) (Ex. 4).

**II.      Plaintiff Is Not Entitled To Summary Judgment On His Disparate Treatment Claims, Because Plaintiff Is Not A Qualified Individual With A Disability.**

Plaintiff cannot obtain summary judgment unless he produces evidence that would convince every reasonable juror that he is "a qualified individual with a disability." *Dollar Corp. v. Zebedee (In re Dollar Corp.),* 25 F.3d 1320 (6th Cir. 1994); *Marbly v. Home Props. of*

*N.Y.*, 205 F. Supp. 2d 736, 740 (E.D. Mich. 2002); *Jones v. City of Monroe,* 341 F.3d 474, 477

(6th Cir. 2003); *Zibbell v. Mich. Dep't of Human Servs.*, 313 Fed. Appx. 843, 849 (6th Cir.

2009); *Alexander v. Choate*, 469 U.S. 287, 300-302 (1985).

The regulations for Section 504 of the Rehabilitation Act of 1973 (Section 504), 29

U.S.C. § 794(a) provide that a "qualified handicapped person" is one who, "in spite of their

handicap" meets the academic and technical standards requisite to admission or participation in

the recipient's education program or activity.[5] 45 C.F.R. Part 84, Appendix A; 45 C.F.R. § 84.3.[6]

At the time Plaintiff submitted his housing application, the "academic and technical standards

requisite to admission into" on-campus housing at OU was that Plaintiff had to be "enrolled as a

student." (Ex. 5, 2007-2008 Contract for Residence Hall Services) Without citing to a single

fact in the record, Plaintiff makes the self-serving claim that he was "an enrolled student at OU,"

and was, therefore, qualified for on-campus housing. (Plaintiff's Brief, p. 8) Plaintiff's claim in

this regard suffers from several insurmountable flaws, and he is not qualified for housing in spite

---

[5] The regulations explain that the "in spite of" language" comports with the intent of the statute because, read literally, "otherwise" qualified handicapped persons include persons who are qualified except for their handicap, rather than in spite of their handicap. Under such a literal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be "otherwise qualified" for the job of driving. Clearly, such a result was not intended by Congress." 45 C.F.R. Part 84, Appendix A. Similarly, here, Congress clearly did not intend that Plaintiff, who might possess all the qualifications for living in on-campus housing, except for the most essential one--being an enrolled student--could said to be "otherwise qualified." That is not a result that Congress intended, as it would fundamentally alter the nature of housing program.
[6] ADA, FHA and Section 504 claims are subject to the same analysis. *See, Zibbell v. Michigan Dep't of Human Servs.*, 313 Fed. Appx. 843, 849 (6th Cir. 2009); *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002).

of his disability.[7]

### A. Plaintiff Has No Admissible Evidence That He Was An Enrolled Student.

Plaintiff admits that in order to be eligible for housing at OU he had to be "enrolled as a student."  OU has produced irrefutable evidence that the term "enrolled as a student" has an actual and meaningful definition both at OU and in the Federal law governing higher education in general. Vice President Snyder and OU's former Director of University Housing both testified that an "enrolled" student is a student in a degree-granting program.  (Ex. 1, p. 9; Ex. 6, Maten Deposition, p. 24)  Furthermore, the Integrated Postsecondary Education Data System report that OU is required to complete as a recipient of federal funds (20 U.S.C. § 1094(a)(17)) requires the disclosure of certain enrollment data, and individuals like Plaintiff who are only engaged in non-credit bearing activities are not included in "enrollment" figures.  (Exs. 7 and 8, 2009-2010 NCES Survey Materials)  Similarly, the annual Fiscal Operations Report and Application to Participate (FISAP) that OU is required to submit directs OU to not report in its enrollment statistics individuals like Plaintiff who are exclusively engaged in non-credit bearing activity.  (Ex. 9, 2008-2009 Sample FISAP Report; Ex. 10, 2010-2011 FISAP Instructions)  Thus, it is not surprising that two experienced higher-education administrators understand that the term "enrolled" in this context refers to students enrolled in degree-granting programs.

Plaintiff tries to fabricate his own definition of what it means to be "enrolled as a student" at OU, but: a) OU is entitled to establish its own definition (which is consistent with the

---

[7] Plaintiff's ADA claim against the University is also barred by Eleventh Amendment Immunity. *Robinson v. Univ. of Akron Sch. of Law*, 307 F.3d 409, 413 (6th Cir. 2002) (when a plaintiff's ADA claim sounds in equal protection, as opposed to a denial of due process, that claim is barred by Eleventh Amendment immunity).

definition used in Federal law governing higher education in general); and b) Plaintiff's definition is self-serving and has no factual basis. (*See* Plaintiff's Brief, pp. 8-9) Plaintiff simply cannot rebut any of OU's evidence that the term "enrolled as a student" has an actual definition that governs the University's operations, including those that entitle OU and its students to Federal financial assistance. (Ex. 11) Plaintiff also cannot rebut that he did not meet the definition of an enrolled student. Finally, Plaintiff has no evidence that OU has ever defined "enrolled as a student" differently than as expressed by Vice President Snyder or that OU has ever allowed anyone who did not meet that definition to live in the dorms with enrolled students during academic terms.

Furthermore, Plaintiff blatantly misrepresents the facts when he claims that Mr. Maten "admits in deposition that an 'enrolled student' could be someone taking as little as one class." (Plaintiff's Brief, p. 9) To the contrary, Mr. Maten's testimony was that under the former housing contract a student could continue to live in the residence halls if that student was taking as few as one <u>credit hour</u>, not one class. (Ex. 6, p. 22) Plaintiff did not receive any credits for taking classes at the University because neither OPTIONS participants nor continuing-education students receive credits for participating in those OU-sponsored programs. (Ex. 12, Fialka Deposition, pp. 83-4)

The bottom line is, just like all other continuing-education students at OU, Plaintiff is not enrolled as a student, and he did not meet the academic and technical standards requisite to admission or participation in OU's housing program. Therefore, Plaintiff is not a qualified individual with a disability under the ADA, FHA or Section 504. It is his status as a continuing-

education student that prevents him from living in student housing, not his disability. Accordingly, his Motion should be denied.

**B.    Plaintiff Has Admitted That He Is Not An "Enrolled Student."**

Despite Plaintiff's attempt to fabricate a definition of enrolled student to overcome but one of the fatal flaws in his case, at the end of the day, even he concedes that he is not an enrolled student at OU.  For example, Plaintiff argues that, while not actually an enrolled student, he did have "all the attributes of a university student." (Brief, p. 8)  Having "attributes of a university student" is a far cry from actually being an "enrolled" university student.  There are many important attributes of an enrolled student that Plaintiff lacks, such as being admitted to the University through its regular admission process, earning credits, receiving grades, carrying a grade-point average, or being enrolled in a degree-granting program.  While Plaintiff may have *some* "attributes of a university student," like using OU's recreation facilities and the library, so do University faculty, staff and other visitors to the University who are not eligible to live in the dorms either, even he admits that he is not actually, and has never been, an enrolled student.

Similarly, Plaintiff has admitted to the University that he was not an enrolled student.  In an October 7, 2008 letter to the University's counsel, Plaintiff's counsel acknowledges that because of Plaintiff's cognitive impairment, he was unable to "enroll in a program or coursework leading toward a degree."  Plaintiff makes the same admission in the Second Amended Complaint:  "Because of his disability, Plaintiff cannot enroll in one of the University's programs leading to a degree."  (*See* Second Amended Complaint, ¶ 5)  Plaintiff also admitted in his deposition that he was not a "regular student".  (Ex. 13, Plaintiff's Deposition, pp. 63-65)

Plaintiff's admissions that he was not enrolled as a student is tantamount to an admission that he did not meet the standards requisite to participation in OU's housing program, as per the Contract for Residence Hall Services that he submitted; and that he is, therefore, not a qualified individual with a disability under the ADA, FHA or Section 504. His Motion should be denied.[8]

### III. Plaintiff Has No Evidence Of Pretext.

Even though this Court does not have to reach the issue of pretext because Plaintiff cannot prove his prima-facie case, as discussed *supra*, Plaintiff also cannot obtain summary judgment on his disparate treatment claims without producing evidence upon which a reasonable juror would conclude that OU's reason for rejecting his housing application was a pretext for disability discrimination. *Zibbell v. Michigan Dep't of Human Servs.*, 313 Fed. Appx. 843, 849 (6th Cir. 2009); *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002). Plaintiff cannot meet that burden, despite the "evidence" he has advanced.

### A. Dr. Wiggins Has No Authority To Speak On Behalf Of The University On The Issue Of Housing.

Plaintiff claims that Dr. Wiggins, the Associate Dean of the School of Education and Human Services, led him to believe that as an OPTIONS participant, he would be allowed to live in on-campus housing. (Plaintiff's Brief, p. 3) He argues that the fact that other University administrators ultimately acted contrary to Dr. Wiggins' statements is evidence that the

---

[8] Plaintiff makes the conclusory allegation that "the fact that the university issued him a student identification card is an admission on their part that they now considered Micah and the other OPTIONS students to be enrolled students at OU." (Plaintiff's Brief, p. 12) There is no support for this allegation and certainly no basis for qualifying this as an admission on the part of the University that it was bestowing on Plaintiff or any other OPTIONS student a particular status.

University's reason for denying his housing application is evidence of pretext. (Plaintiff's Brief, p. 12) This argument has no legal merit.

Plaintiff has a duty to familiarize himself with the relative powers of the Oakland University Board of Trustees and the personnel it appoints: "It is fundamental that those dealing with public officials must take notice of their powers." *Kaplan v. City of Huntington Woods,* 357 Mich. 612, 619 (1959). Indeed, "[p]ersons dealing with a [public body] through its officers must at their peril take notice of the authority of the particular officer to bind the corporation. If his act is beyond the limits of his authority, the [public body] is not bound." *Id.* at 619-620.

Oakland University is governed by a Board of Trustees. M.C.L. § 390.153. The Board has the power to appoint personnel as the interests of OU may require. M.C.L. § 390.154. The Board appointed Dr. Snyder to serve as its Vice President of Student Affairs and Enrollment Management. In her capacity as Vice President of Student Affairs, she has authority for all on-campus housing, and as such, the University speaks through her on housing issues. Vice President Snyder hired Mr. Maten as the Director of University Housing.

Dr. Wiggins as the Associate Dean of the School of Education and Human Services (like Sharon Howell) has absolutely no authority to speak on behalf of the University on the issue of housing – in fact, he admits that he never even consulted with the Housing Department to determine whether the OPTIONS students would be eligible for housing. (Ex. 14, Wiggins Deposition, p. 42) Consequently, any statements that he may have made regarding Plaintiff's eligibility for housing are not binding on the University. *See McCann v. State of Michigan*, 398 Mich. 65, 87 (1976)("the authority of public agents extends only to those duties prescribed by statute and does not include activity which requires that authority be assumed"); *Township of*

*Lake v. Millar*, 257 Mich. 135, 142 (1932)("The extent of the authority of the people's public agents is measured by the statute from which they derive their authority, not by their own acts and assumption of authority"); *Divito v. Oakland Univ.*, Case No. 229738, Michigan Court of Appeals, May 31, 2002 (unpublished)(Ex. 15)("Public officers can exercise only those powers conferred on them by law, and the state is not bound by contracts made in its behalf by agents who lacked authority to make an express contract").

Under these principles, Plaintiff is responsible for knowing the relative authority of the University's administrators. The fact that Plaintiff may have thought that Dr. Wiggins had the authority to make an exception to the University's housing policy is of no consequence. The decision was always within the authority of the Housing Department, Dr. Wiggins had no authority to speak on behalf of that Department, and Plaintiff cannot produce any evidence to the contrary. Therefore, the University's rejection of Plaintiff's housing application, which was consistent with its housing policy, is not evidence of pretext.

**B.      From Its Genesis, The OPTIONS Program Never Had A Housing Component.**

Plaintiff also claims as evidence of pretext that OU changed the OPTIONS program once Plaintiff expressed an interest in housing. His claims in this regard are based, again, on misrepresentations to this Court and conclusory allegations. Indeed, the admissible evidence demonstrates that housing was never a component of the OPTIONS program.

Plaintiff claims that the OPTIONS proposal accepted by the University contained a housing component. (Plaintiff's Brief, p. 2) To the contrary, the undisputed facts are that the Dean of Education never approved a housing component for the program. (Ex. 14, pp. 62-3) In fact, Dr. Wiggins testified that when the Dean of Education approved the OPTIONS proposal,

"housing was not even considered as a part of the program at that point." (*Id.* at 63) Indeed, while housing was mentioned as a possible consideration at some future time, the program outline of the proposal did not seek the inclusion of a housing component. (Ex. 16, pp. 3-4)

Furthermore, Plaintiff admits that long before he ever applied for housing, Mr. Maten explained to him that his status as a "guest" student (a term Plaintiff assigns to himself) would be an obstacle to housing. (Plaintiff's Brief, p. 3) Mr. Maten clearly recalled discussing at Plaintiff's Person Centered Planning meeting (a meeting convened by the Macomb Oakland Regional Center (MORC)) that Plaintiff could not live in housing because being in the OPTIONS program did not satisfy the enrolled student requirement. (Ex. 6, pp. 36-38) Indeed, in MORC's record of that meeting, Plaintiff not being a student registered in the regular program was documented as the obstacle to Plaintiff's ability to live in student housing. (Ex.17) That obstacle was never overcome. The fact is that by at least August 22, 2007, two months before Plaintiff applied for housing, participants in the OPTIONS program were officially recognized as continuing-education students of the University and any notion that they would be regularly enrolled students of the University, and, therefore, eligible for housing, had been specifically rejected. (Ex. 18, Memo from Office of the Registrar)

There is simply no evidence that housing was ever an approved component of the OPTIONS program. As a result, the fact that University did not offer housing to Plaintiff is not evidence of pretext.

### C. Plaintiff's Reliance On The Revised Housing Contract Is A "Red Herring."

Plaintiff also claims that the revision to the housing contract after he submitted his application for housing is evidence of pretext. There is at least one fatal flaw to this argument,

and that is that Plaintiff would not have been eligible for on-campus housing under either version of the contract. The application that Plaintiff submitted required that Plaintiff be an "enrolled student," (Ex. 5) and Plaintiff has never been an enrolled student. *See* Section II, *supra.*

The revised housing application does contain stricter academic requirements for enrolled students to remain in on-campus housing, but the fact remains that those students still must be enrolled. Since Plaintiff never was enrolled, the changes to the contract terms had no effect on Plaintiff's eligibility for housing. Further, it was not unusual for the University to revise the housing contract; indeed, it has been revised three times in just the past five years. (Ex. 3) The revised contract is not evidence of pretext.

### D. Dr. Wiggins' Email To Plaintiff's Father Is Not Evidence Of Pretext.

Plaintiff relies on an email from Associate Dean Wiggins – a University administrator with no authority over housing – to Roxanne Fisher (whom Plaintiff describes as an "experienced secretary") as evidence that Plaintiff's housing application was approved, but then later denied because of his disability. As discussed *supra,* Dr. Wiggins has no authority to speak on behalf of the University regarding housing, and consequently, Dr. Wiggins' alleged representation about Plaintiff's housing application cannot be evidence of pretext.

Furthermore, Dr. Wiggins' email does not state that Plaintiff had been *approved* to live in the dorms. The email simply said that Plaintiff's application had been "accepted and is being processed." (Ex. 19) As Ms. Fisher stated, she does not determine an individual's eligibility for housing; her role is limited in making sure that the application is complete and the deposit is attached. (Ex. 20, Fisher Affidavit) And as it relates to Plaintiff's application, the only notion

she intended to convey was that "the contract form was completed and that the deposit was received." (*Id.* at ¶4)

Dr. Wiggins' email to Plaintiff is not evidence that Plaintiff's housing application had ever been approved. It merely indicates that he was continuing his efforts to facilitate Plaintiff's desire to live in the dorms. The Housing Department controlled that decision, though, and when Mr. Maten learned of the application, he promptly ascertained whether Plaintiff' had changed his status to an enrolled student that would have qualified him for student housing. (Ex. 6, pp. 46-50) Doing so was well within Mr. Maten's responsibilities as Director of University Housing, and his efforts to administer the housing program in a manner consistent with the University's longstanding practices was appropriate, notwithstanding anything Dr. Wiggins thought, did or said. Consequently, Plaintiff's claim that the University changed its position on Plaintiff's housing application is not supported by evidence in the record, and therefore, does not demonstrate pretext.

### E. OU Did Not Treat Plaintiff Differently Than Any Other Continuing-Education Student And Therefore Plaintiff's Discrimination Claim Fails.

Plaintiff claims that "OU has provided on-campus housing to students taking courses when they are not admitted to degree programs, including but not limited to, students in the English-As-A-Second Language Program." (Plaintiff's Brief, p. 5) The only "evidence" that Plaintiff cites in support of this is the conclusory deposition testimony of his parents that they were aware of one young woman from Turkey, Deniz Cikis, who allegedly lived in the dorms, but was not in a degree-granting program. Even if Ms. Cikis was not eligible to live in the dorms, and OU has no record to indicate that she was not, Plaintiff's example of one instance where OU may have made an error in allowing an individual who was not in a degree-granting

program to live in the dorms would not be evidence that the degree-granting requirement did not exist or that it was waived by OU.

In sum, Plaintiff cannot identify a single person whom OU allowed to live in the dormitories who either was not an enrolled student, a student in a degree-granting program at an institution with which OU has a reciprocity agreement, or who lived in the dorms for a week or so as part of an independently operated summer camp program when the dorms do not operate as part of the regular academic program. Plaintiff's failure in that regard, along with the fact that there are currently 75 disabled individuals (31 of whom have reading and/or writing impairments) enrolled as students in degree-granting programs living in on-campus housing, dispel any finding that the University's reason for not accepting Plaintiff's housing application was a pretext for disability discrimination. Summary judgment should be denied.

## IV.	Plaintiff Never Requested, And The University Did Not Deny Him, A Reasonable Accommodation.

An accommodation under Section 504 is reasonable "unless it requires a fundamental alteration in the nature of a program or imposes undue financial and administrative burdens." *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996). Plaintiff bears the burden of proving that the accommodation he requested is reasonable. *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999). Plaintiff cannot meet that burden, because the only accommodation that he ever proposed--a waiver of the requirement that he must be an enrolled student to live in the dorms--is not reasonable as a matter of law, since it would require a fundamental alteration in the nature of the University's housing program. *See e.g., McPherson v. Michigan High School Athletic Association, Inc.*, 119 F.3d 453, 460-62 (6th Cir. 1997).

OU's housing program is an integral part of its academic program, and the Housing Department has implemented special academic and social programs for on-campus housing with the purpose of supporting and encouraging students in their pursuit of an academic degree. (Ex. 1, pp. 9, 29; Ex. 6, pp. 14-15)  If non-degree-seeking students were permitted to live in the dorms, the academic focus of the housing program would be jeopardized, as testified to by Vice President Snyder at her deposition. (Ex. 1, pp. 27-34)

The Sixth Circuit has pronounced that "when reviewing the substance of academic decisions, courts should show great respect for the faculty's professional judgment." *Kaltenberger v. Ohio College of Podiatric Medicine,* 162 F.3d 432 (6th Cir. 1998).  Similarly, the Ninth Circuit has held that the court "will extend judicial deference to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons."  *Zukle,* 166 F.3d at 1048 (citations omitted).  These pronouncements apply with equal force to the University's decisions about standards both in the classroom and in on-campus housing.  Plaintiff has not offered a single fact to rebut that the University's housing program is an academic program the basic nature of which would be altered by allowing continuing-education students to live in the dorms.  And while Plaintiff consistently minimizes that fact, it cannot be forgotten that if OU approved Plaintiff's housing application, it would have to approve the housing application of every other continuing-education student who wanted to live in the dorms.  OU cannot allow only the disabled continuing-education students to live in the dorms, since that would be granting a preference on the basis of a protected status, which the law disfavors.  *See e.g., Gratz v. Bollinger*, 539 U.S. 244 (2003).

Given that the eligibility requirements for on-campus housing are a necessary element of the University's housing and academic programs, and Plaintiff has not proposed any reasonable accommodation that would render him eligible for housing without changing the fundamental nature of the program, no reasonable juror could find in his favor. Summary judgment should be denied.[9]

## V.    Plaintiff's Requested Accommodation Is Unrelated To His Disability.

Plaintiff's claim that he is entitled to summary judgment because the University failed to reasonably accommodate his disability must also fail because the University is only obligated to provide Plaintiff with a reasonable accommodation if his disability is the bar to living in on-campus housing, as opposed to some other factor. *Schanz v. Village Apartments*, 998 F. Supp. 784, 791 (E.D. Mich. 1998). Here, Plaintiff's disability is not the bar to Plaintiff's living in on-campus housing; the bar is the fact that Plaintiff is not enrolled in a degree-granting program.

This case is similar to *Schanz* wherein the plaintiff was mentally disabled and sought a waiver or modification of the landlord's minimum income and credit worthiness requirements. In holding that the requested accommodation (specifically, having a relative guaranty the rent) was unreasonable, the court stated that "P]laintiff has no need for the Village to accept the Guarantor Agreement to accommodate his handicap because his handicap is not preventing him from obtaining an apartment at The Village, and it is plaintiff's financial situation which he is

---

[9] Plaintiff claims that the University did not attempt to arrive at a reasonable accommodation that would have allowed him to live in the dorms. This is simply not true. Vice President Snyder met with Plaintiff and his parents; she spoke to faculty members who had Plaintiff in class; and she discussed the issues with other University administrators. (Ex. 21, Transcript of Address to Board of Trustees)

requesting that defendants accommodate." *Id.* at 792. *See also Sutton v. Piper*, 2009 U.S. App. LEXIS 17201 *3-*4 (July 30, 3009)(citations omitted)(Ex. 22)("[T]he FHAA's accommodation requirement is limited only to lowering barriers to housing that are created by the disability itself").[10]

The holdings in *Schanz* and *Sutton* support not only the denial of Plaintiff's motion, but also the dismissal of Plaintiff's claims. Here, the accommodation that Plaintiff is requesting is a waiver of the University's requirement that, to live in the dorms, one must be enrolled as a student in a degree-granting program. However, waiving that requirement does nothing to accommodate Plaintiff's disability; waiving the requirement would only accommodate the fact that Plaintiff is not enrolled as a student in a degree-granting program. The accommodation that Plaintiff seeks would, because of his disability, grant him a preference or "privilege" over non-disabled continuing-education students. Such a result is not favored or required. *Salute v. Straftord Greens Garden Apartments*, 136 F.3d 293, 302 (2d Cir. 1998)(the FHAA does not elevate the rights of the handicapped over the non-handicapped).

## VI.    Plaintiff Is Not Entitled To A Permanent Injunction.

As discussed in detail above, Plaintiff is not entitled to a permanent injunction. In balancing the equities between the parties, Plaintiff completely misstates and oversimplifies the effect a favorable ruling for Plaintiff would have on OU allowing nine OPTIONS students to live in the dorms. (Plaintiff's Brief, p.19) The actual effect would be to entitle every other continuing-education student who wanted to live in the dorms the right to do so. There are

---

[10] Courts should apply the same line of reasoning in FHA reasonable accommodation cases as they do in Section 504 cases. *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996).

approximately 1,400 continuing-education students at OU. (Ex. 23, Snyder Affidavit) Permitting continuing-education students to reside in on-campus housing would jeopardize the ability of regularly enrolled, degree-seeking students to secure on-campus housing and change the very nature of OU's on-campus housing. The balance of equities does not weigh in Plaintiff's favor here; it weighs in OU's favor.[11]

## CONCLUSION[12]

WHEREFORE, Defendants respectfully request that this Court deny Plaintiff's Motion in its entirety, grant Defendants' Motion, and thereby dismiss Plaintiff's Complaint with prejudice and award Defendants their costs and fees incurred in defending this meritless lawsuit.


Respectfully submitted,

**BUTZEL LONG, a professional corporation**

By: /s/ Robert A. Boonin
Robert A. Boonin (P38172)
350 South Main Street, Suite 300
Ann Arbor, Michigan 48104
(734) 995-3110
boonin@butzel.com
dahle@butzel.com
**Attorneys for Defendants**

Dated: December 7, 2009

---

[11] The requested injunction is also inappropriate since its scope exceeds that required to remedy Plaintiff's claims. The Complaint does not seek to change the OPTIONS program or to seek relief for others.

[12] Defendants do not object to dismissing the claims against OU's former Director of Housing, Lionel Maten. Defendants do object, however, to the substitution of the current Director. The current Director had no role in this matter and her inclusion in this case is unnecessary should relief be ordered. The current Director is a subordinate to Vice President Snyder, and since Vice President Snyder will remain a defendant in her official capacity with the authority to direct the Housing Department should an injunction be issued, there is no need for the substitution.

**Certificate of Service**

I, Robert A. Boonin, hereby certify that on December 7, 2009, I electronically filed the foregoing document with the Clerk of the court using the ECF system, which will send notification of such filing to all counsel of record.

**BUTZEL LONG, a professional corporation**

By: /s/ Robert A. Boonin
Robert A. Boonin (P38172)
350 South Main Street, Suite 300
Ann Arbor, Michigan  48104
(734) 995-3110
boonin@butzel.com
**Attorneys for Defendants**