# EXHIBIT 1



(248)608-9250 Fax (248)608-9252
www.tri-countycourtreporters.com

# Transcript of the Testimony of Mary Beth Snyder

**Date:** September 15, 2009
**Volume:** I

**Case:** Feldman v Oakland University

Printed On: September 21, 2009

Page 5

1 correct?
2 A. Yes, I am.
3 Q. What position title do you hold?
4 A. Vice-president for student affairs and enrollment
5 management.
6 Q. How long have you worked in that position?
7 A. Fifteen years.
8 Q. And can you describe your duties?
9 A. I am responsible for the management of all the non, I'm
10 responsible for all of the student life aspects of the
11 university. The health and welfare programs, and the
12 student activities areas, and also the admissions areas
13 which are part of the enrollment management side of the
14 institution.
15 Q. Pursuant to the notice and subpoena that you were given,
16 you brought your Curriculum Vitae with you today which
17 you've given to me. It mentions also among your duties
18 management over the student center, correct?
19 A. Correct.
20 Q. Campus food service, correct?
21 A. Correct.
22 Q. Recreation center?
23 A. Correct.
24 Q. Career services?
25 A. Correct.

Page 6

1 Q. I'm not going to list all of these, but a couple that are
2 there, health center?
3 A. Correct.
4 Q. And actually I'm not seeing housing, but is housing
5 included?
6 A. University housing is included.
7 Q. Is it including, maybe I'm missing it. It is included?
8 A. It's the third point, admissions, financial aid, student
9 housing.
10 Q. Okay. What are your degrees, what degrees have you
11 received, is there any specialty that they're in?
12 A. The undergraduate degree is in English, the master's is in
13 student personnel work and higher education, and the Ph.D.
14 was in higher education.
15 Q. Do any of your degrees have any specialty or certification
16 regarding special education?
17 A. No, they do not.
18 Q. Do you have any expertise in or training in post-secondary
19 education opportunities for persons with disabilities?
20 A. Nothing special.
21 Q. Any, what experience do you have on that topic?
22 A. I have overseen the programs that work with enrolled
23 students who are disabled at both my former place of
24 employment, Iowa State University, and I oversee that
25 office that works with enrolled students who are disabled

Page 7

1 at Oakland.
2 Q. That office is?
3 A. Office of disability support services.
4 Q. You oversee that part?
5 A. Yes, I do.
6 Q. As overseeing that department as being part of your
7 responsibilities, do you actually make decisions on
8 reasonable accommodation requests?
9 A. No, I do not.
10 Q. And who would usually be involved in making those
11 decisions?
12 A. The director of that program.
13 Q. Who is the current director of that program?
14 A. Linda Sisson.
15 Q. How long has Linda Sisson held that position?
16 A. I don't recall the exact time frame.
17 Q. Is it been since 2000, has it been since November of
18 2007 --
19 A. Yes.
20 Q. -- to the present.
21 A. It has.
22 Q. Do you ever have the opportunity or responsibility to
23 review any of her decisions?
24 A. I have, I can't recall a single decision that I've
25 reviewed.

Page 8

1     MR. BOONIN: On accommodations you're talking
2 about?
3 Q. (Continuing by Mr. Davis:) I'm talking about
4 accommodations, yes.
5 A. I have consulted with her once or twice on accommodations.
6 Or I've, let me clarify that, I've consulted, she reports
7 to someone who reports to me.
8 Q. And who is this person that is in between?
9 A. Nancy Schmitz.
10 Q. And what is her title?
11 A. Assistant vice-president for student affairs.
12 Q. And does, is Nancy Schmitz you said?
13 A. Yes, S-C-H-M-I-T-Z.
14 Q. And to your knowledge, does Nancy Schmitz review in Ms.
15 Sisson's decisions at all?
16 A. I am not aware of any particular example.
17     MR. BOONIN: On accommodations?
18 Q. (Continuing by Mr. Davis:) On accommodations.
19 A. Uh-huh.
20 Q. Have you taken any courses or sessions on reasonable
21 accommodations with persons with disabilities?
22 A. This has been discussed in professional organizations at
23 various points in my past. Not within the past eight to
24 ten years.
25 Q. Are there any academic programs that report to you?

## Page 9

1  A. Yes.
2  Q. What were those programs?
3  A. Housing is restricted to enrolled students, I would
4     characterize that as an academic program. Many of the
5     programs that report to me have an academic requirement
6     that students be enrolled to participate, including many of
7     our international student programs, student organizations
8     have a rule that you have to be an enrolled student to be
9     an official of a club or organization. We have program
10    rules for Graham Health Center, who can and cannot use the
11    Graham Health Center. Those would be examples.
12 Q. And what do you consider an academic program?
13 A. I consider an academic program one that is focused on the
14    purpose of moving students toward an academic degree,
15    achievement of an academic degree.
16 Q. How does housing move them toward achieving an academic
17    degree?
18 A. The services and programs are there in housing to
19    re-enforce the serious and focused requirements that will
20    move a student in the direction and influence them to
21    achieve an academic degree.
22 Q. Do you know what percentage of students attending Oakland
23    University are commuter students?
24 A. The number is approximately, in the freshman year
25    approximately --

## Page 10

1      MR. BOONIN: Regularly enrolled students you're
2  talking about?
3      MR. DAVIS: Yes, regularly enrolled students.
4  A. Approximately eighty-five percent.
5  Q. (Continuing by Mr. Davis:) Just to be clear. Like in any
6     given academic semester, what percentage of the student
7     body is commuter students, do you know?
8  A. Eighty-five, ninety percent.
9  Q. If they're moving toward achieving an academic goal or
10    degree and outcome, correct, the commuting students?
11 A. Many are engaged in programs that lead, they're enrolled
12    and courses that lead to a degree.
13 Q. So I guess I'm trying to understand how housing is an
14    academic program at least, or is involved in the academic
15    aspect of the university?
16 A. How do you define academic?
17 Q. You're the one who said that housing is an academic
18    program. I'm trying to understand what you consider an
19    academic program?
20 A. It's an enriched environment with programs and services
21    that are designed specifically to keep the student focused
22    on their degree objectives.
23 Q. Okay. So it's not a service that the university provides?
24 A. No, it's an experience.
25 Q. It's an experience. What would you consider a service that

## Page 11

1     the university provides?
2  A. A service that the university provides would include
3     recreation services, programs of the Oakland Center,
4     lectures, programs that, counseling perhaps. Those would
5     be examples of services.
6  Q. What responsibilities do you have in relation to the
7     academic programs that you have responsibilities over?
8  A. I oversee admissions, which is directly related to the
9     academic enterprise, financial aid as directly related to
10    student's ability to stay in the academic enterprise,
11    housing, disabled student services. We do call that a
12    service, but it is restricted to students. We are
13    complimenting in the career area what's going on in the
14    classroom, I oversee that aspect, trying to prepare
15    students alongside their classroom experience to prepare
16    them for their first jobs.
17 Q. So persons attending the university but are not working
18    towards a degree or certificate, is just students
19    continuing education program, are they, do they have
20    available to them the disability support services
21    department?
22 A. No, they do not.
23 Q. So if an individual was auditing a class let's say, and
24    they were blind and needed the book in braille, that
25    service would not be provided, or that accommodation would

## Page 12

1     not be provided to them?
2  A. I am not sure of that. Not to my recollection, I don't
3     know whether they are or not.
4  Q. If again an individual is auditing a class, not working
5     towards a degree, if they were wheelchair bound, and needed
6     an accessible classroom or something, would that be
7     something that would be accommodated through disability
8     support services?
9  A. A student who is in continuing education auditing a class?
10 Q. A person who's auditing a class, not working towards a
11    degree, I don't know if you considered them a student or
12    not?
13 A. We do not, we do not serve through our accommodation
14    process individuals who aren't enrolled in a regular degree
15    program who haven't been admitted.
16 Q. What if they are in continuing education program working
17    towards a certificate?
18 A. I don't know the answer to that question.
19 Q. Are they considered students if they're enrolled in
20    continuing education department but are only working
21    towards a certificate?
22 A. No, they are not considered an enrolled student.
23 Q. Are you aware that the continuing education department
24    offers a number of certificate courses in its curriculum?
25 A. I am not familiar with all of the options that the academic

Electronically signed by Amanda Grosshans (501-183-703-0801)      daf68a44-82e4-429f-b2aa-8c95d6252c54

## Page 25

1  A. Yes, they are given to them in a handbook.
2  Q. Do they have to sign acknowledging it?
3  A. I can't answer for sure whether they sign something.
4  Q. Go ahead.
5  A. I vaguely recall a statement, but I don't know if they
6     still operate according to that procedure, that they sign
7     off on a statement that they agree to abide by them.
8  Q. Was there any concerns that because Micah had difficulty
9     with reading and writing that he would not be able to
10    understand the rules and responsibilities of living in
11    campus housing?
12 A. That would be a concern that was expressed between
13    Mr. Maten and myself.
14 Q. Did you ask Micah about his ability to understand the rules
15    and responsibilities of living on campus?
16 A. I did not ask Micah.
17 Q. Did you look into the possibility of, re-ask that question.
18       Are there students that, who are entered in degree
19    programs that have accommodations regarding rules and
20    policies? And by that I mean, let's say you have a student
21    that was blind, a student that is enrolled in the
22    university, working towards a degree. Are such rules and
23    regulations provided to them either in braille, or maybe by
24    having someone read them to them and them acknowledging
25    them verbally?

## Page 26

1  A. That would be an accommodation that we would make for a
2     student who qualified for admission.
3  Q. Was that ever considered as a possibility in Micah's
4     situation?
5  A. No.
6  Q. Why not?
7  A. Because he wasn't enrolled at the university and not been
8     admitted.
9  Q. The enrollment in the university as a matriculating
10    student, re-ask this question.
11       What is Micah's enrollment status with the university?
12 A. As I understand it, he's in a continuing ed program.
13 Q. Is he a student at the university?
14 A. Not according to the official definition of what a student
15    is.
16 Q. Is he a participant in a university program?
17 A. He is a participant in a university program.
18 Q. Participant in the university academic program?
19 A. I would say no, according to what the common knowledge of
20    an academic program is.
21 Q. Is he a participant in an activity of the university?
22 A. Yes.
23 Q. And the OPTIONS Program would be an activity of the
24    university?
25 A. Yes, it would be.

## Page 27

1  Q. Would waving this rule about being enrolled in the
2     university as a matriculating student, waving that housing
3     condition for eligibility, would that change or alter the
4     nature of the housing program?
5  A. Yes, it would.
6  Q. How so?
7  A. You would have individuals living in housing who have a
8     very different purpose for being there then for what
9     housing is designed for.
10 Q. How would their purpose be different?
11 A. Their purpose would be different because they would not be
12    continuously enrolled in courses that are important to
13    their degree aspirations. They would have very different
14    needs for services. It would be hard to say for anybody
15    that wasn't a student what their requirements would be.
16    Right now we designed the programs and services to keep
17    students focused on achieving the academic degree.
18 Q. Options students have requirements to attend a certain
19    number of course each semester; is that correct?
20 A. That's my understanding.
21 Q. So you checked into this when you were reviewing it, is
22    that what you found when you were reviewing this?
23 A. I saw the proposal for what was being thought about the
24    components of the program. I don't know firsthand what is
25    actually required.

## Page 28

1  Q. Okay. Would it have affected your decision to know that
2     they are to maintain a certain number of credit hours each
3     semester at the university?
4  A. No, it would not.
5  Q. Why not?
6  A. Because I learned that they are not, they had not gone
7     through the admissions process, and been determined to meet
8     the requirements that allowed individuals to become a
9     degree for a candidate, or a candidate for a degree. I'm
10    sorry.
11 Q. If there had been a certificate offered for the OPTIONS
12    Program, would that have changed your decision?
13 A. No.
14 Q. Why not?
15 A. Because individuals who receive certificates aren't, to my
16    knowledge, an enrolled student in a degree program.
17 Q. What about the housing program, in terms of what it offers,
18    would be changed by allowing a person from the OPTIONS
19    Program to live in housing on campus?
20 A. The culture itself would change. You've got a culture with
21    undergraduates who all have the same goals, and that is to
22    move toward degree completion. Having individuals who
23    aren't of a similar mind set, who don't have that goal,
24    changes the nature of the program. And you would have
25    undergraduates in an environment with nonstudents, that

Electronically signed by Amanda Grosshans (501-183-703-0801)    daf68a44-82e4-429f-b2aa-8c95d6252c54

## Page 29

1  could very much change the nature of how we interact with
2  the student, the individual. These could be program
3  participants in anything, and I can't imagine how families
4  would feel about having their degree seeking students
5  living next door to individuals who aren't degree seeking
6  students. It could change the entire nature of the
7  relationship between the university and the people in
8  housing to the point where it's, it's no longer an academic
9  program per se. You've got people there who could be
10 living across the street and, you know, old person's home,
11 you could have anybody there. You could have all kinds of
12 people living there if you open.
13 Q. But if you open it up to the OPTIONS Program students,
14 you're having students that, back up.
15    If you open it up to participants in the OPTIONS
16 Program who have gone through an application process to be
17 admitted to this university activity program, who are
18 required to attend a certain number, take a certain number
19 of credits each semester, wouldn't you say that
20 demonstrates a commitment to a participation in the
21 university's community?
22 A. I would say that housing is there to serve the interest of
23 the university in moving students through the pipeline to
24 get their degree, and OPTIONS students don't have that goal
25 and purpose when they --

## Page 30

1  Q. The options --
2  A. -- are participants.
3  Q. -- participants aren't the same as someone coming in from
4  off the street and filing an application to live in housing
5  on campus, would you agree with that statement?
6  A. I would agree that they are, it's a unique program. So
7  there are other unique programs as well that the university
8  is associated with.
9  Q. If it's a unique program, could a unique rule be created
10 for this program?
11 A. I wouldn't want to oversee a presidential system where you
12 pick and choose which participates in unique programs live
13 in the residence halls.
14 Q. Would allowing the participants in the options program into
15 housing create any undo expense for the university to your
16 knowledge?
17 A. Having individuals who don't have degree aspirations in the
18 halls, in my professional judgment, puts the extra burden
19 on the student staff, and the halls, and the management of
20 the halls in general.
21 Q. You're talking about administrative burden?
22 A. Yes.
23 Q. I was going to ask that next. Since you brought it up,
24 what would be that, what do you see the extra
25 administrative burden that they would have to endure?

## Page 31

1  A. I would question whether or not we would have, what kind of
2  rules and regulations would apply to those individuals who
3  are living there who aren't in a degree program. When we
4  have limited space on campus, we would have a whole set of
5  issues if the halls were opened to community members who
6  aren't enrolled.
7  Q. I'm talking specifically about OPTIONS Program
8  participants, what undo administrative expense?
9  A. Expense?
10 Q. What undo administrative burden are they going to create?
11 A. Just take an example, you have study floors, you've got
12 quiet hours, you've got all kind of rules that are designed
13 to work well and keep students who have serious degree
14 aspiration on task. And if you've got individuals, OPTIONS
15 or otherwise, who are not degree programs, student staff
16 wouldn't, they would have to have multiple sets of rules
17 and policies that would guide their interactions with these
18 different segments of the residential population.
19 Q. Could you give me a for instance?
20 A. Well, let's take quiet hours, that's a rule that student
21 staff enforce. Or let's limit it to that, and you've got
22 individuals there who really aren't getting graded in
23 classes, aren't taking classes, perhaps it's a group that
24 comes in for semester long seminar in the business school.
25 What the student staff would, they would constantly be

## Page 32

1  trying to intervene I'm sure in situations where
2  nonstudents might choose not to follow the rules that apply
3  to the enrolled student population.
4  Q. What happens to students that don't follow the rules in the
5  dormitory?
6  A. The students that don't follow the rules in the dormitory
7  are potentially disciplined.
8  Q. They are Subject to discipline?
9  A. They're subject to a disciplinary process, which includes
10 expulsion from the halls or the university.
11 Q. So participants in the OPTIONS Program, if they were
12 allowed in, you've given me one example of undo burden to
13 the student housing monitors; or hall monitors, or what?
14 A. Residential assistants.
15 Q. Residential assistants, thank you. What other undo burdens
16 do you see for these residential assistants?
17 A. The residential assistants would, in trying to create
18 community, could they expect the nonenrolled students to be
19 integrated in the kinds of activities. They have floor
20 meetings, they have faculty coming into the halls talking
21 to the students. They try to get their entire floor there,
22 if they don't, now this is not a disciplinary situation,
23 but if the students don't come, the enrolled students, they
24 follow-up and say, you know, why didn't you come to the
25 enrolled, to the floor meeting. I can't imagine an

## Page 33

1. environment where the kinds of programs that we have that
2. are directly focused on engaging the students in their
3. academic work, would apply to nonstudents, not enrolled
4. students. And if they, if they choose not to be a
5. participant it's, you become a landlord under those
6. conditions as opposed to an academic environment that is
7. trying very hard with the services, and requirements, and
8. the rules and regulations, to keep the students on track to
9. getting, to staying in school and ultimately getting their
10. degree.
11. Q. Do you understand, is it your understanding that one of the
12. objectives of the OPTIONS Program is to have the students
13. experience the college setting with other peers of their
14. own age?
15. A. I understand that.
16. Q. That's your understanding of one of the goals?
17. A. That's one of the goals that I've read.
18. Q. That would be including both responsibilities and benefits
19. of such an experience?
20. A. That would be, that would be an outgrowth of that
21. assumption, that there could be benefits.
22. Q. I guess in looking at the administrative burden that we've
23. talked about, if they're not following rules and
24. responsibilities of any student on campus housing situation
25. are required to do, I guess I'm not seeing what the

## Page 34

1. additional administrative burden would be. They would be
2. disciplined just as any other student would be, what is the
3. administrative burden?
4. A. But they wouldn't be subject to the rules and regulations
5. in the handbook, they aren't an enrolled student. By
6. signing off, or whatever we do now, I'm not sure, that they
7. agree to abide by those rules and regulations. That's our
8. in effect, way of interacting with our students, enrolled
9. students in the residence halls. If you aren't a student,
10. those rules don't apply, the disciplinary process isn't
11. designed for nonstudents. We don't have the leverage
12. ultimately with a nonstudent of suspending them from the
13. university for a semester, or all the way up to expulsion.
14. Q. Can the participants in the OPTIONS Program be asked to
15. leave the housing setting if they don't abide by the rules
16. and responsibilities?
17. A. That would be a separate set of agreements and a contract I
18. would presume.
19. Q. That's not included in the current housing agreement, that
20. they don't follow the rules and terms and conditions of
21. living on campus, that they can't be asked to leave the
22. housing?
23. A. That is true, that is part of the current contract.
24. Q. So they could violate the rules on campus, for on campus
25. housing, they would not be asked to leave on campus

## Page 35

1. housing?
2. MR. BOONIN: You're assuming that they are in
3. housing.
4. A. The contract, right, the contract isn't available for
5. nonuniversity matriculated individuals.
6. Q. (Continuing by Mr. Davis:) Okay. I'm talking about
7. students matriculated.
8. A. Matriculated students.
9. Q. That are living on campus, been accepted into campus
10. housing.
11. A. Uh-huh.
12. Q. If they violate the rules and terms and conditions of
13. living on campus housing, let's say someone starts a fire,
14. or maybe they're illegally dealing drugs out of their dorm
15. room, they can't be removed from dormitory campus housing,
16. is that what you're telling me?
17. A. No, I am not telling you that. Current students who have
18. been admitted to the university, who are, who the contract,
19. the housing contract was designed for, can be removed if
20. they violate the rules and regulations.
21. Q. And how would that process be?
22. A. The process would be a hearing of some kind before a
23. university official that would determine, or a hearing
24. board, whether or not they can continue to live in
25. university housing.

## Page 36

1. Q. Is it possible that they would be expelling from the
2. university housing but remain a student at the university?
3. A. Yes.
4. Q. So if you had a student, or if you had a participant in the
5. OPTIONS Program, and they were admitted to the housing
6. program, and they violated the terms and conditions of
7. living in housing on campus, couldn't they be expelling
8. from the housing?
9. A. Well, they wouldn't be admitted to housing because they
10. aren't a student, that's the gate. And they, it's a
11. speculation if they were to be admitted into housing.
12. Q. I'm asking you to speculate.
13. A. I don't prefer to speculate, because they, they wouldn't,
14. they would not be allowed to live in housing.
15. MR. BOONIN: Objection, there are way too many
16. things that she's going to have to assume in this
17. hypothetical as to, what's the contract, what's the
18. student, what the terms are.
19. Q. (Continuing by Mr. Davis:) Okay. When you were
20. considering Micah's request to reconsider allowing him to
21. live on campus, did you ever consider the possibility that
22. if you allowed him to live in the dorms, that there might
23. be some disciplinary action to be taken against him?
24. A. I did not consider that.
25. Q. You think how that might, so you didn't think how you would

Electronically signed by Amanda Grosshans (501-183-703-0801)    daf68a44-82e4-429f-b2aa-8c95d6252c54