# EXHIBIT 6



# TRI-COUNTY COURT REPORTERS, INC.

(248)608-9250 Fax (248)608-9252
www.tri-countycourtreporters.com



Transcript of the Testimony of **Lionel Maten**

**Date:** September 22, 2009
**Volume:** I

**Case:** Feldman v Oakland University

Printed On: September 29, 2009

### Page 13

1  Q. Are those also upper classmen students?
2  A. Predominately.
3  Q. Okay. Fitzgerald, what educational services did housing
4     offer there?
5  A. Again, it was upper class and it was programmed as Hill as
6     well.
7  Q. Okay. And how about in the apartment building, I think you
8     mentioned two of them, were educational services offered by
9     the housing department to those that were in the apartment
10    buildings?
11        MR. BOONIN: What do you mean by educational
12    services?
13 Q. (Continuing by Mr. Davis:) Well, I'm asking you what
14    educational services did you offer to students in the
15    apartment buildings?
16 A. We provided the apartment buildings with computers, we had
17    programs designed, again, this was upper class students.
18    There was an age requirement for students to reside in that
19    facility, the age or academic standing, junior, it was
20    twenty years or junior is my recollection of that
21    requirement to live in that facility. Again, programs were
22    and educational resources were geared towards preparing
23    those students for life after achieving their degrees.
24 Q. Was any record kept of, or tracking made of what the level
25    of participation by students were in these educational

### Page 14

1     programs?
2  A. At this moment I cannot recollect.
3  Q. What nonacademic needs did the housing department provide
4     to students living in the housing on campus, other than the
5     obvious of a place to live?
6  A. Can you clarify your question?
7  Q. I'm just looking at what other services that the housing
8     department provided to the students living on campus, other
9     than what we've talked about in terms of educational and
10    the obvious of providing a place to live, what other
11    nonacademic services did the housing department offer to
12    students?
13 A. We like to believe that our entire focus as a department
14    was geared towards creating an academic program for
15    students. So everything that we did we, you know, we like
16    to believe that we were enhancing or creating an academic
17    program. Whether that was, you know, even the dining
18    program, it was an opportunity for students to intermingle,
19    talk, discuss academic work and those needs. So we felt
20    our program and our efforts were geared towards creating an
21    academic, an academic program in a residential environment.
22 Q. Did you provide social, let me rephrase that.
23        Did you put on strictly social activities for students
24    in the housing programs?
25 A. Yes.

### Page 15

1  Q. Can you give me an example of some of those social
2     activities that were provided?
3  A. We had movie nights, we had, we had Friday night live where
4     we had comedians that came in and talk to students. The
5     RAs again provided those programs, but again those were we
6     felt opportunities for students to, to engage and build
7     relationships that could have led to someone agreeing, some
8     student social engagement, the student would, may find a
9     study partner. So all of those were social opportunities,
10    I mean they were underlying, in my opinion, they were
11    underlying goals of those students actually focusing on
12    their, on their academic pursuits and that was my vision
13    for the department.
14 Q. Were there, I'm sorry, did you mention were there
15    university sponsored parties for the students at all?
16 A. I can, at this current time, I cannot recall a party being
17    sponsored.
18 Q. With the housing department, was there an internal
19    operations manual about the way the department was run?
20 A. At this current time, not to my recollection.
21 Q. Do you have an operations manual at the University of
22    Texas?
23 A. No.
24 Q. So you didn't create one while you were there at all?
25 A. At this current time I do not remember creating.

### Page 16

1        MR. BOONIN: Is there a specific aspect of
2     operations you're referring to?
3  Q. (Continuing by Mr. Davis:) Any operations type manual at
4     all?
5  A. At this current time, I do not recall an operations manual.
6  Q. So let's say if a student, were there at the halls, were
7     there bulletin boards where students could post things?
8  A. Yes.
9  Q. Did that have to be approved by the university, or could a
10    student put up anything they wanted?
11 A. It had to be approved by a, a housing employee.
12 Q. How did the housing employee know how to go about reviewing
13    that, or knowing what was appropriate or not appropriate by
14    university standards?
15 A. At the current time, I can't recall.
16 Q. Were there any type of guidance to housing department
17    employees about how to put in purchase orders if something
18    needed to be purchased for the housing department?
19 A. Yes.
20 Q. And how would they know how to do that, where would they
21    consult to find out how to do that?
22 A. University purchasing, and actually what just came back to
23    my recollection is that posting would have been available
24    through the two handbooks. There was a housing handbook
25    and a university handbook. That would have had those

Lionel Maten

### Page 21

1  Q. Why was there a need to add that?
2  A. We were, we were continuing to grow the academic component
3  of the, of the residence halls. And my feeling, from my
4  expertise in working in this profession, it was critical
5  that students was focused on their academic, their academic
6  progress to remain in the residence halls. So one way to
7  do that is to have some criteria and standards that
8  students were responsible for and working towards.
9  Q. Okay.
10     (BREAK HAD AT 10:31 A.M. TO 10:33 A.M.)
11     (EXHIBIT NO. 1 MARKED)
12  Q. (Continuing by Mr. Davis:) I'm going to hand you what's
13  been marked as Exhibit No. 1. Take a moment to look at
14  that. Let me know when you've had a chance to review it.
15     MR. BOONIN: Copy for me?
16     MR. DAVIS: Actually I only made one extra copy.
17  A. Okay.
18  Q. (Continuing by Mr. Davis:) I want to direct your attention
19  to paragraph number nine there. And in that paragraph,
20  actually the second sentence, I, began discussing the
21  university's retention rates and how they were negatively
22  affected by the number of credit hours a student was
23  required to carry to be eligible to live in student
24  housing. What was that discussion about, and how did the
25  credits affect retention rates?

### Page 22

1  A. There was always a credit requirement to live in our
2  residential facilities. However, that requirement was one
3  students could initially start with, with what the
4  university termed a full load for the undergraduate
5  student, which was twelve hours, and they could actually
6  reduce their number of hours all the way down to one hour
7  and could continue to live in the residential facilities.
8  That student was not focused on their academic pursuit,
9  making academic progress I felt towards a degree. And our
10  goal in continuing to grow the academic program in the
11  residence halls was for students to, to focus on academic
12  pursuits. And so that's how that discussion started with,
13  at that time.
14  Q. Okay. So a decision was to increase the number of academic
15  hours that was required?
16  A. That was required to live in the residential facilities?
17  Q. Yes. Is that correct?
18  A. Yes.
19  Q. And it went from a minimum of at least one up to what's now
20  in the current contract application?
21  A. Uh-huh.
22  Q. Which is I think about eight; is that correct?
23  A. Eight. Are you talking, is your question eight?
24  Q. What's the current credit application requirements?
25  A. It's eight during the fall and winter semester, and four

### Page 23

1  during the summer term.
2  Q. So you increased them from one up to eight, and four for
3  the respective semesters?
4  A. Increased the number of credits?
5  Q. Increased the required number of credit hours that the
6  students had to carry to live in housing on campus, from
7  one up to eight or four, depending on the respective
8  semester?
9  A. Yes.
10  Q. How did that improve the retention rates?
11  A. There are, there's antidotal, maybe mispronouncing that
12  word wrong, data that supported, we saw increases in
13  student GPA's, and we saw our retention numbers from the
14  first to second year of students residing in the residence
15  halls increase as well.
16  Q. What did they increase from?
17  A. I do not have that data to memory.
18  Q. You say it's antidotal, so the data is not available, was
19  it collected?
20  A. The data, yes.
21  Q. Okay. But again, looking at that paragraph number nine.
22  It says, at the time if a person was a student enrolled in
23  a one credit course, they were eligible to live in student
24  housing. We ultimately decided to increase the minimum
25  credit hour required to be eight hours for the fall and

### Page 24

1  winter semester, and four credit hours for the then spring
2  and summer semesters, and to implement those changes for
3  the following fall 2008 semester, correct?
4  A. Correct.
5  Q. So when Micah applied in the fall of 2007, the actual
6  policy was that he had to be enrolled for at least one
7  credit hour at the university, correct?
8  A. Our policy states that students must be enrolled as a
9  student, matriculating student, working towards a degree.
10  And if that student was accepted, we perceived a student in
11  our operations having been admitted through admissions and
12  going through the admissions process from the university
13  and from a housing perspective, that is really how our
14  process operated.
15  Q. But that's not what you said in paragraph number nine of
16  your affidavit, is it?
17  A. We said that a person was a student enrolled, and again
18  enrollment to housing was a student who had gone through
19  the admissions process, and been admitted to the
20  university, and pursuing an academic, working towards the
21  pursuit of an academic degree.
22  Q. Did that language appear anywhere in the application that
23  was being used in the fall of 2007 to your recollection?
24     MR. BOONIN: Let the record reflect he doesn't have
25  the contract in front of him.

Electronically signed by Amanda Grosshans (501-183-703-0801)    9122ccc3-84b4-406a-a3d0-12922df42a06

### Page 33

1  students that just audited courses.
2  Q. How did Rebecca know about the program, do you recall her
3  telling you that?
4  A. She had a conversation with Dr. Wiggins.
5  Q. She had a conversation with Dr. Wiggins prior to you having
6  a conversation with Dr. Wiggins; is that correct?
7  A. That is correct, yes.
8  Q. So did you speak again with Dr. Wiggins regarding the
9  OPTIONS Program, did you speak again with Dr. Wiggins?
10 A. Yes.
11 Q. And did you, at that time, just inform him that after your
12 conversation with Rebecca that it's not possible to have a
13 housing component?
14 A. Yes.
15 Q. Did you discuss any possibilities of ways that it could be
16 made to work or was --
17 A. Ways the OPTIONS Program could make it work?
18 Q. Yes.
19 A. No.
20 Q. How about, was there any discussions at all about how there
21 could be a housing component added?
22     MR. BOONIN: Between him and Dr. Wiggins?
23 Q. (Continuing by Mr. Davis:) Yes.
24 A. Rephrase your question.
25 Q. Did you and Dr. Wiggins have any further discussions, after

### Page 34

1  you told him initially, this isn't going to work, was there
2  any additional discussions about how this might be able to
3  made to work in the future?
4  A. Dr. Wiggins had his ideas, but my stance was no.
5  Q. And what ideas did Mr. Wiggins have?
6     MR. BOONIN: If you know.
7  A. Hum.
8     MR. BOONIN: If you know his ideas.
9  Q. (Continuing by Mr. Davis:) I'll ask him what he shared
10 with you.
11 A. I don't necessarily know if he shared ideas, other than,
12 you know, really motivating me, trying to motivate me to,
13 to waiver on the policy of the university. That was the
14 extent of those conversations.
15 Q. Do you recall when these conversations took place?
16 A. Again, some of those, as previously mentioned, sometime
17 during the fall 2006, winter 2007.
18 Q. Did discussions continue at all into the summer of 2007?
19 A. I cannot recall.
20 Q. Was the conversations with Dr. Wiggins, did you report that
21 to vice-president Snyder?
22 A. I do not recall.
23 Q. Did you ever have any conversations with vice-president
24 Snyder about the OPTIONS Program prior to the fall of 2007?
25 A. At this current time, I do not recall.

### Page 35

1  Q. Do you recall having any conversations with doctor, or with
2  vice-president Snyder prior to Micah's application in
3  November of 2007?
4  A. At this current time, I do not recall.
5  Q. How many conversations did you have with Dr. Wiggins in
6  2006, 2007 academic year?
7     MR. BOONIN: You're not including the summer now?
8  Q. (Continuing by Mr. Davis:) I believe your earlier comments
9  was you didn't recall any conversations in the summer,
10 correct?
11 A. Uh-huh.
12 Q. So do you recall how many conversations you had in that
13 2006, 2007, fall and winter academic year?
14 A. I'm trying to think, I mean that's a while back. I'm
15 trying to play this stuff through my head. Okay. I cannot
16 provide a hard number of how many conversations.
17 Q. There were at least two?
18 A. Yes.
19 Q. At least the initial one and then the follow-up one,
20 correct?
21 A. Yes.
22 Q. You think there were more than that?
23     MR. BOONIN: These are one on one conversations?
24     MR. DAVIS: Any conversations.
25 A. Yes.

### Page 36

1  Q. (Continuing by Mr. Davis:) Were there conversations
2  involving other persons, let me rephrase that question.
3     When you had these conversation with Dr. Wiggins, were
4  there other persons involved in the conversations as well?
5  A. Present at the conversations?
6  Q. That were present at the conversations, involved in the
7  conversations?
8  A. Yes.
9  Q. Who were those persons?
10 A. They were, the one that comes to mind for me was the, I'm
11 not for certain particulars correct title of the actual
12 forum, but I would label it as an assessment meeting, or an
13 evaluation meeting. Again, there may be a more
14 professional term used for that. In that particular
15 meeting that Dr. Wiggins asked me to attend, there were
16 Micah, his mother and father, Dr. Wiggins, maybe one or
17 more other professionals, and one or more students.
18 Q. Does the term person centered planning meeting, does that
19 recall?
20     MR. BOONIN: What was the first word?
21     MR. DAVIS: Person centered planning meeting.
22 Q. (Continuing by Mr. Davis:) Does that sound familiar at all
23 to you?
24 A. No.
25 Q. Did you speak at this, at this assessment meeting?

Electronically signed by Amanda Grosshans (501-183-703-0801)            9122ccc3-84b4-406a-a3d0-12922df42a06

Lionel Maten

Page 37

1  A. Yes.
2  Q. What did you have to say?
3  A. I answered questions related to housing.
4  Q. And what, this assessment meeting, when did that take
5     place, do you recall?
6  A. I do not remember the exact date or time.
7  Q. Was it in the winter of 2007?
8  A. Again, I don't recall.
9  Q. Is it possible it was before the fall of 2007?
10 A. I don't recall the time and place.
11    MR. BOONIN: I believe he said, I thought this was
12    still within the academic year of 06/07 he was talking
13    about the conversations that he had during that period.
14    One of he said other people were present.
15 A. The question is, that you asked, this meeting that I was
16    invited to attend. And when that meeting occurred, I do
17    not know the time, remember the time or place.
18    MR. BOONIN: I just understood it to be one of the
19    two meetings or discussions that you had with Dr. Wiggins
20    but if it's not.
21 Q. (Continuing by Mr. Davis:) Do you recall what questions
22    you answered regarding housing at this assessment meeting?
23 A. Some.
24 Q. And what were those questions?
25 A. One was, and this is not verbatim.

Page 38

1  Q. I understand.
2  A. One was, you know, what is the, the, could Micah reside in
3     the, in the residential facility. And my answer to that
4     was, you know, was that he needed to actually be a student
5     admitted to the university, and so that was one such
6     question. One was, could we get a tour of the facility
7     and, again, what is the opportunity for Micah to, to give
8     it a try and reside in the facilities.
9  Q. And in regard to that last question, what was your answer
10    to that, do you recall?
11 A. That if, we have a policy, we have actually, my response
12    was steamed around our current policy, our current guest
13    policy and overnight policy, and that is if someone was
14    willing to sign him in, we have a policy in place that he
15    could stay in the facilities.
16 Q. And in regard to giving him a tour of the facilities, did
17    you agree to do that?
18 A. A tour of the residential facilities?
19 Q. Yes.
20 A. Yes.
21 Q. And did that tour in fact take place?
22 A. Yes.
23 Q. Did you conduct the tour, or did you have somebody do that?
24 A. I cannot recall now, I tried to, but I can't recall if I
25    did.

Page 39

1  Q. Were there any discussions about how the OPTIONS Program
2     might satisfy the enrolled student requirement?
3  A. Is there any discussion?
4     MR. BOONIN: During that meeting?
5  Q. (Continuing by Mr. Davis:) Yes. I'm still talking about
6     the assessment meeting.
7  A. Can you rephrase your question, please.
8  Q. Were there any discussions about how the OPTIONS Program
9     might be able to satisfy the housing requirements of being
10    an enrolled student?
11 A. Could be satisfied. I'm trying to remember the last part
12    of your question.
13 Q. Were there any discusses at this assessment meeting about
14    how the OPTIONS Program, if Micah was in the OPTIONS
15    Program, how that might satisfy the housing department's
16    requirement of being an enrolled student for housing?
17 A. Yes, if he was an enrolled student.
18 Q. Did you indicate that being in the OPTIONS Program would be
19    sufficient to satisfy the enrolled student requirement?
20 A. No.
21 Q. Okay. At that time was there any discussion about, I'm
22    talking again about this assessment meeting, the OPTIONS
23    Program having a certificate of completion?
24 A. Not to my, I do not recall at this current time.
25 Q. At this assessment meeting, you agreed to give a tour, but

Page 40

1     why did you agree to give a tour if he wasn't going to be
2     eligible for the housing?
3  A. Our standard, why did I agree to give a tour. Our standard
4     process is to provide tours to anyone who seeks it, who
5     seeks them.
6  Q. You're saying you made it clear that he's not eligible?
7  A. I, yes.
8  Q. In addition to the assessment meeting, did you have any
9     other meetings with the family members, by family members
10    let's be specific, I'm talking about Rick Feldman, Micah
11    Fialka-Feldman, or Janis Fialka, that's his mother and
12    father and himself?
13 A. Yes.
14 Q. Were these meetings prior to or after that assessment
15    meeting?
16 A. To my knowledge, they were, they were after the assessment
17    meeting.
18 Q. How many meetings did you have?
19 A. Can you, can you define meetings?
20 Q. Well, let's just say, did you have any conversations with
21    the family members?
22    MR. BOONIN: Any other family members?
23    MR. DAVIS: Any of the family members.
24 A. Yes.
25 Q. (Continuing by Mr. Davis:) And who, which family members

10 (Pages 37 to 40)

Electronically signed by Amanda Grosshans (501-183-703-0801)
9122ccc3-84b4-406a-a3d0-12922df42a06

### Page 45

1  that has a stamp on it of November 1st that we've used
2  before. But in regards to this application, marked as
3  Exhibit 2, do you know how the, who accepted the
4  application at the housing department?
5  A. Define to me acceptance?
6  Q. Just took the application. I'm not talking about approving
7  the application, I'm just talking about physically taking
8  the application from him for review.
9  A. No.
10 Q. When did you first learn of the fact that Micah had
11 submitted an application?
12 A. I do not recall the date and time.
13 Q. Did it ever, did you ever learn that the housing department
14 staff were discussing with Micah a move-in date for a
15 dormitory room?
16 A. Define, can you just clarify your question?
17 Q. Did you ever learn that a housing staff member, any house
18 staff member, was discussing with Micah a move-in date for
19 a dormitory room on campus?
20 A. Again, I need to understand what the discussion is.
21 Q. When did you learn, did you ever learn of an e-mail from
22 Roxanne, who works in your housing department, correct?
23 A. Yes.
24 Q. Roxanne works in the housing department?
25 A. Uh-huh.

### Page 46

1  Q. Drawing on blank on Roxanne's last name at the moment.
2  A. Fisher.
3  Q. Ms. Fisher. Did you ever see an e-mail from her to Micah
4  discussing a move-in date for a dormitory room for Micah?
5     MR. BOONIN: Prior to the lawsuit or ever?
6     MR. DAVIS: Prior to the lawsuit.
7  A. Did I ever see the e-mail?
8  Q. (Continuing by Mr. Davis:) My question is isn't did you
9  see the e-mail, let me rephrase that.
10    Did you ever learn that someone was processing an
11 application, or did you ever learn of an e-mail from
12 Roxanne to Micah concerning housing, moving into the
13 housing dormitory room?
14 A. Micah moving into the dormitory room, yes.
15 Q. Do you recall when you learned of that?
16 A. I do not at this current time do I recall the date and
17 time.
18 Q. Was it prior to you sending out the rejection letter of
19 November the 29th, 2007?
20 A. Yes.
21 Q. And what did you do when you learned of that communication?
22 A. I, when I learned of the communication, what did I do. I
23 informed Rebecca Wickham to, to take that communication to
24 a committee that she sat on addressing students who were
25 matriculating students, who were on a program where we were

### Page 47

1  doing with students with Asperger's, and to get further
2  clarification as to if, if Micah in fact met the enrollment
3  requires of the university to reside in the residence.
4  Q. You asked for further clarification on Micah's enrollment
5  status?
6  A. On Micah's, on whether or not Micah had made satisfactory,
7  had gone through the satisfactory process of being accepted
8  as an enrolled student at the university.
9  Q. Did you discuss it with vice-president Snyder at all?
10 A. Did I discuss?
11 Q. Did you discuss the situation with vice-president Snyder at
12 all, I'm talking about while this application was pending,
13 before your rejection letter?
14 A. Yes.
15 Q. You recall when you had the discussions with vice-president
16 Snyder?
17 A. Date and actual time, I do not, I cannot recall.
18 Q. Do you recall what the nature of the conversation was?
19 A. It was, it was, had conversation was, yes.
20 Q. And what did the two of you discuss in this conversation?
21 A. Did Micah's application, or had, did Micah complete the
22 necessary requirements of the university to going through
23 the admissions process to qualify himself as a
24 matriculating student pursuing a college degree.
25 Q. At this time, did you understand that OPTIONS students were

### Page 48

1  not matriculating students?
2     MR. BOONIN: Prior to the meeting?
3  Q. (Continuing by Mr. Davis:) At the time you met with
4  doctor, or with vice-president Snyder, did you know that
5  the OPTIONS students were not matriculating students?
6  A. Yes.
7  Q. And it was a firm policy of the university, of the housing
8  department, that matriculating students, nonmatriculating
9  students were not eligible for housing, correct?
10 A. During the time I was employed, I embody those policies of
11 the institution, of the institution, yeah.
12 Q. So that was a firm policy of the university?
13 A. Yes.
14 Q. So why was there a need to have a conversation with
15 vice-president Snyder?
16 A. There was, because, because for the first time, I mean our
17 process for admission into housing was to when we got the
18 contract, was to go in and see of the student had a G
19 number, and, and Micah showed that he had a G number.
20 Q. So you now were questioning whether OPTIONS students were
21 matriculating students?
22 A. Yes.
23 Q. And how do you know Micah had a G number?
24 A. It was included on his contract.
25 Q. Was --

Page 49

1  A. And it was included on his contract, and in addition
2  Roxanne Fisher was able to see it in the student data base.
3  Q. So you went and talked with vice-president Snyder, and did
4  she, is this the first she heard, let me rephrase.
5  Did she indicate to you that this was the first that
6  she learned of the OPTIONS Program?
7  A. I can't, I can't confirm as I went and talked to her, I
8  can't remember if that conversation was over the phone or
9  actually visited her office, and I do not recall if she
10  said it was the first time.
11  Q. Did she know of the OPTIONS Program, was this the first
12  time she was --
13  A. That will be a question she would have to answer.
14  Q. Did she ask you to explain what the OPTIONS Program was?
15  A. At this current time I do not recall.
16  Q. Did she say that she needed to check into what the OPTIONS
17  Program was and get back to you, or did she give you an
18  answer regarding the OPTIONS Program and their eligibility
19  at that time?
20  A. She, she needed to do some research into it and to, and I
21  don't recall if it was into what the OPTIONS Program was,
22  or if the students were, met satisfactory eligibility, you
23  know, admissions back on going through their admission
24  process. I don't recall which part of that process that
25  she needed to do further research.

Page 50

1  Q. And then she, did she get back in touch with you prior to
2  sending out the rejection letter to Micah?
3  A. Yes.
4  Q. And what did she tell you?
5  A. We discussed his, Micah's eligibility as to whether or not
6  he went through the admissions process and was fully
7  admitted to the university matriculating towards an
8  academic degree. We determined that he was not and, and
9  that was the discussion.
10  Q. And what was the conclusion of that?
11  A. It was, it was concluded, we resorted back to our policy
12  that he was not a student and in turn that was our
13  conclusion.
14  Q. So after Micah submitted his application, you said Roxanne
15  Fisher checked the G number in the, I forgot what it is?
16  A. The banner system is our operating system.
17  Q. Who administers the banner system, do you know?
18  A. At this current time I do not.
19  Q. That would not be Adam, your systems specialist?
20  A. Adam is, no.
21  Q. What is Adam responsible for?
22  A. ResNet system.
23  Q. What's the ResNet system?
24  A. The wireless internet for students to go into the system.
25  Q. Is the banner system then administered by the university as

Page 51

1  a whole outside of the housing department?
2  A. Yes.
3  Q. So an application, this application came in and Ms. Fisher
4  checked the G number?
5  A. Uh-huh.
6  Q. How do you check a G number on the banner system?
7  A. No, I've never, have never done it myself.
8  Q. Do you know if there's a sign-on to get into the banner
9  system?
10  A. Yes.
11  Q. Has a password?
12  A. Yes.
13  Q. Is every application that comes in, to your knowledge, are
14  those G numbers checked by housing department staff?
15  A. They're, yes, they're checked by, yes.
16  Q. After the G number is checked, do the applications go to
17  somebody to send out approval letters, or what happens
18  after that G number is checked?
19  A. There's a letter that goes out that says, that says when
20  the move-in dates are and that we're processing the
21  application, or the intent is that we're processing the
22  application.
23  Q. How soon after the G number has been checked do these
24  letters go out?
25  A. It varies as to when the letter came in.

Page 52

1  Q. You're aware that an e-mail went out from Roxanne Fisher to
2  Micah regarding a move-in date, are you not?
3  A. Is there a particular time line?
4  Q. I'm not asking for a particular time. You're aware that
5  there was one?
6  A. Yes.
7  Q. Now, my question would be, when did you become aware of
8  that?
9  A. Is there a particular e-mail that you're discussing?
10  Q. About the e-mail of November, November the 14th of '07 and
11  it mentioned a move-in date for Micah.
12  MR. BOONIN: You don't want to show the witness the
13  e-mail, make sure you're talk about the same e-mail.
14  Q. (Continuing by Mr. Davis:) When did you become aware of
15  that e-mail?
16  A. I'm not for certain exactly what e-mail you're discussing.
17  (BREAK HAD AT 11:45 A.M. TO 11:51 A.M.)
18  MR. DAVIS: Back on the record.
19  Q. (Continuing by Mr. Davis:) I'm going to show you what's
20  been marked as Exhibit No. 3 in the Snyder deposition.
21  Take a look at that. Do you agree that this appears to be
22  an e-mail from Roxanne Fisher to Rick Feldman?
23  A. Yes.
24  Q. Dated November 14th, 2007?
25  A. Yes, November, yes.

Electronically signed by Amanda Grosshans (501-183-703-0801)    9122ccc3-84b4-406a-a3d0-12922df42a06