Fialka-Feldman v. Oakland University Board of Trustees
Doc. 45 Att. 2

# EXHIBIT 1

Dockets.Justia.com




(248)608-9250 Fax (248)608-9252
www.tri-countycourtreporters.com

# Transcript of the Testimony of **Mary Beth Snyder**

**Date:** September 15, 2009
**Volume:** I

**Case:** Feldman v Oakland University

Printed On: September 21, 2009

correct?
A. Yes, I am.
Q. What position title do you hold?
A. Vice-president for student affairs and enrollment management.
Q. How long have you worked in that position?
A. Fifteen years.
Q. And can you describe your duties?
A. I am responsible for the management of all the non, I'm responsible for all of the student life aspects of the university. The health and welfare programs, and the student activities areas, and also the admissions areas which are part of the enrollment management side of the institution.
Q. Pursuant to the notice and subpoena that you were given, you brought your Curriculum Vitae with you today which you've given to me. It mentions also among your duties management over the student center, correct?
A. Correct.
Q. Campus food service, correct?
A. Correct.
Q. Recreation center?
A. Correct.
Q. Career services?
A. Correct.



Q. I'm not going to list all of these, but a couple that are there, health center?
A. Correct.
Q. And actually I'm not seeing housing, but is housing included?
A. University housing is included.
Q. Is it including, maybe I'm missing it. It is included?
A. It's the third point, admissions, financial aid, student housing.
Q. Okay. What are your degrees, what degrees have you received, is there any specialty that they're in?
A. The undergraduate degree is in English, the master's is in student personnel work and higher education, and the Ph.D. was in higher education.
Q. Do any of your degrees have any specialty or certification regarding special education?
A. No, they do not.
Q. Do you have any expertise in or training in post-secondary education opportunities for persons with disabilities?
A. Nothing special.
Q. Any, what experience do you have on that topic?
A. I have overseen the programs that work with enrolled students who are disabled at both my former place of employment, Iowa State University, and I oversee that office that works with enrolled students who are disabled



at Oakland.
Q. That office is?
A. Office of disability support services.
Q. You oversee that part?
A. Yes, I do.
Q. As overseeing that department as being part of your responsibilities, do you actually make decisions on reasonable accommodation requests?
A. No, I do not.
Q. And who would usually be involved in making those decisions?
A. The director of that program.
Q. Who is the current director of that program?
A. Linda Sisson.
Q. How long has Linda Sisson held that position?
A. I don't recall the exact time frame.
Q. Is it been since 2000, has it been since November of 2007 --
A. Yes.
Q. -- to the present.
A. It has.
Q. Do you ever have the opportunity or responsibility to review any of her decisions?
A. I have, I can't recall a single decision that I've reviewed.



MR. BOONIN: On accommodations you're talking about?
Q. (Continuing by Mr. Davis:) I'm talking about accommodations, yes.
A. I have consulted with her once or twice on accommodations. Or I've, let me clarify that, I've consulted, she reports to someone who reports to me.
Q. And who is this person that is in between?
A. Nancy Schmitz.
Q. And what is her title?
A. Assistant vice-president for student affairs.
Q. And does, is Nancy Schmitz you said?
A. Yes, S-C-H-M-I-T-Z.
Q. And to your knowledge, does Nancy Schmitz review in Ms. Sisson's decisions at all?
A. I am not aware of any particular example.
MR. BOONIN: On accommodations?
Q. (Continuing by Mr. Davis:) On accommodations.
A. Uh-huh.
Q. Have you taken any courses or sessions on reasonable accommodations with persons with disabilities?
A. This has been discussed in professional organizations at various points in my past. Not within the past eight to ten years.
Q. Are there any academic programs that report to you?





Electronically signed by Amanda Grosshans (501-183-703-0801) daf68a44-82e4-429f-b2aa-8c95d6252c54

Page 9

A. Yes.
Q. What were those programs?
A. Housing is restricted to enrolled students, I would characterize that as an academic program. Many of the programs that report to me have an academic requirement that students be enrolled to participate, including many of our international student programs, student organizations have a rule that you have to be an enrolled student to be an official of a club or organization. We have program rules for Graham Health Center, who can and cannot use the Graham Health Center. Those would be examples.
Q. And what do you consider an academic program?
A. I consider an academic program one that is focused on the purpose of moving students toward an academic degree, achievement of an academic degree.
Q. How does housing move them toward achieving an academic degree?
A. The services and programs are there in housing to re-enforce the serious and focused requirements that will move a student in the direction and influence them to achieve an academic degree.
Q. Do you know what percentage of students attending Oakland University are commuter students?
A. The number is approximately, in the freshman year approximately --

Page 10

MR. BOONIN: Regularly enrolled students you're talking about?
MR. DAVIS: Yes, regularly enrolled students.
A. Approximately eighty-five percent.
Q. (Continuing by Mr. Davis:) Just to be clear. Like in any given academic semester, what percentage of the student body is commuter students, do you know?
A. Eighty-five, ninety percent.
Q. If they're moving toward achieving an academic goal or degree and outcome, correct, the commuting students?
A. Many are engaged in programs that lead, they're enrolled and courses that lead to a degree.
Q. So I guess I'm trying to understand how housing is an academic program at least, or is involved in the academic aspect of the university?
A. How do you define academic?
Q. You're the one who said that housing is an academic program. I'm trying to understand what you consider an academic program?
A. It's an enriched environment with programs and services that are designed specifically to keep the student focused on their degree objectives.
Q. Okay. So it's not a service that the university provides?
A. No, it's an experience.
Q. It's an experience. What would you consider a service that

Page 11

the university provides?
A. A service that the university provides would include recreation services, programs of the Oakland Center, lectures, programs that, counseling perhaps. Those would be examples of services.
Q. What responsibilities do you have in relation to the academic programs that you have responsibilities over?
A. I oversee admissions, which is directly related to the academic enterprise, financial aid as directly related to student's ability to stay in the academic enterprise, housing, disabled student services. We do call that a service, but it is restricted to students. We are complimenting in the career area what's going on in the classroom, I oversee that aspect, trying to prepare students alongside their classroom experience to prepare them for their first jobs.
Q. So persons attending the university but are not working towards a degree or certificate, is just students continuing education program, are they, do they have available to them the disability support services department?
A. No, they do not.
Q. So if an individual was auditing a class let's say, and they were blind and needed the book in braille, that service would not be provided, or that accommodation would

Page 12

not be provided to them?
A. I am not sure of that. Not to my recollection, I don't know whether they are or not.
Q. If again an individual is auditing a class, not working towards a degree, if they were wheelchair bound, and needed an accessible classroom or something, would that be something that would be accommodated through disability support services?
A. A student who is in continuing education auditing a class?
Q. A person who's auditing a class, not working towards a degree, I don't know if you considered them a student or not?
A. We do not, we do not serve through our accommodation process individuals who aren't enrolled in a regular degree program who haven't been admitted.
Q. What if they are in continuing education program working towards a certificate?
A. I don't know the answer to that question.
Q. Are they considered students if they're enrolled in continuing education department but are only working towards a certificate?
A. No, they are not considered an enrolled student.
Q. Are you aware that the continuing education department offers a number of certificate courses in its curriculum?
A. I am not familiar with all of the options that the academic





Electronically signed by Amanda Grosshans (501-183-703-0801) daf68a44-82e4-429f-b2aa-8c95d6252c54

Page 25

A. Yes, they are given to them in a handbook.
Q. Do they have to sign acknowledging it?
A. I can't answer for sure whether they sign something.
Q. Go ahead.
A. I vaguely recall a statement, but I don't know if they still operate according to that procedure, that they sign off on a statement that they agree to abide by them.
Q. Was there any concerns that because Micah had difficulty with reading and writing that he would not be able to understand the rules and responsibilities of living in campus housing?
A. That would be a concern that was expressed between Mr. Maten and myself.
Q. Did you ask Micah about his ability to understand the rules and responsibilities of living on campus?
A. I did not ask Micah.
Q. Did you look into the possibility of, re-ask that question.
Are there students that, who are entered in degree programs that have accommodations regarding rules and policies? And by that I mean, let's say you have a student that was blind, a student that is enrolled in the university, working towards a degree. Are such rules and regulations provided to them either in braille, or maybe by having someone read them to them and them acknowledging them verbally?

Page 26

A. That would be an accommodation that we would make for a student who qualified for admission.
Q. Was that ever considered as a possibility in Micah's situation?
A. No.
Q. Why not?
A. Because he wasn't enrolled at the university and not been admitted.
Q. The enrollment in the university as a matriculating student, re-ask this question.
What is Micah's enrollment status with the university?
A. As I understand it, he's in a continuing ed program.
Q. Is he a student at the university?
A. Not according to the official definition of what a student is.
Q. Is he a participant in a university program?
A. He is a participant in a university program.
Q. Participant in the university academic program?
A. I would say no, according to what the common knowledge of an academic program is.
Q. Is he a participant in an activity of the university?
A. Yes.
Q. And the OPTIONS Program would be an activity of the university?
A. Yes, it would be.

Page 27

Q. Would waving this rule about being enrolled in the university as a matriculating student, waving that housing condition for eligibility, would that change or alter the nature of the housing program?
A. Yes, it would.
Q. How so?
A. You would have individuals living in housing who have a very different purpose for being there then for what housing is designed for.
Q. How would their purpose be different?
A. Their purpose would be different because they would not be continuously enrolled in courses that are important to their degree aspirations. They would have very different needs for services. It would be hard to say for anybody that wasn't a student what their requirements would be. Right now we designed the programs and services to keep students focused on achieving the academic degree.
Q. Options students have requirements to attend a certain number of course each semester; is that correct?
A. That's my understanding.
Q. So you checked into this when you were reviewing it, is that what you found when you were reviewing this?
A. I saw the proposal for what was being thought about the components of the program. I don't know firsthand what is actually required.

Page 28

Q. Okay. Would it have affected your decision to know that they are to maintain a certain number of credit hours each semester at the university?
A. No, it would not.
Q. Why not?
A. Because I learned that they are not, they had not gone through the admissions process, and been determined to meet the requirements that allowed individuals to become a degree for a candidate, or a candidate for a degree. I'm sorry.
Q. If there had been a certificate offered for the OPTIONS Program, would that have changed your decision?
A. No.
Q. Why not?
A. Because individuals who receive certificates aren't, to my knowledge, an enrolled student in a degree program.
Q. What about the housing program, in terms of what it offers, would be changed by allowing a person from the OPTIONS Program to live in housing on campus?
A. The culture itself would change. You've got a culture with undergraduates who all have the same goals, and that is to move toward degree completion. Having individuals who aren't of a similar mind set, who don't have that goal, changes the nature of the program. And you would have undergraduates in an environment with nonstudents, that





Electronically signed by Amanda Grosshans (501-183-703-0801) daf68a44-82e4-429f-b2aa-8c95d6252c54

Page 29

could very much change the nature of how we interact with the student, the individual. These could be program participants in anything, and I can't imagine how families would feel about having their degree seeking students living next door to individuals who aren't degree seeking students. It could change the entire nature of the relationship between the university and the people in housing to the point where it's, it's no longer an academic program per se. You've got people there who could be living across the street and, you know, old person's home, you could have anybody there. You could have all kinds of people living there if you open.
Q. But if you open it up to the OPTIONS Program students, you're having students that, back up.
If you open it up to participants in the OPTIONS Program who have gone through an application process to be admitted to this university activity program, who are required to attend a certain number, take a certain number of credits each semester, wouldn't you say that demonstrates a commitment to a participation in the university's community?
A. I would say that housing is there to serve the interest of the university in moving students through the pipeline to get their degree, and OPTIONS students don't have that goal and purpose when they --

Page 30

Q. The options --
A. -- are participants.
Q. -- participants aren't the same as someone coming in from off the street and filing an application to live in housing on campus, would you agree with that statement?
A. I would agree that they are, it's a unique program. So there are other unique programs as well that the university is associated with.
Q. If it's a unique program, could a unique rule be created for this program?
A. I wouldn't want to oversee a presidential system where you pick and choose which participates in unique programs live in the residence halls.
Q. Would allowing the participants in the options program into housing create any undo expense for the university to your knowledge?
A. Having individuals who don't have degree aspirations in the halls, in my professional judgment, puts the extra burden on the student staff, and the halls, and the management of the halls in general.
Q. You're talking about administrative burden?
A. Yes.
Q. I was going to ask that next. Since you brought it up, what would be that, what do you see the extra administrative burden that they would have to endure?

Page 31

A. I would question whether or not we would have, what kind of rules and regulations would apply to those individuals who are living there who aren't in a degree program. When we have limited space on campus, we would have a whole set of issues if the halls were opened to community members who aren't enrolled.
Q. I'm talking specifically about OPTIONS Program participants, what undo administrative expense?
A. Expense?
Q. What undo administrative burden are they going to create?
A. Just take an example, you have study floors, you've got quiet hours, you've got all kind of rules that are designed to work well and keep students who have serious degree aspiration on task. And if you've got individuals, OPTIONS or otherwise, who are not degree programs, student staff wouldn't, they would have to have multiple sets of rules and policies that would guide their interactions with these different segments of the residential population.
Q. Could you give me a for instance?
A. Well, let's take quiet hours, that's a rule that student staff enforce. Or let's limit it to that, and you've got individuals there who really aren't getting graded in classes, aren't taking classes, perhaps it's a group that comes in for semester long seminar in the business school. What the student staff would, they would constantly be

Page 32

trying to intervene I'm sure in situations where nonstudents might choose not to follow the rules that apply to the enrolled student population.
Q. What happens to students that don't follow the rules in the dormitory?
A. The students that don't follow the rules in the dormitory are potentially disciplined.
Q. They are Subject to discipline?
A. They're subject to a disciplinary process, which includes expulsion from the halls or the university.
Q. So participants in the OPTIONS Program, if they were allowed in, you've given me one example of undo burden to the student housing monitors; or hall monitors, or what?
A. Residential assistants.
Q. Residential assistants, thank you. What other undo burdens do you see for these residential assistants?
A. The residential assistants would, in trying to create community, could they expect the nonenrolled students to be integrated in the kinds of activities. They have floor meetings, they have faculty coming into the halls talking to the students. They try to get their entire floor there, if they don't, now this is not a disciplinary situation, but if the students don't come, the enrolled students, they follow-up and say, you know, why didn't you come to the enrolled, to the floor meeting. I can't imagine an





Electronically signed by Amanda Grosshans (501-183-703-0801) daf68a44-82e4-429f-b2aa-8c95d6252c54

environment where the kinds of programs that we have that are directly focused on engaging the students in their academic work, would apply to nonstudents, not enrolled students. And if they, if they choose not to be a participant it's, you become a landlord under those conditions as opposed to an academic environment that is trying very hard with the services, and requirements, and the rules and regulations, to keep the students on track to getting, to staying in school and ultimately getting their degree.

Q. Do you understand, is it your understanding that one of the objectives of the OPTIONS Program is to have the students experience the college setting with other peers of their own age?

A. I understand that.

Q. That's your understanding of one of the goals?

A. That's one of the goals that I've read.

Q. That would be including both responsibilities and benefits of such an experience?

A. That would be, that would be an outgrowth of that assumption, that there could be benefits.

Q. I guess in looking at the administrative burden that we've talked about, if they're not following rules and responsibilities of any student on campus housing situation are required to do, I guess I'm not seeing what the



additional administrative burden would be. They would be disciplined just as any other student would be, what is the administrative burden?

A. But they wouldn't be subject to the rules and regulations in the handbook, they aren't an enrolled student. By signing off, or whatever we do now, I'm not sure, that they agree to abide by those rules and regulations. That's our in effect, way of interacting with our students, enrolled students in the residence halls. If you aren't a student, those rules don't apply, the disciplinary process isn't designed for nonstudents. We don't have the leverage ultimately with a nonstudent of suspending them from the university for a semester, or all the way up to expulsion.

Q. Can the participants in the OPTIONS Program be asked to leave the housing setting if they don't abide by the rules and responsibilities?

A. That would be a separate set of agreements and a contract I would presume.

Q. That's not included in the current housing agreement, that they don't follow the rules and terms and conditions of living on campus, that they can't be asked to leave the housing?

A. That is true, that is part of the current contract.

Q. So they could violate the rules on campus, for on campus housing, they would not be asked to leave on campus



housing?

MR. BOONIN: You're assuming that they are in housing.

A. The contract, right, the contract isn't available for nonuniversity matriculated individuals.

Q. (Continuing by Mr. Davis:) Okay. I'm talking about students matriculated.

A. Matriculated students.

Q. That are living on campus, been accepted into campus housing.

A. Uh-huh.

Q. If they violate the rules and terms and conditions of living on campus housing, let's say someone starts a fire, or maybe they're illegally dealing drugs out of their dorm room, they can't be removed from dormitory campus housing, is that what you're telling me?

A. No, I am not telling you that. Current students who have been admitted to the university, who are, who the contract, the housing contract was designed for, can be removed if they violate the rules and regulations.

Q. And how would that process be?

A. The process would be a hearing of some kind before a university official that would determine, or a hearing board, whether or not they can continue to live in university housing.



Q. Is it possible that they would be expelling from the university housing but remain a student at the university?

A. Yes.

Q. So if you had a student, or if you had a participant in the OPTIONS Program, and they were admitted to the housing program, and they violated the terms and conditions of living in housing on campus, couldn't they be expelling from the housing?

A. Well, they wouldn't be admitted to housing because they aren't a student, that's the gate. And they, it's a speculation if they were to be admitted into housing.

Q. I'm asking you to speculate.

A. I don't prefer to speculate, because they, they wouldn't, they would not be allowed to live in housing.

MR. BOONIN: Objection, there are way too many things that she's going to have to assume in this hypothetical as to, what's the contract, what's the student, what the terms are.

Q. (Continuing by Mr. Davis:) Okay. When you were considering Micah's request to reconsider allowing him to live on campus, did you ever consider the possibility that if you allowed him to live in the dorms, that there might be some disciplinary action to be taken against him?

A. I did not consider that.

Q. You think how that might, so you didn't think how you would





Electronically signed by Amanda Grosshans (501-183-703-0801) daf68a44-82e4-429f-b2aa-8c95d6252c54