MICAH FIALKA-FELDMAN                             Case Number 08-CV-14922

            Plaintiff,                                    Hon. Patrick J. Duggan

v.

OAKLAND UNIVERSITY BOARD
OF TRUSTEES, GARY D. RUSSI, MARY BETH
SNYDER, and LIONEL MATEN, in their
official capacity,
            Defendants.
_____/

| | |
|---|---|
| Michigan Protection & Advocacy Service, Inc. | BUTZEL LONG |
| Chris E. Davis (P52159) | By: Robert A. Boonin (P38172) |
| Veena Rao (P52981) | Regan K. Dahle (P53975) |
| 29200 Vassar Blvd., Suite 200 | 350 S. Main Street, Suite 300 |
| Livonia, MI  48152 | Ann Arbor, MI  48104 |
| Phone: (248) 473-2990 | (734) 995-3110 |
| Email: cdavis@mpas.org | Email:  boonin@butzel.com |
| Attorneys for Plaintiff | Attorneys for Defendant |

_____/

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF HIS MOTION FOR SUBSTITUTION**

**OF DEFENDANT, SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

1.      **There Is Ample Evidence Of Defendant Snyder's Discriminatory Intent And That The Proffered Reason For The Defendants' Actions Is Mere Pretext**[1]

Defendants' claim they are treating plaintiff, Micah Fialka-Feldman, the same as other Continuing Education (CE) students. However, Micah and the other OPTIONS students are assigned student identification cards with a student identification numbers (also referred to as G-numbers or Grizzly-numbers, presumably because of the OU's mascot, the Golden Grizzlies); this according to Mr Maten is why Ms. Fisher sent out her e-mail of November 14, 2007. *Maten Dep., pp. 48-49.* This means the OPTIONS students are the only students at OU with student identification cards and numbers and that are required by their program to take 12 credit hours who are denied access to on-campus housing.[2] The Defendants ignore the fact that by providing OPTIONS students with G-numbers it is an admission the OPTIONS students are "enrolled" students.

The Defendants in their response brief make much ado about the case of *Oxford House-C v. City of St. Louis,* 843 F. Supp. 1556 (E.D. Mo. 1994), because it was reversed by the Eighth Circuit[3]. Plaintiff only cited the case to show that "stereotypes, unfounded fears, misperceptions and archaic attitudes as well as simple prejudice" can be <u>evidence</u> of discriminatory intent. Id. It

---

[1] Plaintiff's counsel filed his Motion on Monday, November 16, 2009, not December 1st, as claimed in Defendants' Response Brief, Doc. Item # 43, p.2. This was timely because the court's deadline fell on a Sunday, November 15, 2009. When a deadline falls on a weekend day or a legal holiday a party has until the end of the following business day the court is open to file. Fed. R. Civ. P. 6. Relying on these court rules, Plaintiff's counsel filed the motion on November 16th. The Defendants have not been prejudiced in anyway by the one day delay, they had a full 21 days to respond as allowed by local court rules, and we would ask the Court to proceed with hearing our motion and deciding the matter on the merits of the actual claim.

[2] Defendants claim that ADA claims are limited to equal protection claims. However, disparate treatment claims under the Americans with Disabilities Act, Title II, are by their very nature equal protection claims and the state can be sued pursuant to the ADA for damages. The Supreme Court held this to be a valid exercise of Congressional authority in the abrogation of the states' sovereign immunity. *U.S. v. Georgia*, 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d. 650 (2006)

[3] Which Plaintiff's counsel noted when citing the case. *See Plaintiff's Motion Brief, Docket Item #39, p. 10.*

was not cited to show the level of discriminatory intent Plaintiff needs to show, as Defendants implied.

Plaintiff however did cite the cases of *Larkin v. State of Mich. Dept. of Social Services,* 89 F.3d 285, 289 (6th Cir.1996), and *Tsombanidis v. West Hazen Fire Dept.*, 352 F.3d 565, 579.(2nd Cir.2003) (case involving FHA and ADA claims) relying upon, *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 265-66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), both of which held that a plaintiff need only to show that a discriminatory intent was a motivating factor in the decision maker's process in order to prove discriminatory intent.[4]

The fact remains that Vice President Snyder based her decision on discriminatory, outdated and wrong perceptions concerning persons with intellectual disabilities. *Exhibits #1 & 2*. As a result, the OPTIONS students are the only OU students with student identification cards and G-numbers who are summarily denied access to on-campus housing.

Associate Dean Wiggin's e-mail, *Exhibit #3*, provides proof that numerous OU officials consider Micah to be an "enrolled student." Including staff persons in the Housing Department like Roxanne Fisher. It proves that the IPEDS definition was never a term-of-art, understood by OU officials and staff to mean metriculating students as Defendants claim. In fact, the Housing Department's procedures manual, which outlines the process for housing applications, only references verification of the student's G-number. The manual does not require verification of the student's placement in a particular program. *Exhibit # 4*.

---

[4] Most courts applying the FHA, as amended by the FHAA, have analogized it to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* which prohibits discrimination in employment. They have concluded that a plaintiff may establish a violation under the FHA by showing either: (1) that the defendants were motivated by an intent to discriminate against the handicapped ("discriminatory intent" or "disparate treatment"); or (2) that the defendant's otherwise neutral action has an unnecessarily discriminatory effect ("disparate impact"). *Larkin* at 289. (*Citations omitted*)

Additionally, Director Maten had to ask Vice President Snyder whether Micah was eligible for housing. *Maten Dep. at, pp.46-48*. The Defendants claim Mr. Maten was only verifying that Micah was not enrolled in a degree granting program before rejecting his application. But there was absolutely no reason for Mr. Maten to check Micah's enrollment status. Micah on his application, in capital letters, wrote he was in the "OU TRANSITIONS - OPTIONS" program and provided the OU staff his assigned G-number. *Exhibit #5*. It is clear Mr. Maten was confused because "enrolled student" was not a "term-of-art" and by the common everyday meaning and understanding of the words, Micah was an enrolled student with a G-number. By the fall of 2007, OPTIONS students were the only such full time students with a G-number who would be denied access to housing. It is clear that Mr. Maten was verifying with Snyder if she was sure that Micah's application should be denied. Given these facts, it is the only explanation for his actions that makes any sense. It is also proof that "enrolled student" was not a term-of-art as Defendants claim.

Contrary to what they claim, Defendants have allowed other CE students into housing, such as English-as-a-Second-Language (ESL) student. One ESL student, Deniz Cikis, was not even a metriculating student when she was admitted into housing at OU. *Exhibit #6*.

**2. Plaintiff Needs The Requested Reasonable Accommodation In Order To Afford Him An Equal Opportunity For On-Campus Housing**

Defendants continue to rely upon the Fair Housing Case of, *Schanz v. Village Apartments,* 998 F.Supp. 784 (E.D. Mich.1998). Defendants are asking this court to ignore numerous Supreme Court and Sixth Circuit decisions that are controlling in relation to Micah's reasonable accommodation request under the Rehabilitation Act of 1973. See. *Plaintiff's Response Brief, Docket Item, # 42, pp. 4-7*. This does not change the fact that the Defendants

3

summarily rejected his accommodation request without any analysis as to whether it would fundamentally alter the program or create an undue burden. Analyzing an accommodation request requires an individualized inquiry. Courts have acknowledged that when the accommodation requests goes to the requirements of the program an "individual inquiry" is made into the necessity of the requirement which is being sought to be modified or waived. *School Board of Nassau County v. Arline,* 480 U.S. 273, 287(1987), and 34 C.F.R. 104.3(l)(2)(3) .   Micah is perfectly capable of living in the dorms.[5]  He and the rest of the OPTIONS students attend classes and their participation and involvement in no way lessens the academic nature of the classes.  In fact, they contribute to the academic nature of these programs. *Exhibits #8, 9, 10*.  The Defendants unfounded assertions that the OPTIONS students would alter the academic nature of the housing program are completely meritless and have no basis in fact or reality.  It is astounding that Micah attends OU's academic classes but is now being told that housing is too much of an academic program for him to be admitted.  Defendants' assertions are entirely devoid of any neutral, or non-discriminatory intent.

Defendants' meritless floodgate argument ignores that the Rehabilitation Act requires an "individual analysis" be done. *See above.* The preferential treatment argument Defendants raise has been attempted and rejected numerous times even in FHA cases. See *Giebeler v. M&B Assoc.*, 343 F.3d 1143 (9th Cir.2003); *Smith &Lee Associates, Inc. v. City of Taylor*, 102 F.3d 781, 794-796 (6th Cir.1996), and *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) Essentially, any accommodation request seeks something

---

[5] Defendants have not relied on their expert's opinion in their briefs but they have submitted it to the court and can be expected to rely on it.  In rebuttal, Plaintiff's counsel has attached our own expert's opinion, which demonstrates the Plaintiff's ability to live on campus and that, his presence would not be a fundamental alteration of the Housing Program. *Exhibit #7.*

4

that is not provided to persons without disabilities. The real issues are whether a requested accommodation unduly burdens the defendant or does it fundamentally alter the program, and whether it affords the person with a disability an equal opportunity for participation in the program. Given the nature of his disability, Micah's only option for attending OU is the OPTIONS program. The reasonable accommodation request, waiver of the degree requirement, would not fundamentally alter the Housing Program and would afford him equal opportunity to access the Housing Program the same as other students attending OU full time, who pay tuition and who are issued student cards and G-numbers. Without the accommodation, he and other OPTIONS students would be the only such students being denied access to the Housing Program.

## 3. There Is A Substantial Public Interest That Favors The Court Issuing An Injunction In This Case If Plaintiff Prevails

In the past forty-plus-years, the federal government has mandated that elementary and secondary schools open their doors to children with disabilities and provide inclusive and appropriate education to students with disabilities.[6] It is natural that many of these students with disabilities want to continue their education into a post-secondary education setting just as their

---

[6] Beginning in 1965 the federal government began providing states with financial resources to provide public education to children with disabilities. Elementary and Secondary Education Act of 1965, Pub. L. No. 89-10, 79 Stat. 27 (1965). The law however did not create a right to public education for children with disabilities. Then in 1975, Congress passed the Education for All Handicapped Children Act of 1975. Pub. L. No. 94-142 (1975), increasing appropriations for the states but requiring a free, appropriate public education. This law has received several major amendments and is now known as Individuals with Disabilities Education Act (IDEA) See. Individuals with Disabilities Education Improvement Act , Pub. L. No. 108-446, 118 Stat. 2647 (2004); Individuals with Disabilities Education Act Amendments for 1997, Pub. L. No. 105-17, 111 Stat. 37 (1997); Education of the Handicapped Act Amendments of 1990, Pub. L. No. 101-476, 104 Stat. 1103 (1990). For more information, see, *Reflections On The New Individuals With Disabilities Education Improvement Act,* 58 FLLR 7 (2006) Mark C. Weber. See also 20 U.S.C. § 1400.

non-disabled peers are doing. Great progress has been made for persons with physical disabilities but attitudes and opportunities for persons with intellectual disabilities have lagged.

The Federal Government increasingly recognizes the value of greater opportunities for persons with disabilities in our society and in particular the importance of opportunities for and inclusion of persons with disabilities in post-secondary education. A recent report[7] by the U.S General Accountability Office recognizes the increased diversity of higher education in relation to persons with disabilities and the how the Federal Government has facilitated and made this a national priority with recent legislation:

> Research suggests that more students with disabilities are pursuing higher education than in years past, and recent legislative changes have the potential to increase the diversity and numbers of these students. More specifically, the Higher Education Opportunity Act (HEOA) added new provisions to the Higher Education Act of 1965 (HEA) to support postsecondary students with disabilities; the Americans with Disabilities Amendments Act of 2008 (ADA Amendments Act) amended the Americans with Disabilities Act of 1990 (ADA) to provide broader coverage; and the Post-9/11 Veterans Educational Assistance Act of 2008 (Post-9/11 GI Bill) expanded education benefits for members and veterans of the military who served on or after September 11, 2001, many of whom may have acquired disabilities. (*Footnotes omitted*.) *Exhibit #11, p. 1*.

Additionally, the HEOA makes Federal Pell Grants and other forms of financial assistance available to students with intellectual disabilities for the first time. 20 U.S.C. §1091(s). The U.S. Congress through its legislative action and statements has made a clear pronouncement of a national commitment and interest in ending the unnecessary exclusion of persons with disabilities from the American mainstream. It would therefore be in public's interest that an injunction be issued to enforce Micah's rights.

---

[7] U.S General Accountability Office, *Report to the Chairman, Committee on Education and Labor, House of Representatives: Higher Education and Disability: Education Needs a Coordinated Approach to Improve Its Assistance to Schools in Supporting Students*, (October 2009), http://www.gao.gov/new.items/d1033.pdf

## CONCLUSION

Based on the reasons stated above, Plaintiff respectfully requests this Honorable Court to grant his requests for summary judgment, substitution of party and issuance of an injunction. Plaintiff also requests Defendants' Motion for summary judgment be denied.

Respectfully submitted,

Dated: December 14, 2009
s/Chris E. Davis
MICHIGAN PROTECTION &
ADVOCACY SERVICE, INC.
Attorney for Plaintiff
29200 Vassar Blvd., Suite 200
Livonia, MI  48152
(248) 473-2990
cdavis@mpas.org
P52159

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2009, I electronically file the foregoing Plaintiff's Reply Brief in Support of his Motion for Substitution of Defendant, Summary Judgment and Permanent Injunction with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Robert A. Boonin.

s/Chris E. Davis
MICHIGAN PROTECTION &
ADVOCACY SERVICE, INC.
Attorney for Plaintiff
29200 Vassar Blvd., Suite 200
Livonia, MI  48152
(248) 473-2990
cdavis@mpas.org
P52159