UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

MICAH FIALKA-FELDMAN                              Case Number 08-CV-14922

        Plaintiff,                                     Hon. Patrick J. Duggan

v.

OAKLAND UNIVERSITY BOARD
OF TRUSTEES, GARY D. RUSSI, MARY BETH
SNYDER, and LIONEL MATEN, in their
official capacity,
        Defendants.
_____/

### AFFIDAVIT OF SHARON HOWELL

STATE OF MICHIGAN)
           )ss
COUNTY OF WAYNE )

I, Sharon Howell, being duly sworn, deposes and says as follows:

1. I am Sharon Howell and I am a professor of communication at Oakland University where I have taught for more than 30 years. From 2000 to 2009 I was also Chair of the department. For most of that time the department included Rhetoric and Writing as well as communication and journalism.

2. I have known Micah's parents since the early 1970's and have known Micah all of his life. Because of my long relationship with Micah's parents and Micah, I was invited by them to attend one of the early meetings at Oakland University held with people from disability services, student affairs and representatives from the public school system.

3. At that first meeting it was clear to me that we needed some academic anchoring to be able to set up a program that would enable Micah and other students to continue their public education at the university level. I contacted Bob Wiggins in education and arranged a meeting with him, Micah, Rick and Janice to explore possibilities. At that meeting Bob was extremely supportive of working out a program, indicating that he had a lot of experience in "inclusion" and saw this as an important step to take.

4. At about the same time I stopped in to see Mary Beth Snyder, Vice President of Student Affairs to talk to her about how she could help. At that initial conversation in her office Mary Beth made it clear that she was not in favor of having Micah or other students with cognitive disabilities on the campus. She said in her experience "these kinds of programs never work." She said she thought that the students would be isolated from other students and that they would not really gain anything from the experience. Because she was so negative, I decided to not pursue her assistance in setting up the program and instead worked with Bob.

5. I had no other conversations with Mary Beth about Micah until the release of his film. By that time I had a lot of experience with Micah on the campus, had talked with a lot of his teachers and had seen tremendous growth in him as an individual. I again stopped by her office to ask if she had gotten a copy of the film and to see what she thought of it. I had assumed that given the success of the program and the degree to which Micah had been embraced by the campus that she would have revised her earlier thinking. To my surprise she repeated her earlier negative comments and added that Bob had not really communicated with her or her staff and that they had a lot of the "burden of the program without getting any of the financial rewards." I encouraged her to see the film, thinking that would have an impact on her thinking.

6. Sometime later Micah mentioned that he was going to be living in the dorms. I thought that was a natural part of his progression and development. Shortly thereafter I heard that "the administration" had decided Micah could not stay in the dorm. Sometime in July or August of that year I wrote a letter to Mary Beth, asking her to reconsider her decision and detailing my experiences with Micah as a student. I asked for a meeting to talk about the issue. I cannot find a copy of the letter, but she or Rick may have a copy.

7. We had that meeting upon the beginning of the school year. At that time Mary Beth said that she was opposed to Micah living in the dorm. She said she could put an end to the whole issue just by saying that there was no space, but that would not be honest. Instead she thought that Micah did not belong in the dorms. She thought he would not be able to care for himself, especially if there was an emergency and she also said that she did not trust that the other students would be supportive of him. She said this was her decision and her judgment about the situation and that she saw no reason to change her mind. I talked with her about the fact that Micah had traveled to Israel and said I thought she was wrong about the other students. There was clearly a lot of support for Micah on the campus. Mary Beth made it clear that she was not going to change her mind about the issue. I conveyed this conversation in some detail to Rick, Janice and Micah.

8. I spoke with Mary Beth on several other occasions in casual conversations, either through encounters in the Oakland Center or by stopping by her office. I generally introduced these with the question of how do we get to "yes" for Micah. Mary Beth rebuffed every effort at joint problem solving. At no time did she ever indicate that this was definitional issue about Micah as a student. She did indicate that her decision was a judgment about his ability to live independently and about her concern for the behavior of other students.

9. In all my years at Oakland I have never heard about the restriction of the dorms to students who are matriculating. In fact when we first brought scholars from China to campus we considered having them stay in the dorm. We abandoned that idea because we did not think the international scholars, most of whom were older adults, would find dorm life compatible.

10. We have housed high school students in the dorms for residential journalism programs and I believe the same is true of students coming to campus for other special programs. Certainly in all of my conversations with Mary Beth, she never indicated this definition as a concern.

11. Further I had an opportunity to read the document prepared by Professor John Schuh from Iowa State University, about the role of dorm as an educational environment, especially in relation to learning communities. My department, while I was chair, was instrumental in the establishment and actual conduct of these efforts for first year students. Let me say that Oakland has never been able to create a learning community of the controlled kind referred to in the Professor's statement. Our dorm experience and classroom connections have always been much more porous. In any event, Micah has been in classes comparable to those of the learning community. The suggestion that he would somehow detract from the educational experience of other students has absolutely no basis in his own conduct or in the construction of these communities. If anything, his presence in these classes would enhance them.

12. Once the issue went to the legal area I no longer raised the question with her.

13. Over the course of Micah's career at Oakland I have had him in one class and will probably direct his capstone course if he chooses. I have also been responsible for many of the classes he took, especially in the first few years, in the rhetoric and communication program. I have had extensive conversations with his teachers and have a very good sense of how he contributes in an academic environment. In my own class, Com 401 Persuasion and Social Change, Micah was a very strong student. He participated in all class discussions, often initiating ideas and raising questions. He did all assignments. There were three papers due in the class on some aspect of social movements and Micah submitted video interviews/presentations for each assignment. He did this on time and made presentations to the class about his work, as did all other students. In essence Micah was a fully engaged and contributing member of the class. He was perhaps better than most in getting things in on time and in following up with issues and questions.

14. I think my experience with Micah in the classroom was typical from what I learned from other professors. In one class, that had begun as an independent study, Micah and the professor, Dr. Kitchens, coauthored an article for a refereed journal. Dr. Stamps talked about the books and ideas that Micah brought to his class. At least 5

professors in my department had classes with Micah and all reported nothing but praise both for his participation and for the positive effects he had on the classroom environment and the other students.

If called as a witness, I am competent and fully able to testify to the matters stated herein.

I declare under penalty of perjury that the foregoing is true and correct.

Sharon Howell

Subscribed and sworn to before me
this 12th of November 2009.

Margaret MacDonald
OAKLAND COUNTY, Notary Public
~~Wayne County~~, State of Michigan
My Commission expires: JUNE 11, 2013

MARGARET MACDONALD
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Jun 11, 2013
ACTING IN COUNTY OF OAKLAND