# EXHIBIT 1

# Report of John H. Schuh, Ph.D., in the Matter between Micah Fialka-Feldman and Oakland University Board of Trustees, et al.

Distinguished Professor of Educational Leadership and Policy Studies
Iowa State University.

October 13, 2009

## Report of John H. Schuh, Ph.D., in the Matter between Micah Fialka-Feldman and Oakland University Board of Trustees, et al.

The purpose of this short report is to respond to three questions, listed below. To prepare my answers, I reviewed the depositions of Oakland University Vice President Mary Beth Snyder, former housing director Lionel Maten, and various web sites of Oakland University. I also had a telephone conversation with Vice President Snyder. I am also relying on my experience in higher education and my contributions to higher education. I reviewed several publications including:

Astin, A. W. (1977). *Four critical years*. San Francisco: Jossey-Bass.

Barefoot, B. O., Gardner, J. N., et al. (2005). *Achieving and sustaining institutional excellence for the first year of college*. San Francisco: Jossey-Bass.

Burton, J. D. (2007). The Harvard tutors: The beginning of an academic profession, 1690-1825. In H. S. Wechsler, L. F. Goodchild, & L. Eisenmann (Eds.), *The history of higher education* (pp. 93-103). Boston: Pearson.

Cohen, A. M. (1998). *The shaping of American higher education*. San Francisco: Jossey-Bass.

Dean, L. A. (2006). *CAS professional standards for higher education* (6th ed.). Washington, DC: Council for the Advancement of Standards in Higher Education.

Pascarella, E. T., & Terenzini, P. T. (2005). *How college affects students* (vol. 2). San Francisco: Jossey-Bass.

Schuh, J. H. (2004). Residence halls. In F. J. D. MacKinnon (Ed.), *Rentz's student affairs practice ion higher education* (pp. pp. 268-297). Springfield, IL: Thomas.

Snyder, T. D., Dillow, S. A., & Hoffman, C. M. (2009). *Digest of educational statistics 2008*. Washington, DC: U.S. Department of Education, National Center for Education Statistics, Institute of Education Sciences.

White, D. B., & Porterfield, Psychosocial development in college. In R. B. Winston, Jr., & S. Anchors (Eds.), *Student housing and residential life* (pp. 65-94). San Francisco: Jossey-Bass.

Whitt, E. J., & Nuss, E. M (1994). Connecting residence halls to the curriculum. In C. C. Schroeder & P. Mable (Eds.) *Realizing the educational potential of residence halls* (pp. 133-165). San Francisco: Jossey-Bass.

Winston, Jr., R. B., & Anchors, S. (1993). Student development in the residential environment. In Authors (Eds.), *Student housing and residential life* (pp. 25-64). San Francisco: Jossey-Bass.

I reviewed no other material of any kind in preparing this report. The questions are:

1. What is the definition of a student?
2. Why do colleges and universities operate residence halls?
3. What is the potential impact on university residence hall living if nonstudents are permitted to live in campus residence halls?

1. What is the definition of a student?

A commonly used definition of the term "undergraduate student" can be found in documents published annually by the National Center for Education Statistics, which is overseen by the U.S. Department of Education. The following definition of an undergraduate student is provided in the *Digest of Educational Statistics 2008*[1]: "Students registered at an institution of higher education who are working in a program leading to a baccalaureate degree or other formal award below the baccalaureate, such as an associate degree." (2009, p. 681).

2. Why do colleges and universities operate residence halls?

Institutions of higher education in the United States have operated residences for students since their founding. The colonial colleges had residential components

[1] Snyder, T. D., Dillow, S. A., & Hoffman, C. M. (2009). *Digest of educational statistics 2008*. Washington, DC: U.S. Department of Education, National Center for Education Statistics, Institute of Education Sciences.

to them (see, for example, Cohen, 1998[2]; Schuh, 2004[3]) and the facilities were designed as places to eat and sleep; services were provided by tutors who lived with the students (Burton, 2007[4]). Over the years the purposes of campus-based housing for undergraduate students have evolved and a contemporary approach involves not only providing economical lodging and dining services for students but also supporting the educational goals of students. A landmark study published in 1977 by Astin[5] concluded the following

> Perhaps the most significant aspects of living on campus versus commuting are on achievement and career development. Living on campus substantially increases the student's chances of persisting in college and of aspiring to graduate or professional degrees (p. 220).

Since the publication of Professor Astin's report, additional authors have asserted the potency of the residential experience for students. Winston and Anchors[6] (1993, pp. 32-35) offered suggestions for residence hall programming that could advance the goals of higher education. White and Porterfield reported how the psychosocial development could be advanced for students living in residence halls (1993).[7] Whitt and Nuss (1994) provided suggestions for aligning life in residence halls with the institution's curriculum.[8] This development has led to the contemporary standards for housing and residential life programs

---

[2] Cohen, A. M. (1998). *The shaping of American higher education.* San Francisco: Jossey-Bass.
[3] Schuh, J. H. (2004). Residence halls. In F. J. D. MacKinnon (Ed.), *Rentz's student affairs practice ion higher education* (pp. pp. 268-297). Springfield, IL: Thomas.
[4] Burton, J. D. (2007). The Harvard tutors: The beginning of an academic profession, 1690-1825. In H. S. Wechsler, L. F. Goodchild, & L. Eisenmann (Eds.), *The history of higher education* (pp. 93-103). Boston: Pearson.
[5] Astin, A. W. (1977). *Four critical years.* San Francisco: Jossey-Bass.
[6] Winston, Jr., R. B., & Anchors, S. (1993). Student development in the residential environment. In Authors (Eds.), *Student housing and residential life* (pp. 25-64). San Francisco: Jossey-Bass.
[7] White, D. B., & Porterfield, Psychosocial development in college. In R. B. Winston, Jr., & S. Anchors (Eds.), *Student housing and residential life* (pp. 65-94). San Francisco: Jossey-Bass.
[8] Whitt, E. J., & Nuss, E. M (1994). Connecting residence halls to the curriculum. In C. C. Schroeder & P. Mable (Eds.) *Realizing the educational potential of residence halls* (pp. 133-165). San Francisco: Jossey-Bass.

(Dean, 2006), which state, in part

> The mission of HRLP (housing and residential life programs) must address:
>
> The living environment, including programs and services, that promotes learning and development in the broadest sense, with an emphasis on academic success....(p. 210)[9]

As this brief summary indicates, offering educational experiences that contribute to student learning is central to the operation of residence halls on today's college campuses. Contemporary residential education is informed by a commitment to student learning, growth and development. Programs are planned and offered to complement the institution's academic mission. Staff members are trained to provide assistance to students in accomplishing their educational goals. As the CAS standards indicate, "The Housing and Residential Life Program must incorporate student learning and student development in its mission and enhance the overall educational experience" (Dean, 2006, p. 210)[10]

Institutions of higher education operate residence halls to facilitate the educational experiences and learning of students. Services and programs are provided for the residents that speak specifically to their status as students. Since the person central to this litigation would be in his first year of living in a residence hall, literature relevant to the first year experience is discussed.

A number of publications that address the first year experience. Betsy Barefoot, codirector and senior scholar at the Policy Center on the First Year of College and John Gardner, Distinguished Professor Emeritus and Senior Fellow of the University of South Carolina's National Resource Center for the First Year

---

[9] Dean, L. A. (2006). *CAS professional standards for higher education* (6th ed.). Washington, DC: Council for the Advancement of Standards in Higher Education.
[10] *Ibid.*

Experience and Students in Transition led a team that conducted a noteworthy study that examined 13 institutions with exemplary programs for first year students and found that an important element in successful programs for first year students is that all the students participated in first year experiences at the institutions they studied. They concluded the following: "Thus, what distinguishes these thirteen institutions is their attention to all first year students" (2005, p. 385[11]).

Included among the services and programs that are part of the first year residential experience are access to institutional resources, such as the college's electronic network that can be accessed from a student's room and more importantly, programs designed to facilitate the student's experiences. Typically among these are enriched programs for first year students, learning communities that have ties to the college's academic programs, and staff who are committed to providing assistance as needed for students.

The students in these special programs share experiences of their classes, their preparation of papers, engaging in other experiences to meet their academic requirements, and typically forming study groups to prepare for examinations. A nonstudent living in a campus residence where every student but him would be a participant in these special programs by definition is an outsider. That is, nonstudents do not have the resources and experiences available to them that are provided for students and cannot participate in all of the same experiences as students. Moreover, part of the strength of these programs has to do with developing a culture of learning and support that is shared by students who collaborate, work together and study together. Such interactions can add potency to the student learning experience. For example, Pascarella and Terenzini (2005[12]) concluded the following:

---

[11] Barefoot, B. O., Gardner, J. N., et al. (2005). *Achieving and sustaining institutional excellence for the first year of college.* San Francisco: Jossey-Bass.
[12] Pascarella, E. T., & Terenzini, P. T. (2005). *How college affects students* (vol. 2). San Francisco: Jossey-Bass.

> The weight of the evidence from this research is quite clear in suggesting that certain kinds of nonclassroom interactions with peers have a net positive effect on learning. Not surprisingly, the most influential peer interactions appear to be those that reinforce the ethos of the formal academic program and extend it to nonclassroom settings. That is, they are interactions among students related to campus activities; having serious discussions about religious, philosophical, or political beliefs; discussing personal problems; discussing the arts, science and technology, or international relations, and talking about an idea brought up in class (p. 121).

They added in reference to a specific study:

> With these controls in place, the nonclassroom peer interaction scale had significant, positive effects on self-reported gains in writing and thinking skills and in understanding the arts and humanities across all three years of the study. It also had significant, positive effects on end-of-first year scores on a standardized measure of reading comprehension and on a standardized measure of composite learning consisting of reading, mathematics, and critical thinking (p. 121).

A nonstudent would not be eligible to participate in the specialized programs that are designed for students and offered in a residence hall by virtue of not being enrolled in courses that lead to the completion of an academic degree. Moreover, it is quite doubtful that a nonstudent could benefit by living in a residence hall along the lines designed above because the experiences provided are aligned with the academic programs of students. That is, the experiences in the residence halls are specifically planned to complement that academic goals of the institution. The academic goals of the institution, which include improved student proficiency in such areas as reading comprehension, improved writing and computational skills do not apply to nonstudents.

The question, then, becomes whether or not these academically-related programs

and living in a residence hall actually achieve the goals that have been established for them. The work of Pascarella and Terenzini (2005), cited above, is instructive. They observed the following:

> Our earlier review and others (Blimling, 1989, 1993, 1997; Pascarella, Terenzini, & Blimling, 19094) have pointed to the remarkably consistent evidence that students living on campus are more likely to graduate than students who commute. This relationship remains positive and statistically significant even when a wide array of precollege characteristics related to persistence and educational attainment are taken into account, including precollege academic performance, socioeconomic status, educational aspirations, age and employment status. In our current review we found nothing to change our conclusion on this point (p. 421).

They added,

> Johnson, Jonson, and Smith (1998a) report the results of a meta-analysis of more than 300 studies as indicating that cooperative learning environments promote both academic and social engagement and success. According to their review, learning communities foster development and supportive peer groups, greater student involvement in classroom learning and social activities, perceptions of greater academic development, and greater integration of students' academic and nonacademic lives (p. 423).

The evidence appears to be clear. Living in a residence hall adds value to the student experience along educationally purposeful lines. Programs and experiences are developed to enhance the development of students. Students, then, participate in programs. The result is that their progress toward their academic goals is enhanced. Nonstudents, by definition, must have different goals for living in a campus residence since they are not engaged in progress toward the completion of an academic program.

People who are nonstudents cannot participate in the same experiences as those who are students. Nonstudents will not encounter the same challenges faced by students who have to complete work that is evaluated by faculty members and are awarded grades that ultimately lead to the accumulation of credits that are part of the degree granting process. They will not be engaged in writing papers, completing assignments in the natural and computational sciences, or participating in group projects that are part of course requirements. Their presence on a residential floor has the potential to be distracting particularly during those times of the year when students are preparing for examinations or academic requirements. Because of the unique experiences of students, the standard followed by institutions of higher education is to provide residence halls for students.

3. What is the Potential Impact on University Residence Hall Living if Nonstudents are Permitted to Live in Campus Residence Halls?

It is clear from the information provided above the institutions of higher education operate residence halls for very specific educational reasons, aligned with the educational missions of their institutions. Residence hall living is designed to help students achieve their education goals through the various kinds of programs and experiences that are provided. Nonstudent tenants, by definition, have different goals than students and accordingly, have not been permitted to live in campus residence halls in my experience in higher education.

It is important to note, in my opinion, that once the residence halls are open to anyone who seeks to live on campus, then institutional officials will need to decide who has a compelling reason to live in a residence hall and who does not. If the institution must consider other reasons, it will have to charge a representative with reviewing applications and holding hearings to determine if reasons are of sufficient merit to grant residence on campus. Theoretically, there is no limit to the variety of reasons that could be presented; developing guidelines for securing permission to live on campus would be costly in terms of

time and effort. This expense would have to be borne by all persons who live in campus residence halls, needlessly in my opinion.

Institutions of higher education typically hire an upper class student or graduate student to provide oversight for the residents on the floor. This person is called a resident assistant at Oakland University. The resident assistants provide "advice and guidance in academic, social and financial matters and handle several administrative duties" (http://www.oakland.edu/?id=274&sid=3). If individuals who are nonstudents are permitted to live in campus housing, the job description of this person will change to an assignment more along the lines of that of an apartment manager. It is highly likely that a different kind of staff member would need to be hired since the relationship between the nonstudent resident and the university would be that of a landlord/tenant rather than that of a student resident and the university. Clearly, the resident assistant should not be asked to deal with some people on the floor who are students and others who are nonstudent tenants. It is even possible that additional staff members would have to be hired to provide oversight for nonstudent tenants.

Providing an environment where students can study and engage in their academic pursuits is an important element of campus residential living. In providing this oversight, institutions apply a Code of Student Conduct (http://www.oakland.edu/handbook/) as well as other rules and regulations to the residence hall community. At Oakland University "This code includes nonacademic and academic conduct and applies to all undergraduate students, graduate students and student organizations at Oakland University." Violations of the Code of Conduct can subject a student to removal from the residence hall or removal from the university in extreme cases. The Code does not apply to nonstudents. In cases where tenants (nonstudents) would violate laws or the landlord tenant agreement, the University would have to use means other than the institutional student judicial process to seek relief, such as the court system. This process would place on undue burden on staff that would have to apply one set of regulations and procedures to student residents and another set of procedures, and perhaps regulations, to nonstudent tenants. Put bluntly, the

institution would no longer function as an educational enterprise; it would be in the business of operating group housing similar to apartment buildings off campus. There are no assurances that nonstudent tenants will pay any attention to examination periods or other times when students need to study and complete their academic requirements. Accordingly, even if the disruptive behavior of nonstudent tenants is dealt with, it will be after the fact and it will be impossible to undo the damage done to students who are unable to achieve their educational goals because of the misbehavior of nonstudent tenants.

Students are not required to live on campus at Oakland University. Typically students choose to live in campus residence halls with the expectation that they will live with other students who share their academic and educational goals. They will attend class together, study together, collaborate on projects and share their academic experiences. To alter the nature of the residence halls so that any person may live in campus residence halls changes the fundamental reason students choose to live in campus residences. Nonstudents, as has been established earlier in this report, have different goals that do not include completing courses, earning credits, and ultimately receiving a degree. The placement of nonstudent tenants with students on a residence hall floor potentially will disadvantage the student residents who wish to share and enrich their experiences with other students. Living on campus for students then has the potential to become less attractive, and the institution would be disadvantaged in trying to explain to prospective students and their parents that the university could not guarantee that the new students would be living with other students. Rather, they might be living on a floor with nonstudent tenants who have very different reasons for living in campus housing and do not share the goal of completing academic courses and participating in educational activities.

Finally, the introduction of nonstudent tenants to the special programs housed in campus residence halls for students has the potential to dilute these experiences for students so as to render them useless. In residences designed with special programs for the residents, if some of the residents are students and others are

nonstudent tenants, the potency of the peer culture is weakened and my prediction is that the programs will be discontinued, much to the detriment of the student residents. Nonstudent tenants cannot, by definition, participate in programs and experiences designed for students even if they want to. No act could be more injurious to such special programs than to offer them on residence halls floors that also would house nonstudent tenants.

## Other Matters Related to My Work on this Case

<u>Qualifications of the witness</u>. A copy of my vita was provided to Attorney Boonin several days ago. I have more than 39 years of experience in higher education, including 27 years with direct or oversight responsibility for student housing and residential life. I served two terms on the Executive Board of the Association of College and University Housing Officers-International and have published a number of articles, chapters, books and monographs on student housing and residential life. I received the doctor of philosophy degree with an emphasis in higher education in 1974 from Arizona State University.

<u>Vita.</u> My vita has been provided to Attorney Boonin. It is accurate and includes all of my publications for the past ten years.

<u>Other cases.</u> I have not served as an expert witness during the past four years.

<u>Compensation</u>. I am being paid $150 per hour for services rendered in this case other than testifying. I am being paid $200 per hour for testifying in this case.

Respectfully submitted,

*[signature: John H. Schuh]*

John H. Schuh
October 14, 2009